# EXHIBIT 1

REDACTED FOR PUBLIC RELEASE



**Office of the Inspector General**
U.S. Department of Justice

OVERSIGHT ★ INTEGRITY ★ GUIDANCE



# Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation

Oversight and Review Division 20-012              December 2019 (Revised)

REDACTED FOR PUBLIC RELEASE



# Executive Summary

*Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation*

## Background

The Department of Justice (Department) Office of the Inspector General (OIG) undertook this review to examine certain actions by the Federal Bureau of Investigation (FBI) and the Department during an FBI investigation opened on July 31, 2016, known as "Crossfire Hurricane," into whether individuals associated with the Donald J. Trump for President Campaign were coordinating, wittingly or unwittingly, with the Russian government's efforts to interfere in the 2016 U.S. presidential election. Our review included examining:

- The decision to open Crossfire Hurricane and four individual cases on current and former members of the Trump campaign, George Papadopoulos, Carter Page, Paul Manafort, and Michael Flynn; the early investigative steps taken; and whether the openings and early steps complied with Department and FBI policies;

- The FBI's relationship with Christopher Steele, whom the FBI considered to be a confidential human source (CHS); its receipt, use, and evaluation of election reports from Steele; and its decision to close Steele as an FBI CHS;

- Four FBI applications filed with the Foreign Intelligence Surveillance Court (FISC) in 2016 and 2017 to conduct Foreign Intelligence Surveillance Act (FISA) surveillance targeting Carter Page; and whether these applications complied with Department and FBI policies and satisfied the government's obligations to the FISC;

- The interactions of Department attorney Bruce Ohr with Steele, the FBI, Glenn Simpson of Fusion GPS, and the State Department; whether work Ohr's spouse performed for Fusion GPS implicated ethical rules applicable to Ohr; and Ohr's interactions with Department attorneys regarding the Manafort criminal case; and

- The FBI's use of Undercover Employees (UCEs) and CHSs other than Steele in the Crossfire Hurricane investigation; whether the FBI placed any CHSs within the Trump campaign or tasked any CHSs to report on the Trump campaign; whether the use of CHSs and UCEs complied with Department and FBI policies; and the attendance of a Crossfire Hurricane supervisory agent at counterintelligence briefings given to the 2016 presidential candidates and certain campaign advisors.

## OIG Methodology

The OIG examined more than one million documents that were in the Department's and FBI's possession and conducted over 170 interviews involving more than 100 witnesses. These witnesses included former FBI Director Comey, former Attorney General (AG) Loretta Lynch, former Deputy Attorney General (DAG) Sally Yates, former DAG Rod Rosenstein, former Acting AG and Acting DAG and current FBI General Counsel Dana Boente, former FBI Deputy Director Andrew McCabe, former FBI General Counsel James Baker, and Department attorney Bruce Ohr and his wife. The OIG also interviewed Christopher Steele and current and former employees of other U.S. government agencies. Two witnesses, Glenn Simpson and Jonathan Winer (a former Department of State official), declined our requests for voluntary interviews, and we were unable to compel their testimony.

We were given broad access to relevant materials by the Department and the FBI. In addition, we reviewed relevant information that other U.S. government agencies provided the FBI in the course of the Crossfire Hurricane investigation. However, because the activities of other agencies are outside our jurisdiction, we did not seek to obtain records from them that the FBI never received or reviewed, except for a limited amount of State Department records relating to Steele; we also did not seek to assess any actions other agencies may have taken. Additionally, our review did not independently seek to determine whether corroboration existed for the Steele election reporting; rather, our review was focused on information that was available to the FBI concerning Steele's reports prior to and during the pendency of the Carter Page FISA authority.

Our role in this review was not to second-guess discretionary judgments by Department personnel about whether to open an investigation, or specific judgment calls made during the course of an investigation, where those decisions complied with or were authorized by Department rules, policies, or procedures. We do not criticize particular decisions merely because we might have recommended a different investigative strategy or tactic based on the facts learned during our investigation. The question we considered was not whether a particular investigative decision was ideal or could have been handled more effectively, but rather whether the Department and the FBI complied with applicable legal requirements, policies, and procedures in taking the actions we reviewed or, alternatively, whether the circumstances surrounding the decision indicated that it was based on

# CHAPTER ONE
# INTRODUCTION

## I. Background and Overview

The Department of Justice (Department) Office of the Inspector General (OIG) undertook this review to examine certain actions by the Federal Bureau of Investigation (FBI) and the Department during an FBI investigation into whether individuals associated with the Donald J. Trump for President Campaign were coordinating, wittingly or unwittingly, with the Russian government. The FBI's counterintelligence investigation, known as "Crossfire Hurricane," was opened on July 31, 2016, weeks after the Republican National Convention (RNC) formally nominated Trump as its candidate for President, and several months before the November 8, 2016 elections, through which Trump was elected President of the United States. On May 17, 2017, the Crossfire Hurricane investigation was transferred from the FBI to the Office of Special Counsel upon the appointment of Special Counsel Robert S. Mueller III to investigate Russian interference with the 2016 presidential election and related matters.

The FBI opened Crossfire Hurricane in July 2016 following the receipt of certain information from a Friendly Foreign Government (FFG). According to the information provided by the FFG, in May 2016, a Trump campaign foreign policy advisor, George Papadopoulos, "suggested" to an FFG official that the Trump campaign had received "some kind of suggestion" from Russia that it could assist with the anonymous release of information that would be damaging to Hillary Clinton (Trump's opponent in the presidential election) and President Barack Obama. At the time the FBI received the FFG information, the U.S. Intelligence Community (USIC), which includes the FBI, was aware of Russian efforts to interfere with the 2016 U.S. elections, including efforts to infiltrate servers and steal emails belonging to the Democratic National Committee (DNC) and the Democratic Congressional Campaign Committee. The FFG shared this information with the State Department on July 26, 2016, after the internet site WikiLeaks began releasing emails hacked from computers belonging to the DNC and Clinton's campaign manager. The State Department advised the FBI of the information the next day.

Crossfire Hurricane was opened several weeks after the FBI's July 5, 2016 conclusion of its "Midyear Exam" investigation into Clinton's handling of government emails during her tenure as Secretary of State.[1] Some of the same FBI officials, supervisors, and attorneys responsible for the Midyear investigation were assigned to the newly opened Crossfire Hurricane investigation, but there was almost no

---

[1] *See* U.S. Department of Justice (DOJ) Office of the Inspector General (OIG), *A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election*, Oversight and Review Division Report 18-04 (June 2018), https://www.justice.gov/file/1071991/download (accessed November 12, 2019), 2 (hereinafter *Review of Various Actions in Advance of the 2016 Election*).

1

Russian government. Officials determined there was an insufficient basis to proceed with a FISA application concerning Papadopoulos, and the Crossfire Hurricane team never submitted a FISA application for Papadopoulos. With regard to Page, on August 15, 2016, the Crossfire Hurricane team requested assistance from the FBI's Office of the General Counsel (OGC) to prepare a FISA application for submission to the FISC. However, after consultation between FBI OGC and attorneys in the Office of Intelligence (OI) in the Department's National Security Division (NSD), which is responsible for preparing FISA applications and appearing before the FISC, the Crossfire Hurricane team was told in late August 2016 that more information was needed to establish probable cause for a FISA on Page.

A few weeks later, on September 19, 2016, the Crossfire Hurricane team received a set of six reports prepared by Christopher Steele concerning Russian interference in the 2016 U.S. election and alleged connections between this Russian effort and individuals associated with the Trump campaign.[6] Steele is a former intelligence officer ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ who, following his retirement, opened a consulting firm and furnished information to the FBI beginning in 2010, primarily on matters concerning organized crime and corruption in Russia and Eastern Europe. In 2013, the FBI prepared paperwork to enable it to open Steele as an FBI CHS. In providing the first two election reports to his FBI handling agent in July 2016, Steele told the handling agent that he had been hired by an investigative firm, Fusion GPS, to collect information on the relationship between candidate Trump's businesses and Russia. Steele further informed the FBI handling agent that Fusion GPS had been retained by a law firm to conduct this research. According to the handling agent, it was obvious to him that the request for the research was politically motivated.

Two of the six Steele reports received by the Crossfire Hurricane team on September 19 referenced Carter Page by name. One stated that Page had held secret meetings with two high level Russian officials during Page's July 2016 trip to Moscow. This report also indicated that one of the alleged meetings included a discussion about the Kremlin potentially releasing compromising information about Democratic candidate Hillary Clinton to Trump's campaign team. Another report from Steele described "a well-developed conspiracy of co-operation" between the Russian government and Trump's campaign to defeat Clinton, using Carter Page and others as intermediaries.[7] On September 21, 2016, 2 days after the team received these reports, FBI OGC advised OI that the FBI believed it was ready to

---

[6] As described in this report, information from Christopher Steele's reports—sometimes collectively referred to as the "Steele dossier"—that pertained to Carter Page was relied upon in the Carter Page FISA applications. In those applications, Steele was referred to as "Source #1." We refer to Steele by name in this report because the Department and the FBI have publicly revealed Steele's identity as Source #1 in connection with FOIA litigation.

[7] A third report from Steele, which did not reference Carter Page, stated that Russian intelligence services had used concealed cameras to film Trump's alleged sexual activities with prostitutes at a Moscow hotel, and claimed that the Russians could blackmail Trump by threatening to release this compromising material. These allegations, which have come to be known publicly as the "salacious and unverified" portion of the reporting, were not included in the original Carter Page FISA application or any of the renewal applications.

4

associated with Russian state-sponsored actors.[163]  The FBI learned that Russian efforts also included cyber-enabled scanning and probing of election related infrastructure in several states.

It was in this context that the FBI received information on July 28, 2016, about a conversation between Papadopoulos and an official of a Friendly Foreign Government (FFG) in May 2016 during which Papadopoulos "suggested the Trump team had received some kind of suggestion" from Russia that it could assist this process with the anonymous release of information during the campaign that would be damaging to candidate Clinton and President Obama.  As described below, the FBI opened the Crossfire Hurricane investigation 3 days after receiving this information.

## II.  The Friendly Foreign Government Information and the FBI's Decision to Open Crossfire Hurricane and Four Related Counterintelligence Investigations

On July 31, 2016, the FBI opened the Crossfire Hurricane counterintelligence investigation to determine whether individuals associated with the Donald J. Trump for President Campaign were coordinating or cooperating, wittingly or unwittingly, with the Russian government to influence or interfere with the 2016 U.S. elections. According to the opening Electronic Communication (EC), the investigation was predicated on intelligence from an FFG.  In this section, we describe the receipt of the information from the FFG and the decisions to open the Crossfire Hurricane

---

[163] Beginning in January 2017 and continuing into 2019, several U.S. government agencies, as well as senior intelligence officials, reported on Russia's efforts to interfere with the 2016 U.S. elections.  For example, the Intelligence Community Assessment (ICA) titled "Assessing Russian Activities and Intentions in Recent U.S. Elections," published on January 6, 2017, concluded that Russian President Vladimir Putin and the Russian government conducted an influence campaign followed by a Russian messaging strategy that blended covert intelligence operations, such as cyber activity, with overt efforts in order to undermine public faith in the U.S. democratic process, denigrate then candidate Clinton, and harm Clinton's electability and potential presidency.  Additionally, in June 2017, during a Senate Select Committee on Intelligence Hearing on Russian Interference in the 2016 U.S. Elections, USIC leadership concurred with the ICA and acknowledged that the Russian government was responsible for compromises of and leaks from political figures and institutions, among other activities, as part of its efforts to influence and interfere in U.S. elections.  Similarly, the Senate Select Committee on Intelligence in 2019 and the House Permanent Select Committee on Intelligence in 2018 found, in part, that the Russian government historically has attempted to interfere in U.S. elections and attempted to interfere in the 2016 U.S. elections through attacks on state voter registration databases, cyber operations targeting governments and businesses using tactics such as spear phishing, hacking operations to include the DNC network, and social media campaigns.  U.S. House Permanent Select Committee on Intelligence, *Report on Russian Active Measures*, 115th Cong., 2d sess., 2018, 114-130. U.S. Senate Select Committee on Intelligence, *Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, Volume 1: Russian Efforts Against Election Infrastructure with Additional Views,* 116th Cong., 1st sess., 2019, 1-10.  Further, Special Counsel Robert S. Mueller III concluded that the Russian government interfered with the 2016 U.S. elections through a social media campaign that favored then candidate Trump and disparaged then candidate Clinton, and through cyber intrusion operations against entities and individuals working on the Clinton Campaign.  *See The Special Counsel's Report*, Vol. I at 1, 4-7.

McCabe said that he did not consider a defensive briefing as an alternative to opening a counterintelligence case.  He said that based on the FFG information, the FBI did not know if any member of the campaign was coordinating with Russia and that the FBI did not brief people who "could potentially be the subjects that you are investigating or looking for."  McCabe told us that in a sensitive counterintelligence matter, it was essential to have a better understanding of what was occurring before taking an overt step such as providing a defensive briefing.[168]

We also asked those FBI officials involved in the decision to open Crossfire Hurricane whether the FBI received any other information, such as from members of the USIC, that the FBI relied upon to predicate Crossfire Hurricane.  All of them told us that there was no such information and that predication for the case was based solely on the FFG information.[169]  We also asked Comey and McCabe about then CIA Director John Brennan's statements reported in several news articles that he provided to the FBI intelligence on Russian contacts with U.S. persons that predicated or prompted the opening of Crossfire Hurricane.  Comey told us that while Brennan shared intelligence on the overarching efforts by the Russian government to interfere in the 2016 U.S. elections, Brennan did not provide any information that predicated or prompted the FBI to open Crossfire Hurricane.  McCabe said that he did not recall Brennan providing the FBI with information before the FBI's decision to open an investigation about any U.S person potentially cooperating with Russia in the efforts to interfere with the 2016 U.S. elections.  Priestap and the Intel Section Chief also told us that Brennan did not provide the FBI any intelligence that predicated the opening of Crossfire Hurricane.  We did not find information in FBI or Department electronic communications, emails, or other documents, or through witness testimony, indicating otherwise.

On July 31, 2016, the FBI opened a full counterintelligence investigation under the code name Crossfire Hurricane "to determine whether individual(s) associated with the Trump campaign are witting of and/or coordinating activities with the Government of Russia."  As the predicating information did not indicate a specific individual, the opening EC did not include a specific subject or subjects.  As described in Chapter Two, the factual predication required to open a Full Investigation under the Attorney General's Guidelines for Domestic Operations (AG

---

[168] McCabe told us that the decision to brief the DNC and Clinton campaign about the DNC hack was a different situation than the decision not to brief the Trump campaign about allegations of Russian efforts to assist the Trump campaign.  He said that the DNC was a victim of hacking and the FBI had known that the DNC was not responsible for the hacks for some time.

[169] As we describe in Chapter Four, although the FBI first received reporting from Christopher Steele regarding alleged Russian interference in the 2016 U.S. elections in early July 2016, the agents and analysts investigating the FFG information (the Crossfire Hurricane team) did not become aware of the Steele reporting until September 19, 2016.  We found no evidence the Steele election reporting was known to or used by FBI officials involved in the decision to open the Crossfire Hurricane investigation.

In the OIG's *Review of Various Actions in Advance of the 2016 Election*, we describe in Classified Appendix One certain information that the FBI was in possession of in 2016 but the vast majority of which the FBI had not reviewed by June 2018.  Given that timing, we did not see any evidence that any of that information was considered for or part of the predication for the opening of Crossfire Hurricane.

The AG Guidelines generally describe predication as allegations, reports, facts, or circumstances indicative of possible criminal activity or a national security threat, or the potential for acquiring information responsive to foreign intelligence collection requirements. For full counterintelligence investigations such as Crossfire Hurricane and the four related individual investigations, Section II.B.4 of the AG Guidelines and Section 7 of the DIOG state that the required level of predication is an "articulable factual basis" that "reasonably indicates" that any one of three defined circumstances exists, including:

> An activity constituting a federal crime or a threat to the national security has or may have occurred, is or may be occurring, or will or may occur and the investigation may obtain information relating to the activity or the involvement or role of an individual, group, or organization in such activity.[483]

The AG Guidelines and the DIOG do not provide heightened predication standards for sensitive matters, or for allegations potentially impacting constitutionally protected activity, such as First Amendment rights. Rather, as we discuss below, the approval and notification requirements contained in the AG Guidelines and DIOG are, in part, intended to provide the means by which such concerns can be considered by senior officials.

In Crossfire Hurricane, the "articulable factual basis" set forth in the opening EC was the FFG information received from an FBI Legal Attaché stating that Papadopoulos had suggested during a meeting in May 2016 with officials from a "trusted foreign partner" that the Trump team had received some kind of suggestion from Russia that it could assist by releasing information damaging to candidate Clinton and President Obama.[484] Additionally, by July 31, 2016, although not specifically mentioned in the EC, the FBI had reason to believe that Russia may have been connected to the WikiLeaks disclosures that occurred earlier in July 2016. Further, as we note in Chapter Three, the FBI received the FFG information at a time when the USIC, including the FBI, was aware of Russia's efforts to interfere with the 2016 U.S. elections. Given the low threshold for predication in

---

[483] As detailed in Chapter Two, the DIOG separately provides that a Preliminary Investigation may be opened based upon "any allegation or information" indicative of possible criminal activity or threats to the national security. In cases opened as Preliminary Investigations, the DIOG provides that all lawful investigative methods (including CHS and UCE operations) may be used except for mail opening, physical searches requiring a search warrant, electronic surveillance requiring a judicial order or warrant (Title III wiretap or a FISA order), or requests under Title VII of FISA. A Preliminary Investigation may be converted to a Full Investigation if the available information provides predication for a Full Investigation.

[484] Papadopoulos has stated that the source of the information he shared with the FFG was a professor from London, Joseph Mifsud, and has raised the possibility that Mifsud may have been working with the FBI. As described in Chapter Ten of this report, the OIG searched the FBI's database of Confidential Human Sources (CHSs) and did not find any records indicating that Mifsud was an FBI CHS, or that Mifsud's discussions with Papadopoulos were part of any FBI operation. The FBI also requested information on ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓