IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Donald J. Trump,

               Plaintiff,

    v.

Hillary R. Clinton *et al.*,

               Defendants.

Civil Action No. 2:22-14102-DMM

**HILLARY CLINTON'S, HFACC, INC.'S, JOHN PODESTA'S, ROBERT MOOK'S, JAKE SULLIVAN'S, DNC'S, DNC SERVICES CORPORATION'S, DEBBIE WASSERMAN SCHULTZ'S, PERKINS COIE LLP'S, MARC ELIAS'S, MICHAEL SUSSMANN'S, CHARLES HALLIDAY DOLAN, JR.'S, FUSION GPS'S, GLENN SIMPSON'S, PETER FRITSCH'S, NELLIE OHR'S, BRUCE OHR'S, IGOR DANCHENKO'S, RODNEY JOFFE'S, NEUSTAR SECURITY SERVICES'S, AND NEUSTAR, INC.'S JOINT MOTION TO DISMISS UNDER FEDERAL RULE 12(B)(6) AND INCORPORATED MEMORANDUM OF LAW**

## TABLE OF CONTENTS

Page

INTRODUCTION. ................................................................................................ 1

ARGUMENT .................................................................................................... 2

I.     PLAINTIFF'S CLAIMS ARE TIME-BARRED ................................................. 2

     A.     RICO Violations and Conspiracy to Commit RICO Violations (Counts I–II) ............................................................................ 4

     B.     Injurious Falsehood (Count III) ....................................................... 5

     C.     Malicious Prosecution (Count V) ................................................... 6

     D.     Conspiracy-Related Claims (Counts IV and VI) ................................ 6

     E.     Computer Fraud and Abuse Act (Count VII) ...................................... 6

     F.     Theft of Trade Secrets Under the Defend Trade Secrets Act (Count VIII) ............ 7

     G.     Stored Communications Act (Count IX) ........................................... 7

II.    EACH OF PLAINTIFF'S CLAIMS FAILS ON THE MERITS ............................ 7

     A.     Plaintiff's Civil RICO Claim (Count I) Fails on Multiple Independent Grounds ................................................................. 8

           1.     Plaintiff Has Not Alleged a Cognizable RICO Enterprise ................ 8

           2.     Plaintiff Has Not Alleged That Each RICO Defendant Engaged In At Least Two Predicate Acts. ......................................... 9

           3.     Plaintiff Has Not Plausibly Alleged a Pattern of Racketeering Activity ......................................................... 14

           4.     Plaintiff Fails to Allege RICO Standing or Causation. .................... 15

     B.     Plaintiff Has Not Plausibly Alleged a RICO Conspiracy (Count II). ................. 19

     C.     Plaintiff Fails To Plead Claims For Injurious Falsehood (Count III) and Conspiracy To Commit Injurious Falsehood (Count IV). .......................... 19

           1.     Plaintiff Fails To Plead Multiple Elements of the Injurious Falsehood Claim. ....................................................... 19

           2.     The Injurious Falsehood Claims Are Barred By the First Amendment. ........................................................... 21

           3.     The Conspiracy Claim (Count IV) Fails Because the Underlying Claim Fails and Because the Conspiracy is Inadequately Pleaded. .......... 22

i

**TABLE OF CONTENTS**
(continued)

Page

D.   Plaintiff Fails To Plead a Claim for Malicious Prosecution (Count V) or for the Related Conspiracy Claims (Count VI) ........................................................ 23

E.   Plaintiff Fails To State a Claim Based on Defendants' Alleged Use of DNS Data. ........................................................................................................... 25

1.   Plaintiff Has No Claim Under the Computer Fraud and Abuse Act (Count VII) ........................................................................................ 26

2.   Plaintiff Has No Claim Under the Defend Trade Secrets Act (Count VIII) ....................................................................................... 27

3.   Plaintiff Has No Claim Under the Stored Communications Act (Count IX) ......................................................................................... 27

F.   The Agency and Respondeat Superior Counts Should Be Dismissed Because the Underlying Claims Fail on the Merits (Counts X–XVI) ................. 30

III.   PLAINTIFF'S FACTUAL ALLEGATIONS AS TO INDIVIDUAL DEFENDANTS ARE INSUFFICIENT. ............................................................. 30

A.   Clinton and Clinton Campaign Defendants (Podesta, Mook, Sullivan, and HFAA) ............................................................................................................ 31

B.   DNC and Debbie Wasserman Schultz ..................................................................... 35

C.   Perkins Coie and Former Partners Marc Elias and Michael Sussmann ............... 38

D.   Fusion GPS Defendants ........................................................................................... 42

E.   Nellie Ohr and Bruce Ohr ...................................................................................... 43

F.   Igor Danchenko ....................................................................................................... 43

G.   Rodney Joffe, Neustar Security Services, and Neustar, Inc .................................. 45

CONCLUSION ...................................................................................................................... 47

# TABLE OF AUTHORITIES

Page(s)

## CASES

*777 Partners LLC v. Pagnanelli,*
  No. 20-cv-20172, 2021 WL 2038175 (S.D. Fla. Mar. 8, 2021).................................................. 26

*ADT LLC v. Vivint, Inc.,*
  No. 17-cv-80432, 2017 WL 5640725 (S.D. Fla. Aug. 3, 2017) ............................................... 5

*Agency Holding Corp. v Malley-Duff & Assocs., Inc.,*
  483 U.S. 143 (1987)............................................................................................................ 4

*Agilysys, Inc. v. Hall,*
  258 F. Supp. 3d 1331 (N.D. Ga. 2017) ................................................................................. 37

*Al-Rayes v. Willingham,*
  914 F.3d 1302 (11th Cir. 2019) ............................................................................................ 8

*Alexander v. Sandoval,*
  532 U.S. 275 (2001)............................................................................................................ 35

*Alhassid v. Bank of Am., N.A.,*
  60 F. Supp. 3d 1316 (S.D. Fla. 2014) ....................................................................... 23, 35, 41

*Almanza v. United Airlines, Inc.,*
  851 F.3d 1060 (11th Cir. 2017) ........................................................................................... 46

*Am. Dental Ass'n v. Cigna Corp.,*
  605 F.3d 1283 (11th Cir. 2010) ............................................................................... 8, 42, 45, 46

*Am. Heritage Enters., Inc. v. Am. Paramount Fin., Inc.,*
  No. 10-cv-80921, 2011 WL 13225180 (S.D. Fla. July 5, 2011)............................................ 39

*Ambrosia Coal & Const. Co. v. Pages Morales,*
  482 F.3d 1309 (11th Cir. 2007) ........................................................................................... 36

*Anderson v. Ahluwalia,*
  No. 21-cv-60793, 2022 WL 850000 (S.D. Fla. Feb. 28, 2022) ............................................ 30

*Anza v. Ideal Steel Supply Co.,*
  547 U.S. 451 (2006).......................................................................................................... 15, 18

*Arlington Heights v. Metro. Hous. Dev. Corp.,*
  429 U.S. 252 (1977)............................................................................................................ 11

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Armor Corr. Health Servs., Inc. v. Teal,*
No. 19-cv-24656, 2021 WL 5834245 (S.D. Fla. Dec. 8, 2021)............................................. 26

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009).................................................................................... 7, 30, 39

*Ayres v. Gen. Motors Corp.,*
234 F.3d 514 (11th Cir. 2000) ................................................................................. 14

*Barabe v. Apax Partners Eur. Managers, Ltd.,*
359 F. App'x 82 (11th Cir. 2009) ............................................................................ 30

*Barmapov v. Amuial,*
986 F.3d 1321 (11th Cir. 2021) ............................................................................... 46

*Beck v. Prupis,*
529 U.S. 494 (2000)............................................................................................ 19

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)........................................................................................ 30, 43

*Bently v. Bank of America, N.A.,*
773 F. Supp. 2d 1367 (S.D. Fla. 2011) ..................................................................... 47

*Boyle v. United States,*
556 U.S. 938 (2009).............................................................................................. 8

*Brown Jordan Int'l, Inc. v. Carmicle,*
2016 WL 815827 (S.D. Fl. Mar. 2, 2016)................................................................... 29

*Brown Jordan Int'l, Inc. v. Carmicle,*
846 F.3d 1167 (11th Cir. 2017) ............................................................................... 27

*Cass v. U.S. Dist. Ct.,*
No. 20-cv-6071, 2021 WL 1124540 (E.D.N.Y. Mar. 24, 2021)............................................ 12

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
511 U.S. 164 (1994)............................................................................................ 37

*Cisneros v. Petland, Inc.,*
972 F.3d 1204 (11th Cir. 2020) ............................................................................ 9, 36

*Citizens United v. FEC,*
558 U.S. 310 (2010)............................................................................................ 42

iv

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Coastal Wellness Ctrs., Inc. v. Progressive Am. Ins. Co.*,
    309 F. Supp. 3d 1216 (S.D. Fla. 2018) ............................................................. 10

*Colite Int'l Inc. v. Robert L. Lipton, Inc.*,
    No. 05-cv-60046, 2006 WL 8431505 (S.D. Fla. Jan. 20, 2006)............................................. 30

*Coll Builders Supply, Inc. v. Velez*,
    No. 17-cv-933, 2017 WL 4158661 (M.D. Fla. Aug. 31, 2017), *report and recommendation adopted*, No. 17-cv-933, 2017 WL 4125641 (M.D. Fla. Sept. 18, 2017).............................. 37

*In re Connetics Corp. Sec. Litig.*,
    542 F. Supp. 2d 996 (N.D. Cal. 2008) .................................................................... 41

*Corsello v. Lincare, Inc.*,
    428 F.3d 1008 (11th Cir. 2005) ......................................................................... 2

*Cox v. Adm'r U.S. Steel & Carnegie*,
    17 F.3d 1386 (11th Cir.), *modified on reh'g*, 30 F.3d 1347 (1994)......................................... 39

*Crawford's Auto Ctr., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    945 F.3d 1150 (11th Cir. 2019) ........................................................................ 13

*Ctr. for Immigr. Studies v. Cohen*,
    410 F. Supp. 3d 183 (D.D.C. 2019) ................................................................... 13

*Davis v. Monahan*,
    832 So. 2d 708 (Fla. 2002)............................................................................... 6

*Day v. Taylor*,
    400 F.3d 1272 (11th Cir. 2005) ....................................................................... 17

*DNC v. Russian Fed'n*,
    392 F. Supp. 3d 410 (S.D.N.Y. 2019)................................................................... 9

*Donald J. Trump For President, Inc. v. N.Y. Times Co.*,
    No. 152099/2020, 2021 WL 938979 (N.Y. Sup. Ct. Mar. 9, 2021) ...................................... 22

*E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
    365 U.S. 127 (1961).................................................................................... 41

*In re Facebook, Inc. Internet Tracking Litig.*,
    956 F.3d 589 (9th Cir. 2020) ...................................................................... 28, 29

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Falic v. Legg Mason Wood Walker, Inc.*,
    347 F. Supp. 2d 1260 (S.D. Fla. 2004) ............................................................... 19, 20

*FEC v. Craig for U.S. Senate*,
    816 F.3d 829 (D.C. Cir. 2016) ...................................................................................... 16

*Ferrell v. Durbin*,
    311 F. App'x 253 (11th Cir. 2009) .............................................................................. 15

*First Nat'l Bank of Boston v. Bellotti*,
    435 U.S. 765 (1978) ......................................................................................................... 9

*Fischer v. Debrincat*,
    169 So. 3d 1204 (Fla. 4th DCA 2015) ................................................................... 23, 24

*Fortson v. Colangelo*,
    434 F. Supp. 2d 1369 (S.D. Fla. 2006) ....................................................................... 22

*Fox v. Loews Corp.*,
    309 F. Supp. 3d 1241 (S.D. Fla. 2018) ....................................................................... 47

*From v. Tallahassee Democrat, Inc.*,
    400 So. 2d 52 (Fla. 1st DCA 1981) ............................................................................. 22

*Funny Cide Ventures, LLC v. Miami Herald Publ'g Co.*,
    955 So. 2d 1241 (Fla. 4th DCA 2007) ........................................................................ 20

*Garcia v. City of Laredo*,
    702 F.3d 788 (5th Cir. 2012) ................................................................................ 29, 30

*Genentech, Inc. v. JHL Biotech, Inc.*,
    No. 18-cv-06582, 2019 WL 1045911 (N.D. Cal. Mar. 5, 2019) .............................. 38

*In re Google Inc.*,
    806 F.3d 125 (3d Cir. 2015)......................................................................................... 28

*Green Leaf Nursery v. E.I. DuPont de Nemours & Co.*,
    341 F.3d 1292 (11th Cir. 2003) ................................................................................... 16

*H.J. Inc. v. Nw. Bell Tel. Co.*,
    492 U.S. 229 (1989)....................................................................................................... 14

*Halvorssen v. Simpson*,
    807 F. App'x 26 (2d Cir. 2020) ................................................................................... 14

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Hawaii v. Trump*,
859 F.3d 741 (9th Cir.), *vacated on other grounds*, 138 S. Ct. 377 (2017) ............................ 3

*Hemi Grp. v. City of N.Y.*,
559 U.S. 1 (2010) ........................................................................................................ 15, 18

*Henry v. Examworks Inc.*,
No. 20-cv-12268, 2021 WL 3440698 (11th Cir. Aug. 6, 2021) ........................................ 3

*hiQ Labs, Inc. v. LinkedIn Corp.*,
31 F.4th 1180 (9th Cir. 2022) ...................................................................................... 28

*Honig v. Kornfeld*,
339 F. Supp. 3d 1323 (S.D. Fla. 2018) ........................................................................ 23

*Horsley v. Feldt*,
304 F.3d 1125 (11th Cir. 2002) .................................................................................... 21

*Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Phillip Morris Inc.*,
196 F.3d 818 (7th Cir. 1999) ........................................................................................ 42

*Integrated Waste Sols., Inc. v. Goverdhanam*,
No. 10-cv-2155, 2010 WL 4910176 (E.D. Pa. 2010) ................................................... 29

*Jackson v. Bank of Am., N.A.*,
898 F.3d 1348 (11th Cir. 2018) .................................................................................... 47

*Jackson v. BellSouth Telecommc'ns*,
372 F.3d 1250 (11th Cir. 2004) ........................................................................... *passim*

*Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*,
162 F.3d 1290 (11th Cir. 1998) .................................................................................... 27

*Kanarick v. GE Credit Retail Bank Care Credit*,
No. 13-cv-80039, 2013 WL 12092479 (S.D. Fla. Sept. 6, 2013) .................................. 20

*Kelly v. Palmer, Reifler, & Assocs., P.A.*,
681 F. Supp. 2d 1356 (S.D. Fla. 2010) ........................................................................ 39

*Kelly v. United States*,
140 S. Ct. 1565 (2020) .................................................................................................. 13

*Kimberlin v. Nat'l Bloggers Club*,
No. 13-cv-3059, 2015 WL 1242763 (D. Md. Mar. 17, 2015) ...................................... 13

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997) ................................................................................. 4, 5

*La Grasta v. First Union Sec., Inc.*,
    358 F.3d 840 (11th Cir. 2004) ..................................................................... 2

*Lehman v. Lucom*,
    727 F.3d 1326 (11th Cir. 2013) ................................................................... 4

*Libov v. Readix, Inc.*,
    No. 10-cv-61755, 2011 WL 13216996 (S.D. Fla. Sept. 8, 2011) ............................ 36

*Local 355 Hotel, Motel, Rest. & Hi-Rise Emps. & Bartenders Union v. Pier 66 Co.*,
    599 F. Supp. 761 (S.D. Fla. 1984) .............................................................. 16

*Love v. Delta Air Lines*,
    310 F.3d 1347 (11th Cir. 2002) ................................................................. 37

*Magluta v. Samples*,
    256 F.3d 1282 (11th Cir. 2001) ................................................................. 47

*Malhotra v. Aggarwal*,
    No. 17-cv-24407, 2019 WL 3425161 (S.D. Fla. July 30, 2019) ............................. 36

*Masson v. New Yorker Mag., Inc.*,
    501 U.S. 496 (1991) ............................................................................. 22

*McGuire Oil Co. v. Mapco, Inc.*,
    958 F.2d 1552 (11th Cir. 1992) ................................................................. 42

*McMurray v. U-Haul Co.*,
    425 So. 2d 1208 (Fla. 4th DCA 1983) ............................................................ 6

*Melford v. Kahane & Assocs.*,
    371 F. Supp. 3d 1116 (S.D. Fla. 2019) ......................................................... 23

*Miccosukee Tribe of Indians of Fla. v. Cypress*,
    814 F.3d 1202 (11th Cir. 2015) ................................................................... 8

*Micro v. Shabanets*,
    No. 15-cv-80999, 2015 WL 11438937 (S.D. Fla. Dec. 4, 2015) ............................. 19

*Mortg. Now, Inc. v. Stone*,
    No. 09-cv-80, 2010 WL 11519201 (N.D. Fla. Sept. 29, 2010) ............................... 27

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Muskegan Hotels, LLC v. Patel,*
    986 F.3d 692 (7th Cir. 2021) ................................................................. 37

*Nexans Wires S.A. v. Sark–USA, Inc.,*
    319 F. Supp. 2d 468 (S.D.N.Y. 2004) .................................................... 27

*Nunes v. Fusion GPS,*
    531 F. Supp. 3d 993 (E.D. Va. 2021) .................................................... 16

*NW Monitoring LLC v. Hollander,*
    534 F. Supp. 3d 1329 (W.D. Wash. 2021) ............................................. 38

*O'Rourke v. Dominion Voting Sys. Inc.,*
    552 F. Supp. 3d 1168 (D. Colo. 2021) .................................................. 41

*Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin,*
    418 U.S. 264 (1974) .............................................................................. 21

*United States ex rel. Osheroff v. Humana Inc.,*
    776 F.3d 805 (11th Cir. 2015) .............................................................. 22

*Pavelic & LeFlore v. Marvel Entm't Group,*
    493 U.S. 120 (1989) .............................................................................. 41

*Ray v. Spirit Airlines,*
    836 F.3d 1340 (11th Cir. 2016) ........................................................ 8, 16

*Resdev, LLC v. Lot Builders Ass'n, Inc.,*
    No. 04-cv-1374, 2005 WL 1924743 (M.D. Fla. Aug. 10, 2005) ............ 27

*Reves v. Ernst & Young,*
    507 U.S. 170 (1993) .............................................................................. 35

*Rock the Vote v. Trump,*
    No. 20-cv-06021, 2020 WL 6342927 (N.D. Cal. Oct. 29, 2020) ............. 3

*Rodgers v. Addy,*
    No. 17-cv-23429, 2021 WL 4487903 (S.D. Fla. Sept. 27, 2021) ........... 40

*Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.,*
    742 So. 2d 381 (Fla. 4th DCA 1999) ................................................... 20

*Se. Laborers Health & Welfare Fund v. Bayer Corp.,*
    655 F. Supp. 2d 1270 (S.D. Fla. 2009) ................................................... 8

ix

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Sentry Data Sys. v. CVS Health,*
    361 F. Supp. 3d (S.D. Fla. 2018) ............................................................. 10

*Sewell v. Bernardin,*
    795 F.3d 337 (2d Cir. 2015) ..................................................................... 7

*Sierra v. City of Hallandale Beach,*
    996 F.3d 1110 (11th Cir. 2021) ............................................................... 11

*SilverHorse Racing, LLC v. Ford Motor Co.,*
    No. 16-cv-53, 2016 WL 7137273 (M.D. Fla. Apr. 27, 2016) ................. 42

*Spence-Jones v. Rundle,*
    991 F. Supp. 2d. 1221 (S.D. Fla. 2013) ........................................... 1, 13

*Sream, Inc. v. PB Grocery, Inc.,*
    No. 16-cv-81584, 2017 WL 6409006 (S.D. Fla. Mar. 1, 2017) ............. 19

*St. Johns Vein Ctr., Inc. v. Streamline MD LLC,*
    347 F. Supp. 3d 1047 (M.D. Fla. 2018) ................................................ 26

*Steves & Sons, Inc. v. JELD-WEN, Inc.,*
    271 F. Supp. 3d 835 (E.D. Va. 2017) .................................................... 38

*Super Vision Int'l v. Mega Int'l Comm. Bank,*
    534 F. Supp. 2d 1326 (S.D. Fla. 2008) ........................................... 19, 43

*Turner v. Wells,*
    879 F.3d 1254 (11th Cir. 2018) ............................................................. 22

*Union Oil of Cal. v. Watson,*
    468 So. 2d 349 (Fla. 3d DCA 1985) ..................................................... 25

*United Mine Workers of Am. v. Pennington,*
    381 U.S. 657 (1965) ............................................................................... 42

*United States v. Cioni,*
    649 F.3d 276 (4th Cir. 2011) ................................................................. 28

*United States v. Ermoian,*
    752 F.3d 1165 (9th Cir. 2013) ............................................................... 12

*United States v. Flynn,*
    507 F. Supp. 3d 116 (D.D.C. 2020) ........................................................ 3

## TABLE OF AUTHORITIES
(continued)

Page(s)

*United States v. Peterson,*
    627 F. Supp. 2d 1359 (M.D. Ga. 2008) ................................................................. 23

*United States v. Smith,*
    22 F.4th 1236 (11th Cir. 2022) ........................................................................... 10

*United States v. Steiger,*
    318 F.3d 1039 (11th Cir. 2003) ..................................................................... 28, 29

*United States v. Turkette,*
    452 U.S. 576 (1981) ............................................................................................. 9

*United States v. Wheeler,*
    16 F.4th 805 (11th Cir. 2021) ............................................................................. 13

*United States v. Young,*
    916 F.3d 368 (4th Cir. 2019) .............................................................................. 12

*United Techs. Corp. v. Mazer,*
    556 F.3d 1260 (11th Cir. 2009) ........................................................................... 38

*Valladares v. Bank of Am. Corp.,*
    197 So. 3d 1 (Fla. 2016) ..................................................................................... 23

*Van Buren v. United States,*
    141 S. Ct. 1648 (2021) .................................................................................. 26, 27

*Vibe Micro, Inc. v. Shabanets,*
    878 F.3d 1291 (11th Cir. 2018) ...................................................................... 46, 47

*Vista Mktg., LLC v. Burkett,*
    812 F.3d 954 (11th Cir. 2016) ............................................................................. 29

*Wagner, Nugent, Johnson, Roth, Romano, Erikson & Kupfer, P.A. v. Flanagan,*
    629 So. 2d 113 (Fla. 1993) .................................................................................. 5

*Weiland v. Palm Beach Cty. Sheriff's Office,*
    792 F.3d 1313 (11th Cir. 2015) ...................................................................... 46, 47

*Wilder v. J.P. Morgan Chase Bank, N.A.,*
    No. 18-cv-20820, 2018 WL 5629922 (S.D. Fla. Oct. 30, 2018) ....................... 6, 30

*Willis v. Lipton,*
    947 F.2d 998 (1st Cir. 1991) ............................................................................... 16

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Wound Care Concepts, Inc. v. Vohra Health Servs., P.A.*,
No. 19-cv-62078, 2022 WL 320952 (S.D. Fla. Jan. 28, 2022)................................... 21

*XTec, Inc. v. Hembree Consulting Servs., Inc.*,
No. 14-cv-21029, 2014 WL 12729173 (S.D. Fla. Aug. 1, 2014) ............................... 20

*Young v. Ball*,
835 So. 2d 385 (Fla. 2d DCA 2003) ........................................................................ 6

*In re Zynga Priv. Litig.*,
750 F.3d 1098 (9th Cir. 2014) ................................................................................. 29

### STATUTES

15 U.S.C § 16(i) .......................................................................................................... 5

18 U.S.C. § 1030(a) .................................................................................................... 26

18 U.S.C. § 1030(g) ........................................................................................... 6, 26, 37

18 U.S.C. § 1343 ................................................................................................... 13, 42

18 U.S.C. § 1515(a) .................................................................................................... 12

18 U.S.C. § 1832 ................................................................................................... 26, 38

18 U.S.C. § 1836(b) .................................................................................................... 38

18 U.S.C. § 1836(d) ..................................................................................................... 7

18 U.S.C. § 1839(3)(B) ............................................................................................... 10

18 U.S.C. § 1961(1) .................................................................................................... 12

18 U.S.C. § 1962(c) .......................................................................................... 35, 39, 42

18 U.S.C. § 1962(d) .................................................................................................... 19

18 U.S.C. § 2511(2)(g)(i) ........................................................................................ 28, 29

18 U.S.C. § 2701(a) .................................................................................................... 29

18 U.S.C. § 2707(f) ...................................................................................................... 7

Fla. Stat. § 95.11(4)(g) ................................................................................................. 5

xii

**TABLE OF AUTHORITIES**
(continued)

Page(s)

Fla. Stat. § 95.11(p) ................................................................................................ 6

**OTHER SOURCES**

ACLU, *A Little-Known Privacy Battle Is Being Waged Over Encrypting the Nuts and Bolts of the Internet* (Dec. 18, 2019), https://tinyurl.com/3dj6eerr ............................................................ 11

Devlin Barrett & Matt Zapotosky, *Mueller Complained that Barr's Letter Did Not Capture "Context" of Trump Probe*, Wash. Post (Apr. 30, 2019) ...................................................... 25

Samantha Bradshaw & Laura DeNardis, *Privacy by Infrastructure: The Unresolved Case of the Domain Name System* Pol'y & Internet 16 (2019) ................................................................ 11

Nick Gass, *Lewandowski on Manafort firing: 'People think I won,'* Politico (Aug. 19, 2016), https://tinyurl.com/a6vdpx3h .................................................................................... 44

Office of the Inspector General ,U.S. Dep't of Justice, *Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation* (2019) ...................... 17, 24, 44

Office of Special Counsel, U.S. Dep't of Justice, *Report on the Investigation into Russian Interference in the 2016 Presidential Election* (2019) ............................................................ 25

Orin S. Kerr, *A User's Guide to the Stored Communications Act, and A Legislator's Guide to Amending It*, 72 Geo. Wash. L. Rev. 1208, 1214 (2004) ...................................................... 28

Paul Schmitt et al., *Oblivious DNS: Practical Privacy for DNS Queries*, Proceedings of the Applied Networking Research Workshop (2019) .................................................................. 11

*Social media erupts as Lewandowski tweets report on Manafort's ties to Ukraine*, The Hill (Aug. 14, 2016) ............................................................................................................. 44

U.S. Dep't of Commerce, Nat'l Inst. of Standards & Tech., *Secure Domain Name System (DNS) Deployment Guide* (Sept. 2013) ................................................................................ 10

**RULES**

Fed. R. Civ. P. 8 ............................................................................................... 1, 7

Fed. R. Civ. P. 9(b) ......................................................................................... 8, 13

Fed. R. Civ. P. 9(g) ............................................................................................ 21

Fed. R. Evid. 201(b) ........................................................................................... 19

## INTRODUCTION

Defendants filed fifteen separate motions to dismiss that provided Plaintiff Donald Trump with a comprehensive guide to the many fatal defects in his original complaint.  Rather than attempt "to cure any deficiencies," DE 111 at 1, Plaintiff returned an amended complaint ("AC"), DE 177, swollen with eighty new pages of irrelevant allegations that mirror grievances he has repeatedly voiced over the years in speeches, tweets, interviews, and debates, but which do nothing to lend merit to his suit.  The AC "reads more like a political manifesto than the short, plain statement of jurisdiction and . . . claims contemplated by Rule 8 of the Federal Rules of Civil Procedure." *Spence-Jones v. Rundle,* 991 F. Supp. 2d 1221, 1224 (S.D. Fla. 2013) (Middlebrooks, J.).

The AC alleges a series of disconnected political disputes that Plaintiff has alchemized into a sweeping conspiracy among the many individuals Plaintiff believes to have aggrieved him.  This supposed conspiracy improbably includes Hillary Clinton and James Comey as coconspirators.  It even paints one of the former President's own appointees, former Deputy Attorney General Rod Rosenstein, as someone who "wanted to see harm caused upon Donald J. Trump." AC ¶ 436.  All that links these disparate people and events is Plaintiff's antipathy toward them.  This is a President who doesn't just list enemies:  he sues them.  Although the AC meanders through numerous irrelevant episodes, the factual allegations underlying Plaintiff's nine substantive claims are straightforward.[1]  Plaintiff asserts that Hillary Clinton and her campaign, the Democratic National Committee, and lawyers for the Campaign and the Committee commissioned Fusion GPS to create the so-called "Steele Dossier" and separately directed technology executive Rodney Joffe to use his access to so-called Domain Name System ("DNS") data to investigate a suspicious pattern of activity between Trump Organization servers and those of Alfa Bank, a notorious Russian bank

---

[1]  Plaintiff asserts sixteen counts in total:  RICO and conspiracy to commit RICO; injurious falsehood and conspiracy to commit injurious falsehood; malicious prosecution and conspiracy to commit malicious prosecution; computer fraud; theft of trade secrets; violation of the Stored Communications Act; and various agency or respondeat superior counts.  The Defendants named in each count are listed in the Appendix to this motion.

with close ties to Vladimir Putin.  Various Defendants then supposedly gave interviews to the press and provided this research to federal law enforcement officers, allegedly sparking investigations that caused Plaintiff to amass $24 million in legal fees—including the fees his counsel charged for preparing the complaint in this very suit.  AC ¶ 527.

The Court should dismiss these baseless claims with prejudice.  Each of the claims is hopelessly stale and fails on the merits in multiple independent respects.  Any further amendment would be futile and serve only to give Plaintiff a platform for rehashing tired rivalries from the 2016 election.  *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005).  Whatever the utility of Plaintiff's amended complaint as a fundraising tool, a press release, or a list of political grievances, it has no merit as a lawsuit.

## ARGUMENT

## I.   PLAINTIFF'S CLAIMS ARE TIME-BARRED.

"[A] Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate . . . if it is apparent from the face of the complaint that the claim is time-barred."  *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845–46 (11th Cir. 2004) (quotation marks omitted).  This is plainly such a case.  The gravamen of Plaintiff's claims concerns alleged events occurring in 2015, 2016, and 2017, so the statute of limitations on his claims expired long ago.[2]

Plaintiff focuses on three supposed instances of Defendants' alleged wrongdoing, which he collectively characterizes as "an unthinkable plot . . . to weave a false narrative that their Republican opponent, Donald J. Trump, was colluding with a hostile foreign sovereignty."  AC ¶ 1.  First, he alleges that Defendants conspired in the creation of the Steele Dossier.  *Id.* ¶ 4.  Second, he alleges that Defendants conspired to provide false statements to law enforcement, including about a connection between the Trump Organization and Alfa Bank, and he asserts these Defendants were single-handedly responsible for a variety of investigations into Plaintiff, his

---

[2]   Indeed, the 193-page AC cites dates in the years 2015, 2016, and 2017 a total of 355 times, dwarfing totals for later years:  2018 (24 times), 2019 (43 times), 2020 (43 times), 2021 (30 times).

campaign, and his associates. *Id.* ¶¶ 7, 8. Finally, he alleges that Defendants "orchestrated a malicious conspiracy to disseminate patently false and injurious information"—that is, public speech with which he disagrees. *Id.* ¶ 9.

By the AC's own telling, these alleged events occurred long ago, and Plaintiff has been aware of his purported injuries for years. For example, Plaintiff alleges that the DNS data concerning interactions between Trump Organization servers and those of Alfa Bank, and the federal investigation of the same, was public knowledge when Slate published on "October 31, 2016 . . . an article reporting on the supposed Trump-Alfa Bank connection." AC ¶ 261 & n.185; *see also id.* ¶ 265 (noting federal investigation).

Plaintiff's claims about the "Steele Dossier" fare no better. The AC notes that Buzzfeed News published the Dossier on January 10, 2017. AC ¶ 294. Plaintiff immediately took to Twitter to level the same allegations that now appear in the AC, confirming that he was on notice of his supposed claims at that time.[3] On January 11, 2017, Plaintiff tweeted "Russia just said the unverified report paid for by political opponents is 'A COMPLETE AND TOTAL FABRICATION, UTTER NONSENSE.' Very unfair!"[4] On January 13, 2017, in a series of tweets, he laid out his allegations in more detail:

> It now turns out that the phony allegations against me were put together by my political opponents and a failed spy afraid of being sued.... Totally made up facts by sleazebag political operatives, both Democrats and Republicans – FAKE NEWS! Russia says nothing exists. Probably... released by "Intelligence" even knowing there is no proof, and never will be. My people will have a full report on hacking within 90 days![5]

---

[3] The Court may take judicial notice of Plaintiff's tweets. *See Hawaii v. Trump*, 859 F.3d 741, 773 n.14 (9th Cir.) (taking judicial notice of Plaintiff's tweets), *vacated on other grounds*, 138 S. Ct. 377 (2017); *Rock the Vote v. Trump*, No. 20-cv-06021, 2020 WL 6342927, at *4 n.2 (N.D. Cal. Oct. 29, 2020) (same); *United States v. Flynn*, 507 F. Supp. 3d 116, 126 n.6 (D.D.C. 2020) (same). Furthermore, the Court may rely on judicially noticeable facts in ruling on the timeliness of Plaintiff's claims on a motion to dismiss. *See, e.g., Henry v. Examworks Inc.*, No. 20-cv-12268, 2021 WL 3440698, at *3 (11th Cir. Aug. 6, 2021) (affirming statute-of-limitations dismissal).

[4] Donald J. Trump (@realDonaldTrump), Twitter (Jan. 11, 2017). All tweets cited herein are archived at the Trump Twitter Archive, thetrumparchive.com.

[5] Donald J. Trump (@realDonaldTrump), Twitter (Jan. 13, 2017).

Indeed, *all* of Plaintiff's claims accrued no later than October 29, 2017, when Plaintiff publicly asserted that certain Defendants were responsible for the Steele Dossier, "the Comey fix," and "phony" stories on his collusion with Russia, and claimed the facts of the alleged conspiracy were "pouring out":

> Never seen such Republican ANGER & UNITY as I have concerning the lack of investigation on Clinton made Fake Dossier (now $12,000,000?),… …the Uranium to Russia deal, the 33,000 plus deleted Emails, the Comey fix and so much more. Instead they look at phony Trump/Russia,…. …"collusion," which doesn't exist. The Dems are using this terrible (and bad for our country) Witch Hunt for evil politics, but the R's… …are now fighting back like never before. There is so much GUILT by Democrats/Clinton, and now the facts are pouring out. DO SOMETHING![6]

These allegations form the foundation of all of Plaintiff's claims. But notwithstanding Plaintiff's rousing, all-caps call to action, he waited four years, four months, and twenty-four days before filing suit. His delay renders each of his claims untimely.

### A.    RICO Violations and Conspiracy to Commit RICO Violations (Counts I–II)

The statute of limitations for civil RICO actions and conspiracy to commit RICO violations is four years, and begins running when the injury was or should have been discovered. *See Lehman v. Lucom*, 727 F.3d 1326, 1330 (11th Cir. 2013); *Agency Holding Corp. v Malley-Duff & Assocs., Inc.*, 483 U.S. 143 (1987). While Plaintiff makes a perfunctory attempt to plead that Defendants' "fraudulent concealment" tolled the statute of limitations, AC ¶¶ 589–607, this defense "in the context of civil RICO embodies a 'due diligence' requirement." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 196 (1997). Thus, "the concealment requirement is satisfied only if the plaintiff shows that he neither knew nor, in the exercise of due diligence, could reasonably have known of the offense." *Id.* (brackets omitted). Plaintiff's own statements and allegations make clear he was aware of not only his alleged injury, but also the supposed conspiracy and the Defendants' alleged role in it no later than October 29, 2017.

Plaintiff also argues in passing that he is entitled to tolling of his RICO claims under the Clayton Act, which tolls the statute of limitations for a private action "[w]henever any civil or

---

[6] Donald J. Trump (@realDonaldTrump), Twitter (Oct. 29, 2017).

criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws." 15 U.S.C. § 16(i); AC ¶¶ 608–12. Even assuming RICO borrows the Clayton Act's tolling provision in some cases—a doubtful proposition[7]—this is not a case in which such tolling would apply. The government has not brought any "any civil or criminal proceeding . . . to prevent, restrain, or punish violations of [RICO]," that would toll the statute of limitations for Plaintiff's civil RICO claim, nor has Plaintiff even pointed to any government actions founded on the specific RICO predicate acts he alleges. Plaintiff's position appears to be that a civil RICO claim should be tolled based on *any government proceeding that might conceivably relate to the alleged conspiracy, regardless of the government's cause of action*. Plaintiff's broad proposed tolling rule—wholly unsupported by either the text of the statute or the Supreme Court's rationale for extending the Clayton Act's general four-year statute of limitations to RICO—would effectively toll the limitations period for any RICO claim so long as a RICO plaintiff was sufficiently creative in pleading the scope of the supposed RICO conspiracy. Such a result would be absurd.

## B.     Injurious Falsehood (Count III)

The statute of limitations for injurious falsehood, a type of "trade slander" under Florida law, is two years from publication.[8] *ADT LLC v. Vivint, Inc.*, No. 17-cv-80432, 2017 WL 5640725, at *6 & n.8 (S.D. Fla. Aug. 3, 2017) (Middlebrooks, J.); *see also Wagner, Nugent, Johnson, Roth, Romano, Erikson & Kupfer, P.A. v. Flanagan*, 629 So. 2d 113, 114–15 (Fla. 1993); Fla. Stat. § 95.11(4)(g). The two-year statute of limitations on the statements Plaintiff identifies ran long ago. *See, e.g.*, AC ¶¶ 268–69 (Clinton's tweets dated October 31, 2016); *id.* ¶ 265 (Sullivan's

---

[7]  Plaintiff cites only a small handful of out-of-circuit district court cases for this proposition. But the text of RICO lacks any indication of an intent to include a specialized tolling provision analogous to the Clayton Act's, and the Supreme Court itself noted that the "Clayton Act's express statute of limitations does not necessarily provide all the answers" as to RICO. *Klehr*, 521 U.S. at 193.

[8]  Defendants assume only for purposes of this motion that Florida law governs the state law claims, but explicitly reserve the right to argue that a law other than Florida law governs the claims if any survive this motion.

campaign statement dated October 31, 2016); *id.* ¶ 503 (Wasserman Schultz's MSNBC interview on May 10, 2019).

### C.    Malicious Prosecution (Count V)

The statute of limitations for malicious prosecution expires after four years. *Olson v. Johnson*, 961 So. 2d 356, 359 (Fla. Dist. Ct. App. 2007). Although such a claim never accrued in the first place because Plaintiff was not prosecuted, *see McMurray v. U-Haul Co.*, 425 So. 2d 1208, 1211 (Fla. 4th DCA 1983); pp. 23–24, *infra*, Plaintiff has long been on notice of the investigations that underlie this claim. AC ¶ 265.

### D.    Conspiracy-Related Claims (Counts IV and VI)

The statute of limitations for conspiracy to commit injurious falsehood (Count IV) and conspiracy to commit malicious prosecution (Count VI) is four years from the date of injury, in keeping with Florida's statute of limitations for general claims of civil conspiracy. *Davis v. Monahan*, 832 So. 2d 708, 709 (Fla. 2002); *Wilder v. J.P. Morgan Chase Bank, N.A.*, No. 18-cv-20820, 2018 WL 5629922, at *2 (S.D. Fla. Oct. 30, 2018); *see also* Fla. Stat. § 95.11(p). Because Plaintiff's claims accrued no later than October 29, 2017, the statute of limitations on these claims expired by October 29, 2021.[9] These conspiracy claims are therefore untimely. The AC also contains only nonactionable allegations of conspiratorial conduct later than 2017: it complains only of First Amendment-protected speech, AC ¶¶ 315–16, 462, 497, 519–22, and makes purely conclusory allegations of continuing conduct, *id.* ¶¶ 9, 492–93, 533–34, 681.

### E.    Computer Fraud and Abuse Act (Count VII)

The statute of limitations under the Computer Fraud and Abuse Act ("CFAA") is two years from the violation or discovery of the violation. 18 U.S.C. § 1030(g). Plaintiff asserts that "[t]he acts of the above-mentioned Defendants" were not discoverable until September 2021. AC ¶ 704. But Plaintiff's other factual allegations—which state that the DNS lookup information was publicly known in October 2016—contradict this boilerplate legal conclusion. *Id.* ¶¶ 124–30, 253–

---

[9]  Tolling for delayed discovery does not apply to conspiracy claims under Florida law. *See Davis*, 832 So. 2d at 709; *Young v. Ball*, 835 So. 2d 385, 386 (Fla. 2d DCA 2003).

77. As the Second Circuit has held, a claim under the CFAA accrues when the plaintiff is aware of the alleged violation, even if he does not know the identity of the alleged perpetrators. *Sewell v. Bernardin*, 795 F.3d 337, 342 (2d Cir. 2015). Thus, even if Plaintiff was unaware of the identity of the supposed perpetrators until more recently, his knowledge of the DNS information's release in October 2016 means the statute of limitations ran in October 2018.

### F.     Theft of Trade Secrets Under the Defend Trade Secrets Act (Count VIII)

The limitations period for a civil theft of trade secrets action under the federal Defend Trade Secrets Act ("DTSA") is three years from the date "on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d). Here, again, Plaintiff's claims accrued upon public knowledge of his DNS traffic in October 2016, and the statute of limitations therefore ran in late October 2019. AC ¶ 261 & n.185.

### G.     Stored Communications Act (Count IX)

Similarly, Plaintiff's claim under the Stored Communications Act ("SCA") is time-barred because it, too, relies on the DNS data. The limitations period for the SCA is two years "after the date upon which the claimant first discovered or had reasonable opportunity to discover the violation." 18 U.S.C. § 2707(f). As noted above, Plaintiff's SCA claim accrued upon public knowledge of his DNS traffic in October 2016, so the limitations period expired in late October 2018. *See* AC ¶ 268.

## II.     EACH OF PLAINTIFF'S CLAIMS FAILS ON THE MERITS.

Even were Plaintiff's claims timely, they are still meritless. To be clear, Defendants vigorously dispute the allegations in the AC. But even taking those allegations as true, Plaintiff fails to plead any cognizable causes of action.

The Rule 8 pleading standard is a familiar one. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of

action will not do," nor will "naked assertions devoid of further factual enhancement." *Id.* (quotation marks and alteration omitted). Because Plaintiff hinges his RICO claim on a pattern of allegedly fraudulent activity, *see, e.g.*, AC ¶¶ 533, 576–88, he must also comply with Rule 9(b)'s heightened pleading standard, which requires a party to state with particularity the circumstances constituting fraud. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010); *see also Miccosukee Tribe of Indians of Fla. v. Cypress*, 814 F.3d 1202, 1212 (11th Cir. 2015). Plaintiff satisfies neither standard.

### A. Plaintiff's Civil RICO Claim (Count I) Fails on Multiple Independent Grounds.

To state a viable civil RICO claim, a plaintiff must plausibly allege that each defendant (1) operated or managed (2) an enterprise (3) through a pattern of racketeering activity (4) consisting of at least two racketeering acts, and that plaintiff (5) suffered injury to "business or property" (6) directly caused by the substantive RICO violation. *Ray v. Spirit Airlines,* 836 F.3d 1340, 1348 (11th Cir. 2016). Plaintiff fails to satisfy any of these essential elements.

#### 1. Plaintiff Has Not Alleged a Cognizable RICO Enterprise.

A RICO enterprise is "a continuing unit that functions with a common purpose." *Boyle v. United States*, 556 U.S. 938, 948 (2009). To state the obvious, groups affiliated for legitimate purposes—like political campaigns and their agents—do not constitute RICO enterprises. "[T]he relevant 'purpose' in an association-in-fact enterprise is the members' shared purpose of engaging in *illegal activity*." *Al-Rayes v. Willingham*, 914 F.3d 1302, 1308 (11th Cir. 2019) (emphasis added); *Se. Laborers Health & Welfare Fund v. Bayer Corp.*, 655 F. Supp. 2d 1270, 1278 (S.D. Fla. 2009) (Middlebrooks, J.) (dismissing RICO claim where complaint "fails to adequately allege any facts which would indicate the existence of a common purpose to commit racketeering acts").

Far from pursuing unlawful ends, the RICO Defendants shared a purpose that was not only legitimate, but constitutionally protected: opposing Plaintiff, the Republican candidate, in the 2016 presidential election. AC ¶¶ 2, 9. The lead RICO Defendant was the Democratic candidate in that election, and many of the others were alleged participants in her campaign. Although

8

Plaintiff attempts to cast their legitimate political activity in pejorative terms, his allegations that Defendants sought to "harm[ his] political reputation" and "damag[e] his electability," *id.* ¶ 531, reveal that at root this case is an attempt to relitigate grievances from the 2016 election (which *Plaintiff won*).   But the courts are not a forum for rehashing yesterday's politics, and Plaintiff cannot spin a RICO enterprise out of campaign activity "at the heart of the First Amendment's protection." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 776 (1978); *see also DNC v. Russian Fed'n*, 392 F. Supp. 3d 410, 440 (S.D.N.Y. 2019) (rejecting RICO enterprise where "alleged common goal" of electing Trump was neither "unlawful or fraudulent").

Plaintiff's assertion that Defendants somehow used "deceptive, criminal and fraudulent *means*" to oppose his candidacy does not satisfy the enterprise requirement.   AC ¶ 531 (emphasis added).   Not only are these assertions conclusory, but they address a "separate element" of the claim—the pattern of racketeering activity. *United States v. Turkette*, 452 U.S. 576, 583 (1981). "The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages." *Id.*   What defines the enterprise is the common "purpose of conducting illegal activity." *Jackson v. BellSouth Telecommc'ns*, 372 F.3d 1250, 1264 (11th Cir. 2004).   Absent any allegation of an illicit purpose binding the enterprise together, Plaintiff flunks this basic RICO requirement.

### 2. Plaintiff Has Not Alleged That Each RICO Defendant Engaged In At Least Two Predicate Acts.

Plaintiff also fails to allege any RICO predicate acts, let alone a pattern of racketeering that involves at least *two* predicate acts by each RICO Defendant. *See Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1208 (11th Cir. 2020).

***No Theft of Trade Secrets Under the DTSA.***   Plaintiff seems to think any information that potentially implicates privacy interests can be called a trade secret.   He is wrong.   "Theft of trade secrets consists of five elements:  [1] the defendant must intend to convert proprietary information to the economic benefit of anyone other than the owner; [2] the proprietary information must be a trade secret; [3] the defendant must knowingly steal, take without authorization, or obtain by fraud

or deception trade secret information; [4] the defendant must intend or know that the offense would injure the owner of the trade secret; and [5] the trade secret must be related to a product that is in interstate or foreign commerce." *United States v. Smith*, 22 F.4th 1236, 1243 (11th Cir. 2022).

Plaintiff has not established that DNS information is a "trade secret," let alone that it is a trade secret "related to a product . . . in interstate or foreign commerce." *See Smith*, 22 F.4th at 1243. A trade secret "derives independent economic value" from "not being generally known to" others who "can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3)(B); *Sentry Data Sys. v. CVS Health*, 361 F. Supp. 3d, 1279, 1292 (S.D. Fla. 2018). Plaintiff attempts to get by with mere assertions that DNS data "reveals a comprehensive view" into a person's "website traffic [and] e-mail traffic." AC ¶ 545. But the fact that Plaintiff claims a personal privacy interest in the computers' internet activity—and more specifically, in the multiple "look ups" between Alfa Bank and Trump-related servers—does not render it a trade secret. DNS internet traffic data is not information "owned" by Plaintiff; rather, it is automatically shared by all internet users with third-party technology providers. *See* U.S. Dep't of Commerce, Nat'l Inst. of Standards & Tech. ("NIST"), *Secure Domain Name System (DNS) Deployment Guide* iii, 2-1 to 2-2 (Sept. 2013), https://tinyurl.com/2p9f2r24.[10] Plaintiff articulates no way in which DNS data is *independently* valuable to him: unlike a customer list, a confidential process, or other recognized trade secret, Plaintiff does not capitalize on DNS data, nor does he allege that Defendants sought to convert this information for their own "economic benefit." *Smith*, 22 F.4th at 1243. Instead, nonparty data scientists supposedly combed through the DNS data so that Defendants could use such analysis for the alleged political purpose of "damaging the candidacy and overall electability of Donald J. Trump." AC ¶ 138.

DNS data is not even secret; on the contrary, it is meant to be public. *See* NIST, *supra*, at iii. Plaintiff alleges that defendant Joffe "had access" to "DNS internet traffic" in his capacity as

---

[10] Courts routinely take judicial notice of government publications, including from the U.S. Department of Commerce. *See, e.g., Coastal Wellness Ctrs., Inc. v. Progressive Am. Ins. Co.*, 309 F. Supp. 3d 1216, 1220, n.4 (S.D. Fla. 2018).

an executive at Neustar, "an information technology company" that provides "Domain Name System ('DNS') resolution services." AC ¶¶ 126, 130, 142 (alteration omitted). DNS resolution is a necessary link in the digital chain that enables individuals to call up websites on their computers. Every website has a location in cyberspace known as an Internet Protocol ("IP") address. *See* ACLU, *A Little-Known Privacy Battle Is Being Waged Over Encrypting the Nuts and Bolts of the Internet* (Dec. 18, 2019), https://tinyurl.com/3dj6eerr. When a user types the name of a website into his browser, his computer then "reaches out to a server known as a 'DNS resolver,' which tells [the] computer the IP address that it needs to download [the] web page." *Id.* DNS resolvers thus serve as the Internet's address book, matching "human-readable domain names (www.american.edu) into the binary addresses (147.9.4.186) that routers use to locate online services and information." Samantha Bradshaw & Laura DeNardis, *Privacy by Infrastructure: The Unresolved Case of the Domain Name System*, 11 Pol'y & Internet 16, 18 (2019). As a result, "whoever operates the DNS resolver gets to see the names of all the web sites" a user visits. ACLU, *supra*; *see also* Paul Schmitt et al., *Oblivious DNS: Practical Privacy for DNS Queries*, Proceedings of the Applied Networking Research Workshop 17 (2019) ("DNS operators . . . can see all of the DNS queries that a user issues.").

Plaintiff's own allegations thus show that he does not "own" the DNS data,[11] nor did any Defendant "steal" such data from Plaintiff, "take [it] without authorization, or obtain [it] by fraud or deception." *Smith,* 22 F.4th at 1243. The allegation that Defendants enlisted Joffe to "mine[] internet data" to which he had "access" in the ordinary course of business does not amount to criminal theft of trade secrets. AC ¶¶ 130, 134, 140–42.

---

[11] Plaintiff attempts to include the Trump Organization in his trade secret and other claims. AC ¶¶ 546, 699. And he further asserts that DNS information was gathered from the Executive Office of the President ("EOP") during a period of time when Plaintiff was not even in office. *Id.* ¶¶ 491, 697. But Plaintiff cannot press a claim on behalf of these nonparties. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977) ("The plaintiff must show that he himself is injured by the challenged action of the defendant."); *Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1124–25 (11th Cir. 2021) (Newsom, J., concurring) (plaintiff can sue for injury to government only in *qui tam* suits).

***No Obstruction of Justice***.  Plaintiff's allegations that the RICO Defendants violated 18 U.S.C. § 1512, the federal witness tampering statute, fare no better.  AC ¶¶ 558–575.  Plaintiff appears to rely on § 1512(c), which creates criminal penalties for "[w]hoever corruptly . . . alters, destroys, mutilates, or conceals a record, document, or other object . . . with the intent to impair the object's integrity or availability for use in an official proceeding," or who "otherwise obstructs, influences, or impedes any official proceeding."

But Plaintiff fails to identify any "official proceeding" that these Defendants supposedly obstructed.  By statute, "official proceedings" are strictly limited to federal judicial cases or proceedings before Congress or a federal agency.  18 U.S.C. § 1515(a).  Investigations that do not result in charges do not constitute "official proceedings" under the statute.  *See United States v. Young*, 916 F.3d 368, 384 (4th Cir. 2019) (FBI investigation insufficient); *United States v. Ermoian*, 752 F.3d 1165, 1171–72 (9th Cir. 2013) (same).  Here, Plaintiff asserts only that individual Defendants impeded the FBI's Crossfire Hurricane investigation, its short-lived "Trump-Alfa Bank" investigation, and unspecified "other investigations" by "the FBI, the DOJ, the CIA, Congress and/or the IG."  AC ¶¶ 562, 564, 566–67.  But he does not allege (nor can he) that any of these investigations matured into official proceedings (or had become official proceedings at the time of the alleged tampering/obstruction).

Plaintiff also fails to allege any "witness tampering."  He alleges that the RICO Defendants *created* documents that contained purported inaccuracies, like the Steele Dossier, or "curated" information, like DNS data.  AC ¶ 561.  He also asserts that, as part of the enterprise, Defendants Sussmann and Danchenko provided supposedly false testimony.[12]  But perjury and falsifying documents (even if adequately alleged, which they are not) are not RICO predicate acts.  *See* 18 U.S.C. § 1961(1).  Nor does conspiracy under 18 U.S.C. § 1512(k) circumvent Plaintiff's pleading failures.  *See Cass v. U.S. Dist. Ct.*, No. 20-cv-6071, 2021 WL 1124540, at *3 (E.D.N.Y. Mar. 24,

---

[12] Conspicuously absent from the AC is the fact that, on May 31, 2022, Sussmann was acquitted by the jury of the single charge (making a false statement) brought against him by Special Counsel Durham.  *United States v. Sussmann*, No. 21-cr-582 (D.D.C.), DE 156.

2021) (rejecting conspiracy to obstruct justice as RICO predicate act where complaint lacked "any plausible, credible factual allegations of . . . agreements to act").

*No Wire Fraud*. In recognition of the foregoing flaws, Plaintiff's AC adds a catalog of allegedly false email communications, tweets, and televised public statements supposedly constituting wire fraud. AC ¶¶ 583(a)–(gg). But Rule 9(b) requires Plaintiff to specify "precisely" why any allegedly fraudulent statements were false and how they misled him—and this specificity is nowhere to be found. *See Crawford's Auto Ctr., Inc. v. State Farm Mut. Auto. Ins. Co.*, 945 F.3d 1150, 1159 (11th Cir. 2019); p. 8, *supra*. In many instances, Plaintiff does not describe the content of these communications at all, nor does he allege he was the one defrauded. AC ¶ 583(a)–(c), (j), (m)–(p). And, of course, many of the public statements constitute protected political speech under the First Amendment. *Id.* ¶ 583(u)–(w), (y), (bb), (dd)–(gg); pp. 21–22, *infra*.

But even assuming Plaintiff had alleged falsity with particularity, his wire fraud allegations would still fall short. The federal wire fraud statute, 18 U.S.C. § 1343, is not a catchall prohibition on "all acts of dishonesty." *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020). Instead, it prohibits "only deceptive schemes to deprive the victim of money or property." *Id.* (alteration omitted); *see also Spence-Jones*, 991 F. Supp. 2d at 1254 ("The federal mail fraud statute is limited in scope to the protection of property rights."). Plaintiff, however, does not allege that the RICO Defendants intended to deprive him or anyone else of "something of value." *See United States v. Wheeler*, 16 F.4th 805, 820 (11th Cir. 2021). His theory is that these Defendants damaged his "political and/or business reputation" and cost him unspecified business opportunities with their supposed scheme to "defraud the news media, law enforcement and counterintelligence officials" with a "false narrative" about his ties to Russia. AC ¶¶ 577–78.[13] But absent any allegation that "an object of the[] dishonesty was to *obtain* . . . money or property," *Kelly*, 140 S. Ct. at 1568 (emphasis added), Plaintiff necessarily fails to plead wire fraud as a predicate act.

---

[13] Plaintiff presumably did not style this alleged scheme to harm his reputation as a defamation claim because state torts do not qualify as RICO predicate acts. *See Ctr. for Immigr. Studies v. Cohen*, 410 F. Supp. 3d 183, 191–92 (D.D.C. 2019); *Kimberlin v. Nat'l Bloggers Club*, No. 13-cv-3059, 2015 WL 1242763, at *9 (D. Md. Mar. 17, 2015).

Plaintiff also asserts that the RICO Defendants committed wire fraud by "misreporting" payments to Fusion GPS in campaign finance reports, citing to a voluntary conciliation agreement between the Clinton campaign, the DNC, and the Federal Election Commission ("FEC").[14] AC ¶¶ 470–79, 583(d)–(f). But violations of federal campaign finance laws—much less unproven violations—do not constitute RICO predicate offenses. *See Ayres v. Gen. Motors Corp.*, 234 F.3d 514, 522 (11th Cir. 2000) (holding that violations of the federal Safety Act's disclosure requirements could not be prosecuted as wire fraud under the civil RICO statute). Nor does Plaintiff allege that these campaign finance reports defrauded him of anything of value, as needed to plead wire fraud.

### 3.     Plaintiff Has Not Plausibly Alleged a Pattern of Racketeering Activity.

Beyond pleading two specific predicate acts by each defendant, a RICO plaintiff must also allege that defendants engaged in a *pattern* of racketeering activity—that is, that the acts "amount to, or . . . otherwise constitute a threat of, continuing racketeering activity." *H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 240 (1989). A plaintiff must do this either by pleading "closed-ended" or "open-ended" continuity. Here, Plaintiff succeeds at neither.

A party can allege closed-ended continuity "by proving a series of related predicates extending over a substantial period of time." *Jackson*, 372 F.3d at 1265 (quotation marks omitted). The Eleventh Circuit has categorically rejected allegations of closed-ended continuity when the supposed pattern of racketeering activity lasted less than nine months, and other circuits reject patterns lasting less than two years. *Id.* at 1266 (collecting cases); *Halvorssen v. Simpson*, 807 F. App'x 26, 31 (2d Cir. 2020) (noting two-year "minimum" for closed-ended continuity).

Here, the alleged scheme had only a limited shelf life. The purported predicate offenses took place over an approximately half-year period around the 2016 election—the alleged theft of trade secrets between July 2016 and "early 2017," AC ¶¶ 134, 140, 298, 321; the alleged witness

---

[14] While the FEC made a preliminary finding of probable cause that the payments were not appropriately classified, the ultimate conciliation agreements between the FEC, the Clinton campaign, and the DNC expressly stated that the Campaign and the DNC did not concede such a finding. AC ¶ 477 & n.251, *available at* https://tinyurl.com/cxr4nue6.

tampering between September 2016 and February 2017, *id.* ¶¶ 205, 218, 304, 561–65; and the alleged wire fraud between May and October 2016, *id.* ¶ 583(a)–(y). But even assuming the alleged racketeering "took place over longer periods of time," courts have refused to find closed-end continuity where "the RICO allegations concern only a single scheme with a discrete goal." *Jackson,* 372 F.3d at 1267. These Defendants allegedly shared a single, time-limited objective: "to vilify Donald J. Trump" in connection with his 2016 campaign and presidency. AC ¶ 2.

Plaintiff has also failed to plead open-ended continuity, which requires a showing that "the alleged acts were part of the defendants' regular way of doing business, or that the illegal acts threatened repetition in the future." *Jackson,* 372 F.3d at 1267 (quotation marks omitted). The AC lacks any allegation that the predicate acts—which were supposedly engineered to target Plaintiff's candidacy—were part of the RICO Defendants' "regular" way of doing business. Nor does the AC provide any basis to infer such activity will recur in the future. "[S]ingle schemes with a specific objective and a natural ending point can almost never present a threat of continuing racketeering activity." *Ferrell v. Durbin,* 311 F. App'x 253, 257 (11th Cir. 2009); *see* AC ¶ 240 (alleging scheme's "deadline" was "Election Day"). Plaintiff's assertion that he may seek the presidency in 2024 does not change the analysis. AC ¶ 533. The speculative possibility that Plaintiff may run against a *different* Democratic nominee does not suggest that *these* Defendants will engage in any future racketeering activity.

### 4.   Plaintiff Fails to Allege RICO Standing or Causation.

Even if Plaintiff had alleged a pattern of racketeering activity (which he has not), he fails to allege an injury to business or property directly caused by that racketeering. *See Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 452 (2006). "A link that is too remote, purely contingent, or indirect is insufficient." *Hemi Grp. v. City of N.Y.,* 559 U.S. 1, 9 (2010) (quotation marks omitted). Similarly, that an injury was "foreseeable" is not enough; "the injury must be direct." *Ray*, 836 F.3d at 1349.

Plaintiff alleges injury in only the vaguest terms, asserting that he "incurred" $24 million in "defense costs, legal fees and related expenses . . . in connection with his efforts to defend

against . . . various federal investigations" supposedly instigated by Defendants. AC ¶ 616. But "legal fees" resulting from a supposed "smear campaign" against a political figure (even if Plaintiff himself paid these fees) do not constitute compensable injuries to business or property for purposes of the RICO statute. *Nunes v. Fusion GPS*, 531 F. Supp. 3d 993, 1013 (E.D. Va. 2021); *see also Local 355 Hotel, Motel, Rest. & Hi-Rise Emps. & Bartenders Union v. Pier 66 Co.*, 599 F. Supp. 761, 765 (S.D. Fla. 1984). Moreover, Plaintiff has not even alleged that he paid these fees himself. *See* AC ¶¶ 524, 616. Federal election law permits candidates or office holders to use *campaign funds* to pay "legal expenditures made in response to charges of campaign or official misconduct." *FEC v. Craig for U.S. Senate*, 816 F.3d 829, 842 (D.C. Cir. 2016).[15] Tellingly, Plaintiff repeatedly alleges that Defendants inflicted damages on "the Trump Campaign." AC ¶¶ 524, 616. Finally, Plaintiff added no new allegations showing injury to *his own* business or property in the AC, in response to these arguments made previously by Defendants. *See* DE 143 at 8.

Even if legal fees could be considered injuries to business or property, Plaintiff fails to make the requisite causal link between his legal fees and the alleged racketeering activity. Nor can he, because independent actors not part of the alleged RICO enterprise—*i.e.*, federal officials and agents—made the decisions to pursue investigations based on their own judgment and a variety of evidence. *See Green Leaf Nursery v. E.I. DuPont de Nemours & Co.*, 341 F.3d 1292, 1308 (11th Cir. 2003) (affirming dismissal where plaintiffs could not establish "obstruction of justice and witness tampering" as "the proximate cause of their alleged injury"); *Willis v. Lipton*, 947 F.2d 998, 1001 (1st Cir. 1991) (defendant's conduct did not proximately cause the plaintiff's loss of employment where that conduct preceded an FTC enforcement action).

Time and again, the AC and its incorporated documents show that causation does not exist—even though it is Plaintiff's obligation to plead facts showing that it does. For example,

---

[15] Plaintiff alleges that the fees he paid his counsel to file this complaint form part of his alleged damages. AC ¶ 527. Recent campaign finance disclosures, however, indicate that Plaintiff's Save America PAC paid Habba, Maddaio & Associates nearly $250,000 in April 2022 and his Make America Great Again PAC paid the firm $10,000 in February 2022. These PACs are not parties to this suit.

Plaintiff speculates that the FBI might not have pursued the Crossfire Hurricane or Alfa Bank investigations had Sussmann disclosed "the political nature of his work" when he provided the Steele Dossier and DNS information while allegedly representing "he was not acting on behalf of any client." AC ¶¶ 208, 211. But this theory suffers from multiple fatal defects—most conspicuously that Sussmann was *acquitted* on May 31, 2022 of misleading the FBI about this very statement. *See* n.12, *supra*; AC ¶ 486. And far from showing that Sussmann or other Defendants misled federal agents about their political ties, Plaintiff's own allegations establish that the "FBI knew that Sussmann worked for Democratic campaigns," AC ¶¶ 414–15; *see also id.* ¶ 402(c), and could judge the credibility of the information he provided accordingly.

Moreover, the Department of Justice's Inspector General ("IG") concluded, in a report incorporated by reference into the AC, that the FBI opened Crossfire Hurricane after a friendly foreign government reported that a Trump campaign advisor had "suggested" that "Russia could assist . . . with the anonymous release of information . . . damaging to candidate Clinton." *See* Ex. 1 (excerpts from Report) at 346 (cited at AC ¶¶ 3 n.1, 226(d), 426, 467); *see also Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (noting court may consider incorporated documents on motion to dismiss). While the AC notes that the IG "performed a review to determine whether the Crossfire Hurricane investigation was adequately predicated," AC ¶ 465, it notably fails to include the *result* of this investigation. The IG found that the FBI pursued Crossfire Hurricane "for an authorized purpose" and "with adequate factual predication," Ex. 1 at 347, that existed entirely independent of any Defendants. Plaintiff's speculative assertions of causation are thus unfounded.

Indeed, even assuming that Defendants somehow influenced the opening of the FBI's Crossfire Hurricane or Alfa Bank investigations, the AC does not trace the alleged $24 million in legal fees and other unspecified expenses to those inquiries. In Plaintiff's telling, "the FBI . . . debunked the Steele dossier" no later than January 2017, only six months after Steele (a non-RICO Defendant) allegedly began providing the Dossier to the agency. AC ¶¶ 158, 444. Similarly, Plaintiff asserts that the FBI "debunked" the "Alfa Bank allegations" by October 5, 2016, mere weeks after Sussmann presented the DNS information to the FBI on September 19. *Id.* ¶ 205. The

AC offers no plausible explanation for how Plaintiff could possibly have accrued $24 million in legal fees as a result of two short-lived FBI investigations that resulted in no charges against him.

The chain of causation grows even more remote—and, indeed, never connects at all—when one attempts to track Plaintiff's legal fees back to the alleged acts of racketeering. And Plaintiff makes no attempt whatsoever to tie any injury to the alleged campaign finance violations that supposedly constitute wire fraud. Plaintiff has no standing to pursue this wire fraud theory at all because the reporting violation had a more "direct victim," *Anza*, 547 U.S. at 458—the FEC, which "vindicate[d] the laws by pursuing [its] own claims," *id.* at 460; *see* AC ¶¶ 470–79.

In a last-ditch effort to satisfy RICO's standing requirements, Plaintiff vaguely asserts that he was injured by the "loss of business opportunities" that are "too many to list." AC ¶¶ 524 & n.277, 615. But these losses go wholly unidentified and remain implausible in any event. As the winner of the 2016 presidential election, *id.* ¶ 278, Plaintiff was engaged in the conduct of state rather than private business ventures from January 2017 to January 2021. Any alleged business losses he suffered since returning to the private sector are far too remote in time from the alleged racketeering activity in 2016 and 2017 and are easily traceable to Plaintiff's own conduct while in office or other intervening causes. *See Hemi Grp.*, 559 U.S. at 9.

The closest Plaintiff comes to identifying an "evaporated" opportunity is a single footnote alleging that he was "banned from different social media platforms, including Twitter," as a result of "the misinformation campaign waged by Hillary Clinton." AC ¶ 524 n.277. But Plaintiff rewrites history when he suggests that Twitter shut down his account as a result of any conduct by Defendants. Twitter suspended Plaintiff from its platform on January 8, 2021—two days after the insurrection at the U.S. Capitol, and nearly five years after the alleged racketeering at issue in this case—because it determined that Plaintiff's tweets posed "the risk of further incitement of violence." Twitter Blog, Permanent Suspension of @realDonaldTrump (Jan. 8, 2021).[16]

---

[16] The Court may judicially notice the date and content of Twitter's suspension notice even at the pleading stage because these are facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," namely from Twitter's own

**B.     Plaintiff Has Not Plausibly Alleged a RICO Conspiracy (Count II).**

To state a RICO conspiracy claim under 18 U.S.C. § 1962(d), a "plaintiff must allege an illegal agreement to violate a substantive provision of the RICO statute." *Super Vision Int'l v. Mega Int'l Com. Bank*, 534 F. Supp. 2d 1326, 1342 (S.D. Fla. 2008); *see also Micro v. Shabanets*, No. 15-cv-80999, 2015 WL 11438937, at *8 (S.D. Fla. Dec. 4, 2015) (Middlebrooks, J.) (holding that conspiracy claim should be dismissed where "the underlying claims are not supported by factual allegations to state a RICO violation"). Plaintiff's conclusory allegations of conspiracy "unsupported by actual allegations of fact" do not suffice. *Super Vision*, 534 F. Supp. 2d at 1343; AC ¶¶ 619–33. Furthermore, for a plaintiff to prevail under § 1962(d), the overt act causing injury must itself be an act of racketeering. *Beck v. Prupis*, 529 U.S. 494, 495–96 (2000). Plaintiff, however, has not alleged a predicate act of racketeering here, nor any injury from such an act, and therefore fails to state a viable RICO conspiracy claim.

**C.     Plaintiff Fails To Plead Claims For Injurious Falsehood (Count III) and Conspiracy To Commit Injurious Falsehood (Count IV).**

The injurious falsehood claim should be dismissed because Plaintiff fails to plead multiple elements of the claim, and because the First Amendment bars the claim. Because the substantive claim fails, the related conspiracy to commit injurious falsehood claim must also be dismissed.

**1.     Plaintiff Fails To Plead Multiple Elements of the Injurious Falsehood Claim.**

Injurious falsehood is a close cousin to defamation, except that it protects "economic interests" rather than "personal reputation." *Falic v. Legg Mason Wood Walker, Inc.*, 347 F. Supp. 2d 1260, 1268 (S.D. Fla. 2004). "Injurious falsehood essentially concerns intentional interference with another's economic relations." *XTec, Inc. v. Hembree Consulting Servs., Inc.*, No. 14-cv-21029, 2014 WL 12729173, at *6 (S.D. Fla. Aug. 1, 2014) (quotation marks omitted). Because the tort vindicates commercial interests, a plaintiff must plausibly allege, among other elements, that (1) the defendant published "a falsehood," (2) the defendant knew his falsehood would "likely induce others not to deal with the Plaintiff," (3) "the falsehood did play a material and substantial

---

website. *See* Fed. R. Evid. 201(b); *Sream, Inc. v. PB Grocery, Inc.*, No. 16-cv-81584, 2017 WL 6409006 (S.D. Fla. Mar. 1, 2017) (Middlebrooks, J.).

part in inducing others not to deal with the Plaintiff," and (4) special damages. *Kanarick v. GE Credit Retail Bank Care Credit*, No. 13-cv-80039, 2013 WL 12092479, at *4 (S.D. Fla. Sept. 6, 2013) (Middlebrooks, J.).

The injurious falsehood claim fails at the outset because the alleged injuries Plaintiff claims are not "economic" in nature. *See Falic*, 347 F. Supp. 2d at 1268. Although the AC recites boilerplate allegations that Plaintiff "suffer[ed] economic losses" and "has been injured in his business and property," AC ¶¶ 653–54, the gravamen of the alleged injury concerns Plaintiff's political prospects. *Id.* ¶ 2 (alleging conspiracy "to cripple Trump's initial bid for presidency and tarnish his electability for future elections"). Indeed, Plaintiff does not allege that Defendants propagated falsehoods that interfered with his *economic* relations. And even if harm in the political arena could amount to an economic injury cognizable under the banner of injurious falsehood (it does not), Plaintiff does not plausibly allege that any supposed falsehoods actually damaged his political career. *Plaintiff*—not Hillary Clinton—won the 2016 election. *Id.* ¶ 278.

On top of this fatal defect, Plaintiff makes only unadorned and conclusory assertions that Defendants' statements were false, *see, e.g.*, AC ¶ 635 ("Defendants . . . made, disseminated and/or published false and damaging statements concerning Plaintiff, specifically that he was colluding with Russia and its President Vladimir Putin."), and the AC is devoid of any allegations that Defendants knew that their statements would likely induce any individual or entity not to engage in business dealings with Plaintiff, or that the statements in fact played a material role in inducing others not to deal with Plaintiff.

Plaintiff also fails to plead the "crucial element" of special damages. *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 388 (Fla. 4th DCA 1999). "The special damage rule requires the plaintiff to establish pecuniary loss that has been realized or liquidated, as in the case of specific lost sales." *Id.* "Special damages require proof that the loss is directly attributed to defendants['] conduct and the loss is not to be explained by other considerations." *Wound Care Concepts, Inc. v. Vohra Health Servs., P.A.*, No. 19-cv-62078, 2022 WL 320952, at *14 (S.D. Fla. Jan. 28, 2022); *see also Funny Cide Ventures, LLC v. Miami Herald Publ'g Co.*,

955 So. 2d 1241, 1246 (Fla. 4th DCA 2007).  Under the Federal Rules, special damages must be "specifically stated" in the complaint.  Fed. R. Civ. P. 9(g).

The allegations do not come close to establishing the required nexus between Plaintiff's legal bills and the various statements referenced in Count III.  By Plaintiff's telling, he accumulated the vast legal fees and other expenses in the course of defending himself from "various federal investigations" and "official proceedings."  AC ¶ 655.  But the AC does not identify these various investigations and proceedings, does not explain how Defendants' statements relate to these unspecified inquiries, and provides no accounting of how the $24 million in legal fees and other costs occurred.  *See* pp. 16, 18, *supra*.  Consequently, Plaintiff has not plausibly alleged that his "loss is directly attributed to defendants," *Wound Care Concepts*, 2022 WL 320952, at *14, or stated his damages with the specificity required by Rule 9(g).

### 2.    The Injurious Falsehood Claims Are Barred By the First Amendment.

Plaintiff's injurious falsehood claims also run headlong into the First Amendment.  Many of the statements on which Plaintiff bases his claims are quintessential statements of "rhetorical hyperbole" that are not actionable.  *Horsley v. Feldt*, 304 F.3d 1125, 1131 (11th Cir. 2002).  For instance, the AC asserts that Hillary Clinton referred to Plaintiff as Putin's "spokesperson."  AC ¶ 643.  This "loose language" falls squarely within the First Amendment's ambit as "part of the conventional give-and-take in our economic and political controversies."  *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 284 (1974) (holding the epithet "traitor" not actionable).

Other challenged statements amount to political commentary based on facts "known or available to the reader or listener as a member of the public," which are, by definition, unactionable "[p]ure opinion."  *From v. Tallahassee Democrat, Inc.*, 400 So. 2d 52, 57 (Fla. 1st DCA 1981); *accord Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1384 (S.D. Fla. 2006) (finding "textbook expression of pure opinion" where defendant "merely offered readers his judgment—albeit, a harsh one—based upon facts that were known or available to them").  For instance, Plaintiff cites a campaign statement allegedly issued by Jake Sullivan (subsequently tweeted out by Hillary

Clinton), which offered opinion commentary on facts reported in an article published in *Slate*. AC ¶¶ 640–41.[17]  While Plaintiff may find the statement objectionable, that does not convert it into a false statement of fact. *See Donald J. Trump For President, Inc. v. N.Y. Times Co.*, No. 152099/2020, 2021 WL 938979, at *1 (N.Y. Sup. Ct. Mar. 9, 2021) (dismissing defamation claim brought by Plaintiff based on newspaper column describing ties between Plaintiff and Russia, concluding those statements were "nonactionable opinion").

As a separate First Amendment basis for dismissal, Plaintiff—a quintessential example of both a public official and a public figure—fails to adequately plead that Defendants' statements were made with "actual malice"—that is, "deliberate or reckless falsification." *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 499 (1991).  Plaintiff's only allegations on this front are, once again, formulaic and insufficient. *See* AC ¶ 636 ("Defendants acted with actual malice, as they knew that the Plaintiff was not colluding with Russia."); *id.* ¶ 652 ("Defendants knew that the statements were false at the time they made then [*sic*]."). Such allegations plainly do not pass the plausibility threshold. *See Turner v. Wells*, 879 F.3d 1254, 1273–74 (11th Cir. 2018) (affirming dismissal of defamation claim due to plaintiff's conclusory allegations about actual malice).

### 3. The Conspiracy Claim (Count IV) Fails Because the Underlying Claim Fails and Because the Conspiracy is Inadequately Pleaded.

Plaintiff cannot salvage his meritless injurious falsehood claim by repackaging it as a claim for conspiracy to commit an injurious falsehood.  "An actionable conspiracy requires an actionable underlying tort or wrong." *Honig v. Kornfeld*, 339 F. Supp. 3d 1323, 1345 (S.D. Fla. 2018). Because the underlying tort claim fails, the Court should dismiss the conspiracy claim as well. Independently, Plaintiff asserts the existence of a conspiracy in only the most conclusory terms,

---

[17]  Plaintiff relies on the tweet and incorporates it by reference, AC ¶ 268 & n.190, and the Court may therefore take judicial notice of it, *see* n.3, *supra*.  The tweet is available at https://tinyurl.com/4632k4db.  The Court also may judicially notice the October 31, 2016 *Slate* article on which the campaign statement was explicitly predicated, *United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 812 (11th Cir. 2015), and which is also incorporated into the AC, *see* AC ¶¶ 261–65.  The article is available at https://tinyurl.com/mtp4sxh3.

without the supporting facts necessary to state a claim. *See Alhassid v. Bank of Am.*, 60 F. Supp. 3d 1302, 1316 (S.D. Fla. 2014). This independently requires dismissal of the conspiracy claim.

### D. Plaintiff Fails To Plead a Claim for Malicious Prosecution (Count V) or for the Related Conspiracy Claim (Count VI).

Under Florida law, a plaintiff claiming malicious prosecution must establish: (1) an original judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination in favor of the plaintiff; (4) an absence of probable cause for the original proceeding; (5) malice on the part of the defendant; and (6) damages resulting from the original proceeding. *Melford v. Kahane & Assocs.*, 371 F. Supp. 3d 1116, 1123–24 (S.D. Fla. 2019). Plaintiff pleads none of these elements.

The AC fails to satisfy the first element because it identifies no "judicial proceeding" against Plaintiff, let alone one that terminated in his favor. Counts V and VI allege that some of the undersigned Defendants induced or conspired to induce the Crossfire Hurricane investigation. *See* AC ¶¶ 669–71, 680–82. And he blames the *federal* defendants for allegedly causing certain "*extrajudicial* FISA surveillance," as well as "the Mueller investigation," and "other related investigations regarding the alleged Trump-Russia connection." AC ¶ 674 (emphasis added). But none of these investigations amounts to a "judicial proceeding" because none is a civil or criminal lawsuit, and "[a]n action for malicious prosecution . . . [can] never occur outside the context of litigation." *Fischer v. Debrincat*, 169 So. 3d 1204, 1209 (Fla. 4th DCA 2015); *see also United States v. Peterson*, 627 F. Supp. 2d 1359, 1370 (M.D. Ga. 2008) (wiretap investigation not a judicial proceeding). The AC fails to allege that any of these investigations became a civil or criminal case, and therefore the malicious prosecution claim fails as a matter of law. *See Valladares v. Bank of Am. Corp.*, 197 So. 3d 1, 10 (Fla. 2016).

Even if Crossfire Hurricane were a judicial proceeding, Plaintiff was not the subject of that investigation—the only investigation he even attempts to link to Defendants Sussmann, Elias, Danchenko, Fritsch, Simpson, Nellie Ohr, Steele, and Joffe. AC ¶¶ 670–71. The AC sometimes

calls Crossfire Hurricane an "investigation into Donald J. Trump," *id.* ¶¶ 414, 418, 447; *see also id.* ¶¶ 351, 416, 441 (similar terminology), but these conclusory allegations are inconsistent with the AC's own description of the investigation.  As alleged in the AC, the FBI opened individual cases into Carter Page, George Papadopoulous, and Paul Manafort, all of whom were "associated with the Trump Campaign," and into Michael Flynn, who later served as Plaintiff's National Security Advisor.  *Id.* ¶¶ 345, 386.  But the AC nowhere explains when, how, or even if the Crossfire Hurricane investigation broadened to include Plaintiff personally—instead conflating an investigation into Plaintiff's campaign and associates with an investigation into Plaintiff himself. The AC thus fails to plausibly allege any judicial proceeding "against the present plaintiff," *Debrincat*, 217 So. 3d at 70, and the malicious prosecution claim must be dismissed.

The AC also fails to allege the second and fourth elements of a malicious prosecution claim—that the Defendants were the legal cause of the judicial proceeding and that the alleged proceeding suffered from an absence of probable cause.  If anything, the AC's allegations undermine the conclusions that Defendants were the "legal cause" of the Crossfire Hurricane investigation and that the FBI lacked "probable cause" in initiating it.  *See Debrincat*, 217 So. 3d at 70.  As discussed at page 17, *supra*, the Department of Justice's Inspector General concluded that the FBI opened Crossfire Hurricane "for an authorized purpose" and "with adequate factual predication" that had nothing to do with any Defendant.  Ex. 1 at 347.  In particular, the IG Report explains that the investigation was *not* predicated on DNS information or the Steele Dossier, but on a tip from a friendly foreign government.  *Id.* at 346.

Finally, the AC fails to satisfy the third element of a malicious prosecution claim because there is no plausible allegation that any investigation supposedly instigated by Defendants terminated in Plaintiff's favor.  "That element is satisfied by either a favorable decision on the merits or a bona fide termination of the proceedings," that is, "a good faith nolle prosequi or declination to prosecute." *Union Oil of Cal. v. Watson*, 468 So. 2d 349, 353 & n.3 (Fla. 3d DCA 1985).  Plaintiff does not adequately allege that Crossfire Hurricane terminated in his favor.  And his cursory attempt to rely on the supposed conclusions of the Mueller investigation to show

favorable termination, *see* AC ¶ 460, fails because that is a different investigation from the one at issue in his malicious prosecution claim. *Cf. id.* ¶¶ 674, 686 (alleging that other Defendants caused the Mueller investigation). Moreover, the Mueller investigation also did not conclude with "a favorable decision on the merits" as to Plaintiff's innocence. *See Union Oil*, 468 So. 2d at 353. The Mueller Report explicitly states that while it does not affirmatively conclude Plaintiff committed a crime, "it also *does not exonerate him*." Office of Special Counsel, U.S. Dep't of Justice, 2 *Report on the Investigation into Russian Interference in the 2016 Presidential Election* 1–2 (2019) (cited at AC ¶ 460) (emphasis added).[18] This conclusion was neither "on the merits" nor "favorable" toward Plaintiff. *See Union Oil*, 468 So. 2d at 353.

As with the injurious falsehood claim, the claim for conspiracy to commit malicious prosecution (Count VI) fails both because the underlying claim fails, and because the conspiracy is asserted only in a purely conclusory fashion. *See* p. 23, *supra*.

### E.   Plaintiff Fails To State a Claim Based on Defendants' Alleged Use of DNS Data.

Three of Plaintiff's claims arise from the allegation that certain Defendants wrongfully "exploited" their access to DNS data to uncover "derogatory" information about Plaintiff. *See* AC ¶¶ 697, 706–20, 727–34. On this basis, Plaintiff attempts to plead claims under three different federal statutes: the CFAA, 18 U.S.C. § 1030(a); the DTSA, 18 U.S.C. § 1832; and the SCA, 18 U.S.C. §§ 2701–12. Each of these claims is rooted in the false premise that DNS data is "non-public" or "proprietary." AC ¶ 142. It is neither. As explained at pages 10–11, *supra*, companies that provide DNS resolution services have a view into "all the web sites" a user visits. ACLU, *supra*. Simply stated, "DNS data is meant to be public." NIST, *supra*, at iii.

---

[18] The Mueller Report itself, not Attorney General Barr's letter to Congress summarizing its conclusions, *see* AC ¶ 461 & n.244, is the best evidence of the Report's contents. Indeed, Mueller issued his own letter asserting that Barr's summary letter "did not fully capture the context, nature, and substance" of the Special Counsel's investigatory conclusions. *See* Devlin Barrett & Matt Zapotosky, *Mueller Complained that Barr's Letter Did Not Capture "Context" of Trump Probe*, Wash. Post (Apr. 30, 2019).

1.    **Plaintiff Has No Claim Under the Computer Fraud and Abuse Act (Count VII).**

Congress enacted the CFAA primarily as a criminal statute to punish computer hacking, and allowed private civil actions only under a "narrow set of circumstances." *St. Johns Vein Ctr., Inc. v. StreamlineMD LLC*, 347 F. Supp. 3d 1047, 1057 (M.D. Fla. 2018).  To state a civil claim under the CFAA, a plaintiff must allege:  (1) the "defendant intentionally accessed a protected computer," (2) "without authorization or exceeding authorized access," (3) thereby obtaining information, and (4) causing certain types of "damage or loss of at least $5,000.00." *777 Partners LLC v. Pagnanelli*, No. 20-cv-20172, 2021 WL 2038175, at *4–5 (S.D. Fla. Mar. 8, 2021) (citing 18 U.S.C. § 1030(g)).  Here, Plaintiff fails to plead facts to establish the second and fourth elements.  Accordingly, Count VII should be dismissed.

The "without authorization" element requires a CFAA plaintiff to show that a defendant accessed "information located in particular areas of the computer—such as files, folders, or databases—that are off limits" to him.  *Van Buren v. United States*, 141 S. Ct. 1648, 1652, 1662 (2021).  Thus, the Act does not extend liability to individuals who "have improper motives for obtaining information that is otherwise available to them." *Id.* at 1652; *see also Armor Corr. Health Servs., Inc. v. Teal*, No. 19-cv-24656, 2021 WL 5834245, at *27 (S.D. Fla. Dec. 8, 2021) (executive did not violate CFAA by accessing his employer's systems despite executive's intent to use the information to compete against employer).  Notwithstanding the conclusory (and inflammatory) allegation that certain Defendants were hired to "hack servers," AC ¶ 69, Plaintiff's claim ultimately boils down to the assertion that certain Defendants used DNS data that was already available to them. *See, e.g., id.* ¶ 212 ("Joffe had exploited his access to non-public data.").  Even accepting as true Plaintiff's claim that the relevant Defendants acted with "nefarious" purposes, *id.* ¶ 703,[19] such actions do not equate to accessing files that are "off limits," which the CFAA requires. *Van Buren*, 141 S. Ct. at 1662.

---

[19]  Defendants deny that there was anything "improper" about their motives, given that communications to the U.S. government about potential links between a presidential candidate

Plaintiff's claim also fails because the harm for which he seeks recovery—lost profits to his business interests, loss of trade secrets, and the cost of "defending himself against federal investigations," AC ¶ 705—is not recoverable under the CFAA.  Congress deliberately limited the definition of a compensable "loss" to (1) the reasonable cost of responding to a hack and restoring the affected data and (2) lost revenues or costs incurred because of an interruption in service. *Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1174 (11th Cir. 2017).  Although Plaintiff parrots this statutory language, the allegation that he incurred costs in excess of $5,000 for "investigating and responding to the unauthorized access," AC ¶¶ 702, 705, is devoid of any factual support.  And his claimed pecuniary losses to his business interests (due to the publication of unflattering information) are entirely unsupported by the AC, and well outside the statute's bounds. *See Mortg. Now, Inc. v. Stone*, No. 09-cv-80, 2010 WL 11519201, at *5 (N.D. Fla. Sept. 29, 2010) ("lost profits" untethered to an "interruption of service" "do not constitute loss under the CFAA"); *Resdev, LLC v. Lot Builders Ass'n, Inc.*, No. 04-cv-1374, 2005 WL 1924743, at *2–5 (M.D. Fla. Aug. 10, 2005) (rejecting argument that "loss" covers lost value of a trade secret); *Nexans Wires S.A. v. Sark–USA, Inc.*, 319 F. Supp. 2d 468, 477–78 (S.D.N.Y. 2004) (concluding that loss of business from defendant's use of proprietary information was not covered by CFAA).

Because Plaintiff's allegations do not fall within the CFAA's definitions of "unauthorized access" or "damage or loss"—each of which is an independent statutory requirement—this Court should dismiss Count VII with prejudice. *See Van Buren*, 141 S. Ct. at 1662.

### 2. Plaintiff Has No Claim Under the Defend Trade Secrets Act (Count VIII).

Plaintiff has failed to state a claim under the DTSA for all the reasons stated above at pages 9–11, *supra*, especially because DNS data does not constitute a trade secret.

### 3. Plaintiff Has No Claim Under the Stored Communications Act (Count IX).

---

and a foreign power fall squarely within the protections afforded to "petitioning" activity under the *Noerr-Pennington* doctrine. *See Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1316, n.65 (11th Cir. 1998); pp. 41–42, *infra*.

Congress enacted the SCA to ensure that historical Fourth Amendment privacy protections over personal communications extended to internet users' personal information stored in "large data banks," such as internet service providers. *See In re Google Inc.*, 806 F.3d 125, 147 (3d Cir. 2015); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 598 (9th Cir. 2020).[20]  In this regard, the SCA closely resembles the CFAA as an anti-hacking measure, but differs principally because it applies exclusively to communications kept by internet service providers or similar storage facilities. *See United States v. Cioni*, 649 F.3d 276, 282 (4th Cir. 2011); *United States v. Steiger*, 318 F.3d 1039, 1049 (11th Cir. 2003) (SCA does not apply to information stored on a personal hard drive).  To state a claim under the SCA, a plaintiff must allege, among other things, that the defendant intentionally accessed such a facility—either without authorization or in excess of authorization—and thereby obtained unauthorized access to private communications. *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1200 (9th Cir. 2022).  Consistent with Congress' focus on privacy protections, the statute expressly exempts from civil liability any access—even if unauthorized—to electronic communications that are "readily accessible to the general public." 18 U.S.C. § 2511(2)(g)(i).  Again, Plaintiff does not and cannot plead the required elements of a claim.

As an initial matter, Plaintiff does not allege that there was any intrusion into a "facility." As noted above, the SCA imposes liability only to unauthorized intrusions of facilities "through which an electronic communication service is provided,"—*i.e.*, internet or network service providers—*not* personal devices or organizational servers. *See Steiger*, 318 F.3d at 1049 (SCA does not apply to information on personal hard drive); *Garcia v. City of Laredo*, 702 F.3d 788, 793 (5th Cir. 2012) (SCA does not apply to texts and pictures on cell phone).  Although Plaintiff alleges intrusion into multiple different locations—*i.e.*, private, EOP, and Trump Organization computers

---

[20] The SCA has a "narrow scope" and is "not a catch-all statute designed to protect the privacy of stored Internet communications."   Orin S. Kerr, *A User's Guide to the Stored Communications Act, and A Legislator's Guide to Amending It*, 72 Geo. Wash. L. Rev. 1208, 1214 (2004).

and servers, *see, e.g.*, AC ¶¶ 695–97, 729—none of these is a "facility" within the scope of the SCA.

Plaintiff's claim also fails because—as was the case for Plaintiff's DTSA claim—the information at issue is DNS data, which is indisputably public.  Like the DTSA, the SCA does not impose liability for accessing data in the public domain.  18 U.S.C. § 2511(2)(g)(i).  In addition, DNS data are not "electronic communications" under the SCA, as they do not reveal the underlying contents of any communications.[21]  *See In re Facebook, Inc. Internet Tracking Litig.,* 956 F.3d at 609 (holding URLs are not protected under the SCA); *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014) (IP addresses are not "contents" of communications under the SCA because they "do not [] reveal any more about the underlying contents of communication than do phone numbers").

Further, Plaintiff's claim fails because he pleads no factual or legal explanation as to how DNS data is "in electronic storage" within the meaning of the SCA.  18 U.S.C. § 2701(a).  The allegation that Defendants obtained (unidentified) communications from "the Computers that were in electronic storage in such systems," AC ¶ 730, is plainly insufficient.  *See Integrated Waste Sols., Inc. v. Goverdhanam*, No. 10-cv-2155, 2010 WL 4910176, at *6–7 (E.D. Pa. Nov. 30, 2010) (finding proprietary information stored on business's computer was not in "electronic storage").  Moreover, "electronic storage" "encompasses only the information that has been stored by an electronic communication service provider," and does not include emails stored on a computer, nor on Trump or EOP servers.  *See Garcia*, 702 F.3d at 793.

### F.   The Agency and Respondeat Superior Counts Should Be Dismissed Because the Underlying Claims Fail on the Merits (Counts X–XVI)

Plaintiff's claims against Clinton on an agency theory of liability and his claims against Perkins Coie, the DNC, HFACC, Fusion GPS, Neustar, Inc., and Neustar Security Services on a

---

[21]  The "communications" that most often serve as the basis of SCA claims are personal emails. *See, e.g.*, *Vista Mktg., LLC v. Burkett*, 812 F.3d 954, 963–64 (11th Cir. 2016); *Brown Jordan Int'l, Inc. v. Carmicle*, No. 14-cv-60629, 2016 WL 815827, at *2 (S.D. Fla. Mar. 2, 2016).  Of course, Plaintiff brings no claim based on unauthorized access to emails.  His only factually supported allegations relate exclusively to DNS data.

respondeat superior theory should be dismissed. "Respondeat superior is not an independent cause of action." *Colite Int'l Inc. v. Robert L. Lipton, Inc.*, No. 05-cv-60046, 2006 WL 8431505, at *12 (S.D. Fla. Jan. 20, 2006); *see also Barabe v. Apax Partners Eur. Managers, Ltd.*, 359 F. App'x 82, 84 (11th Cir. 2009) (*per curiam*) (holding that plaintiff's agency claim was not an "independent cause[] of action"). "Rather, it is a legal theory that presupposes the existence of an underlying claim and assesses liability . . . because of a certain status." *Colite*, 2006 WL 8431505, at *12. Because the underlying substantive claims each fail on the merits, Plaintiff cannot maintain standalone claims for agency or vicarious liability. *See, e.g.*, *Anderson v. Ahluwalia*, No. 21-cv-60793, 2022 WL 850000, at *8 (S.D. Fla. Feb. 28, 2022); *Wilder*, 2018 WL 5629922, at *5.

## III. PLAINTIFF'S FACTUAL ALLEGATIONS AS TO INDIVIDUAL DEFENDANTS ARE INSUFFICIENT.

The arguments set forth above fully dispose of Plaintiff's claims against all undersigned Defendants. Beyond the substantive flaws with each cause of action, the AC lacks specific factual allegations linking particular Defendants to the elements of the alleged torts. The allegations regarding specific Defendants are for the most part conclusory and vague. These "formulaic recitation[s] of the elements of a cause of action," and "legal conclusions" are the type of fact-free pleading this Court is required to reject. *Bell. Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Iqbal*, 556 U.S. at 678.

### A. Clinton and Clinton Campaign Defendants (Podesta, Mook, Sullivan, and HFAA)

After Donald Trump won the 2016 Presidential election, the Clinton campaign apparatus was quickly disbanded, and HFAA ceased to operate as a legal entity.[22] The candidate, her campaign chair John Podesta, her campaign manager Robert Mook, and her national security advisor Jake Sullivan went their separate ways. Despite the prolixity of the AC, Plaintiff has not

---

[22] Lawyers for HFAA signed a Conciliation Agreement with the Federal Election Commission earlier this year, paying an $8000 fine for record keeping violations but not conceding the FEC's allegations.

really alleged otherwise, as the claims made in the AC against these Defendants relate almost[23] entirely to the events of 2015, 2016, and 2017.  For all the reasons already explained above, they fail.

***Hillary Clinton.***  Plaintiff's pleading as to the candidate flunks both the traditional and the heightened fraud standards.  The *only* factually supported allegations concerning Clinton in the lengthy AC are that she declared her candidacy for president on April 12, 2015, AC ¶ 47; she won the Democratic Party nomination for president on July 26, 2016, *id.* ¶ 161; she tweeted twice regarding reported computer connections between Trump and Alfa Bank on October 31, 2016, *id.* ¶¶ 265, 269; and she made four subsequent brief statements regarding Plaintiff and Putin, *id.* ¶¶ 519–22, in 2019, 2021, and 2022.

The remainder of the allegations about Clinton are purely conclusory:  that she "orchestrated" schemes, AC ¶ 1, "exerted" "control over" others, *id.* ¶ 61, "conceived and funded" Defendants' "numerous tortious and criminal acts," *id.* ¶ 64, "was 'aware of . . .'" Christopher Steele's reporting, ¶ 102, "direct[ed]" activities, *id.* ¶ 103, that others acted "at [her] behest," *id.* ¶ 207, and that she otherwise masterminded each element of Defendants' alleged wrongdoing through agents and intermediaries, *see generally id.* ¶¶ 735–60 (alleging a cause of action for "Agency" against Clinton).

***John Podesta.***  The limited facts pertaining to John Podesta allegedly occurred no later than 2017, and according to the AC, "at all relevant times herein, [he] was acting within the scope of his employment with the Clinton Campaign." AC ¶ 23.  Podesta is alleged to have received an email from the Campaign's lawyer about Alfa Bank in September 2016, but there are no other specifics regarding the content of that email.  *Id.* ¶ 203.  He is alleged to have participated in a conversation regarding Alfa Bank, but there is no allegation concerning who said what.  *Id.* ¶ 247.  He is alleged, without more, to have participated in the decision to "give [the Alfa Bank

---

[23] The AC cites four brief statements by Clinton made in 2019, 2021, and 2022, allegedly about Trump and Putin, although the last does not even refer to Trump.  *See* AC ¶¶ 519–22.  These statements fall within two years of the AC's filing, but any claims based on them plainly fail on the merits.  *See supra*, pp. 19–22.

allegations] to a reporter." *Id.* ¶ 250.  And the AC alleges that, when Podesta was himself a victim of Russian hacking, he publicly complained about it. *Id.* ¶ 276.  Finally, the AC alleges that Podesta and Jake Sullivan met in February 2017 with Dan Jones (not a defendant) and with Glenn Simpson and Peter Fritsch, who asked Podesta to "help the trio open doors to big Democratic fund-raisers and sit down for press interviews and documentaries regarding any 'new developments' uncovered by" Christopher Steele. *Id.* ¶ 313.  Even ignoring the statute of limitations bar, nothing in these allegations can remotely support liability on any of the claims made in the AC.[24]

***Robert Mook.***  Mook is named as a defendant in only three of the sixteen counts asserted in the AC:  RICO Conspiracy (Count II), Conspiracy to Commit Injurious Falsehood (Count IV), and Conspiracy to Commit Malicious Prosecution (Count VI).  At the outset, the most recent allegation concerning Mook dates to October 2016.  AC ¶¶ 245–53.  The four-year statute of limitations for conspiracy, *see* p. 6, *supra*, therefore expired by October 2020, long before Plaintiff filed this action.

On the substance, none of the allegations shows Mook participated in an actionable conspiracy.  The sole facts alleged as to Mook are that he (*i*) exchanged emails with Elias that Plaintiff speculates—based solely on the email's subject line, "Alfa article"—were about a supposed "plot to falsely connect Donald J. Trump to the Russian bank, Alfa Bank, by disseminating the lies to the media," AC ¶¶ 203, 583(j); (*ii*) discussed the "Trump-Alfa Bank connection" with Elias and members of the Clinton Campaign and decided to give the information to a reporter, *id.* ¶¶ 245–53, 583(r); and *(iii)* discussed sharing the information with the media with

---

[24] In an apparent effort to sidestep the obvious statute of limitations barriers to his lawsuit, Plaintiff has vaguely referred to First Amendment protected public criticism of the Plaintiff that was first published in March 2017 and is still accessible on a website entitled the Moscow Project, which was established by the nonprofit, Center for American Progress (CAP).  AC ¶¶ 499, 500.  Lacking specifics regarding actions by any individual, the AC makes conclusory allegations seeking to link Podesta's alleged corporate role as Chair at CAP, and CAP's quintessential political expressive conduct, to the far-flung conspiracy alleged to include Podesta and his 30 codefendants who are not alleged to have anything to do with CAP.  None of CAP's First Amendment protected activity can be actionable as part of an illegal conspiracy.  Certainly none of CAP's activity, protected or not, can give rise to individual liability for Podesta.

Clinton, *id.* ¶¶ 252, 583(q). Even assuming Mook agreed to share information with the press, such conduct is not illegal, and a defendant "cannot be found guilty of conspiring to commit an act that is not itself against the law." *Jackson*, 372 F.3d at 1269. The AC also fails to allege that Mook believed the information about the connection between Alfa Bank and the Trump Organization was false or that he entered into an agreement to disseminate information he believed to be false. AC ¶¶ 248–49 (quoting Mook Tr. 1253:22–1254:10, 1264:20–24). The only allegation that comes close is facially inadequate to support this count and is based on a mischaracterization of Mook's testimony.[25]

The conspiracy to commit malicious prosecution claim (Count VI) also fails because the AC only lists Mook in the heading for Count VI and does not include any facts alleging that he had knowledge of or involvement in any effort to persuade the FBI or the Department of Justice to investigate (much less prosecute) Plaintiff.

***Jake Sullivan.*** The AC's sole allegations with respect to Sullivan fare no better. The allegations are that he spoke with reporters and news outlets about reported ties between Plaintiff and a Russian bank, *id.* ¶¶ 164–67, 250; "exchanged emails," *id.* ¶ 203, "had several conversations" about, *id.* ¶ 247, and published a campaign statement on the same subject, *id.* ¶¶ 265, 267; and that he attended a meeting, *id.* ¶ 313. The AC also suggests that Sullivan "directed" Joffe to undertake certain tasks, *id.* ¶ 141(c), but provides no factual support for this conclusory allegation. These flimsy allegations, even if accepted as true (and they are not), are insufficient to make out any of the claims asserted against Sullivan.

---

[25] The AC implies that Mook thought that the "veracity of the information" about "the Trump-Alfa Bank allegations" was "highly suspect." AC ¶ 248 (quoting Mook Tr. 1253–54, 1282). The "highly suspect" quotation came from a different line of questioning 30 pages later in the transcript, in which Mook testified that he believed the possible connection between Trump Tower and Alfa Bank was "highly suspect"—not the veracity of the information—and that "if it was something troubling, yes, we wanted the American people to know about it." Mook Tr. 1282:7–12; *see also id.* 1254 ("if it was true that there was some sort of passage of information between Trump Tower and a bank in Russia owned by an oligarch which is a main supporter of Vladimir Putin, that's obviously incredibly alarming and concerning, and that's probably something the American people should know when they're thinking about how they're going to vote"). Similarly, the AC's characterization of the Alfa Bank allegations as "false" has no support in the cited testimony. AC ¶ 252 (citing Mook Tr. 1267, 1274).

With respect to the injurious falsehood claim (Count III), which is predicated on a campaign statement discussing reporting in *Slate* about Plaintiff's ties to a Russian bank, *id.* ¶ 265, Plaintiff asserts in summary fashion that the multi-paragraph statement is "false," *id.* ¶¶ 635, 637, but offers no factual allegations to support this "formulaic recitation of [an] element[]" of his claim. *Chaparro*, 693 F.3d at 1337.  The AC does not even do the minimum work of identifying which portion of the statement is supposedly false.[26]  For this reason and those discussed at pages 19–22, *supra*, the injurious falsehood claim should be dismissed as to Sullivan.

As for the conspiracy claims in which Sullivan is named (Counts II, IV, and VI), the AC is devoid of any factual allegations that Sullivan entered into an agreement to commit any of the alleged underlying offenses.  The AC summarily asserts in each Count that there was a meeting of the minds or a criminal conspiracy, and the AC's references to purported interactions between Sullivan and other Defendants are both sparse and conclusory.  *See id.* ¶ 147 (Sullivan is a "VIP" who "directed" Joffe), ¶ 203 (exchanged emails with other Defendants), ¶ 247 ("had several conversations with" other Defendants), ¶ 250 (along with other Defendants, engaged with the media), ¶ 267 (received "assistance" from Elias); ¶ 268 (Clinton tweeted Sullivan's statement); ¶ 313 ("accompanied Podesta to [a] meeting").  Nowhere does the AC spell out how these interactions (the *sole* interactions between Sullivan and other Defendants cited in the AC) could possibly amount to an agreement to commit an unlawful act—and they do not.  "Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."  *Alhassid*, 60 F. Supp. 3d at 1319.  For these reasons and those discussed at pages 19, 23, and 25, *supra*, the conspiracy claims should be dismissed as to Sullivan.

---

[26] To the extent Plaintiff challenges the sentence about a federal investigation, he has misconstrued the statement.  Specifically, whereas the statement says "*we can only assume* that federal authorities will now explore this direct connection between Trump and Russia as part of their existing probe into Russia's meddling in our elections," Plaintiff alleges the statement says that "federal authorities *were investigating*" the connection.  AC ¶ 265 (emphases added).  Plaintiff cannot make out a claim by transforming an "assum[ption]" into a definitive statement.

**HFAA.** Because the plaintiff's case against HFAA is only as good as the case against the individuals who acted for the campaign—the candidate, her campaign chair John Podesta, her campaign manager, Robert Mook, and her national security advisor, Jake Sullivan—the claims against HFAA must also be dismissed.

### B.      DNC and Debbie Wasserman Schultz

The arguments set forth in Parts I and II fully dispose of all of Plaintiff's claims against the Democratic National Committee, DNC Services Corp. (together, "DNC") and Debbie Wasserman Schultz. These claims, however, also fail for several additional reasons.

**RICO (Count I).** Plaintiff does not plausibly allege that the DNC participated in the purported enterprise, let alone participated through a pattern of racketeering activity, as required by the RICO statute. 18 U.S.C. § 1962(c); *see Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (holding that "one must have some part in directing" the enterprise to be liable under the statute). Plaintiff's allegations concerning the DNC's connection to the alleged racketeering activity are wholly conclusory. *See, e.g.*, AC ¶¶ 103, 131, 208. Indeed, Plaintiff's vague allegations that the DNC "directed" other alleged participants to commit predicate acts are contradicted in key respects by Plaintiff's own, more specific allegations. For example, although Plaintiff alleges that Joffe acted to unlawfully exploit access to internet data at "at the behest of certain 'VIPs' of the Clinton Campaign and Perkins Coie," including "Clinton, Sullivan, Elias and/or Sussmann," *id.* ¶ 141, in the very next paragraph, the AC alleges that Joffe acted "at the direction of Clinton, the Clinton Campaign, the DNC, Perkins Coie, and Sussmann" *id.* ¶ 142. Similarly, Plaintiff alleges that Sussmann met with the FBI's General Counsel "at the behest of Clinton, the Clinton Campaign, and the DNC," but in the very next sentence alleges that "he billed the Clinton Campaign for his efforts, as he had with all of his actions taken in furtherance of the Defendants' conspiracy." *Id.* ¶ 207. Black-letter principles prohibiting improper group pleading, *see, e.g., Libov v. Readix, Inc.*, No. 10-cv-61755, 2011 WL 13216996, at *1 (S.D. Fla. Sept. 8, 2011), mean that Plaintiff cannot simply "lump[] together all of the defendants in their allegations of fraud," *Ambrosia Coal & Const. Co. v. Pages Morales*, 482 F.3d 1309, 1317 (11th Cir. 2007) (affirming dismissal of civil

RICO claims).  Plaintiff's failure "to describe the who, what, when, where, and how" of the DNC's participation in the alleged racketeering activity, with specificity, is fatal to his RICO claim against the DNC.  *Cisneros*, 972 F.3d at 1217 (affirming dismissal of federal RICO claims).

>> *Injurious Falsehood (Count III).*  Plaintiff alleges "Schultz appeared on MSNBC and boldly announced that there were 'clear indications' that Donald J. Trump colluded with Russia." AC ¶ 503.  Any claim based on this allegation should be dismissed because it "fail[s] to provide an adequate description of the statements."  *Malhotra v. Aggarwal*, No. 17-cv-24407, 2019 WL 3425161, at *2 (S.D. Fla. July 30, 2019).  Plaintiff also alleges that Wasserman Schultz stated on CNN, "[W]ith every passing day, it gets more and more disturbing, and more and more evidence that there was collusion. . . . Donald Trump should be the first person asking for one, but since I think he likely was part of it, it's not surprising that hasn't happened." AC ¶ 648.  Any claim based on this claim is time-barred because, on its face, it occurred before Special Counsel Robert Mueller was appointed in May 2017.  *See id.* ("Donald Trump should be the first person asking for one"— *i.e.*, an investigation into allegations of Russian collusion).  In the alternative, it fails because Plaintiff "fail[s] to provide an adequate description of the . . . time frame" in which the statement was made.  *Malhotra*, 2019 WL 3425161, at *2.

>> *Conspiracy to Commit Malicious Prosecution (Count VI).*  Plaintiff offers no factual allegations indicating Wasserman Schultz had interactions with any of the other alleged conspirators, let alone any factual allegations to support the conclusion that Wasserman Schultz agreed to join a conspiracy "to feed false and/or misleading information to the FBI and the DOJ," AC ¶ 682, other than the conclusory allegation that Wasserman Schultz and eleven other defendants supposedly "had a meeting of minds," *id.* ¶ 680.  This conclusory allegation is insufficient to support a claim for conspiracy.

>> *Computer Fraud and Abuse Act (Count VII).*  Plaintiff alleges the DNC "conspired with Neustar, Inc., and/or Neustar Security Services, and Joffe in *their* commission" of acts allegedly violating the CFAA.  AC ¶ 701 (emphasis added).  But this stretches civil liability beyond the bounds of the statute.  As a general rule, courts do not read civil secondary liability into laws that

do not provide for it. *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 182 (1994). And here, there is no basis to expand liability under the CFAA, which expressly limits its private right of action to suits "against the violator." 18 U.S.C. § 1030(g); *see Agilysys, Inc. v. Hall*, 258 F. Supp. 3d 1331, 1344 (N.D. Ga. 2017).

Moreover, Plaintiff does not allege sufficient facts to establish "an agreement to violate the law," as is required in order to state a claim for conspiracy in any event. *Coll Builders Supply, Inc. v. Velez*, No. 17-cv-933, 2017 WL 4158661, at *10 (M.D. Fla. Aug. 31, 2017) (dismissing CFAA conspiracy claim based on allegations that one defendant acted "at the behest of and on the behalf of" another defendant), *report and recommendation adopted*, No. 17-cv-933, 2017 WL 4125641 (M.D. Fla. Sept. 18, 2017).[27]

***Theft of Trade Secrets (Count VIII).*** There is no private right of action for conspiracy claims based on theft of trade secrets, Plaintiff's sole relevant claim against the DNC. *See* AC ¶ 724. Instead, "private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). The statutory provision at issue does not expressly provide for a private right of action; nor can one be implied in light of the substantial criminal enforcement mechanism in the statute. *See, e.g., Love v. Delta Air Lines*, 310 F.3d 1347, 1357 (11th Cir. 2002). While a *separate* provision of the DTSA does provide for a private right of action to obtain "an order providing for the seizure of property necessary to prevent the propagation or dissemination of the trade secret that is the subject of the action," that cause of action is limited to civil actions under that subsection. *Id.* § 1836(b). Accordingly, "the weight of authority tips against the viability of conspiracy claims based on misappropriation of trade secrets under" 18 U.S.C. § 1832. *NW Monitoring LLC v. Hollander*, 534 F. Supp. 3d 1329, 1338 (W.D. Wash. 2021); *see also, e.g., Genentech, Inc. v. JHL Biotech, Inc.*, No. 18-cv-06582, 2019 WL

---

[27] In *Coll Builders*, the court noted that "it remains a somewhat unsettled question of law as to whether a civil defendant may be held liable for attempting or conspiring to violate the CFAA." 2017 WL 4158661, at *6. This Court should reject civil liability for conspiracy to violate the CFAA for the reasons explained herein.

1045911, at *12 (N.D. Cal. Mar. 5, 2019); *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 271 F. Supp. 3d 835, 840–44 (E.D. Va. 2017).

*Respondeat Superior (Count XII)*.  The AC is bereft of any factual allegations establishing that Wasserman Schultz was acting within the scope of her employment when she undertook the actions described in the AC.  Under Florida law, an employee's conduct is within the scope of his employment—as required for a theory of respondeat superior—only where, among other things, the conduct "occurred within the time and space limits of the employee's employment." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1271 (11th Cir. 2009).  However, Plaintiff's own allegations make it clear that Wasserman Schultz had already resigned as Chair of the DNC on July 28, 2016, AC ¶ 18, well before she made the alleged statements concerning Plaintiff on MSNBC and CNN.

### C.    Perkins Coie and Former Partners Marc Elias and Michael Sussmann

Plaintiff's assertion that Perkins Coie LLP, Marc Elias, and Michael Sussmann form part of an ongoing RICO enterprise or conspiracy lacks any factual support—neither Elias or Sussmann even remains a partner at the firm.[28]  For both the reasons given above and the more specific pleading failures detailed below, all claims against these Defendants should be dismissed.

*Perkins Coie*.  The new RICO allegations concerning Perkins Coie (Counts I and II) lack substance.  Plaintiff has inexplicably elevated Perkins Coie, a bit player in the original AC, to "the central hub that coordinated and oversaw the day-to-day operations" of the RICO enterprise, with the role of "devising, coordinating, and overseeing" the enterprise's affairs. AC ¶ 534.  But these are mere "labels and conclusions," devoid of any supporting facts. *Iqbal*, 556 U.S. at 678.  Stripped of this self-serving rhetoric, the AC alleges only that Perkins Coie served as general counsel to the Clinton campaign and the DNC and as counsel to Neustar and Joffe, AC ¶¶ 46, 53, 133; hired Fusion GPS for services related to the campaign, *id.* ¶ 75; paid Fusion with funds reimbursed by the campaign or the DNC, *id.* ¶ 83; and had regular conference calls with its clients and with Fusion

---

[28] *Contra* Plaintiff's unsupported allegation, AC ¶ 494, Perkins Coie no longer serves as general counsel to the DNC.

with the expectation that these discussions would remain private, *id.* ¶¶ 84–85.  In short, Perkins Coie conducted the ordinary business of a law firm.

The allegations that Perkins Coie performed legal services for the alleged enterprise do not suffice to state a RICO claim.  "To establish a valid enterprise to sustain RICO liability, Plaintiff[] must prove that each party to the enterprise is separate and distinct from the other."  *Kelly v. Palmer, Reifler, & Assocs., P.A.*, 681 F. Supp. 2d 1356, 1378 (S.D. Fla. 2010).  A law firm that provides "traditional legal services" or otherwise acts "as an agent" for the enterprise does not qualify as "a separate and independent entity" for RICO purposes.  *Id.* at 1379.  "A complaint that does no more than allege that a law firm performed legal work for an enterprise fails to state a violation of § 1962(c)."  *Muskegan Hotels, LLC v. Patel*, 986 F.3d 692, 698–99 (7th Cir. 2021).

Plaintiff also has not plausibly alleged that Perkins Coie is vicariously liable for any supposed RICO violations by its former partners (Count XI).  To recover under a respondeat superior theory in the RICO context, Plaintiff must plausibly allege that Perkins Coie "derive[d] some benefit from the RICO violation."  *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1406 (11th Cir.), *modified on reh'g*, 30 F.3d 1347 (1994); *Am. Heritage Enters., Inc. v. Am. Paramount Fin., Inc.*, No. 10-cv-80921, 2011 WL 13225180, at *6 n.8 (S.D. Fla. July 5, 2011).  Plaintiff nowhere even attempts to satisfy this requirement (nor could he).

The remaining vague and conclusory allegations that Perkins Coie "spearhead[ed] the scheme to find . . . proof of a sinister link" between Plaintiff and Russia, AC ¶ 3, "coordinate[d] a two-pronged plan to publicly and falsely denigrate" Plaintiff, *id.* ¶ 67, "did [its] best to proliferate the spread of those dubious and false claims," *id.* ¶ 6, and was "well aware [of] []Joffe's intention to feed false information to the FBI," *id.* ¶ 225, lack factual support and do not state a claim for conspiracy to commit injurious falsehood (Count IV).  Similarly, Plaintiff's bare assertion that Perkins Coie and others "tasked Joffe to exploit his access to . . . non-public data of Neustar," *id.* ¶ 134, does not add up to a CFAA or DTSA claim (Counts VII and VIII).

***Marc Elias.***  Plaintiff's claims against Elias are defective for all the reasons set forth above, but a few points specific to Elias merit focus.  Plaintiff does not allege any conduct whatsoever by

Elias after October 31, 2016, *see* AC ¶¶ 265–67, rendering all claims against him untimely.  In addition, the allegations against Elias boil down to his alleged participation in calls and meetings with clients, their agents, and his former law partner, *see* AC ¶¶ 175, 178, 180–84, 195, 197—with few to no details about what those events entailed, if they even occurred.  These assertions and the conclusory allegation that Elias served as a "gatekeeper" between his clients and Fusion GPS, *id.* ¶ 81, reflect ordinary legal work, not a tort, conspiracy, or RICO enterprise.

Otherwise, as to Count I, Plaintiff has not alleged that Elias personally committed at least two RICO predicate acts.  *See Rodgers v. Addy*, No. 17-cv-23429, 2021 WL 4487903, at *4 (S.D. Fla. Sept. 27, 2021).  Plaintiff improperly lumps Elias in with other Defendants in alleging theft of trade secrets as a RICO predicate act, *e.g.*, AC ¶¶ 553–54; *see also* p. 36, *supra* (citing cases prohibiting improper group pleading), and tellingly does not assert a stand-alone trade secret claim against Elias.  For wire fraud, Plaintiff cites a single email from Elias, *id.* ¶ 583(j), but fails to identify anything about the email other than its subject line or explain (let alone with the required particularity) why this single email deceived him, or anyone, out of money or property.  For RICO conspiracy (Count II), Plaintiff pleads no facts showing that Elias entered "an illegal agreement to violate a substantive provision of the RICO statute." *Jackson*, 372 F.3d at 1269.  On malicious prosecution (Count V), there is no allegation whatsoever that Elias met with, spoke to, or interacted with any federal agents involved in the Crossfire Hurricane investigation.  Elias was therefore not a "legal cause" of any proceeding (let alone a judicial one) against Plaintiff.  *See* p. 24, *supra*.  On the two conspiracy counts (Counts IV and VI), Plaintiff does not allege facts showing that Elias personally agreed to the alleged misconduct.  *See Alhassid*, 60 F. Supp. 3d at 1316.

***Michael Sussmann.***  Plaintiff's allegations concerning Sussmann are disingenuous, at best.  The AC draws liberally from the one-count speaking indictment filed against Sussmann in an entirely separate case by Special Counsel John Durham, including its charge that Sussmann lied when he allegedly told the FBI that he was not acting "on behalf of any client" when he presented information concerning Plaintiff's possible ties to Alfa Bank.  AC ¶¶ 206, 486 & n.259.  But the AC omits that a *unanimous* jury *acquitted* Sussmann of that precise conduct.  *See* n.12, *infra*.

Plaintiff also fails to mention the fact that many allegations he lifted from the indictment were never subject to any offer of proof at trial. *See, e.g.*, AC ¶ 135 (alleging various defendants intended to "falsify" DNS data); *id.* ¶ 142 (alleging defendants "exploited . . . access" to DNS data). And there is nothing to suggest that Plaintiff himself made any effort to independently investigate—let alone substantiate—these parroted (and unsuccessful) allegations. *See Pavelic & LeFlore v. Marvel Entm't Grp.*, 493 U.S. 120, 126 (1989) (confirming an attorney has a "nondelegable responsibility" to "personally . . . validate the truth and legal reasonableness of the papers filed").[29] These allegations therefore provide no support for the numerous claims Plaintiff asserts against Sussmann (Counts I–VIII).

Plaintiff's claims against Sussmann all rest on the premise that Sussmann presented to the government evidence of potential ties between Plaintiff and Alfa Bank and that Plaintiff was harmed by the resulting federal investigation. *See, e.g.*, AC ¶¶ 524, 670.[30] Leaving aside their other defects, these allegations fall squarely within the protection afforded to First Amendment petitioning activity by the *Noerr-Pennington* doctrine. *See E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135 (1961). Specifically, *Noerr-Pennington* immunity allows a party to present grievances to the government—"regardless of intent or purpose"—without fear that those adversely affected by resulting government action can obtain civil redress. *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965). Because of its constitutional rooting, courts have applied *Noerr-Pennington* to reject both federal and state-law claims based on the results of a party's governmental petitioning. *See, e.g.*, *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1559, 1559–62 (11th Cir. 1992) (citing the doctrine's "First Amendment underpinnings"

---

[29] *See also In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005–06 (N.D. Cal. 2008) (holding that, in light of an attorney's obligation under Rule 11 "to conduct a reasonable factual investigation" before filing suit, "it would make little sense that an attorney somehow can rely on the analysis of attorneys in different actions" without "personally investigat[ing] their claims" (emphasis omitted)); *O'Rourke v. Dominion Voting Sys. Inc.*, 552 F. Supp. 3d 1168 (D. Colo. 2021) (sanctioning plaintiffs' counsel for not making adequate inquiry into factual allegations borrowed from complaints in failed cases).

[30] Plaintiff ties his injuries and resulting damages directly to harms flowing from the various investigations he identifies, to the express exclusion of reputational harms. AC ¶¶ 524–25.

and applying it to dismiss a state-law claim); *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Phillip Morris Inc.*, 196 F.3d 818, 826 (7th Cir. 1999) (dismissing a RICO action); *SilverHorse Racing, LLC v. Ford Motor Co.*, No. 16-cv-53, 2016 WL 7137273, at *2–3 (M.D. Fla. Apr. 27, 2016) (collecting cases). And where, as here, a petition implicates "speech uttered during a campaign for political office," the First Amendment's protections are at their "fullest." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010). Accordingly, the *Noerr-Pennington* doctrine provides an independent basis for dismissing Plaintiff's claims against Sussmann.

### D. Fusion GPS Defendants

The AC identifies no specific conduct by Fusion GPS, Glenn Simpson, or Peter Fritsch ("Fusion Defendants") in connection with the RICO claim (Count I) or the RICO conspiracy claim (Count II) except for the use of interstate wires for communications. AC ¶ 583. But the AC fails to plausibly allege that any of the Fusion Defendants' communications amount to wire *fraud*. Even accepting as true the allegation that they spread false information to the media, an allegation they vigorously dispute, allegedly "defrauding the media," *id.* ¶ 589, is not a violation of 18 U.S.C. § 1343; *see also* pp. 13–14, *supra*. As for the RICO conspiracy claim, the AC's allegations concerning the Fusion Defendants' meetings and coordination set forth—at most—only "parallel conduct" that can be "explained by lawful, independent . . . behavior" that "[does] not plausibly suggest an illegal conspiracy." *Am. Dental Ass'n*, 605 F.3d at 1289. "[A]n allegation of possible parallel conduct without any allegation of an agreement" does not amount to a RICO or RICO conspiracy violation. *Id.* at 1292–93 ("Simply specifying particular dates and contents of communications cannot automatically constitute a valid claim that a defendant violated 18 U.S.C. § 1962(c)."). The Fusion Defendants are alleged to have been hired to conduct research and to have met with the firm and lawyers who hired them, and to have attempted to share their research. This is not actionable, or even unusual conduct in the context of a presidential election. Thousands of other Americans were working in opposition to the Plaintiff's campaign in 2016. The AC singles out a subset of those opposed to Trump's campaign and labels their ordinary election-year campaigning and parallel conduct a conspiracy. The Fusion Defendants' alleged conduct amounts

42

to nothing more than "[l]egitimate conduct" in the context of political research operations, *id.* at 1295, to which the Plaintiff has applied "labels and conclusions," *Twombly*, 550 U.S. at 555.

### E.    Nellie Ohr and Bruce Ohr

The AC fails to identify specific conduct by Bruce or Nellie Ohr in connection with the RICO conspiracy claim (Count II).  The AC alleges that Nellie Ohr provided some "assistance" to certain other Defendants in creating the Steele Dossier, AC ¶ 103, and that Bruce Ohr provided a thumb drive of "opposition research" prepared by Nellie Ohr to the FBI, AC ¶ 288.  However, the AC makes no attempt to link these alleged actions to any RICO predicate.  The AC also alleges that Bruce Ohr and Nellie Ohr met with Defendant Christopher Steele in July 2016, at which time Steele discussed his work on the Steele Dossier.  AC ¶ 169.  Again, however, the AC makes no attempt to tie this meeting to any RICO predicate.  In short, the AC offers, at best, conclusory allegations that Bruce Ohr and Nellie Ohr entered a RICO conspiracy with other Defendants.  In the RICO context (as well as in other contexts), "[c]onclusory allegations that Defendants conspired with each other are insufficient to survive a motion to dismiss." *Super Vision Int'l, Inc. v. Mega Int'l Com. Bank Co.*, 534 F. Supp. 2d 1326, 1343 (S.D. Fla. 2008).

### F.    Igor Danchenko

Danchenko is named in the AC for his alleged connection to the Steele Dossier.  AC ¶¶ 103–04.  That fact alone renders the claims against him meritless.  *See* p. 24, *supra* (no causal link).  But in any event, Plaintiff alleges only that Danchenko "assembled and provided" information that was relied on to draft the Steele Dossier.  *Id.* ¶ 110.  Danchenko is not alleged to have made any statements in the Steele Dossier or to have decided which statements it would include.  Plaintiff *implies* Danchenko provided information about Paul Manafort's departure from Plaintiff's presidential campaign, which Plaintiff alleges was provided to Danchenko by Dolan and then allegedly made its way to the Dossier.  *Id.* ¶¶ 117–18.  Of course, Plaintiff does not allege this information about Manafort's resignation was false, and he conveniently overlooks that it was

widely reported prior to when he alleges Danchenko received an email about it.[31]   Furthermore, just as the media's reporting on the goings-on of Plaintiff's political campaign was political speech protected by the First Amendment, so it would have been for any Defendant.

The AC further asserts that the Steele Dossier provided support for Foreign Intelligence Surveillance Act ("FISA") applications regarding Carter Page.  But Page is not a plaintiff here, and Plaintiff cannot recover for any alleged injuries on his behalf.  In any event, Plaintiff does not allege that Danchenko provided any information regarding Page, or that he had any awareness of or anything to do with any FISA application.  AC ¶¶ 121–22.[32]   Furthermore, as with Manafort, statements about Page would have been political speech protected by the First Amendment.

Finally, Danchenko could not have conspired with the alleged RICO Defendants.  AC ¶ 529.  He does not know them.  He has never met, communicated, or *agreed* with any of them about anything.  This is why all of Plaintiff's allegations that Danchenko conspired with anyone are conclusory and factually baseless:  "the RICO Defendants *conspired* with Danchenko in connection with his conduct . . . ," *id.* ¶ 572 (emphasis added); "Danchenko stated, *at the direction of and in coordination with* the RICO Defendants . . . ," *id.* ¶ 572(a) (emphasis added); "[t]he RICO Defendants had a *meeting of the minds, common intent, were aware of, and conspired with* . . . [lumping Defendants together, including] Danchenko," *id.* ¶ 573 (emphasis added).  Plaintiff can allege no specifics.  There are none.

---

[31]   *Compare* AC ¶ 118 (alleged email dated Aug. 19, 2016) *with Social media erupts as Lewandowski tweets report on Manafort's ties to Ukraine*, The Hill (Aug. 14, 2016), https://tinyurl.com/yc5dupz2; Nick Gass, *Lewandowski on Manafort firing:  'People think I won,'* Politico (Aug. 19, 2016), https://tinyurl.com/a6vdpx3h.

[32]   Plaintiff alleges that information regarding "salacious sexual activity" in the Steele Dossier was "derived from Dolan" and apparently passed through Danchenko to the Dossier.  AC ¶ 114.  This insufficiently pleaded allegation is also no basis for any of Plaintiff's claims:  "These allegations, which have come to be known publicly as the 'salacious and unverified' portion of the reporting, were not included in the original Carter Page FISA application or any of the renewal applications."  Ex. 1 at 4 n.7.

G.      **Rodney Joffe, Neustar Security Services, and Neustar, Inc.**

*Rodney Joffe.* Plaintiff has failed to plausibly plead that *Joffe* (or Neustar, Inc. or Neustar Security Services by association)[33] "agreed to the overall objective of the conspiracy" or "agreed to commit two predicate acts." *Am. Dental Ass'n*, 605 F.3d at 1293. Stripping away Plaintiff's unsupported legal conclusions, *e.g.*, AC ¶¶ 141–42, 534, 621–624, and conclusory assertions of "coordination" of "[a]ll" acts by the "Clinton Campaign, the DNC, and Perkins Coie," *id.* ¶¶ 5, 134, 172, *none* of the allegations meets Plaintiff's burden to plausibly plead facts showing an *agreement* by Joffe. Instead, the allegations amount to nothing more than a description of perfectly legitimate connections between Joffe and others, including Joffe's engagement of Perkins Coie and Sussmann as his counsel, *e.g.*, *id.* ¶¶ 113, 134, and Joffe's status as an employee of Neustar during the relevant time period, *id.* ¶ 129.[34] The remaining assertions, while adorned with inflammatory assertions of "spoofing" of information, *id.* ¶ 142, and the inaccurate assertion that DNS data is "confidential, proprietary, [and] non-public," *id.* ¶ 134, simply show that Joffe, as part of his employment, observed suspicious public DNS data and reported information he obtained to the FBI, *id.* ¶¶ 218–25, and that Joffe operated under a pseudonym, "Max," when dealing with Daniel Jones, *id.* ¶¶ 312–320. This does not allege a viable predicate act, nor does it show any agreement by Joffe to participate in the alleged conspiracy. No factual allegation supports that Joffe was aware of or agreed to be involved in a conspiracy with others, like Steele, the FBI employees, or even Clinton. Moreover, there is no fact pleaded to support Joffe's knowledge of, or involvement, in any other alleged part of the conspiracy, including the Steele Dossier, or any conduct by officials in the Crossfire Hurricane investigation.

---

[33] This argument is likewise applicable to Neustar, Inc. and NSS, as both entities are included in this lawsuit by virtue of Joffe's affiliation with them. The AC states that "[a]t all relevant times, Joffe was an executive of Neustar" and had access to data through his position at "Neustar." AC ¶¶ 129–30.

[34] Plaintiff makes the vague assertion that "Joffe was in communication" with unspecified "officials of the Clinton Campaign and/or the DNC." AC ¶ 131. This too, fails to plead agreement.

Further, to successfully allege a conspiracy, a complaint must give the court a basis for inferring that defendants were conspiring and not simply engaging in "unknowingly parallel conduct." *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1069 (11th Cir. 2017). In that regard, the Supreme Court and Eleventh Circuit have cautioned courts not to infer an agreement where there is an "obvious alternative explanation." *Am. Dental Ass'n*, 605 F.3d at 1294–95. Even assuming that the AC pleads parallel conduct by different groups of actors (it does not), it completely fails to plead a non-conclusory connection between them. At most, it shows that Joffe and a group of researchers were concerned about the possibility that publicly accessible DNS information suggested a suspicious connection between a presidential candidate and a large Russian bank owned by oligarchs with close ties to Vladimir Putin.

**Neustar and NSS**. The AC is an improper "shotgun pleading" that warrants dismissal with prejudice. *See Barmapov v. Amuial*, 986 F.3d 1321,1325–26 (11th Cir. 2021). "A district court has the inherent authority to control its docket and ensure the prompt resolution of lawsuits, which includes the ability to dismiss a complaint on shotgun pleading grounds." *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018) (quotation marks omitted).

"Shotgun pleadings are flatly forbidden by the spirit, if not the letter of [the Federal Rules] because they are calculated to confuse the [opponent], and the court, so that theories of relief not provided by law . . . can be masked." 986 F.3d at 1324. Improper "shotgun pleadings" come in at least four varieties, including where the complaint "assert[ed] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions." *See Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1321–23 (11th Cir. 2015). Indeed, Plaintiff repeatedly refers to Neustar and NSS as a single entity ("Neustar") or in some combination thereof ("and/or"), while at the same time alleging that they are separate entities. AC ¶¶ 35–36. By asserting claims against multiple Defendants without specifying which Defendant is responsible for which act, neither NSS nor Neustar can respond to Plaintiff's allegations because they cannot "discern what [Plaintiff] is claiming and frame a responsive

pleading." *Weiland*, 792 F.3d at 1320–23.  Plaintiff already had one chance to replead.[35]  *See Vibe Micro*, 878 F.3d at 1294 (affirming dismissal with prejudice of the shotgun second amended complaint because it did not improve the allegations that were "oftentimes not connected to a particular Defendant or set of Defendants, making it impossible to understand who did what"); *accord Magluta v. Samples*, 256 F.3d 1282 (11th Cir. 2001); *Fox v. Loews Corp.*, 309 F. Supp. 3d 1241, 1249 (S.D. Fla. 2018); *Bently v. Bank of Am., N.A.*, 773 F. Supp. 2d 1367, 1373 (S.D. Fla. 2011).  This Court should not provide him with another opportunity to do so.

## CONCLUSION

For the reasons given above, the AC should be dismissed with prejudice.[36]

---

[35]  Neustar identified this as one of its grounds for dismissal of the initial complaint.  *See* DE 160 at 7–8, n.8.  Plaintiff did not oppose Neustar's motion; his "failure to oppose operated as an acknowledgment of these defects."  *See Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1358 (11th Cir. 2018).

[36]  Pursuant to the Court's June 23, 2022 Order, DE 188, undersigned Defendants also incorporate by reference their previously filed motions to dismiss the initial complaint.

Dated:  July 14, 2022                                    Respectfully submitted,

/s/ David Oscar Markus                                  /s/ David E. Kendall
David Oscar Markus                                      David E. Kendall (pro hac vice)
MARKUS/MOSS PLLC                                        Katherine M. Turner (pro hac vice)
40 NW 3rd Street, PH 1                                  Michael J. Mestitz (pro hac vice)
Miami, FL 33128                                         WILLIAMS & CONNOLLY LLP
Tel:  (305) 379-6667                                    680 Maine Avenue, S.W.
                                                        Washington, DC 20024
                                                        Tel:  (202) 434-5000
                                                        Fax:  (202) 434-5029
                                                        dkendall@wc.com

*Attorneys for Defendant Hillary Rodham Clinton*

/s/ Robert P. Trout
Robert P. Trout (pro hac vice)
Paola Pinto (Florida Bar Number 1013933)
SCHERTLER ONORATO MEAD & SEARS
555 13th Street, N.W.
Suite 500 West
Washington, D.C. 20004
Phone:  (202) 628-4155
rtrout@schertlerlaw.com
ppinto@schertlerlaw.com

*Attorneys for Defendants HFACC, Inc. and John Podesta*

/s/ Gerald Edward Greenberg                             /s/ Roberta A. Kaplan
Gerald Edward Greenberg                                 Roberta A. Kaplan (pro hac vice)
GELBER SCHACHTER & GREENBERG PA                         Shawn G. Crowley (pro hac vice)
One Southeast Third Avenue                              Maximillian L. Feldman (pro hac vice)
Suite 2600                                              KAPLAN HECKER & FINK LLP
Miami, FL 33131-1715                                    350 Fifth Avenue, 63rd Floor
(305) 728-0950                                          New York, NY 10118
ggreenberg@gsgpa.com                                    212.763.0883
                                                        rkaplan@kaplanhecker.com
                                                        scrowley@kaplanhecker.com
                                                        mfeldman@kaplanhecker.com

*Attorneys for Defendants Democratic National Committee, DNC Services Corporation, and*
*Debbie Wasserman Schultz*

/s/ Eleni Kastrenakes Howard
Eleni Kastrenakes Howard (Fla. Bar No.
0073073)
Howard J. Harrington (Fla. Bar No. 0118719)
AKERMAN LLP
777 South Flagler Drive
Suite 1100, West Tower
West Palm Beach, FL 33401
Telephone:  (561) 653-5000
Fax:  (561) 659-6313
eleni.kastrenakeshoward@akerman.com
jay.harrington@akerman.com

/s/ F. Joseph Warin
F. Joseph Warin (pro hac vice)
Geoffrey M. Sigler (pro hac vice)
Katherine Moran Meeks (pro hac vice)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
fwarin@gibsondunn.com
gsigler@gibsondunn.com
kmeeks@gibsondunn.com

/s/ Nancy E. Hart
Nancy E. Hart (pro hac vice)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
nhart@gibsondunn.com

*Attorneys for Perkins Coie LLP*

/s/ Eugene K. Pettis
Eugene K. Pettis (Fla. Bar #508454)
Debbie P. Klauber (Fla. Bar #55646)
HALICZER, PETTIS & SCHWAMM
One Financial Plaza
100 S.E. 3rd Ave., Seventh Floor
Fort Lauderdale, FL 33394
Tel:  (954) 523-9922

/s/ Reid J. Schar
Reid J. Schar (pro hac vice)
April A. Otterberg (pro hac vice)
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
Tel:  (312) 222-9350

*Attorneys for Defendant Marc Elias*

/s/ Roberto Martínez
Roberto Martínez (Florida Bar No. 305596)
Zachary Lipschultz (Florida Bar No. 123594)
COLSON, HICKS, EIDSON, P.A.
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
(305) 476-7400
bob@colson.com
zach@colson.com

/s/ Sean M. Berkowitz
Sean M. Berkowitz (pro hac vice)
LATHAM & WATKINS LLP
330 N. Wabash, Suite 2800
Chicago, IL 60611
(312) 876-7700
sean.berkowitz@lw.com

/s/ Stephen P. Barry
Stephen P. Barry (pro hac vice)
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200
stephen.barry@lw.com

/s/ Michael F. Houlihan
Michael F. Houlihan (pro hac vice)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
(617) 880-4642
michael.houlihan@lw.com

*Attorneys for Defendant Michael Sussmann*

/s/ Jonathan Edward Levine
Jonathan Edward Levine (FBN 937711)
Levine & Associates, PLLC
5311 Lee Highway
Arlington, VA 22207
Tel. (703) 525-2669

/s/ George R.A. Doumar
George R.A. Doumar (pro hac vice)
Mahdavi, Bacon, Halfhill & Young PLLC
11350 Random Hills Road, Suite 700
Fairfax, VA 22030
Tel. (703) 352-1300

*Attorneys for Charles Halliday Dolan, Jr.*

/s/ Brian L. Stekloff
Brian L. Stekloff (pro hac vice)
Sarah E. Neuman (pro hac vice)
WILKINSON STEKLOFF LLP
2001 M Street, NW, 10th Floor
Washington, DC 20036
Tel: (202) 847-4000
bstekloff@wilkinsonstekloff.com
sneuman@wilkinsonstekloff.com

/s/ William R. Barzee
William R. Barzee (Florida Bar No. 158720)
BARZEE FLORES
Courthouse Center, Penthouse One
40 NW Third Street
Miami, FL 33128
Tel: (305) 374–3998
williambarzee@barzeeflores.com

*Attorneys for Defendant Jake Sullivan*

/s/ Andrew J. Ceresney
DEBEVOISE & PLIMPTON LLP
Andrew J. Ceresney (pro hac vice)
Wendy B. Reilly (pro hac vice)
Isabela M. Garcez (pro hac vice)
919 Third Avenue
New York, NY 10022
Tel:  (212) 909-6000
aceresney@debevoise.com
wbreilly@debevoise.com
imgarcez@debevoise.com

/s/ William R. Barzee
William R. Barzee (Florida Bar No. 158720)
BARZEE FLORES
Courthouse Center, Penthouse One
40 NW Third Street
Miami, FL 33128
Tel:  (305) 374–3998
williambarzee@barzeeflores.com

*Attorneys for Defendant Robert E. Mook*

/s/ Adam S. Fels
Adam S. Fels
FRIDMAN FELS & SOTO PLLC
2525 Ponce de Leon Blvd., Suite 750
Coral Gables, FL 33134
Tel:  305-569-7701
afels@ffslawfirm.com

/s/ Joshua A. Levy
Joshua A. Levy (pro hac vice)
Rachel Clattenburg (pro hac vice)
Kevin P. Crenny (pro hac vice)
LEVY FIRESTONE MUSE LLP
900 17th St. NW, Suite 1200
Washington, D.C. 20006
Tel:  202-845-3215
Fax:  202-595-8253
jal@levyfirestone.com
rmc@levyfirestone.com
kcrenny@levyfirestone.com

*Attorneys for Defendants Fusion GPS, Peter Fritsch, and Glenn Simpson*

/s/ Joshua Berman
Joshua Berman
CLIFFORD CHANCE US LLP
2011 K Street, NW
Washington, D.C.  20006
Tel. (202) 912-5000
Fax (202) 912-6000
Joshua.Berman@CliffordChance.com

/s/ Adam Fels
Adam Fels (Florida Bar No. 0114917)
FRIDMAN FELS & SOTO, PLLC
2525 Ponce de Leon Blvd., Suite 750
Coral Gables, FL  33134
Tel. (305) 569-7701
Afels@ffslawfirm.com

/s/ Benjamin Peacock
Benjamin Peacock
CLIFFORD CHANCE US LLP
New York, New York 10019
Tel. (212) 878-8000
Fax (212) 878-8375
Benjamin.Peacock@CliffordChance.com

*Attorneys for Bruce Ohr and Nellie Ohr*

51

/s/ Franklin Monsour Jr.
Franklin Monsour Jr. (pro hac vice)
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
Tel: (212) 506-3512
Fax: (212) 506-5151
fmonsour@orrick.com

/s/ Diana Marie Fassbender
Diana Marie Fassbender (Fla Bar ID #17095)
ORRICK, HERRINGTON & SUTCLIFFE LLP
1152 15th Street N.W.
Washington, DC  20005-1706
Tel:  (202) 339-88533
Fax:  (202) 339-8500
dszego@orrick.com

*Attorneys for Igor Danchenko*

/s/ Samantha L. Southall
Samantha L. Southall (pro hac vice)
Pennsylvania Bar No. 80709
BUCHANAN INGERSOLL & ROONEY PC
50 S. 16th Street, Suite 3200
Philadelphia, PA 19102
Tel: (215) 665 8700
Fax (215) 667 8760
samantha.southall@bipc.com

/s/ Jennifer Olmedo Rodriguez
Jennifer Olmedo Rodriguez (Florida Bar No.
605158)
BUCHANAN INGERSOLL & ROONEY PC
2 South Biscayne Blvd., Suite 1500
Miami, Florida 33131
Tel:  (305) 347 4080
Fax:  (305) 347 4089
jennifer.olmedo-rodriguez@bipc.com

*Attorneys for Defendant Neustar, Inc.*

/s/ John M. McNichols
John M. McNichols (pro hac vice)
Allison S. Eisen (pro hac vice)
Kathryn E. Garza (pro hac vice)
WILLIAMS & CONNOLLY LLP
680 Maine Ave, S.W.
Washington, D.C. 20024
Telephone:  (202) 434-5000
Fax:  (202) 434-5029
jmcnichols@wc.com

/s/ James E. Gillenwater
James E. Gillenwater (Bar No. 1013518)
GREENBERG TRAURIG P.A.
333 SE 2nd Ave., Suite 4400
Miami, FL 33131
Telephone:  (305) 579-0500
Fax:  (305) 579-0717
gillenwaterj@gtlaw.com

*Attorneys for Neustar Security Services*

/s/ Edward Soto
Edward Soto (FBN 0265144)
WEIL GOTSHAL & MANGES LLP
1395 Brickell Avenue, Suite 1200
Miami, FL 33131
Telephone:  (305) 577-3100
Facsimile:  (305) 374-7159

/s/ Steven A. Tyrrell
Steven A. Tyrrell (pro hac vice)
WEIL GOTSHAL & MANGES LLP
2001 M Street, N.W., Suite 600
Washington, D.C. 20036
Telephone:  (202) 682-7000
Facsimile:  (202) 857-0940

*Attorneys for Rodney Joffe*

## APPENDIX

### Claims Asserted Against Each Defendant

| Claim | Defendants |
|---|---|
| RICO (Count I) | Clinton, Clinton Campaign, DNC, Perkins Coie, Elias, Sussmann, Fusion GPS, and Joffe |
| RICO Conspiracy (Count II) | Clinton, Clinton Campaign, DNC, Perkins Coie, Sussmann, Dolan, Sullivan, Podesta, Mook, Reines, Elias, Fusion GPS, Simpson, Fritsch, Nellie Ohr, Bruce Ohr, Orbis Ltd., Steele, Danchenko, Neustar, Inc., Neustar Security Services, and Joffe |
| Injurious Falsehood (Count III) | Clinton, Sullivan, Schultz, Schiff, Danchenko, Sussmann, and Steele |
| Conspiracy to Commit Injurious Falsehood (Count IV) | Clinton, Clinton Campaign, DNC, Perkins Coie, Sussmann, Dolan, Sullivan, Podesta, Mook, Reines, Elias, Fusion GPS, Simpson, Fritsch, Nellie Ohr, Bruce Ohr, Orbis Ltd., Steele, Danchenko, Neustar, Inc., Neustar Security Services, and Joffe |
| Malicious Prosecution (Count V) | Sussmann, Elias, Danchenko, Fritsch, Simpson, Nellie Ohr, Steele, Joffe, Comey, Rosenstein, McCabe, Strzok, Page, and Clinesmith |
| Conspiracy to Commit Malicious Prosecution (Count VI) | Clinton, Sussmann, Schultz, Dolan, Sullivan, Elias, Simpson, Fritsch, Steele, Ohr, Danchenko, Joffe, Podesta, Mook, Reines, Comey, McCabe, Rosenstein, Strzok, Page, and Clinesmith |
| Computer Fraud and Abuse Act (Count VII) | Neustar, Inc., Neustar Security Services, Joffe, DNC, Clinton Campaign, Clinton, Perkins Coie, and Sussmann |
| Theft of Trade Secrets (Count VIII) | Neustar, Inc., Neustar Security Services, Joffe, Perkins Coie, Sussmann, Clinton Campaign, DNC, and Clinton |
| Stored Communications Act (Count IX) | Neustar, Inc. and/or Neustar Security Services, and Joffe |
| Agency (Count X) | Clinton |
| Respondeat Superior/Vicarious Liability (Count XI) | Perkins Coie LLP |
| Respondeat Superior/Vicarious Liability (Count XII) | DNC |

| Claim | Defendants |
|---|---|
| Respondeat Superior/Vicarious Liability (Count XIII) | Clinton Campaign |
| Respondeat Superior/Vicarious Liability (Count XIV) | Fusion GPS |
| Respondeat Superior/Vicarious Liability (Count XV) | Orbis Business Intelligence Ltd. |
| Respondeat Superior/Vicarious Liability (Count XVI) | Neustar, Inc and/or Neustar Security Services |

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of July, 2022, I caused a copy of the foregoing Memorandum of Law in Support of Defendants' Motion to Dismiss to be served on all counsel of record via CM/ECF.  All parties required to be served have been served.

 */s/ David Oscar Markus*
David Oscar Markus