# Exhibit 1

**REDACTED FOR PUBLIC RELEASE**



# Office of the Inspector General
## U.S. Department of Justice

**OVERSIGHT ★ INTEGRITY ★ GUIDANCE**



# Review of Four FISA Applications and Other Aspects of the FBI's Crossfire Hurricane Investigation

Oversight and Review Division 20-012                    December 2019 (Revised)

**REDACTED FOR PUBLIC RELEASE**

# NOTICE

This report was originally issued on December 9, 2019.  The report was updated on December 11 and December 20, 2019, with the following changes (page references are to the public version of the report):

- On pages iv, xvi, 400, and 407, we changed the phrase "before and after" to "both during and after the time."  In all instances, the phrase appears in connection to the time period during which we found that the Crossfire Hurricane team used Confidential Human Sources (CHSs) to interact and consensually record conversations with Page and Papadopoulos.  The corrected information appearing in this updated report reflects the accurate information concerning these time periods that previously appeared, and still appears, on pages 305 and 313 (*e.g.,* the statement on page 305 that "the Crossfire Hurricane team tasked CHSs to interact with Page and Papadopoulos both during the time Page and Papadopoulos were advisors to the Trump campaign, and after Page and Papadopoulos were no longer affiliated with the Trump campaign").

- On pages ix, 164, 165, 214, and 364 we removed redactions of certain information related to Person 1.  We also removed redactions throughout the report related to the dates the Carter Page FISA applications were filed and the dates FISA authority expired for each application.  These changes to previously-redacted text were made in response to subsequent decisions made by the Department of Justice and the FBI about the classification of the underlying information.  *See* page 14, footnote 24.

- On pages xi, 242, 368, and 370, we changed the phrase "had no discussion" to "did not recall any discussion or mention."  On page 242, we also changed the phrase "made no mention at all of" to "did not recall any discussion or mention of."  On page 370, we also changed the word "assertion" to "statement," and the words "and Person 1 had no discussion at all regarding WikiLeaks directly contradicted" to "did not recall any discussion or mention of WikiLeaks during the telephone call was inconsistent with."  In all instances, this phrase appears in connection with statements that Steele's Primary Sub-source made to the FBI during a January 2017 interview about information he provided to Steele that appeared in Steele's election reports.  The corrected information appearing in this updated report reflects the accurate characterization of the Primary Sub-source's account to the FBI that previously appeared, and still appears, on page 191, stating that "[the Primary Sub-Source] did not recall any discussion or mention of Wiki[L]eaks."

- On page 57, we added the specific provision of the United States Code where the Foreign Agents Registration Act (FARA) is codified, and revised a footnote in order to reference prior OIG work examining the Department's enforcement and administration of FARA.

- On page 413, we changed the word, "three" to "second and third."  The corrected information appearing in this updated report reflects the accurate description of the Carter Page FISA applications that did not contain the information the FBI obtained from Steele's Primary Sub-source in January 2017 that raised significant questions about the reliability of the Steele reporting.  This information previously appeared, and still appears, accurately on pages xi, xiii, 368, and 372.

# TABLE OF CONTENTS

CHAPTER ONE:  INTRODUCTION ........................................................................ 1

I.      Background and Overview ............................................................... 1

II.     Prior OIG Reports on FISA and Related Issues ........................... 9

III.    Methodology ................................................................................. 11

IV.     Structure of the Report............................................................... 14

CHAPTER TWO:  APPLICABLE LAWS AND DEPARTMENT AND FBI POLICIES ......... 16

I.      FBI Counterintelligence Investigations .................................... 16

        A.      Predicated Investigations ............................................. 19

        B.      Sensitive Investigative Matters (SIM) .......................... 21

II.     Department and FBI Policies Governing the Use of Confidential Human
        Sources (CHS)............................................................................... 22

        A.      Risk Management Issues Related to CHSs.................... 22

        B.      Documenting CHS Activities ......................................... 25

        C.      Validation Process for CHSs.......................................... 26

        D.      Closure and Re-Opening of CHSs ................................. 28

        E.      Use of CHSs in Sensitive Monitoring Circumstances......................... 29

        F.      Use of CHS Reporting in FISA Applications ................... 30

III.    The Foreign Intelligence Surveillance Act (FISA) ..................... 31

        A.      Statutory Requirements and the Foreign Intelligence Surveillance
                Court.................................................................................... 31

        B.      FBI and Department FISA Procedures............................ 39

                1.      Preparation and Approval of FISA Applications..................... 39
                2.      "Woods Procedures"............................................................ 42

IV.     Ethics Regulations................................................................... 45

V.      Examples of Other Department and FBI Policies Regulating Investigative
        Activity that Could Potentially Impact Civil Liberties ................. 46

        A.      Undisclosed Participation ............................................ 46

        B.      Investigative Activities Concerning Members of the News Media,
                White House and Executive Branch Personnel, and Members of
                Congress ......................................................................... 47

|   |   | 1. | Members of the News Media | 47 |
|   |   | 2. | White House and Executive Branch Personnel | 48 |
|   |   | 3. | Members of Congress and Their Staff | 48 |

**CHAPTER THREE: THE OPENING OF CROSSFIRE HURRICANE, STAFFING, AND THE EARLY STAGES OF THE INVESTIGATION** ........................................ 49

I. Intelligence Community Awareness of Attempted Russian Interference in the 2016 U.S. Elections ........................................................ 49

II. The Friendly Foreign Government Information and the FBI's Decision to Open Crossfire Hurricane and Four Related Counterintelligence Investigations .................................................................. 50

    A. Receipt of Information from the Friendly Foreign Government and the Opening of Crossfire Hurricane .................................... 51

    B. The FBI Opens Counterintelligence Investigations on Papadopoulos, Carter Page, Manafort, and Flynn .................................... 59

    C. The Pre-Existing FBI New York Field Office Counterintelligence Investigation of Carter Page .......................................... 61

III. Organization and Oversight of the Crossfire Hurricane Investigation ......... 63

    A. FBI Staffing of the Crossfire Hurricane Investigation .................. 64

        1. The Management and Structure of the Crossfire Hurricane Team ............................................................. 64

        2. The Role of Peter Strzok and Lisa Page in Crossfire Hurricane and Relevant Text Messages .................................... 66

    B. The Role of Senior FBI and Department Leadership in the Crossfire Hurricane Investigation ............................................. 68

        1. FBI Leadership ................................................. 68
        2. Department of Justice .......................................... 69
        3. White House Briefings ......................................... 76

IV. Investigative Steps in Crossfire Hurricane Prior to Receipt of Christopher Steele Reporting on September 19 ........................................... 77

**CHAPTER FOUR: THE FBI'S RECEIPT AND EVALUATION OF INFORMATION FROM CHRISTOPHER STEELE PRIOR TO THE FIRST FISA APPLICATION** ............. 84

I. Steele and His Assistance to the FBI Prior to June 2016 ........................ 84

    A. Introduction to Handling Agent 1 and Early Assistance ................ 84

    B. The FBI Opens Steele as a CHS in October 2013 ..................... 86

    C. Steele's Work for the FBI During 2014-2015 ......................... 90

II. Steele Provides the FBI with Election Reporting in 2016 ....................... 93

A. Steele's Engagement by Fusion GPS in June 2016 ........................... 93

B. Steele Informs Handling Agent 1 in July 2016 about his Election Reporting Work ......................................................... 95

C. The Crossfire Hurricane Team Receives Steele's Reports on September 19 ......................................................... 98

D. The Crossfire Hurricane Team's Initial Handling of the Steele Reporting in September 2016.....................................101

E. Steele Discusses His Reporting with Third Parties in Late September 2016 and the *Yahoo News* Article.................................104

F. The FBI's Early October Meeting with Steele.................................108

G. FBI Disclosures to Steele during the Early October Meeting ...........114

H. Steele's Reporting to the FBI Following the Early October Meeting and Continuing Media Contacts...................................116

CHAPTER FIVE: THE FIRST APPLICATION FOR FISA AUTHORITY ON CARTER PAGE........................................................................121

I. Decision to Seek FISA Authority...........................................121

A. Early Consideration of a Potential FISA .......................................121

B. The FBI's Submission of a FISA Request Following Receipt of the Steele Reporting ......................................................124

II. Preparation and Approval of the First FISA Application............................128

A. Initial Drafts...........................................................128

B. Review and Approval Process ...................................................133

1. Initial Feedback and NSD Concerns over Steele's Potential Motivation and Bias.......................................................134

2. FBI Leadership Supports Moving Forward with the FISA Application and OI Drafts Additional Disclosures Concerning Steele .........................................................139

3. Other Substantive Changes to the Application before ODAG Review .......................................................144

4. October Meeting between Page and an FBI CHS..................146

5. Feedback from ODAG and Submission of the Read Copy .......147

III. Feedback from the FISC on the Read Copy, Completion of the Woods Procedures, and Final Briefing and Signatures .......................................150

A. Feedback from the FISC and Revisions to the Application...............150

B. The FBI's Completion of the Factual Accuracy Review ("Woods Procedures") ..........................................................151

C. FBI Director's Certification .......................................................153

       D.    DAG Oral Briefing and Approval ...................................................154

       E.    Final Orders .............................................................................156

IV.   Inaccurate, Incomplete, or Undocumented Information in the First FISA Application ....................................................................................................156

       A.    Information about Page's Prior Relationship with Another U.S. Government Agency and Information Page Provided to the Other Agency that Overlapped with Facts Asserted in the FISA Application .............................................................................157

       B.    Source Characterization Statement .............................................160

       C.    Information about a Steele Sub-Source Relied Upon in the FISA Application (Person 1) .............................................................163

       D.    September 23 Media Disclosure ..................................................165

       E.    Papadopoulos's Denials to an FBI CHS in September 2016 .............166

       F.    Carter Page's Denials to an FBI CHS in August and October 2016 ...168

CHAPTER SIX:  FBI ACTIVITIES INVOLVING CHRISTOPHER STEELE AFTER THE FIRST FISA AND FBI EFFORTS TO ASSESS STEELE'S ELECTION REPORTING.....................................................................................................172

I.     Steele's Briefing to *Mother Jones* and the FBI's Closure of Steele as a CHS in November 2016.........................................................................172

II.    The FBI Receives Additional Steele Reporting Post-Election .....................175

III.   The FBI Disseminates the Steele Reporting to the U.S. Intelligence Community and Seeks to Have It Included in the January 2017 Intelligence Community Assessment.....................................................177

IV.   FBI Validation Efforts Following Steele's Closure as a CHS.......................182

       A.    Information from Persons with Direct Knowledge of Steele's Work-Related Performance in a Prior Position.......................................182

       B.    The FBI's Human Source Validation Review of Steele in March 2017 ......................................................................................183

       C.    The FBI Identifies and Interviews the Primary Sub-Source in Early 2017 ......................................................................................186

       D.    The FBI Obtains Additional Information about the Reliability of Steele's Reporting after FISA Renewal Application No. 3 ...............190

       E.    Crossfire Hurricane Team's Assessment of Potential Russian Influence on the Steele Election Reporting ...................................193

V.    The FBI's Efforts to Assess Steele's Election Reporting in 2016 and 2017 ............................................................................................195

CHAPTER SEVEN: THE THREE RENEWAL APPLICATIONS FOR CONTINUED FISA AUTHORITYON CARTER PAGE ............................................................197

I.    FISA Renewal Application No. 1 (January 12, 2017) ...............197

      A.    Investigative Developments and Decision to Seek Renewal ............198

      B.    Preparation and Approval of Renewal Application No. 1..................199

            1.    Draft Renewal Application ................................199
            2.    Review and Approval Process ...........................204
            3.    Feedback from the FISC, Completion of the Final Renewal Application and Woods Procedures, and Final Legal Review ...207
            4.    FBI Director's Certification ..............................208
            5.    DAG Oral Briefing and Approval ........................209
            6.    Final Orders ................................................209

II.   FISA Renewal Application No. 2 (April 7, 2017)....................210

      A.    Case Reorganization, Investigative Developments, and Decision to Seek Renewal.....................................................210

      B.    Preparation and Approval of Renewal Application No. 2..................212

            1.    Draft Renewal Application ................................212
            2.    Review and Approval Process ...........................215
            3.    Feedback from the FISC, Completion of the Final Renewal Application and Woods Procedures, and Final Legal Review ...216
            4.    FBI Director's Certification ..............................218
            5.    Oral Briefing and Approval ..............................218
            6.    Final Orders ................................................219

III.  FISA Renewal Application No. 3 (June 29, 2017)....................219

      A.    Investigative Developments and Decision to Seek FISA Renewal.....219

      B.    Preparation and Approval of Renewal Application No. 3..................220

            1.    Draft Renewal Application ................................220
            2.    Review and Approval Process ...........................224
            3.    Feedback from the FISC, Completion of the Final Renewal Application and Woods Procedures, and FBI Director Certification ...............................................224
            4.    DAG Oral Briefing and Approval ........................226
            5.    Final Orders ................................................227

CHAPTER EIGHT: MISSTATEMENTS, OMISSIONS, AND ERRORS IN THE FISA RENEWAL APPLICATIONS.....................................................229

I.    Omissions in the FISA Applications, as NSD Reported to the FISC in July 2018 ...........................................................................230

      A.    Papadopoulos's Denials to FBI Confidential Human Sources............232

    B.    Information the FBI Received From Bruce Ohr Concerning Steele and His Reporting ........................................................................233

    C.    Inaccuracies Regarding Steele's Disclosures to Third Parties and Admissions Concerning Steele's *Yahoo News* Contact ....................238

II.   Other Inaccurate, Incomplete, or Undocumented Information in the Three FISA Renewal Applications ....................................................................240

    A.    Inconsistencies between Steele's Reporting and Information His Primary Sub-source Provided to the FBI........................................241

    B.    Information about Page's Prior Relationship with Another U.S. Government Agency and Information Page Provided the Other Agency that Overlapped with Facts Asserted in the FISA Applications ...........................................................................247

          1.    June 15, 2017—FBI OGC Attorney Requests Information about Page from Other U.S. Government Agency................249
          2.    June 16, 2017—FBI OGC Attorney Provides the Liaison's Response to the OI Attorney ...........................................251
          3.    June 19, 2017—FBI OGC Attorney Provides SSA 2 with Inaccurate Information....................................................252

    C.    Information Concerning Steele's Past Work-Related Performance....256

    D.    Information Regarding Steele Reporting's Ties to the Democratic Party, the Democratic National Committee, and the Hillary Clinton Campaign ..............................................................................258

    E.    FBI's Source Validation Report Concerning Steele ........................261

    F.    Joseph Mifsud's Denials to the FBI .............................................262

    G.    Carter Page's Alleged Role in Changing the Republican Platform on Russia's Annexation of Ukraine ..................................................263

CHAPTER NINE: DEPARTMENT ATTORNEY BRUCE OHR'S ACTIVITIES DURING THE CROSSFIRE HURRICANE INVESTIGATION......................................268

I.   Bruce Ohr's Background......................................................................268

    A.    Department Positions and Responsibilities....................................268

    B.    Ohr's Relationship with Steele and Glenn Simpson ........................269

          1.    Ohr's Relationship with Steele from 2007 to March 2016 ......269
          2.    Ohr's Relationship with Simpson .......................................270

    C.    Nellie Ohr's Relationship with Steele and Work for Fusion GPS........271

II.   Ohr's Communications with Steele, Simpson, and the FBI in 2016 and 2017 ...............................................................................................271

    A.    Ohr's 2016 Contacts with Steele and Simpson Regarding Russian Issues ...................................................................................272

|   |   | 1. | Ohr's July 30, 2016 Meeting with Steele ...............................272 |
|---|---|---|---|
|   |   | 2. | Ohr's August 22, 2016 Meeting with Simpson.......................274 |
|   |   | 3. | Ohr's September 23, 2016 Meeting with Steele ....................274 |
|   |   | 4. | Ohr's Early October 2016 Activities Regarding Steele's Information.......................................................................275 |
|   |   | 5. | Ohr's October 18-19, 2016 Communications with Steele and Meeting with McCabe and Lisa Page .....................................276 |
|   |   | 6. | Ohr's November 2016 Communications with the FBI and State Department Regarding Steele .....................................278 |
|   |   | 7. | Ohr's December 2016 Meetings with the FBI and Simpson ....281 |

B.  Ohr's Continued Contacts with Steele and Simpson from January to November 2017........................................................................283

C.  Ohr's Lack of Notification to ODAG, NSD, and Others Regarding His Contacts with Steele, Simpson, and the FBI ..................................284

III.  The FBI's Understanding of Its Relationship and Communications with Ohr .................................................................................................286

A.  The Crossfire Hurricane Team's Understanding of Ohr's Activities Related to the Investigation ........................................................286

B.  FBI Management's Knowledge of Ohr's Activities............................288

IV.  Ohr's Activities Relating to the Criminal Division's Manafort Investigation..291

A.  November 2016 to December 2016..............................................291

B.  January 31 and February 1, 2017 Meetings ..................................295

V.  Ohr's Removal from ODAG and OCDETF..............................................298

A.  ODAG's Communication Expectations and Lack of Knowledge of Ohr's Activities ........................................................................298

B.  Ohr Provides Rosenstein with Limited Information about His Connection with Steele and Fusion GPS ......................................301

C.  ODAG Learns of Ohr's Activities in Connection to the Russian Investigation and Transfers Ohr...................................................302

CHAPTER TEN:  THE USE OF OTHER CONFIDENTIAL HUMAN SOURCES AND UNDERCOVER EMPLOYEES IN CROSSFIRE HURRICANE...........................305

I.  Methodology ..................................................................................306

II.  Background.....................................................................................307

III.  Strategy and Planning for Use of CHSs and UCEs in the Crossfire Hurricane Investigation.....................................................................308

A.  Strategy for Use of CHSs and UCEs in Crossfire Hurricane.............308

B.  Planning for Operations Involving CHSs and UCEs.........................309

        C.      Absence of FBI CHSs Inside the Trump Campaign ..........................311

IV.    Use of CHSs and UCEs in the Crossfire Hurricane Investigation ...............312

        A.      No CHSs and UCEs Used Prior to the Opening of the Crossfire
               Hurricane Investigation .............................................................312

        B.      CHS and UCE Involvement in Crossfire Hurricane...........................313

               1.      Source 2.........................................................................313
               2.      Source 3.........................................................................333

        B.      Other CHSs Who Were Not Tasked As Part of Crossfire Hurricane....336

V.     ODNI Strategic Intelligence Briefing Provided to Candidate Trump, Flynn,
       and Another Trump Campaign Advisor.................................................340

CHAPTER ELEVEN:  ANALYSIS .....................................................................345

I.      The Opening of Crossfire Hurricane and Four Related Counterintelligence
       Investigations.................................................................................346

        A.      Authorized Purpose .................................................................347

        B.      Factual Predication...................................................................350

        C.      Sensitive Investigative Matters (SIMs).........................................352

        D.      Staffing of Investigation ...........................................................354

        E.      Least Intrusive Investigative Techniques......................................355

II.     The FISA Applications .........................................................................357

        A.      The Role of the Steele Election Reporting in the Applications ..........359

        B.      Inaccurate, Incomplete, or Undocumented Information in the FISA
               Applications ...........................................................................361

                1.      The First FISA Application ..................................................363
               2.      The Three Renewal Applications.........................................368
               3.      Failures in the Woods Process ...........................................373

        C.      Conclusions Regarding the FISA Applications.................................375

                1.      The Failure to Share Relevant Factual Information with OI,
                    the Department's Decision Makers, and the Court, and Other
                    FISA Related Errors..........................................................375
                2.      Failure of Managers and Supervisors, including Senior
                    Officials, in the Chain of Command ....................................378
                3.      Clarification Regarding OGC Legal Review During the Woods
                    Process.........................................................................380

III.    The FBI's Relationship with Christopher Steele and Its Receipt and Use of
       His Election Reporting.......................................................................380

        A.      The FBI's Receipt, Use, and Assessment of Steele's Reporting ........382

B.    The Lack of Agreement on Steele's Status as an FBI CHS and its Effect on the Crossfire Hurricane Team's Relationship with Steele ...386

IV.   Issues Relating to Department Attorney Bruce Ohr..................................390

A.    Bruce Ohr's Interactions with Steele, Simpson, the State Department, and the FBI ...........................................................392

B.    FBI Interactions with Ohr Concerning Steele and Simpson .............394

C.    Ethics Issues Raised by Nellie Ohr's Former Employment with Fusion GPS ................................................................396

D.    Meetings Involving Ohr, CRM officials, and the FBI Regarding the MLARS Investigation ................................................397

V.    The Use of Other Confidential Human Sources and Undercover Employees and Compliance with Applicable Policies...............................................399

E.    Use of CHSs and UCEs.............................................................401

F.    Compliance with FBI Policies ....................................................403

G.    Participation in ODNI Strategic Intelligence Briefing .....................407

CHAPTER TWELVE:  CONCLUSIONS AND RECOMMENDATIONS .........................410

I.    Conclusions..........................................................................410

II.   Recommendations...................................................................414

APPENDIX 1:  WOODS PROCEDURES..........................................................418

APPENDIX 2:  FBI'S RESPONSE.................................................................424

# CHAPTER ONE
# INTRODUCTION

## I.    Background and Overview

The Department of Justice (Department) Office of the Inspector General (OIG) undertook this review to examine certain actions by the Federal Bureau of Investigation (FBI) and the Department during an FBI investigation into whether individuals associated with the Donald J. Trump for President Campaign were coordinating, wittingly or unwittingly, with the Russian government.  The FBI's counterintelligence investigation, known as "Crossfire Hurricane," was opened on July 31, 2016, weeks after the Republican National Convention (RNC) formally nominated Trump as its candidate for President, and several months before the November 8, 2016 elections, through which Trump was elected President of the United States.  On May 17, 2017, the Crossfire Hurricane investigation was transferred from the FBI to the Office of Special Counsel upon the appointment of Special Counsel Robert S. Mueller III to investigate Russian interference with the 2016 presidential election and related matters.

The FBI opened Crossfire Hurricane in July 2016 following the receipt of certain information from a Friendly Foreign Government (FFG).  According to the information provided by the FFG, in May 2016, a Trump campaign foreign policy advisor, George Papadopoulos, "suggested" to an FFG official that the Trump campaign had received "some kind of suggestion" from Russia that it could assist with the anonymous release of information that would be damaging to Hillary Clinton (Trump's opponent in the presidential election) and President Barack Obama.  At the time the FBI received the FFG information, the U.S. Intelligence Community (USIC), which includes the FBI, was aware of Russian efforts to interfere with the 2016 U.S. elections, including efforts to infiltrate servers and steal emails belonging to the Democratic National Committee (DNC) and the Democratic Congressional Campaign Committee.  The FFG shared this information with the State Department on July 26, 2016, after the internet site WikiLeaks began releasing emails hacked from computers belonging to the DNC and Clinton's campaign manager.  The State Department advised the FBI of the information the next day.

Crossfire Hurricane was opened several weeks after the FBI's July 5, 2016 conclusion of its "Midyear Exam" investigation into Clinton's handling of government emails during her tenure as Secretary of State.[1]  Some of the same FBI officials, supervisors, and attorneys responsible for the Midyear investigation were assigned to the newly opened Crossfire Hurricane investigation, but there was almost no

---

[1] *See* U.S. Department of Justice (DOJ) Office of the Inspector General (OIG), *A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election*, Oversight and Review Division Report 18-04 (June 2018), https://www.justice.gov/file/1071991/download (accessed November 12, 2019), 2 (hereinafter *Review of Various Actions in Advance of the 2016 Election*).

overlap between the FBI agents and analysts assigned to the Midyear and Crossfire Hurricane investigations.

The FBI opened Crossfire Hurricane as an umbrella counterintelligence investigation, without identifying any specific subjects or targets. FBI officials told us that they did not immediately identify subjects or targets because it was unclear from the FFG information who within the Trump campaign may have received the reported offer of assistance and might be coordinating, wittingly or unwittingly, with the Russian government. By August 10, 2016, the FBI had assembled an investigative team of special agents, analysts, and supervisory special agents (the Crossfire Hurricane team) and conducted an initial analysis of links between Trump campaign members and Russia. Based upon this analysis, the FBI opened individual cases under the Crossfire Hurricane umbrella on three U.S. persons—Papadopoulos, Carter Page, and Paul Manafort—all of whom were affiliated with the Trump campaign at the time the cases were opened.[2] On August 16, 2016, the FBI opened a fourth individual case under Crossfire Hurricane on Michael Flynn, who was serving at the time as the Trump campaign's National Security Advisor.[3]

Two of the four Crossfire Hurricane subjects were already the subjects of other existing federal investigations. Carter Page was the subject of an ongoing counterintelligence investigation opened by the FBI's New York Field Office (NYFO) on April 4, 2016, relating to his contacts with suspected Russian intelligence officers. Manafort was the subject of an ongoing criminal investigation, supervised by the Money Laundering and Asset Recovery Section (MLARS) in the Department's Criminal Division, concerning millions of dollars Manafort allegedly received from the government of Ukraine.[4]

---

[2] According to public reporting, Carter Page ceased being associated with the Trump campaign as of September 26, 2016, and Manafort resigned as of August 19, 2016. As noted in Chapter Ten, accounts vary as to when Papadopoulos left the Trump campaign; according to The Special Counsel's *Report on the Investigation into Russian Interference with the 2016 Presidential Election*, Papadopoulos was dismissed from the campaign in early October 2016. *See* Special Counsel Robert S. Mueller III, *Report on the Investigation Into Russian Interference in the 2016 Presidential Election*, Vol. I (March 2019), 93 (hereinafter *The Special Counsel's Report*).

[3] Flynn remained on the Trump campaign through the election and was subsequently appointed as National Security Advisor. Flynn resigned that position on February 13, 2017. Papadopoulos, Manafort, and Flynn were later indicted in federal district court for crimes prosecuted by the Special Counsel. On October 5, 2017, and December 1, 2017, respectively, Papadopoulos and Flynn pleaded guilty to making material false statements and material omissions during interviews with the FBI. On August 21, 2018, Manafort was convicted after trial on tax and bank fraud charges, and on September 14, 2018, pleaded guilty to charges of conspiracy against the United States and conspiracy to obstruct justice.

The indictments and sentencing documents are publicly available and therefore we refer to these individuals by name in this report. We also refer to Carter Page by name in this report because the Department publicly released, in response to Freedom of Information Act (FOIA) requests, redacted versions of the Foreign Intelligence Surveillance Act (FISA) applications and orders that name him.

[4] Prior to January 2017, MLARS was named the Asset Forfeiture and Money Laundering Section.

Some of the early investigative steps taken by the Crossfire Hurricane team immediately after opening the investigation were to develop profiles on each subject; send names of, among others, individuals associated with the Trump campaign to other U.S. government intelligence agencies for any further information; and review FBI files for potential FBI Confidential Human Sources (CHSs) who might be able to assist the investigation. FBI witnesses we interviewed told us they believed that using CHSs in covert operations would be an efficient way to develop a better understanding of the information received from the FFG. We determined that the Crossfire Hurricane team tasked several CHSs and Undercover Employees (UCEs) during the 2016 presidential campaign, which resulted in interactions with Carter Page, Papadopoulos, and a high-level Trump campaign official who was not a subject of the investigation. All of these interactions were consensually monitored and recorded by the FBI. The interactions between CHSs and Page and Papadopoulos occurred both during the time Page and Papadopoulos were advisors to the Trump campaign, and after Page and Papadopoulos were no longer affiliated with the Trump campaign. We also learned that in August 2016, a supervisor of the Crossfire Hurricane investigation participated on behalf of the FBI in a strategic intelligence briefing given by the Office of the Director of National Intelligence (ODNI) to candidate Trump and his national security advisors, including investigative subject Flynn, and also participated in a separate strategic intelligence briefing given to candidate Clinton and her national security advisors. The FBI viewed the briefing of candidate Trump and his advisors as a possible opportunity to collect information potentially relevant to the Crossfire Hurricane and Flynn investigations. The supervisor memorialized the results of the briefing in an official FBI document, including instances where he was engaged by Trump and Flynn, as well as anything he considered related to the FBI or pertinent to the Crossfire Hurricane investigation. The supervisor did not memorialize the results of the briefing of candidate Clinton and her advisors.

An early investigative step considered but not initially taken by the Crossfire Hurricane team was to seek court orders under the Foreign Intelligence Surveillance Act (FISA) authorizing surveillance of Page and Papadopoulos. The U.S. Foreign Intelligence Surveillance Court (FISC) may approve FISA surveillance of an American citizen for a period of up to 90 days, subject to renewal, if the government's FISA application establishes probable cause to believe that the targeted individual is an agent of a foreign power by knowingly engaging in at least one of the five activities enumerated in the FISA statute.[5] The Crossfire Hurricane team initially considered seeking FISA surveillance of Papadopoulos as a result of his statement to the FFG and of Page based upon information the FBI had collected about his prior and more recent contacts with known and suspected Russian intelligence officers, as well as Page's financial, political, and business ties to the

---

[5] *See* 50 U.S.C. §§ 1801(b)(2)(A) through (E). In the case of the Carter Page FISA applications, the government relied upon the definition of an agent of a foreign power in Section 1801(b)(2)(E), which covers, among other things, any person who knowingly aids or abets any other person who knowingly engages in clandestine intelligence activities (other than intelligence gathering activities) that involve or are about to involve a violation of the criminal statutes of the United States, pursuant to the direction of an intelligence service or network of a foreign power, or knowingly conspires with other persons in such activities.

Russian government. Officials determined there was an insufficient basis to proceed with a FISA application concerning Papadopoulos, and the Crossfire Hurricane team never submitted a FISA application for Papadopoulos. With regard to Page, on August 15, 2016, the Crossfire Hurricane team requested assistance from the FBI's Office of the General Counsel (OGC) to prepare a FISA application for submission to the FISC. However, after consultation between FBI OGC and attorneys in the Office of Intelligence (OI) in the Department's National Security Division (NSD), which is responsible for preparing FISA applications and appearing before the FISC, the Crossfire Hurricane team was told in late August 2016 that more information was needed to establish probable cause for a FISA on Page.

A few weeks later, on September 19, 2016, the Crossfire Hurricane team received a set of six reports prepared by Christopher Steele concerning Russian interference in the 2016 U.S. election and alleged connections between this Russian effort and individuals associated with the Trump campaign.[6] Steele is a former intelligence officer ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ who, following his retirement, opened a consulting firm and furnished information to the FBI beginning in 2010, primarily on matters concerning organized crime and corruption in Russia and Eastern Europe. In 2013, the FBI prepared paperwork to enable it to open Steele as an FBI CHS. In providing the first two election reports to his FBI handling agent in July 2016, Steele told the handling agent that he had been hired by an investigative firm, Fusion GPS, to collect information on the relationship between candidate Trump's businesses and Russia. Steele further informed the FBI handling agent that Fusion GPS had been retained by a law firm to conduct this research. According to the handling agent, it was obvious to him that the request for the research was politically motivated.

Two of the six Steele reports received by the Crossfire Hurricane team on September 19 referenced Carter Page by name. One stated that Page had held secret meetings with two high level Russian officials during Page's July 2016 trip to Moscow. This report also indicated that one of the alleged meetings included a discussion about the Kremlin potentially releasing compromising information about Democratic candidate Hillary Clinton to Trump's campaign team. Another report from Steele described "a well-developed conspiracy of co-operation" between the Russian government and Trump's campaign to defeat Clinton, using Carter Page and others as intermediaries.[7] On September 21, 2016, 2 days after the team received these reports, FBI OGC advised OI that the FBI believed it was ready to

---

[6] As described in this report, information from Christopher Steele's reports—sometimes collectively referred to as the "Steele dossier"—that pertained to Carter Page was relied upon in the Carter Page FISA applications. In those applications, Steele was referred to as "Source #1." We refer to Steele by name in this report because the Department and the FBI have publicly revealed Steele's identity as Source #1 in connection with FOIA litigation.

[7] A third report from Steele, which did not reference Carter Page, stated that Russian intelligence services had used concealed cameras to film Trump's alleged sexual activities with prostitutes at a Moscow hotel, and claimed that the Russians could blackmail Trump by threatening to release this compromising material. These allegations, which have come to be known publicly as the "salacious and unverified" portion of the reporting, were not included in the original Carter Page FISA application or any of the renewal applications.

# CHAPTER THREE
# THE OPENING OF CROSSFIRE HURRICANE, STAFFING, AND THE EARLY STAGES OF THE INVESTIGATION

On July 31, 2016, the FBI opened a counterintelligence investigation known as "Crossfire Hurricane." In this chapter, we provide an overview of the opening and initial steps of the Crossfire Hurricane investigation and its related cases. We first summarize the intelligence available to the FBI in the summer of 2016 regarding the Russian government's efforts to interfere with the 2016 U.S. elections. We then describe the events that led to the opening of the Crossfire Hurricane umbrella investigation and the related counterintelligence investigations of George Papadopoulos, Carter Page, Paul Manafort, and Michael Flynn. We also describe the structure and oversight of these investigations, including the FBI's staffing of the cases and the involvement of senior FBI and Department officials. Finally, we describe the early investigative steps taken in furtherance of the investigations.

## I.     Intelligence Community Awareness of Attempted Russian Interference in the 2016 U.S. Elections

At the time the Crossfire Hurricane investigation was opened in July 2016, the U.S. Intelligence Community (USIC), which includes the FBI, was aware of Russian efforts to interfere with the 2016 U.S. elections. The Russian efforts included cyber intrusions into various political organizations, including the Democratic National Committee (DNC) and Democratic Congressional Campaign Committee (DCCC). Throughout spring and early summer 2016, the FBI became aware of specific cyber intrusions for which the Russian government was responsible, through ongoing investigations into Russian hacking operations conducted by the FBI's Cyber Division and the FBI's Counterintelligence Division (CD).

In March and May 2016, FBI field offices identified a spear phishing campaign by the Russian military intelligence agency, known as the General Staff Intelligence Directorate (GRU), targeting email addresses associated with the DNC and the Hillary Clinton campaign, as well as efforts to place malware on DNC and DCCC computer networks. In June and July 2016, stolen materials were released online through the fictitious personas "Guccifer 2.0" and "DCLeaks." In addition, in late July 2016, WikiLeaks released emails obtained from DNC servers as part of its "Hillary Leak Series." By August 2016, the USIC assessed that in the weeks leading up to the 2016 U.S. elections, Russia was considering further intelligence operations to impact or disrupt the elections.

In addition to the Russian infiltration of DNC and DCCC computer systems, between March and August 2016, the FBI became aware of numerous attempts to hack into state election systems. These included confirmed access into elements of multiple state or local electoral boards using tactics, techniques, and procedures

associated with Russian state-sponsored actors.[163]  The FBI learned that Russian efforts also included cyber-enabled scanning and probing of election related infrastructure in several states.

It was in this context that the FBI received information on July 28, 2016, about a conversation between Papadopoulos and an official of a Friendly Foreign Government (FFG) in May 2016 during which Papadopoulos "suggested the Trump team had received some kind of suggestion" from Russia that it could assist this process with the anonymous release of information during the campaign that would be damaging to candidate Clinton and President Obama.  As described below, the FBI opened the Crossfire Hurricane investigation 3 days after receiving this information.

## II.    The Friendly Foreign Government Information and the FBI's Decision to Open Crossfire Hurricane and Four Related Counterintelligence Investigations

On July 31, 2016, the FBI opened the Crossfire Hurricane counterintelligence investigation to determine whether individuals associated with the Donald J. Trump for President Campaign were coordinating or cooperating, wittingly or unwittingly, with the Russian government to influence or interfere with the 2016 U.S. elections. According to the opening Electronic Communication (EC), the investigation was predicated on intelligence from an FFG.  In this section, we describe the receipt of the information from the FFG and the decisions to open the Crossfire Hurricane

---

[163]  Beginning in January 2017 and continuing into 2019, several U.S. government agencies, as well as senior intelligence officials, reported on Russia's efforts to interfere with the 2016 U.S. elections.  For example, the Intelligence Community Assessment (ICA) titled "Assessing Russian Activities and Intentions in Recent U.S. Elections," published on January 6, 2017, concluded that Russian President Vladimir Putin and the Russian government conducted an influence campaign followed by a Russian messaging strategy that blended covert intelligence operations, such as cyber activity, with overt efforts in order to undermine public faith in the U.S. democratic process, denigrate then candidate Clinton, and harm Clinton's electability and potential presidency.  Additionally, in June 2017, during a Senate Select Committee on Intelligence Hearing on Russian Interference in the 2016 U.S. Elections, USIC leadership concurred with the ICA and acknowledged that the Russian government was responsible for compromises of and leaks from political figures and institutions, among other activities, as part of its efforts to influence and interfere in U.S. elections.  Similarly, the Senate Select Committee on Intelligence in 2019 and the House Permanent Select Committee on Intelligence in 2018 found, in part, that the Russian government historically has attempted to interfere in U.S. elections and attempted to interfere in the 2016 U.S. elections through attacks on state voter registration databases, cyber operations targeting governments and businesses using tactics such as spear phishing, hacking operations to include the DNC network, and social media campaigns.  U.S. House Permanent Select Committee on Intelligence, *Report on Russian Active Measures*, 115th Cong., 2d sess., 2018, 114-130.  U.S. Senate Select Committee on Intelligence, *Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, Volume 1: Russian Efforts Against Election Infrastructure with Additional Views,* 116th Cong., 1st sess., 2019, 1-10.  Further, Special Counsel Robert S. Mueller III concluded that the Russian government interfered with the 2016 U.S. elections through a social media campaign that favored then candidate Trump and disparaged then candidate Clinton, and through cyber intrusion operations against entities and individuals working on the Clinton Campaign.  *See The Special Counsel's Report*, Vol. I at 1, 4-7.

counterintelligence investigation and the related investigations of Papadopoulos, Page, Manafort, and Flynn.

## A.    Receipt of Information from the Friendly Foreign Government and the Opening of Crossfire Hurricane

By March 2016, Papadopoulos, Page, and Flynn were among several individuals serving as foreign policy advisors for the Trump campaign. Manafort joined the Trump campaign in March 2016 as the campaign convention manager. In the weeks that followed, Papadopoulos met with officials of an FFG in a European city that had arranged several meetings in May 2016 to engage with members of the Trump campaign. During one of these meetings, Papadopoulos reportedly "suggested" to an FFG official that the Trump campaign "received some kind of a suggestion from Russia" that it could assist the campaign by anonymously releasing derogatory information about presidential candidate Hillary Clinton.[164] However, the FFG did not provide information about Papadopoulos's statements to the U.S. government at that time.

On July 26, 2016, 4 days after WikiLeaks publicly released hacked emails from the DNC, the FFG official spoke with a U.S. government (USG) official in the European city about an "urgent matter" that required an in-person meeting. At the meeting, the FFG official informed the USG official of the meeting with Papadopoulos. The FFG official also provided ███████████████ information from ███████ FFG officials ███████ following the May 2016 meeting (hereinafter referred to as the FFG information). ███████████ stated, in part, that Papadopoulos

---

[164] During October 25, 2018 testimony before the House Judiciary and House Committee on Government Reform and Oversight, Papadopoulos stated that the source of the information he shared with the FFG official was a professor from London, Joseph Mifsud. Papadopoulos testified that Mifsud provided him with information about the Russians possessing "dirt" on Hillary Clinton. Papadopoulos raised the possibility during his Congressional testimony that Mifsud might have been "working with the FBI and this was some sort of operation" to entrap Papadopoulos. As discussed in Chapter Ten of this report, the OIG searched the FBI's database of Confidential Human Sources (CHS), and did not find any records indicating that Mifsud was an FBI CHS, or that Mifsud's discussions with Papadopoulos were part of any FBI operation. In Chapter Ten, we also note that the FBI requested information ██
███████████████████████████████████████████████████████████████████████████
███████

We refer to Joseph Mifsud by name in this report because the Department publicly revealed Mifsud's identity in The Special Counsel's Report (public version). According to The Special Counsel's Report, Papadopoulos first met Mifsud in March 2016, after Papadopoulos had already learned that he would be serving as a foreign policy advisor for the Trump campaign. According to The Special Counsel's Report, Mifsud only showed interest in Papadopoulos after learning of Papadopoulos's role in the campaign, and told Papadopoulos about the Russians possessing "dirt" on then candidate Clinton in late April 2016. The Special Counsel found that Papadopoulos lied to the FBI about the timing of his discussions with Mifsud, as well as the nature and extent of his communications with Mifsud. The Special Counsel charged Papadopoulos under Title 18 U.S.C. § 1001 with making false statements. Papadopoulos pled guilty and was sentenced to 14 days in prison. *See The Special Counsel's Report*, Vol. 1, at 192-94.

suggested the Trump team had received some kind of suggestion from Russia that it could assist this process with the anonymous release of information during the campaign that would be damaging to Mrs. Clinton (and President Obama).  It was unclear whether he or the Russians were referring to material acquired publicly of [sic] through other means.  It was also unclear how Mr. Trump's team reacted to the offer.  We note the Trump team's reaction could, in the end, have little bearing of what Russia decides to do, with or without Mr. Trump's cooperation.

On July 27, 2016, the USG official called the FBI's Legal Attaché (Legat) and ██████████████████ in the European city to her office and provided them with the FFG information.[165]  The Legat told us he was not provided any other information about the meetings between the FFG and Papadopoulos.[166]  The Legat also told us that he did not know under what FBI case number the FFG information should be documented and transmitted.  At the recommendation of the European city Assistant Legal Attaché (ALAT) for Counterintelligence, the Legat contacted a former ALAT who at the time was an Assistant Special Agent in Charge (ASAC) in the FBI's Philadelphia Field Office.  The ASAC told the Legat that he believed the FFG information was related to the hack of DNC emails and identified a case number for that investigation for the Legat to use to transmit the information.  The following day, on July 28, 2016, the Legat sent an EC documenting the FFG information to the Philadelphia Field Office ASAC.  The same day, the information in the EC was emailed to the Section Chief of the Cyber Counterintelligence Coordination Section at FBI Headquarters.

From July 28 to July 31, officials at FBI Headquarters discussed the FFG information and whether it warranted opening a counterintelligence investigation.  The Assistant Director (AD) for CD, E.W. "Bill" Priestap, was a central figure in these discussions.  According to Priestap, he discussed the matter with then Section Chief of CD's Counterespionage Section Peter Strzok, as well as the Section Chief of CD's Counterintelligence Analysis Section I (Intel Section Chief); and with representatives of the FBI's Office of the General Counsel (OGC), including Deputy General Counsel Trisha Anderson and a unit chief (OGC Unit Chief) in OGC's National Security and Cyber Law Branch (NSCLB).  Priestap told us that he also discussed the matter with either then Deputy Director (DD) Andrew McCabe or then Executive Assistant Director (EAD) Michael Steinbach, but did not recall discussing the matter with then Director James Comey told the OIG that he did not recall being briefed on the FFG information until after the Crossfire Hurricane investigation was opened, and that he was not involved in the decision to open the case.  McCabe said that although he did not specifically recall meeting with Comey immediately after the FFG information was received, it was "the kind of thing that would have been brought to Director Comey's attention immediately."  McCabe's

---

[165] A Legal Attaché (Legat) is the FBI Director's personal representative in a country in which the FBI has regional responsibility.

[166] According to the Legat, the ██████████████████ stated at the meeting with the USG official that the FFG information "sounds like an FBI matter."

contemporaneous notes reflect that the FFG information, Carter Page, and Manafort, were discussed on July 29, after a regularly scheduled morning meeting of senior FBI leadership with the Director.  Although McCabe told us he did not have an independent recollection of this discussion, he told us that, based upon his notes, this discussion likely included the Director.  McCabe's notes reflect only the topic of the discussion and not the substance of what was discussed.

McCabe told us that he recalled discussing the FFG information with Priestap, Strzok, then Special Counsel to the Deputy Director Lisa Page, and Comey, sometime before Crossfire Hurricane was opened, and he agreed with opening a counterintelligence investigation based on the FFG information.  He told us the decision to open the case was unanimous.  McCabe said the FBI viewed the FFG information in the context of Russian attempts to interfere with the 2016 U.S. elections in the years and months prior, as well as the FBI's ongoing investigation into the DNC hack by a Russian Intelligence Service (RIS).  He also said that when the FBI received the FFG information it was a "tipping point" in terms of opening a counterintelligence investigation regarding Russia's attempts to influence and interfere with the 2016 U.S. elections because not only was there information that Russia was targeting U.S. political institutions, but now the FBI had received an allegation from a trusted partner that there had been some sort of contact between the Russians and the Trump campaign.  McCabe said that he did not recall any discussion about whether the FFG information constituted sufficient predication for opening a Full Investigation, as opposed to a Preliminary Investigation, but said that his belief at the time, based on his experience, was that the FFG information was adequate predication.[167]

According to Priestap, he authorized opening the Crossfire Hurricane counterintelligence investigation on July 31, 2016, based upon these discussions.  He told us that the FFG information was provided by a trusted source—the FFG—and he therefore felt it "wise to open an investigation to look into" whether someone associated with the Trump campaign may have accepted the reported offer from the Russians.  Priestap also told us that the combination of the FFG information and the FBI's ongoing cyber intrusion investigation of the DNC hacks created a counterintelligence concern that the FBI was "obligated" to investigate.  Priestap said that he did not recall any disagreement about the decision to open Crossfire Hurricane, and told us that he was not pressured to open the case.

We interviewed all of the senior FBI officials who participated in these discussions about their reactions to the FFG information and assessments of it as

---

[167] As detailed in Chapter Two, the DIOG provides for two types of predicated investigations, Preliminary Investigations and Full Investigations.  A Preliminary Investigation may be opened based upon "any allegation or information" indicative of possible criminal activity or threats to the national security; a Full Investigation may be opened based upon an "articulable factual basis" of possible criminal activity or threats to the national security.  In cases opened as Preliminary Investigations, all lawful investigative methods (including CHS and UCE operations) may be used except for mail opening, physical searches requiring a search warrant, electronic surveillance requiring a judicial order or warrant (Title III wiretap or a FISA order), or requests under Title VII of FISA.  A Preliminary Investigation may be converted to a Full Investigation if the available information provides predication for a Full Investigation.

predication for Crossfire Hurricane. Each of these officials told us the information warranted opening a counterintelligence investigation. For example, Anderson told us that when the information from the Legat arrived it was "really disturbing," and that she told Priestap the information needed to be reviewed by the Deputy Director immediately (Anderson and Priestap, in fact, briefed McCabe that day, July 28). She also told us that the decision to open the case was based upon the concern that the U.S. democratic process could be manipulated by a foreign power. Anderson also told us that "[the FBI] would have been derelict in our responsibilities had we not opened the case," and that a foreign power allegedly colluding with a presidential candidate or his team members was a threat to our nation that the FBI was obligated to investigate under its counterintelligence mission.

Similarly, then FBI General Counsel James Baker told us that everyone was in agreement about opening an investigation because the information came from a trusted intelligence partner, and it concerned a "Russian connection to the Trump campaign." He told us the FBI had information about the Russian's hacking activities, which they considered "a threat." Baker could not specifically recall whether Crossfire Hurricane was opened as a Preliminary Investigation or a Full Investigation, but told us that a Full Investigation "would have been justified under these facts."

The Intel Section Chief also told us that he recalled the discussions about the FFG information when it arrived and said no one disagreed with opening a counterintelligence investigation based on the information. The Intel Section Chief also said that in the context of what was occurring with the DNC hacks and the release of the DNC emails, there was a possibility that the Russians reached out to a campaign to offer their assistance, and the FBI needed to investigate the allegation. The OGC Unit Chief had the same recollection, telling us that there was no real question about whether to investigate and that her impression was everyone thought the FFG information was so serious that the FBI had to investigate the allegations: "[T]his is not something we were looking to do, but given the allegations, we thought they were serious enough [that] we had to investigate."

Like Priestap, these officials told us that their evaluation of the FFG information was informed by the FBI's ongoing cyber investigation involving Russia and the DNC hack. According to the Intel Section Chief and Strzok, when the FFG information arrived, the FBI already had strong corroborating information indicating that senior officials in the Russian government were responsible for directing attacks on the 2016 U.S. elections, including the hack of the DNC. Anderson said the FBI's ongoing cyber investigation supported the decision to open a counterintelligence case based on the FFG information. Anderson stated:

> ...I don't remember exactly when we felt, you know, the moment in time when we felt that we had Russian attribution, not just to the hack, but also to the release of the emails. So though that was suspected or we had some information to support that theory for quite some time, but whether you...can attribute that to the Russians with a

high degree of certainty or...not, it sort of puts the whole thing together. On the one hand you've got the Russian efforts to obtain material that could be used as part of a foreign influence campaign and then on the other hand you've got [this] information about the possibility of collusion between the Russians and members of a presidential candidate's campaign.

Priestap told the OIG that before arriving at a final decision, he considered whether to provide a "defensive briefing" to any member of the Trump campaign in lieu of opening an investigation. According to Priestap, defensive briefings occur when U.S. government or corporate officials are being targeted by a foreign adversary and the FBI determines the officials should be alerted to the potential threat. Priestap did not recall who first raised the issue of defensive briefings, but said he discussed the subject collaboratively with other FBI officials. Priestap told us that he ultimately decided not to conduct defensive briefings and explained his reasoning:

> While the Counterintelligence Division does regularly provide defensive briefings to U.S. government officials or possible soon to be officials, in my experience, we do this when there is no indication, whatsoever, that the person to whom we would brief could be working with the relevant foreign adversary. In other words, we provide defensive briefings when we obtain information indicating a foreign adversary is trying or will try to influence a specific U.S. person, and when there is no indication that the specific U.S. person could be working with the adversary. In regard to the information the [FFG] provided us, we had no indication as to which person in the Trump campaign allegedly received the offer from the Russians. There was no specific U.S. person identified. We also had no indication, whatsoever, that the person affiliated with the Trump campaign had rejected the alleged offer from the Russians. In fact, the information we received indicated that Papadopoulos told the [FFG] he felt confident Mr. Trump would win the election, and Papadopoulos commented that the Clintons had a lot of baggage and that the Trump team had plenty of material to use in its campaign. While Papadopoulos didn't say where the Trump team had received the "material," one could reasonably infer that some of the material might have come from the Russians. Had we provided a defensive briefing to someone on the Trump campaign, we would have alerted the campaign to what we were looking into, and, if someone on the campaign was engaged with the Russians, he/she would very likely change his/her tactics and/or otherwise seek to cover-up his/her activities, thereby preventing us from finding the truth. On the other hand, if no one on the Trump campaign was working with the Russians, an investigation could prove that. Because the possibility existed that someone on the Trump campaign could have taken the Russians up on their offer, I thought it wise to open an investigation to look into the situation.

McCabe said that he did not consider a defensive briefing as an alternative to opening a counterintelligence case. He said that based on the FFG information, the FBI did not know if any member of the campaign was coordinating with Russia and that the FBI did not brief people who "could potentially be the subjects that you are investigating or looking for." McCabe told us that in a sensitive counterintelligence matter, it was essential to have a better understanding of what was occurring before taking an overt step such as providing a defensive briefing.[168]

We also asked those FBI officials involved in the decision to open Crossfire Hurricane whether the FBI received any other information, such as from members of the USIC, that the FBI relied upon to predicate Crossfire Hurricane. All of them told us that there was no such information and that predication for the case was based solely on the FFG information.[169] We also asked Comey and McCabe about then CIA Director John Brennan's statements reported in several news articles that he provided to the FBI intelligence on Russian contacts with U.S. persons that predicated or prompted the opening of Crossfire Hurricane. Comey told us that while Brennan shared intelligence on the overarching efforts by the Russian government to interfere in the 2016 U.S. elections, Brennan did not provide any information that predicated or prompted the FBI to open Crossfire Hurricane. McCabe said that he did not recall Brennan providing the FBI with information before the FBI's decision to open an investigation about any U.S person potentially cooperating with Russia in the efforts to interfere with the 2016 U.S. elections. Priestap and the Intel Section Chief also told us that Brennan did not provide the FBI any intelligence that predicated the opening of Crossfire Hurricane. We did not find information in FBI or Department electronic communications, emails, or other documents, or through witness testimony, indicating otherwise.

On July 31, 2016, the FBI opened a full counterintelligence investigation under the code name Crossfire Hurricane "to determine whether individual(s) associated with the Trump campaign were witting of and/or coordinating activities with the Government of Russia." As the predicating information did not indicate a specific individual, the opening EC did not include a specific subject or subjects. As described in Chapter Two, the factual predication required to open a Full Investigation under the Attorney General's Guidelines for Domestic Operations (AG

---

[168] McCabe told us that the decision to brief the DNC and Clinton campaign about the DNC hack was a different situation than the decision not to brief the Trump campaign about allegations of Russian efforts to assist the Trump campaign. He said that the DNC was a victim of hacking and the FBI had known that the DNC was not responsible for the hacks for some time.

[169] As we describe in Chapter Four, although the FBI first received reporting from Christopher Steele regarding alleged Russian interference in the 2016 U.S. elections in early July 2016, the agents and analysts investigating the FFG information (the Crossfire Hurricane team) did not become aware of the Steele reporting until September 19, 2016. We found no evidence the Steele election reporting was known to or used by FBI officials involved in the decision to open the Crossfire Hurricane investigation.

In the OIG's *Review of Various Actions in Advance of the 2016 Election*, we describe in Classified Appendix One certain information that the FBI was in possession of in 2016 but the vast majority of which the FBI had not reviewed by June 2018. Given that timing, we did not see any evidence that any of that information was considered for or part of the predication for the opening of Crossfire Hurricane.

Guidelines) and the FBI's Domestic Investigations and Operations Guide (DIOG) is an "articulable factual basis" that reasonably indicates that one of several circumstances exist:

- An activity constituting a federal crime or a threat to the national security has or may have occurred, is or may be occurring, or will or may occur and the investigation may obtain information relating to the activity or the involvement or role of an individual, group, or organization in such activity;

- An individual, group, organization, entity, information, property, or activity is or may be a target of attack, victimization, acquisition, infiltration, or recruitment in connection with criminal activity in violation of federal law or a threat to the national security and the investigation may obtain information that would help to protect against such activity or threat; or

- The investigation may obtain foreign intelligence that is responsive to a requirement that the FBI collect positive foreign intelligence—*i.e.*, information relating to the capabilities, intentions, or activities of foreign governments or elements thereof, foreign organizations or foreign persons, or international terrorists.

The opening EC describing the predication for Crossfire Hurricane relied exclusively on Papadopoulos's statements to the FFG ▮▮▮▮▮▮▮▮ in the FFG information.

Crossfire Hurricane was opened by CD and was assigned a case number used by the FBI for possible violations of the Foreign Agents Registration Act (FARA), 22 U.S.C. § 611, *et seq.*, and 18 U.S.C. § 951 (Agents of Foreign Governments).[170] As described in Chapter Two, the AG Guidelines recognize that activities subject to investigation as "threats to the national security" may also involve violations or potential violations of federal criminal laws, or may serve important purposes outside the ambit of normal criminal investigation and prosecution by informing national security decisions. Given such potential overlap in subject matter, neither the AG Guidelines nor the DIOG require the FBI to differently label its activities as criminal investigations, national security investigations, or foreign intelligence collections. Rather, the AG Guidelines state that, where an authorized purpose exists, all of the FBI's legal authorities are available for deployment in all cases to which they apply.[171]

The opening EC also designated Crossfire Hurricane as a "sensitive investigative matter," or SIM, which as described in Chapter Two, includes matters

---

[170] We have previously found differing understandings between FBI agents and federal prosecutors and NSD officials about the intent of FARA as well as what constitutes a "FARA case." *See* DOJ OIG, *Audit of the National Security Division's Enforcement and Administration of the Foreign Agents Registration Act*, Audit Division 16-24 (September 2016), https://oig.justice.gov/reports/2016/a1624.pdf (accessed December 19, 2019).

[171] *See* AG Guidelines § A, II.

involving the activities of a domestic public official or political candidate (involving corruption or a threat to the national security), or a domestic political organization or an individual prominent in such an organization.[172] The term "domestic political organization" includes, in relevant part, a committee or group formed to elect an individual to public office. According to David Laufman, then Chief of the National Security Division's (NSD) Counterintelligence and Export Control Section (CES), the case was designated a SIM because it involved a campaign and "people associated with a campaign." The DIOG requires that cases opened and designated as SIMs by FBI Headquarters be reviewed by OGC and approved by the appropriate FBI Headquarters operational section chief. The DIOG also requires that the FBI provide an "appropriate NSD official" with written notification of the opening of a SIM.[173] The DIOG does not impose any additional special requirements on SIMs, but does state particular care should be taken when considering whether a planned course of action is the least intrusive method and if reasonable based upon the circumstances of the investigation.[174]

After Priestap authorized the opening of Crossfire Hurricane, Strzok, with input from the OGC Unit Chief, drafted and approved the opening EC.[175] Strzok told us that the case agent normally drafts the opening EC for an investigation, but that Strzok did so for Crossfire Hurricane because a case agent was not yet assigned and there was an immediate need to travel to the European city to interview the FFG officials who had met with Papadopoulos. With respect to the DIOG's notification requirement to NSD, we located in the Crossfire Hurricane case file a Letterhead Memorandum (LHM) dated August 3, 2016, addressed to NSD. However, NSD officials told us that NSD has no record showing it received the LHM, and we were unable to determine whether the FBI in fact provided the LHM to NSD.[176]

In addition to being designated a SIM, witnesses told us that, because the information being investigated related to an ongoing presidential election campaign, the Crossfire Hurricane case file was designated as "prohibited" meaning that access to the file was restricted and viewable to only those individuals assigned to

---

[172] The DIOG requires that if a case is designated as a SIM at the time of opening, the title or case caption must contain the words "Sensitive Investigative Matter." The opening EC for Crossfire Hurricane met this DIOG requirement.

[173] There is no requirement under the AG Guidelines or the DIOG that a senior Department official approve of or be consulted prior to the opening of an investigation designated a SIM.

[174] The DIOG requires that the least intrusive means or method be considered and—if reasonable based upon the circumstances of the investigation—used to obtain intelligence or evidence in lieu of a more intrusive method. The concept of least intrusive method applies to the collection of all information.

[175] Strzok was promoted to a CD Section Chief in February 2016, and later to Deputy Assistant Director (DAD) of CD's Operations Branch I on September 4, 2016.

[176] According to FBI documents, although the FBI usually provides an LHM to NSD, "due to the extreme sensitivity of both predication and subject of [Crossfire Hurricane], NSD was orally briefed." Notes and testimony reflect that in early August, NSD officials were briefed on at least two occasions at FBI Headquarters about the Crossfire Hurricane investigation.

work on the investigation. Agents and analysts referred to the investigation as "close-hold" and, as discussed later in this chapter, used covert investigative techniques to ensure information about the investigation remained known only to the team and FBI and Department officials.

## B. The FBI Opens Counterintelligence Investigations on Papadopoulos, Carter Page, Manafort, and Flynn

On August 1, 2016, Strzok and a supervisory special agent (SSA 1) traveled to the European city to interview the FFG officials who met with Papadopoulos in May 2016.[177] According to Strzok and SSA 1, during the interview they learned that Papadopoulos did not say that he had direct contact with the Russians; that while his statement did not include him, it did not exclude him either; and that Papadopoulos stated the Russians told "us." Strzok and SSA 1 also said they learned that Papadopoulos did not specify any other individual who received the Russian suggestion. Strzok, the Intel Section Chief, the Supervisory Intelligence Analyst (Supervisory Intel Analyst), and Case Agent 2 told the OIG that, based on this information, the initial investigative objective of Crossfire Hurricane was to determine which individuals associated with the Trump campaign may have been in a position to have received the alleged offer of assistance from Russia.

After conducting preliminary open source and FBI database inquiries, intelligence analysts on the Crossfire Hurricane team identified three individuals— Carter Page, Paul Manafort, and Michael Flynn—associated with the Trump campaign with either ties to Russia or a history of travel to Russia. On August 10, 2016, the team opened separate counterintelligence FARA cases on Carter Page, Manafort, and Papadopoulos, under code names assigned by the FBI. On August 16, 2016, a counterintelligence FARA case was opened on Flynn under a code name assigned by the FBI. The opening ECs for all four investigations were drafted by either of the two Special Agents assigned to serve as the Case Agents for the investigation (Case Agent 1 or Case Agent 2) and were approved by Strzok, as required by the DIOG.[178] Each case was designated a SIM because the individual subjects were believed to be "prominent in a domestic political campaign."[179]

As summarized below, the opening ECs for the investigations provided similar descriptions of the predicating information relied upon to open the cases. The ECs

---

[177] Email exchanges reflect that the FBI planned to interview the FFG officials by telephone; however, the Legat told Strzok that a Senior Executive Service-level (SES) FBI official from CD should make the trip and meet with the FFG officials. Emails also reflect that a USG official advised the FBI that one of the FFG officials the FBI planned to interview would be unavailable on August 9 and suggested the interview take place prior to that date.

[178] Although the opening ECs identified Strzok, SSA 1, and the OGC Unit Chief as approvers, the OGC Unit Chief said that she provided legal review of the opening ECs only. As we described in Chapter Two, when a case is opened and designated a SIM by FBI Headquarters, the case opening requires review by OGC and approval by the FBI Headquarters operational Section Chief (SC).

[179] We did not locate any records that indicated the FBI provided written notification to NSD about the opening of these cases. However, as we described earlier in this chapter, the FBI orally briefed NSD officials on at least two occasions in August 2016 about the Crossfire Hurricane investigation to include Papadopoulos, Manafort, Flynn, and Carter Page.

differed in their descriptions of the particular activities of the subjects that gained the FBI's attention.

- The opening EC for the Carter Page investigation stated that there was an articulable factual basis that Carter Page "may wittingly or unwittingly be involved in activity on behalf of the Russian Federation which may constitute a federal crime or threat to the national security." The EC cross-referenced the predication for Crossfire Hurricane and stated that Page was a senior foreign policy advisor for the Trump campaign, had extensive ties to various Russia-owned entities, and had traveled to Russia as recently as July 2016. The EC also noted that Carter Page was the subject of an open, ongoing counterintelligence investigation assigned to the FBI's New York Field Office (NYFO), which we describe in the next section.

- The opening EC for the Manafort investigation stated that there was an articulable factual basis that Manafort "may wittingly or unwittingly be involved in activity on behalf of the Russian Federation which may constitute a federal crime or threat to the national security." The EC cross-referenced the predication for Crossfire Hurricane and stated that Manafort was designated the Delegate Process and Convention Manager for the Trump campaign, was promoted to Campaign Manager for the Trump campaign, and had extensive ties to pro-Russian entities of the Ukrainian government.

- The opening EC for the Papadopoulos investigation stated that there was an articulable factual basis that Papadopoulos "may wittingly or unwittingly be involved in activity on behalf of the Russian Federation which may constitute a federal crime or threat to the national security." The EC cross-referenced the predication for Crossfire Hurricane and stated that Papadopoulos was a senior foreign advisor for the Trump campaign and had "made statements indicating that he is knowledgeable that the Russians made a suggestion to the Trump team that they could assist the Trump campaign with an anonymous release of information during the campaign that would be damaging to the Clinton Campaign."

- The opening EC for the Flynn investigation stated that there was an articulable factual basis that Flynn "may wittingly or unwittingly be involved in activity on behalf of the Russian Federation which may constitute a federal crime or threat to the national security." The EC cross-referenced the predication for Crossfire Hurricane and stated that Flynn was an advisor to the Trump campaign, had various ties to state-affiliated entities of Russia, and traveled to Russia in December 2015.

## C. The Pre-Existing FBI New York Field Office Counterintelligence Investigation of Carter Page

The OGC Unit Chief told us that of all the individuals associated with the Trump campaign best positioned to have received the alleged offer of assistance from Russia, Carter Page "quickly rose to the top" of the list because of his past connections to Russian officials and the FBI's previous contacts with Page. As reflected in the FISA applications described in Chapters Five and Seven, as well as in other FBI documents, NYFO had an interest in Carter Page for several years before August 2016 and had interviewed him on multiple occasions because of his relationships with individuals the FBI knew to be Russian intelligence officers.

An FBI counterintelligence agent in NYFO (NYFO CI Agent) with extensive experience in Russian matters told the OIG that Carter Page had been on NYFO's radar since 2009, when he had contact with a known Russian intelligence officer (Intelligence Officer 1). According to the EC documenting NYFO's June 2009 interview with Page, Page told NYFO agents that he knew and kept in regular contact with Intelligence Officer 1 and provided him with a copy of a non-public annual report from an American company. The EC stated that Page "immediately advised [the agents] that due to his work and overseas experiences, he has been questioned by and provides information to representatives of [another U.S. government agency] on an ongoing basis." The EC also noted that agents did not ask Page any questions about his dealings with the other U.S. government agency during the interviews.[180]

NYFO CI agents believed that Carter Page was "passed" from Intelligence Officer 1 to a successor Russian intelligence officer (Intelligence Officer 2) in 2013 and that Page would continue to be introduced to other Russian intelligence officers in the future.[181] In June 2013, NYFO CI agents interviewed Carter Page about these contacts. Page acknowledged meeting Intelligence Officer 2 following an introduction earlier in 2013. When agents intimated to Carter Page during the interview that Intelligence Officer 2 may be a Russian intelligence officer, specifically, an "SVR" officer, Page told them he believed in "openness" and because

---

[180] On or about August 17, 2016, the Crossfire Hurricane team received a memorandum from the other U.S. government agency detailing its prior relationship with Carter Page, including that Page had been approved as an operational contact for the other agency from 2008 to 2013 and information that Page had provided to the other agency concerning Page's prior contacts with certain Russian intelligence officers. We found no evidence that, after receiving the August 17 Memorandum, the Crossfire Hurricane team requested additional information from the other agency prior to submission of the first FISA application in order to deconflict on issues that we believe were relevant to the FISA application. According to the U.S. government agency, "operational contact," as that term is used in the August 17 Memorandum, provides "Contact Approval," which allows the agency to contact and discuss sensitive information with a U.S. person and to collect information from that person via "passive debriefing," or debriefing a person of information that is within the knowledge of an individual and has been acquired through the normal course of that individual's activities. According to the U.S. government agency, a "Contact Approval" does not allow for operational use of a U.S. person or tasking of that person.

[181] CI agents refer to this as "slot succession," whereby a departing intelligence officer "passes" his or her contacts to an incoming intelligence officer.

he did not have access to classified information, his acquaintance with Intelligence Officer 2 was a "positive" for him. In August 2013, NYFO CI agents again interviewed Page regarding his contacts with Intelligence Officer 2. Page acknowledged meeting with Intelligence Officer 2 since his June 2013 FBI interview.

In January 2015, three Russian intelligence officers, including Intelligence Officer 2, were charged in a sealed complaint, and subsequently indicted, in the Southern District of New York (SDNY) for conspiring to act in the United States as unregistered agents of the Russian Federation.[182] The indictment referenced Intelligence Officer 2's attempts to recruit "Male-1" as an asset for gathering intelligence on behalf of Russia.

On March 2, 2016, the NYFO CI Agent and SDNY Assistant United States Attorneys interviewed Carter Page in preparation for the trial of one of the indicted Russian intelligence officers. During the interview, Page stated that he knew he was the person referred to as Male-1 in the indictment and further said that he had identified himself as Male-1 to a Russian Minister and various Russian officials at a United Nations event in "the spirit of openness." The NYFO CI Agent told us she returned to her office after the interview and discussed with her supervisor opening a counterintelligence case on Page based on his statement to Russian officials that he believed he was Male-1 in the indictment and his continued contact with Russian intelligence officers.

The FBI's NYFO CI squad supervisor (NYFO CI Supervisor) told us she believed she should have opened a counterintelligence case on Carter Page prior to March 2, 2016 based on his continued contacts with Russian intelligence officers; however, she said the squad was preparing for a big trial, and they did not focus on Page until he was interviewed again on March 2. She told us that after the March 2 interview, she called CD's Counterespionage Section at FBI Headquarters to determine whether Page had any security clearances and to ask for guidance as to what type of investigation to open on Page.[183] On April 1, 2016, the NYFO CI Supervisor received an email from the Counterespionage Section advising her to open a ▮▮▮▮▮▮▮ investigation on Page. The NYFO CI Supervisor said that ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In addition, according to FBI records, the relevant CD section at FBI Headquarters, in consultation with OGC, determined at that time that the Page investigation opened by NYFO was not a SIM, but also noted, "should his status change, the appropriate case modification would be made." The NYFO CI Supervisor told us that based on what was documented in

---

[182] Intelligence Officer 3 pled guilty in March 2016. The remaining two indicted Russian intelligence officers were no longer in the United States.

[183] CI agents in NYFO told us that the databases containing security clearance information were located at FBI Headquarters. When a subject possesses a security clearance, the FBI opens an espionage investigation; if the subject does not possess a security clearance, the FBI typically opens a counterintelligence investigation.

the file and what was known at that time, the NYFO Carter Page investigation was not a SIM.

Although Carter Page was announced as a foreign policy advisor for the Trump campaign prior to NYFO receiving this guidance from FBI Headquarters, the NYFO CI Supervisor and CI Agent both told the OIG that this announcement did not influence their decision to open a case on Page and that their concerns about Page, particularly his disclosure to the Russians about his role in the indictment, pre-dated the announcement. However, the NYFO CI Supervisor said that the announcement required noting his new position in the case file should his new position require he obtain a security clearance.

On April 6, 2016, NYFO opened a counterintelligence ▇▇▇▇ investigation on Carter Page under a code name the FBI assigned to him (NYFO investigation) based on his contacts with Russian intelligence officers and his statement to Russian officials that he was "Male-1" in the SDNY indictment. Based on our review of documents in the NYFO case file, as well as our interview of the NYFO CI Agent, there was limited investigative activity in the NYFO investigation between April 6 and the Crossfire Hurricane team's opening of its investigation of Page on August 10. The NYFO CI Agent told the OIG that the steps she took in the first few months of the case were to observe whether any other intelligence officers contacted Page and to prepare national security letters seeking Carter Page's cell phone number(s) and residence information. The NYFO CI agent said that she did not use any CHSs to target Page during the NYFO investigation. The NYFO investigation was transferred to the Crossfire Hurricane team on August 10 and became part of the Crossfire Hurricane investigation.

## III. Organization and Oversight of the Crossfire Hurricane Investigation

The FBI conducted and oversaw the Crossfire Hurricane investigation from July 31, 2016, to May 17, 2017, at which time it was transferred to the Special Counsel's Office. Over that 10-month period, three different teams of agents and analysts were assigned to the case: the first team worked out of FBI Headquarters from the opening of the case through December 2016; the second team worked out of three FBI field offices and FBI Headquarters from approximately January 2017 through April 2017; and the third team worked, like the second team, out of the three FBI field offices and FBI Headquarters from April 2017 to May 17, 2017. In this section, we describe the organization and staffing of the three investigative teams and the FBI's reasons for making changes as to how the investigation was organized. We also describe the role played by FBI and Department senior leadership in the investigation.

## H. Steele's Reporting to the FBI Following the Early October Meeting and Continuing Media Contacts

Steele continued to furnish the FBI with written reports following the early October meeting. Handling Agent 1 told us that he became a "middleman" between Steele and the Crossfire Hurricane team and forwarded Steele's reports to the team. According to Handling Agent 1's records, during October 2016, Steele communicated with him four times and provided seven written reports, one of which concerned Carter Page and thus was responsive to the FBI's request for information concerning Page's activities.[253]

On October 19, 2016, Steele also forwarded to Handling Agent 1 a report that Steele said he had obtained from State Department official Jonathan Winer. Steele included a notation on the report explaining that Winer had been given the report by a friend of a well-known Clinton supporter, and that the friend had obtained the report from a Turkish businessman with strong links to Russia, including the Federal Security Service of the Russian Federation (FSB).[254] The report included numerous allegations attributed to an FSB source, including that (1) a "'pervasive' and 'sophisticated' intelligence operation" was focused in part on

---

[253] These seven reports, with selected highlights, were:

- Report 130 (Putin and his colleagues were surprised and disappointed that leaks of Clinton's emails had not had a greater impact on the campaign; a stream of hacked Clinton material had been injected by the Kremlin into compliant western media outlets like WikiLeaks and the stream would continue until the election);

- Report ██████████████████████████████████████████████████████ ████████████████████████████████████ ;

- Report 134 (a close associate of Rosneft President Sechin confirmed a secret meeting with Carter Page in July; Sechin was keen to have sanctions on the company lifted and offered up to a 19 percent stake in return);

- Report 135 (Trump attorney Michael Cohen was heavily engaged in a cover up and damage control in an attempt to prevent the full details of Trump's relationship with Russia being exposed; Cohen had met secretly with several Russian Presidential Administration Legal Department officials; immediate issues were efforts to contain further scandals involving Manafort's commercial and political role in Russia/Ukraine and to limit damage from the exposure of Carter Page's secret meetings with Russian leadership figures in Moscow the previous month);

- Report 136 (Kremlin insider reports that Cohen's secret meeting/s with Kremlin officials in August 2016 was/were held in Prague);

- Report ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ; and



- Report ████████████████████████████████████████ ██████████████████████████████████████████ .

[254] According to open source reporting, the FSB serves as Russia's domestic intelligence and security service that retains a broad mission of counterintelligence, counterterrorism, cyber defense, border security, and economic security, in addition to overseeing Russia's vast technical monitoring system known as SORM.

Trump and was an "open secret" in Putin's government; (2) sex videos existed of Trump; and (3) the FSB funneled payments to Trump through an Azerbaijani family. According to Steele's notation to the report, Steele did not have a way to verify the source(s) or the information but noted that, even though the reporting originated from a different source network, some of it was "remarkably similar" to Steele's reporting, especially with regard to the alleged 2013 Ritz Carlton incident involving Trump and prostitutes, Trump's compromise by the FSB, and the Kremlin's funding of the Trump campaign by way of the Azerbaijani family. The Supervisory Intel Analyst characterized the report as "yet another report that would need to be evaluated."

In addition to continuing to provide reporting to the FBI, Steele also was, unbeknownst to the FBI at the time, continuing his outreach to the media concerning alleged contacts between the Trump campaign and the Russian government. According to information from the foreign litigation noted above, Steele returned to Washington, D.C., in mid-October and provided additional briefings to *The New York Times*, *The Washington Post*, and *Yahoo News*. We asked Steele why he did not advise the FBI of his engagements with the media. He stated that he did not alert the FBI because the media briefings were part of his contract with Fusion GPS and were set up and attended by Simpson. As noted above, Steele did not believe that the FBI had raised the issue of media contacts with him at the early October meeting, and his contemporaneous notes from that meeting do not mention the issue.

Further, Steele met on October 11 at the State Department with Winer and Deputy Assistant Secretary Kathleen Kavalec, who was a deputy to then Assistant Secretary Victoria Nuland. Steele told us that Winer had originally contacted him to request that he meet with Nuland, who ultimately did not attend.[255] Notes of the meeting taken by State Department staff reflect that Steele addressed a wide array of topics during the meeting, including:

- Derogatory information on Trump;

- Manafort's role as a "go-between" with the campaign and Kremlin;

- The role of Alfa Bank, one of Russia's largest privately owned banks, as a conduit for secret communications between Manafort and the Kremlin;

- Manafort's debts to the Russians;

- Carter Page's meeting with Sechin;

- The Russian Embassy's management of a network of Russian émigrés in the United States who carry out hacking and recruiting operations; and

---

[255] Steele told us that he was delayed from the airport and arrived late for the meeting, by which time Nuland had departed.

- The Russian cyber penetration of the DNC.[256]

The notes also indicate that Steele explained that the information his firm collected on the connection between Trump and Russia came from ████████████, ███████████████████ According to the notes, Steele stated that ████ ████████████████████ The notes also state that Steele's firm had ██████████████

We asked Kavalec about the meeting with Steele. She stated that Nuland did not ask to meet with Steele and that Nuland requested she attend the meeting because Nuland did not want to devote time to it. It was Kavalec's understanding that Steele sought the meeting with Nuland as part of a wider effort to disseminate his election report findings to persons in Washington, D.C. She stated that during the meeting Steele expressed frustration that the FBI had not acted on his reporting and explained that when he first offered information to the FBI he found a lack of interest.

Kavalec told us that shortly after the meeting with Steele, she encountered the FBI's liaison to the State Department and mentioned the meeting to him. According to Kavalec, she explained to the liaison that she was willing to be interviewed by the FBI regarding her meeting with Steele, though Steele had informed her that he had already been in contact with the FBI to share his reporting. The FBI liaison told us that Kavalec also informed him that a particular piece of information in Steele's reporting appeared to be incorrect. She explained to the FBI liaison that Russia did not have a consulate in Miami as indicated by Steele's reporting, which claimed that a cyber-hacking operation was being run, in part, out of the Russian consulate in Miami.[257] The FBI liaison informed SSA 1 and Case Agent 1 via email on November 18 that Kavalec had met with Steele, she had taken notes of their meeting, the liaison could obtain information from Kavalec about the meeting, and, according to Kavalec, the information from Steele's reporting about a Russian consulate being located in Miami was inaccurate.[258] The

---

[256] Much of the information presented by Steele at the State Department briefing can be found in Reports 130 and 132, both of which Steele provided to the FBI in October.

[257] Kavalec's typed notes from Steele's October 11, 2016 briefing stated that Steele told her that a Russian cyber hacking operation targeting the 2016 U.S. elections was making payments to involved persons from "the Russian [c]onsulate in Miami." Steele's election Report 95 contained similar, but not fully consistent, information. Report 95 did not explicitly state that there was a Russian consulate in Miami. Instead, Report 95 stated that Russian consular officials and diplomatic staff in Miami were making payments in order to facilitate a secret exchange of intelligence between persons affiliated with Trump and the Russian government.

[258] After reviewing a portion of our draft report and his November 18, 2016 email to SSA 1 and Case Agent 1, the FBI liaison told us that he believes that he first learned about Kavalec's meeting with Steele on or about November 18, 2016.

FBI liaison told us that he received no directives from the Crossfire Hurricane team to gather information from Kavalec regarding her contact with Steele.

In anticipation of an FBI interview, Kavalec said she prepared a typewritten summary of the meeting within 1 to 2 weeks after talking with the liaison. The typed summary began by noting that Steele said at the meeting that he had undertaken the investigation "at the behest of an institution he declined to identify that had been hacked." The summary also noted that Steele told the attendees that the "institution...is keen to see this information come to light prior to November 8." However, the FBI did not interview Kavalec nor did they seek her notes.

Two days after the meeting with Steele, Kavalec emailed an FBI CD Section Chief a document that Kavalec received from Winer discussing allegations about a linkage between Alfa Bank and the Trump campaign, a topic that was discussed at the October 11 meeting.[259] Kavalec advised the FBI Section Chief in the email that the information related to an investigation that Steele's firm had been conducting. The Section Chief forwarded the document to SSA 1 the same day.

We asked Steele why he did not inform the FBI of the meeting at the State Department and why he did not abide by the FBI's request for exclusivity. He said he did not think it was appropriate to turn down a meeting request from an Assistant Secretary of State, which he said he received on short notice. He also stated that, at the time he received the meeting request, the meeting agenda was unclear, and he was uncertain what topics he would be asked to discuss. He said it was his understanding that the FBI did not object to his discussing general themes with other agencies as opposed to "details" about his intelligence and source network.

Handling Agent 1 told us that he believed Steele should have alerted him to both his media contacts in September and October and his meeting with State Department staff in October. As noted above, the Crossfire Hurricane team first learned of Steele's October meeting with the State Department from the FBI liaison on November 18, by which date the FBI had already closed Steele as a CHS because of his *Mother Jones* disclosure, which we discuss in Chapter Six. Handling Agent 1 explained that Steele should have recognized the need to provide this notice to the FBI, especially given the discussions that took place with the Crossfire Hurricane team in early October.

---

[259] Steele separately wrote in Report 112, dated September 14, 2016, that Alfa Bank allegedly had close ties to Putin. The Crossfire Hurricane team received Report 112 on or about November 6, 2016, from a *Mother Jones* journalist through then FBI General Counsel James Baker. Additionally, Ohr advised the FBI on November 21, 2016, according to an FBI FD-302, that Steele had told Ohr that the Alfa Bank server was a link to the Trump campaign and that Person 1's Russia/American organization in the U.S. had used the Alfa Bank server two weeks prior. Steele told us that the information about Alfa Bank was not generated by Orbis. The FBI investigated whether there were cyber links between the Trump Organization and Alfa Bank, but had concluded by early February 2017 that there were no such links. The Supervisory Intel Analyst told us that he factored the Alfa Bank/Trump server allegations into his assessment of Steele's reporting.

# CHAPTER ELEVEN
# ANALYSIS

In this chapter, we provide the OIG's analysis of the events described in Chapter Three through Chapter Ten. We divide our analysis into five sections. In Section I, we discuss whether the opening of the Crossfire Hurricane investigation and four related investigations, and whether certain early investigative techniques used by the FBI, complied with the requirements of the Attorney General's Guidelines for Domestic FBI Operations (AG Guidelines) and the FBI's Domestic Investigations and Operations Guide (DIOG).

In Section II, we analyze the role of Christopher Steele's election reporting in the four Carter Page Foreign Intelligence Surveillance Act (FISA) applications and the numerous instances in which factual representations in those applications were inaccurate, incomplete, or unsupported by appropriate documentation, based upon information the FBI had in its possession at the time the applications were filed. In Section III, we analyze the FBI's handling of Christopher Steele and his election reporting, and whether the FBI's receipt and use of his reporting during the Crossfire Hurricane investigation complied with FBI Confidential Human Source (CHS) policies and procedures.

Section IV examines issues relating to Department attorney Bruce Ohr's interactions with Steele, Glenn Simpson, the FBI, and the State Department during the Crossfire Hurricane investigation, as well as whether the work Ohr's spouse performed for Simpson's firm implicated any ethical rules applicable to Ohr. We also analyze Ohr's interactions with Department attorneys and FBI officials concerning the Department's criminal investigation of Paul Manafort.

Lastly, in Section V, we focus on the FBI's use of CHSs, other than Steele, and Undercover Employees (UCEs) in the Crossfire Hurricane investigation and analyze whether the Crossfire Hurricane team's use of such individuals complied with Department and FBI policies. We also analyze the attendance of an FBI Supervisory Special Agent (SSA) assigned to the Crossfire Hurricane investigation at counterintelligence briefings given to the 2016 presidential candidates and certain campaign advisors.

As we explained in Chapter One, we did not analyze all of the decisions in the Crossfire Hurricane investigation. Rather, we reviewed the topics described above. Moreover, our role in this review was not to second-guess discretionary judgments by Department personnel about whether to open an investigation, or specific judgment calls made during the course of an investigation, where those decisions complied with or were authorized by Department rules, policies, or procedures. We do not criticize particular decisions merely because we might have recommended a different investigative strategy or tactic based on the facts learned during our investigation. The question we considered was not whether a particular investigative decision was ideal or could have been handled more effectively, but rather whether the Department and the FBI complied with applicable legal requirements, policies, and procedures in taking the actions we reviewed, or,

alternatively, whether the circumstances surrounding a decision indicated that it was based on inaccurate or incomplete information, or considerations other than the merits of the investigation. If the explanations we were given for a particular decision were consistent with legal requirements, policies, and procedures, and were not unreasonable, we did not conclude that the decision was based on improper considerations in the absence of documentary or testimonial evidence to the contrary.

## I.     The Opening of Crossfire Hurricane and Four Related Counterintelligence Investigations

In this section, we examine the opening of Crossfire Hurricane and four related counterintelligence investigations of individuals associated with the Donald J. Trump for President Campaign. Specifically, we analyze whether, in opening these investigations, the FBI complied with the requirements set forth in the AG Guidelines and the DIOG.

The applicable provisions of the AG Guidelines and the DIOG require that FBI investigations be undertaken for an "authorized purpose"—that is, "to detect, obtain information about, or prevent or protect against federal crimes or threats to the national security or to collect foreign intelligence." The AG Guidelines also require that FBI investigations have adequate factual predication—that is, allegations, reports, facts, or circumstances indicative of possible criminal activity or a national security threat. In addition, for investigations designated as Sensitive Investigative Matters (SIMs), such as Crossfire Hurricane, the DIOG imposes special approval and notification requirements when opening such a matter. The DIOG also emphasizes that investigators take particular care to consider whether a planned investigative activity is the least intrusive method and is reasonably based upon the needs of the investigation.

As described in Chapter Three, on July 31, 2016, the FBI's Counterintelligence Division (CD) opened a Full Investigation titled "Crossfire Hurricane" to determine whether individual(s) associated with the Trump campaign were "witting of and/or coordinating activities with the Government of Russia." The opening of the investigation occurred days after WikiLeaks publicly released hacked emails from the Democratic National Committee (DNC). According to the FBI Electronic Communication (EC) documenting the decision, the investigation was opened in response to information CD officials received on July 28, 2016, from a Friendly Foreign Government (FFG) indicating that in a May 2016 meeting with the FFG, George Papadopoulos, an advisor to the Trump campaign, "suggested the Trump team had received some kind of a suggestion" from Russia that it could assist in the election process with the anonymous release of information during the campaign that would be damaging to candidate Clinton and President Obama. We did not find information in FBI or Department emails, or other documents, or through witness testimony, indicating that any information other than the FFG information was relied upon to predicate the opening of the Crossfire Hurricane investigation. However, as noted below, the FBI received the FFG information at a time when it had reason to believe that Russia may have been connected to the

WikiLeaks disclosures that occurred earlier in July 2016, and when the U.S. Intelligence Community (USIC), including the FBI, was aware of Russia's efforts to interfere with 2016 U.S. elections.

In the following weeks, the FBI also opened related counterintelligence investigations into four individuals associated with the Trump campaign— Papadopoulos, Carter Page, Michael Flynn, and Paul Manafort—because the FBI identified these individuals as having alleged ties to Russia or a history of travel to Russia.

We concluded that the FBI's decision to open Crossfire Hurricane and the four related individual investigations was, under Department and FBI policy, a discretionary judgment call and that the FBI's exercise of discretion was in compliance with those policies. For the reasons described below, we found that each investigation was opened for an authorized purpose and, in light of the low threshold established by Department and FBI predication policy, with adequate factual predication. We also found that the FBI satisfied the DIOG's notification and approval requirements for designating Crossfire Hurricane and the four related individual investigations as SIMs. Nevertheless, we were concerned about the limited notice requirements under Department and FBI policy before opening investigations such as these, relating to constitutionally protected activity occurring during a national presidential campaign. We were also concerned about the limited notice requirements before using more intrusive investigative techniques that could impact constitutionally protected activity. Accordingly, we make several recommendations below to address these concerns.

## A.    Authorized Purpose

The AG Guidelines and the DIOG both require that FBI investigations be undertaken for an "authorized purpose"—that is, "to detect, obtain information about, or prevent or protect against federal crimes or threats to the national security or to collect foreign intelligence." Under both the AG Guidelines and the DIOG, the FBI may not undertake an investigation for the sole purpose of monitoring activities protected by the First Amendment or to interfere with the lawful exercise of other rights secured by the Constitution or laws of the United States. However, both the AG Guidelines and the DIOG permit the FBI to conduct an investigation, even if it might impact First Amendment or other constitutionally protected activity, so long as there is a legitimate law enforcement purpose associated with the investigation.

We concluded that, under the AG Guidelines and the DIOG, the FBI had an authorized purpose when it opened Crossfire Hurricane to obtain information about, or to protect against, a national security threat or federal crime, even though the investigation also had the potential to impact constitutionally protected activity. The FBI's opening EC referenced the Foreign Agents Registration Act (FARA) and stated, "[b]ased on the information provided by [the FBI Legal Attaché], this investigation is being opened to determine whether individual(s) associated with the Trump campaign are witting of and/or coordinating activities with the Government of Russia." We found that the FBI opened the Crossfire Hurricane

investigation shortly after officials in CD received the FFG information on July 28. The opening EC documented the pertinent FFG information verbatim and described relevant background information. All of the senior FBI officials who participated in the discussions about whether to open a case told us the information from the FFG warranted investigation. For example, the FBI's then Deputy General Counsel told us that the FBI "would have been derelict in our responsibilities had we not opened the case," because a foreign power allegedly colluding with a presidential candidate or his campaign was a threat to our nation that the FBI was obligated to investigate under its counterintelligence mission.

Then CD Assistant Director E.W. "Bill" Priestap, who approved opening the case, told us that the combination of the FFG information and the FBI's ongoing cyber intrusion investigation into the July 2016 hacks of the DNC's emails created a counterintelligence concern that the FBI was "obligated" to investigate. Priestap also told us that, prior to making the final decision to approve the opening of Crossfire Hurricane, he considered whether the FBI should conduct defensive briefings for the Trump campaign about the information from the FFG. However, Priestap ultimately decided that providing such briefings created the risk that "if someone on the campaign was engaged with the Russians, he/she would very likely change his/her tactics and/or otherwise seek to cover-up his/her activities, thereby preventing us from finding the truth." We did not identify any Department or FBI policy that applied to this decision and therefore determined that the decision whether to conduct defensive briefings in lieu of opening an investigation, or at any time during an investigation, was a judgment call that is left to the discretion of FBI officials.[482]

As part of our review, we sought to determine whether there was evidence that political bias or other improper considerations affected decision making in Crossfire Hurricane, including the decision to open the investigation. Such evidence would raise questions as to whether Crossfire Hurricane was opened for an authorized purpose, and serious concerns about whether the decision compromised the constitutional rights of any U.S. persons. We discussed the issue of political bias in a prior OIG report, *Review of Various Actions in Advance of the 2016 Election*, where we described text messages between then Special Counsel to the Deputy Director Lisa Page and then Section Chief Peter Strzok, among others. These text messages included statements of hostility toward then candidate Trump and statements of support for then candidate Hillary Clinton. These messages, most of which pertained to the Russia investigation, potentially indicated or created the appearance that investigative decisions were impacted by bias or improper considerations. Our prior review stated that the text messages were "not only

---

[482] Later in this chapter, we recommend that the Department and FBI evaluate which types of sensitive investigative matters should require advance notification to a senior Department official, such as the Deputy Attorney General, in addition to the notifications currently required for such matters, especially for opening investigations that implicate core First Amendment activity and raise policy considerations or heighten enterprise risk. Such a requirement would not only give senior Department leadership the opportunity to consider the constitutional and prudential issues associated with opening certain investigations but also the opportunity to consult with the FBI about whether to conduct a defensive briefing in a circumstance such as this one.

indicative of a biased state of mind but, even more seriously, impl[y] a willingness to take official action to impact [Trump's] electoral prospects." For example, on July 31, 2016, in connection with the formal opening of Crossfire Hurricane, Strzok texted Page: "And damn this feels momentous. Because this matters. The [Clinton email investigation] did, too, but that was to ensure we didn't F something up. This matters because this MATTERS. So super glad to be on this voyage with you." Additionally, on August 8, 2016, Page sent a text message to Strzok that stated, "[Trump's] not ever going to become president, right? Right?!" Strzok responded, "No. No he's not. We'll stop it." Although we did not find in our prior report any documentary or testimonial evidence directly connecting the political views stated in the text messages to the specific investigative actions in Midyear that we reviewed, we concluded that Strzok's text messages with Page indicated or created the appearance of bias against Trump. We further concluded that the messages raised serious questions about the propriety of any investigative decisions in which Strzok and Lisa Page played a role. Because several of these inappropriate and troubling messages occurred at or near the time of the opening of Crossfire Hurricane, we closely reviewed the roles of Strzok and Lisa Page in the investigation's opening and whether there was any documentary or testimonial evidence that their views impacted the decision to open the investigation.

We found that while she attended some of the discussions, Lisa Page did not play a role in the decision to open Crossfire Hurricane or the four individual cases. Strzok was directly involved in the decisions to open Crossfire Hurricane and the four individual cases, but we found that he was not the sole, or even the highest level decision maker as to any of those matters. Priestap, Strzok's supervisor, told us that ultimately he was the official who made the decision to open the Crossfire Hurricane investigation, and Strzok then prepared and approved the formal documentation, as required by the DIOG. Evidence reflected that this decision by Priestap was reached by consensus after multiple days of discussions and meetings that included Strzok and other leadership in CD, the FBI Deputy Director, the FBI General Counsel, and the FBI Deputy General Counsel. We similarly found that the decisions to open the four individual cases were reached by consensus of Crossfire Hurricane agents and analysts who identified individuals associated with the Trump campaign who had recently travelled to Russia or had other alleged ties to Russia, and that Priestap was involved in those decisions. The formal documentation opening each of these four investigations was approved by Strzok, as required by the DIOG.

We did not find documentary or testimonial evidence that political bias or improper motivation influenced Priestap's decision to open Crossfire Hurricane. The evidence also showed that FBI officials responsible for and involved in the case opening decisions were unanimous in their belief that, together with the July 2016 release by WikiLeaks of hacked DNC emails, the Papadopoulos statement described in the FFG information reflected the Russian government's potential next step to interfere with the 2016 U.S. elections. These FBI officials were similarly unanimous in their belief that the FFG information represented a threat to national security that warranted further investigation by the FBI. Witnesses told us that they did not

recall observing during these discussions any instances or indications of improper motivations or political bias on the part of the participants, including Strzok.

We also reviewed the text messages and emails of each of the FBI officials, in addition to Strzok, who participated in the decision to open Crossfire Hurricane and the four individual cases, and did not identify any statements in those communications that indicated or suggested the decision could have been affected by political bias or other improper considerations. We also reviewed other contemporaneous documents, such as meeting notes, and asked witnesses who were not involved in the decision to open Crossfire Hurricane but who were familiar with the predication for the case for any evidence of political bias or improper motivation in the FBI's decision making. Again, we found no such evidence, including from Department officials briefed about Crossfire Hurricane subsequent to it being opened. These officials also did not express any concerns about the FBI's decision to open the investigation. By way of example, David Laufman, then Chief of the National Security Division's (NSD) Counterintelligence and Export Control Section (CES), told us that it would have been "a dereliction of duty and responsibility of the highest order not to commit the appropriate resources as urgently as possible to run these facts to the ground, and find out what was going on."

We therefore concluded the FBI met the requirement in the AG Guidelines and the DIOG that Crossfire Hurricane be opened for an "authorized purpose," namely "to detect, obtain information about, or prevent or protect against federal crimes or threats to the national security or to collect foreign intelligence." We also determined that, although the investigation had the potential to impact constitutionally protected activity, the FBI's decision to open the investigation was permissible under both Department and FBI policies because there was a legitimate law enforcement purpose associated with the investigation. Nevertheless, we believe that investigations affecting core First Amendment activity and national political campaigns raise significant constitutional and prudential issues and therefore we recommend below that Department policy require advance notification to a senior Department official, such as the Deputy Attorney General (DAG), before a Department component opens such an investigation so that Department leadership can consider these issues from the outset.

## B.    Factual Predication

In addition to requiring an authorized purpose, Department and FBI policy also mandate that each case have adequate factual predication before being initiated. The predication requirement is not a legal requirement but rather a prudential one imposed by Department and FBI policy. For example, the Supreme Court has held that the Department and FBI can lawfully open a federal criminal grand jury investigation even in the absence of predication. *See United States* v. *Morton Salt*, 338 U.S. 632, 642-43 (1950) (a grand jury "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not"); *see also United States* v. *R. Enterprises*, 498 U.S. 292, 297 (1991).

The AG Guidelines generally describe predication as allegations, reports, facts, or circumstances indicative of possible criminal activity or a national security threat, or the potential for acquiring information responsive to foreign intelligence collection requirements. For full counterintelligence investigations such as Crossfire Hurricane and the four related individual investigations, Section II.B.4 of the AG Guidelines and Section 7 of the DIOG state that the required level of predication is an "articulable factual basis" that "reasonably indicates" that any one of three defined circumstances exists, including:

> An activity constituting a federal crime or a threat to the national security has or may have occurred, is or may be occurring, or will or may occur and the investigation may obtain information relating to the activity or the involvement or role of an individual, group, or organization in such activity.[483]

The AG Guidelines and the DIOG do not provide heightened predication standards for sensitive matters, or for allegations potentially impacting constitutionally protected activity, such as First Amendment rights. Rather, as we discuss below, the approval and notification requirements contained in the AG Guidelines and DIOG are, in part, intended to provide the means by which such concerns can be considered by senior officials.

In Crossfire Hurricane, the "articulable factual basis" set forth in the opening EC was the FFG information received from an FBI Legal Attaché stating that Papadopoulos had suggested during a meeting in May 2016 with officials from a "trusted foreign partner" that the Trump team had received some kind of suggestion from Russia that it could assist by releasing information damaging to candidate Clinton and President Obama.[484] Additionally, by July 31, 2016, although not specifically mentioned in the EC, the FBI had reason to believe that Russia may have been connected to the WikiLeaks disclosures that occurred earlier in July 2016. Further, as we note in Chapter Three, the FBI received the FFG information at a time when the USIC, including the FBI, was aware of Russia's efforts to interfere with the 2016 U.S. elections. Given the low threshold for predication in

---

[483] As detailed in Chapter Two, the DIOG separately provides that a Preliminary Investigation may be opened based upon "any allegation or information" indicative of possible criminal activity or threats to the national security. In cases opened as Preliminary Investigations, the DIOG provides that all lawful investigative methods (including CHS and UCE operations) may be used except for mail opening, physical searches requiring a search warrant, electronic surveillance requiring a judicial order or warrant (Title III wiretap or a FISA order), or requests under Title VII of FISA. A Preliminary Investigation may be converted to a Full Investigation if the available information provides predication for a Full Investigation.

[484] Papadopoulos has stated that the source of the information he shared with the FFG was a professor from London, Joseph Mifsud, and has raised the possibility that Mifsud may have been working with the FBI. As described in Chapter Ten of this report, the OIG searched the FBI's database of Confidential Human Sources (CHSs) and did not find any records indicating that Mifsud was an FBI CHS, or that Mifsud's discussions with Papadopoulos were part of any FBI operation. The FBI also requested information on ███████████████████████████████████████████

the AG Guidelines and the DIOG, we concluded that the FFG information, provided by a government the USIC deems trustworthy, and describing a first-hand account from an FFG employee of the content of a conversation with Papadopoulos, was sufficient to predicate the full counterintelligence investigation because it provided the FBI an articulable factual basis that, if true, reasonably indicated activity constituting either a federal crime or a threat to national security may have occurred or may be occurring.[485]

We similarly concluded that the FBI had sufficient predication to open full counterintelligence investigations of Papadopoulos, Page, Flynn, and Manafort in August 2016. The investigation of Papadopoulos was predicated upon his alleged statements in May 2016 to an employee of the FFG. According to the opening EC, Papadopoulos was "identical to the individual who made statements indicating that he is knowledgeable that the Russians made a suggestion to the Trump team that they could assist the Trump campaign with an anonymous release of information during the campaign that would be damaging to the Clinton campaign." The three other cases were predicated on information developed by the Crossfire Hurricane team through law enforcement database and open source searches, conducted to determine which individuals associated with the Trump campaign may have been in a position to have received the alleged offer of assistance from Russia. As described in Chapter Three, through these efforts, the Crossfire Hurricane team identified three individuals—Page, Manafort, and Flynn—associated with the Trump campaign with either ties to Russia or a history of travel to Russia, two of whom (Page and Manafort) were already the subjects of open FBI investigations pertaining to, in part, their Russia-related activities. The FBI determined that this information, taken together with the information from the FFG indicating Russia had made a suggestion to the Trump team that it could assist by releasing information damaging to candidate Clinton, stated an articulable factual basis reasonably indicating activity may be occurring that may constitute a federal crime or a threat to national security. As with the opening of Crossfire Hurricane, we concluded that the quantum of information articulated by the FBI to open these individual investigations was sufficient to satisfy the low threshold established by Department and FBI predication policy, particularly in the context of the FBI's separate and ongoing investigative efforts to address Russian interference in 2016 U.S. elections.

## C.    Sensitive Investigative Matters (SIMs)

We concluded that the FBI appropriately designated Crossfire Hurricane and each of the four individual counterintelligence investigations as SIMs, or Sensitive

---

[485] We determined that the election reporting from Christopher Steele played no role in the opening of Crossfire Hurricane. As described in Chapter Four, while some individuals in the FBI, including Steele's handling agent, had received Steele's election reporting as early as July 2016, the CD officials at FBI Headquarters and the members of the Crossfire Hurricane team did not receive the first Steele reports until September 19—weeks after the Crossfire Hurricane investigation was opened—and were not aware of any of the information in the reports prior to that date. We also found no evidence that the FBI undertook any investigative activities directed at the Trump campaign or members of the Trump campaign before opening Crossfire Hurricane on July 31, 2016. As described in Chapters Three and Nine, the FBI had ongoing investigations of Paul Manafort and Carter Page at that time, which were unrelated to the information that predicated Crossfire Hurricane.