UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 2:22-cv-14102-DMM

DONALD J. TRUMP,

Plaintiff,

v.

HILLARY R. CLINTON, HFACC, INC.,
DEMOCRATIC NATIONAL COMMITTEE,
DNC SERVICES CORPORATION, PERKINS
COIE, LLC, MICHAEL SUSSMANN, MARC
ELIAS, DEBBIE WASSERMAN SCHULTZ,
CHARLES HALLIDAY DOLAN, JR., JAKE
SULLIVAN, ADAM SCHIFF, JOHN PODESTA,
ROBERT E. MOOK, PHILLIPE REINES,
FUSION GPS, GLENN SIMPSON, PETER
FRITSCH, NELLIE OHR, BRUCE OHR, ORBIS
BUSINESS INTELLIGENCE, LTD.,
CHRISTOPHER STEELE, IGOR DANCHENKO,
NEUSTAR, INC., NEUSTAR SECURITY SERVICES,
RODNEY JOFFE, JAMES COMEY, PETER STRZOK,
LISA PAGE, KEVIN CLINESMITH, ANDREW MCCABE,
ROD ROSENSTEIN, JOHN DOES 1 THROUGH 10
(said names being fictitious and unknown persons),
and ABC CORPORATIONS 1 THROUGH 10 (said
names being fictitious and unknown entities),

Defendants.

_____

**PLAINITFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

LEGAL ARGUMENT ............................................................................................................ 2

I.    PLAINTIFF'S CLAIMS ARE TIMELY ........................................................................ 2

    A.    EQUITABLE TOLLING IS WARRANTED FOR THE DURATION OF PLAINTIFF'S PRESIDENTIAL TERM ....................................................................................... 2

    B.    ALL OF PLAINTIFF'S CAUSES OF ACTION HAVE BEEN TIMELY ASSERTED ... 6

        i.    Civil RICO (18 U.S.C. § 1962(c) and RICO Conspiracy (18 U.S.C. § 1964) .............. 6

            a.    *The Statute of Limitations Has Been Suspended Throughout the Pendency of Related Criminal and Civil Proceedings* ........................................................................ 6

            b.    *Fraudulent Concealment Compels Equitable Tolling of Plaintiff's RICO Claims* ... 13

            c.    *Accrual Under the Discovery Rule* .......................................................................... 14

    C.    THE REMAINING CLAIMS ARE TIMELY ................................................................ 16

            a.    *Malicious Prosecution* ........................................................................................ 16

            b.    *Injurious Falsehood* ............................................................................................. 17

            c.    *Computer Fraud and Abuse Act and Theft of Trade Secrets* ..................................... 17

II.    THE COMPLAINT PUTS FORTH VALID AND COGNIZABLE CLAIMS AGAINST ALL OF DEFENDANTS ....................................................................................................... 18

    A.    CIVIL RICO (18 U.S.C. § 1962(C)) ........................................................................... 18

        i.    Existence of an Enterprise ........................................................................................ 19

        ii.    Participation in the Enterprise's Affairs .................................................................... 24

        iii.    Pattern of Racketeering Activity ............................................................................. 27

            a.    *Obstruction of Justice (18 U.S.C. § 1512)* ............................................................. 27

            b.    *Theft of Trade Secrets (18 U.S.C. § 1832)* ............................................................. 29

            c.    *Wire Fraud (18 U.S.C. § 1343)* ............................................................................. 33

            d.    *Continuity of the Racketeering Activity* ................................................................. 36

        iv.    RICO Standing and Causation .................................................................................. 40

    B.    RICO CONSPIRACY (18 U.S.C. § 1962(D)) .............................................................. 43

i

C.    INJURIOUS FALSEHOOD ............................................................................ 47

D.    MALICIOUS PROSECUTION........................................................................ 50

E.    STORED COMMUNICATIONS ACT ............................................................ 52

F.    COMPUTER FRAUD & ABUSE ACT ........................................................... 53

G.    THEFT OF TRADE SECRETS (18 U.S.C. § 1832) ....................................... 55

III.   ALTERNATIVELY, PLAINTIFF SEEKS LEAVE TO AMEND THE COMPLAINT
       ……………………………………………………………………………………..55

CONCLUSION................................................................................................................ 55

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Agency Holding Corp. v. Malley-Duff & Assoc.*,
   483 U.S. 143 (1987) ........................................................................................ 6, 7

*Alachua County v. Cheshire*,
   603 So.2d 1334 (Fla. 1992) ................................................................................ 3

*Alexander Grant and Co. v. Tiffany Industries, Inc.*,
   770 F.2d 717 (8th Cir. 1985) ............................................................................ 42

*Alix v. McKinsey & Co.*,
   23 F.4th 196 (2d Cir. 2022) ................................................................. 37, 41, 42

*Al-Rayes v. Willingham*,
   2007 WL 788401 (M.D. Fla. 2007) .................................................................. 27

*American Dental Ass'n v. Cigna Corp.*,
   605 F.3d 1283 (11th Cir. 2010) .............................................................. 34, 35, 45

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ......................................................................................... 18

*Asinmaz v. Semrau*,
   42 So. 3d 955 (Fla. 4th DCA 2010) .................................................................. 48

*Baez v. Root*,
   2014 WL 1414433 (S.D. Fla., April 11, 2014) ................................................ 16

*Baggett v. Bullitt*,
   377 U.S. 360 (1964) ........................................................................................... 3

*Bailey v. Glover*,
   88 U.S. 342 (1874) ............................................................................................. 3

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ......................................................................................... 18

*Bessemer Sys. Fed. Credit Union v. Fiserv Sols.*, LLC, No. 2:19-cv-00624-RJC,
   2021 U.S. Dist. LEXIS 175153, at *30 (W.D. Pa. Sep. 15, 2021) ................... 55

*Bothmann v. Harrington*,
   458 So. 2d 1163 (Fla. 3d DCA. 1984) .............................................................. 47

*Bovino v. MacMillan,*
  28 F. Supp. 3d 1170 (D. Colo. 2014) ................................................................... 52

*Boyle v. United States,*
  556 U.S. 938 (2009) ........................................................................... 19, 20, 22

*Bridge v. Phoenix Bond & Indem. Co.,*
  553 U.S. 639 (2008) ...................................................................................... Passim

*Brooks v. BCBS of Fla., Inc.,*
  116 F.3d 1364 (11th Cir.1997) ........................................................................ 35

*Brown Jordan Int'l, Inc. v. Carmicle,*
  846 F.3d 1167 (11th Cir. 2017) .................................................................. 52, 55

*Capital Asset Rsch. Corp. v. Finnegan,*
  160 F.3d 683 (11th Cir. 1998) ........................................................................ 32

*Caplan v. Johnson,*
  414 F.2d 615 (5th Cir. 1969) .......................................................................... 50

*Chappell v. Rich,*
  340 F.3d 1279 (11th Cir. 2003) ...................................................................... 18

*Chardon v. Fumero Soto,*
  462 U.S. 650 (1983) ........................................................................................... 7

*Cheney v. United States Dist. Court for D. C.,*
  542 U.S. 367 (2004) ........................................................................................... 6

*Chipanno v. Cahmpion Int'l Corp.,*
  702 F.2d 827 (9th Cir. 1983) ............................................................................ 8

*Cisneros v. Petland, Inc.,*
  972 F.2 1204 .................................................................................................... 22

*City of Columbia v. Omni Outdoor Adv., Inc.,*
  499 U.S. 365 (1991) ........................................................................................ 30

*Clark v. Bunker,*
  453 F.2d 1006 (9th Cir. 1972) ........................................................................ 31

*Clinton v. Jones,*
  520 U.S. 681 (1997) ........................................................................................... 4

*Coca–Cola Bottling Co. v. Coca–Cola Co.*,
   107 F.R.D. 288 (D.Del.1985) ........................................................................ 33

*Cocke v. Merrill Lynch & Co.*,
   817 F.2d 1559 (11th Cir.1987) ................................................................. 3, 5

*Compulife Software Inc. v. Newman*,
   959 F.3d 1288 (11th Cir. 2020) ........................................................ 30, 32, 34

*Conley v. Gibson*,
   355 U.S. 41 (1957) ....................................................................................... 18

*Corcel Corp. v. Ferguson Enters., Inc.*,
   551 F. App'x 571 (11th Cir. 2014) .......................................................... 43, 45

*Cytodyne Tech., Inc. v. Biogenic Tech., Inc.*,
   216 F.R.D. 533 (M.D. Fla. 2003) ................................................................ 33

*Davis v. Johnson*,
   158 F.3d 806 (5th Cir. 1998) ......................................................................... 3

*Del Monte Fresh Prod. Co. v. Dole Food Co.*,
   136 F. Supp. 2d 1271 (S.D. Fla. 2001) ........................................................ 30

*Digiport, Inc. v Foram Dev. BFC, LLC*,
   314 So.3d 550 (Fla. Dist. Ct. App. 2020) ..................................................... 32

*Domain Protection, LLC v. Sea Wasp, LLC*,
   426 F.Supp.3d 355 (E.D. Tex. 2019) ...................................................... 33, 52

*Durham v. Bus. Mgmt. Assocs.*,
   847 F.2d 1505 (11th Cir. 1988) .................................................................... 35

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*,
   365 U.S. 127 (1961) ..................................................................................... 30

*Fedance v. Harris*,
   1 F.4th 1278 (11th Cir. 2021) ................................................................. 13, 15

*Foman v. Davis*,
   371 U.S. 178 (1962) ..................................................................................... 55

*Foudy v. Indian River*,
   845 F.3d (11th Cir. 2017) ............................................................................ 13

*Fridovich v. Fridovich,*
   598 So. 2d 65 (Fla. 1992) ........................................................................ 48, 49

*Gabelli v. SEC,*
   568 U.S. 442 ................................................................................................ 15

*Gianelli v. Schoenfeld,*
   2021 WL 4690724 (E.D. Cal. Oct. 7, 2021) ................................................ 8

*H.J. Inc. v. Nw. Bell Tel. Co.,*
   492 U.S. 229 (1989) ............................................................................... 27, 37

*Haekal v. Refco, Inc.,*
   198 F.3d 37 (2d Cir 1999) ......................................................................... 3

*Hallstrom v. Tillamook County,*
   493 U.S. 20 (1989) ...................................................................................... 2

*Hamilton Grp. Funding, Inc. v. Basel,*
   311 F. Supp. 3d 1307 (S.D. Fla. 2018) ...................................................... 52

*Harbin v. Straub,*
   490 U.S. 536 (1989) .................................................................................... 7

*Hill v. Morehouse Med. Assocs., Inc.,*
   2003 WL 22019936 (11th Cir. Aug. 15, 2003) ................................... 35, 40

*Holland v. Florida,*
   560 U.S. 631 (2010) .................................................................................... 3

*Holmes v. Sec. Investor Prot. Corp.,*
   503 U.S. 258 (1992) ................................................................................... 41

*Horgan v. Felton,*
   123 Nev. 577, 170 P.3d 982 (2007) ........................................................... 47

*Hyundai Motor Am. Corp. v. North Am. Auto. Servs.,*
   2021 U.S. Dist. LEXIS 99713 at *22 (S.D. Fla. May 25, 2021) ................. 39

*Hyundai Motor Am. Corp.,*
   2021 U.S. Dist. LEXIS 99713 at *11 .......................................................... 41

*In re Managed Care Litig.,*
   298 F.Supp. 1259 (S.D.FL. 2003) ............................................................. 45

*Integrated Direct Mktg., LLC v. May,*
   495 S.W.3d 73 (Ark. 2016) ..................................................................... 33

*Jackson v. BellSouth Telecomms.,*
   *372 F.3d 1250, 1265 (11th Cir. 2004),* .............................. 38, 39, 40, 41

*Johnson v. Railway Exp. Agency, Inc.,*
   421 U.S. 454 (1975) .......................................................................... 7, 8

*Klehr v. A.O. Smith Corp.,*
   521 U.S. 179, 189, 117 S. Ct. 1984, 1990 (1997) ............................... 6, 15

*Kremen v. Cohen,*
   337 F.3d 1024 (9th Cir 2003) ........................................................ 32, 33

*La Grasta v. First Union Sec., Inc.,*
   358 F.3d 840 (11th Cir. 2004) .................................................................. 2

*Latonik v. Fla. Dept. of Highway Safety & Motor Vehicles,*
   2014 WL 7010737 (M.D. Fla. Dec. 11, 2014) ........................................... 2

*Le Maistre v. Leffers,*
   319 U.S. 561 (1948) .................................................................................. 5

*Leh v. Gen. Petroleum Corp.,*
   382 U.S. 54 (1965) ........................................................... 8, 9, 12, 13

*Lehman v. Lucom,*
   727 F.3d 1326 (11th Cir. 2013) .............................................................. 15

*Lewis v. Lhu,*
   696 F.Supp. 723 (D.D.C. 1988) ............................................... 37, 41, 42

*Lozano v. Montoya Alvarez,*
   572 U.S. 1 (2014) ..................................................................................... 2

*Machules v. Dept. of Admin.,*
   523 So.2d 1132 (Fla. 1988) ...................................................................... 3

*Magnifico v. Villanueva,*
   783 F. Supp. 2d 1217 (S.D. Fla. 2011) .............................................. 39, 40

*Maiz v. Virani,*
   253 F.3d 641 (11th Cir. 2001) ................................................................ 15

*Mathews v. Kidder, Peabody & Co., Inc.*,
    260 F.3d 239 (3d Cir. 2001) ................................................................ 13

*Metallurgical Indus. Inc. v. Fourtek, Inc.*,
    790 F.2d 1195 (5th Cir. 1986) .............................................................. 32

*Mid Atlantic Telecom, Inc. v. Long Distance Services, Inc.*,
    18 F.3d 260 (4th Cir. 1994) ................................................... 37, 41, 42

*Minnesota Min. & Mfg. Co. v. New Jersey Wood Finishing Co.*,
    381 U.S. 311 (1965) ................................................... 8, 9, 10, 12

*Mullinax v. McElhenney*,
    817 F.2d 711 (11th Cir. 1987) .............................................................. 18

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982) ................................................................... 4, 5

*Nixon*,
    418 U.S. ................................................................................................ 6

*Nodar v. Galbreath*,
    462 So. 2d 803 (Fla. 1984) .................................................................. 48

*Olson v. Johnson*,
    961 So. 2d 356 (Fla. 2nd DCA 2007).................................................. 16

*P.C. Yonkers, Inc. v. Celebrations the Party Seasonal Superstore, LLC*,
    428 F.3d 504 (3d Cir. 2005) ................................................................ 53

*Pace v. DiGuglielmo*,
    544 U.S. 408 (2005) .............................................................................. 3

*Pelletier v. Zweifel*,
    921 F.2d 1465 (11th Cir.1991) ............................................................ 34

*Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*,
    318 F.3d 1284 (11th Cir. 2003) ........................................................... 34

*Pension Fund Mid Jersey Trucking Industry v. Omni Funding*,
    687 F.Supp. 962 (D.N.J., June 28, 1988) ............................................. 8

*Pharmerica, Inc. v. Arledge*,
    2007 WL 865510 (M.D. Fla. March 21, 2007) ................................... 53

*Pilkington v. United Airlines*,
   112 F.3d 1532 (11th Cir.1997) ............................................................... 15

*Pres. Petrified Forrest v. Renzi*,
   2014 WL 530574, at *3-4 (D. Ariz. Feb. 12, 2013) ................................ 8

*Procter & Gamble Co. v. Amway Corp.*,
   242 F.3d 539 (5th Cir. 2001) ................................................... 37, 41, 42

*Professional Real Estate Investors v. Columbia Pictures Industries, Inc.*,
   508 U.S. 49 (1993) ................................................................................ 30

*Ray v. Spirit Airlines, Inc.*,
   836 F.3d 1340 (11th Cir. 2016) ............................................................ 19

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993) ........................................................................ 24, 27

*Rotella v. Wood*,
   528 U.S. 549 (2000) .............................................................................. 14

*Sailboat Kev. Inc. v. Gardner*, ............................................................... 46
   378 So.2d 47, 48 (Fla. 3d DCA 1979)

*Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*,
   742 So.2d 381 (Fla. 4th DCA 1999) ................................................ 46, 47

*Schmuck v. United States*,
   489 U.S. 705 (1989) .............................................................................. 35

*SEC v. Gabelli*,
   653 F.3d 49 (2d Cir. 2011) ................................................................... 13

*Sedima, S.P.R.L. v. Imrex Co.*,
   473 U.S. 479 (1985) .............................................................................. 19

*Southern Bell Telephone & Telegraph Company v. Roper*,
   482 So. 2d 538 (Fla. 3d DCA 1986) ..................................................... 48

*Sprinkler Warehouse, Inc. v. Systematic Rain, Inc.*,
   880 N.W.2d 16 (Minn. 2016) ............................................................... 33

*State Farm Mut. Auto. Ins. Co. v. Kugler*, No.,
   2011 WL 4389915 (S.D. Fla. Sept. 21, 2011) ....................................... 2

*Steve Jackson Games, Inc. v. United States Secret Service,*
  36 F.3d 457 (5th Cir. 1994) ......................................................................... 52

*Story Parchment Co. v. Paterson Parchment Co.,*
  282 U.S. 555 (1931) .................................................................................... 42

*Tello v. Dean Witter Reynolds, Inc.,*
  410 F.3d 1275 (11th Cir. 2005) .................................................................... 2

*Theofel v. Farey-Jones,*
  359 F.3d 1066 (9th Cir. 2004) ..................................................................... 52

*Thomas v. Ross & Hardies,*
  9 F.Supp.2d 547 (D. Md. 1998)................................................................... 27

*Trump v. Mazars USA LLP,*
  140 S.Ct. 2019 ............................................................................................. 6

*Trump v. Vance,*
  140 S. Ct. 2412 (2020)............................................................................ 4, 5

*U.S. v. Pendergraft,*
  297 F.3d 1198 (11th Cir. 2002) ................................................................... 36

*U.S. v. Phillips,*
  477 F.3d 215 (5th Cir. 2007) ....................................................................... 52

*Union Carbide & Carbon Corp. v. Nisley,*
  300 F.2d 561 (10th Cir. 1962) ..................................................................... 8

*Unistar Corp. v. Child,*
  415 So. 2d 733 (Fla. 3rd DCA 1982) .......................................................... 32

*United States v. Bradley,*
  644 F.3d 1213 (11th Cir. 2011) ............................................................ 34, 36

*United States v. Councilman,*
  418 F.3d 67 (1st Cir. 2005).......................................................................... 52

*United States v. Friske,*
  640 F.3d 1288 (11th Cir. 2011) ................................................................... 29

*United States v. Grubb,*
  11 F.3d 426 (1993) ...................................................................................... 29

x

*United States v. Lee,*
  919 F.3d 340 (6th Cir. 2019) ................................................................................................ 29

*United States v. Mintmire,*
  507 F.3d 1273 (11th Cir. 2007) ........................................................................................... 29

*United States v. Patterson,*
  211 F.3d 927 (5th Cir. 2000) ................................................................................................. 3

*United States v. Ronda,*
  455 F.3d 1273 (11th Cir 2006) ............................................................................................. 28

*United States v. Ronga,*
  682 Fed.Appx. 849 (11th Cir. 2017) .................................................................................... 28

*United States v. Sylvestri,*
  409 F.3d 1311 (11th Cir. 2005) ........................................................................................... 45

*United States v. Takhalov,*
  827 F.3d 1307 (11th Cir. 2016) ........................................................................................... 34

*United States v. United Fruit Co.,*
  410 F.2d 553 (5th Cir. 1969) ............................................................................................... 33

*United States v. Veal,*
  153 F.3d 1233 (11th Cir. 1998) ........................................................................................... 28

*Van Buren v. United States,*
  *141 S. Ct. 1648* ............................................................................................................ 53, 54

*ViChip Corp. v. Lee,*
  438 F. Supp.2d 1087 (N.D. Cal. 2006.) ............................................................................... 53

*Wagner, Nugent, Johnson, Roth, Romano, Erikson & Kupfer, P.A. v. Flanagan,*
  629 So. 2d 113 (Fla. 1993) .................................................................................................. 17

*Williams v. Mohawk Indus., Inc.,*
  465 F.3d 1277 (11th Cir. 2006) ........................................................................................... 24

*Young v. United States,*
  535 U.S. 43 (2002) ................................................................................................................ 2

*Zenith Radio Corp. v. Hazeltine Research,*
  401 U.S. 321, 336, 91 S. Ct. 795, 805 (1971) ...................................................................... 8

## **Statutes**

15 U.S.C. § 15(b) ............................................................................................................. 6
15 U.S.C. § 16(i) ..................................................................................................... Passim
18 U.S.C. 1515(a)(1)(B),(C) .......................................................................................... 29
18 U.S.C. 1515(a)(3)(A),(C),(D) .................................................................................. 28
18 U.S.C. § 1001(a)(2) ................................................................................................... 12
18 U.S.C. § 1030(e)(11) ................................................................................................. 55
18 U.S.C. § 1030(g) ................................................................................................. 17, 53
28 U.S.C. § 1343 ...................................................................................................... 28, 34
18 U.S.C. § 1512 ..................................................................................................... Passim
18 U.S.C. § 1832 .................................................................................... 27, 30, 34, 55
18 U.S.C. § 1839(3) .................................................................................................. 31, 33
18 U.S.C. § 1961-1968 ............................................................................................... 6, 19
18 U.S.C. § 1961(1) ....................................................................................................... 27
18 U.S.C. § 1961(4) ....................................................................................................... 19
18 U.S.C. § 1961(5) ....................................................................................................... 27
*18 U.S.C. § 1962(c)* ................................................................................................ Passim
18 U.S.C. § 1962(D) .................................................................................................. 45, 46
*18 U.S.C. § 1964* ............................................................................................................ 6
18 U.S.C. § 1964(c) ....................................................................................................... 41
18 U.S.C. § 2701 ............................................................................................................ 51
28 U.S.C. § 515 ............................................................................................................. 50
50 U.S.C. §§ 3901-4043 ................................................................................................... 5
Fla. Stat. § 95.11(3)(o) ................................................................................................. 16
Fla. Stat. § 95.11(4)(g) ................................................................................................. 17
U.S. Const. Art. II ........................................................................................................... 4
§ 1030(a)(4) .................................................................................................................. 53
§ 1512 (b)(3) .................................................................................................................. 28
§ 1512 (b)(3) and § 1512 (c)(2) .................................................................................... 28
§ 1512(c)(2) ................................................................................................................... 29

## **Rules**

Fed. R. Civ. P. 9(b) .................................................................................................. 20, 35
Fed. R. Civ. P. 15(a) ...................................................................................................... 55
Rule 8 ............................................................................................................................ 18
Rule 8(a)(2) F. R. Civ. P ............................................................................................... 18
Rule 15 of the Federal Rules of Civil Procedure ......................................................... 55

## **Other Authorities**

2 U.S. Code Cong. And Admin. News ............................................................................ 8

## INTRODUCTION

In their consolidated motion to dismiss, Defendants[1] are heavy on hyperbole and light on substance. Indeed, despite characterizing the Complaint as a "fundraising tool," Defendants conspicuously shy away from bona fide legal argument and largely fail to address the substance of Plaintiff's claims. Instead, they strain credibility by raising a diatribe of disingenuous arguments which gloss over pertinent facts, distort Plaintiff's legal theories, and mischaracterize operative case law. In doing so, Defendants seemingly hope to divert attention from the validity of Plaintiff's explosive claims—which are meticulously sourced and thoroughly pled—while simultaneously minimizing the reprehensible nature of the conduct outlined in the Complaint.

To start, Defendants devote a significant portion of their motion making the ill-fated argument that Plaintiff's claims are time-barred. The thrust of Defendants' argument is that, since some of the events referenced in the Complaint occurred in 2016, it follows that all relevant statutes of limitations must have expired by the time the Complaint was filed on March 24, 2022. This argument misses the mark for several reasons. First, when considering all relevant factors, such as the federal discovery rule, there is no question that each of Plaintiff's claims have been asserted within the applicable time periods. Further, Defendants fail to recognize that there are numerous unique and special factors at play which counsel in favor of an equitable tolling of all applicable statutes of limitations in Plaintiff's favor – including that Plaintiff was immersed in the diligent execution of his presidential duties during a majority of the relevant time period while Defendants were making every effort to conceal their illicit conduct. Therefore, contrary to Defendants' contention, Plaintiff's claims have been asserted in a timely fashion.

Beyond that, Defendant's motion merely consists of scattershot arguments that do nothing to dispute the merits of Plaintiff's claims. Despite their best efforts, Defendants simply cannot muster a single viable argument as to why any of the claims should be dismissed. This is because the Complaint puts forth actionable, cognizable claims which cannot conceivably be subject to dismissal at this stage of litigation. Therefore, for the reasons set forth herein, Defendants' motion must be denied in its entirety.

---

[1] All capitalized terms herein shall have the same meaning and shall be defined in the same manner and context as they appear and are pleaded in the Amended Complaint filed on June 21, 2022 (ECF Doc. No. 177) (the "Complaint").

**LEGAL ARGUMENT**

## I.   PLAINTIFF'S CLAIMS ARE TIMELY

Plaintiff's claims have been timely asserted and are not barred by the applicable statutes of limitations. As an initial matter, a "statute of limitations bar is an affirmative defense, and plaintiff[s] [are] not required to negate an affirmative defense in [their] complaint." *La Grasta v. First Union Sec., Inc.,* 358 F.3d 840, 845 (11th Cir. 2004) (quotation omitted). At the motion to dismiss stage, an action can only be excluded on statute of limitations grounds "if it appears beyond a doubt that Plaintiffs can prove no set of facts that toll the statute." *Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288 n.13 (11th Cir. 2005) (internal quotations omitted); *see also Latonik v. Fla. Dept. of Highway Safety & Motor Vehicles,* No. 6:14-cv-1793*,* 2014 WL 7010737 at *2 (M.D. Fla. Dec. 11, 2014) (quoting *La Grasta*) (refusing to find claims time-barred at motion-to-dismiss stage); *State Farm Mut. Auto. Ins. Co. v. Kugler,* No. 11-80051, 2011 WL 4389915 at *13 (S.D. Fla. Sept. 21, 2011) (denying motion to dismiss RICO and state law claims, noting "perimeters of [four year] limitations period are appropriately defined by reference to the delayed discovery doctrine. . . and the doctrine of equitable tolling" and refusing to resolve on motion to dismiss).

Defendants' position that Plaintiff's claims are time-barred is misguided and contrary to the case law governing when each of the respective causes of action actually began to accrue. Furthermore, there are numerous special factors involved in the instant matter which warrant an equitable tolling of all relevant statutes of limitations in Plaintiff's favor. Therefore, for the reasons set forth herein, all of Plaintiff's causes of action are timely.

### A. EQUITABLE TOLLING IS WARRANTED FOR THE DURATION OF PLAINTIFF'S PRESIDENTIAL TERM

Given the novel circumstances at hand, an equitable tolling is warranted for the duration of time that Plaintiff was serving as President of the United States.

Statutes of limitations in civil actions are "traditional subject to equitable tolling." *Hallstrom v. Tillamook County,* 493 U.S. 20, 27 (1989) (citation omitted); *see also Young v. United States*, 535 U.S. 43, 49 (2002) (noting that statutes of limitations are "customarily subject to equitable tolling, unless tolling would be inconsistent with the text of the relevant statute.") (citations omitted); *Lozano v. Montoya Alvarez*, 572 U.S. 1, 11 (2014) (stating that courts must "presume that equitable tolling applies if the period in question is a statute of limitations[.]"). When applicable, equitable tolling "pauses the running of, or 'tolls,' a statute of limitations when. . . some extraordinary

circumstance prevents [a plaintiff] from bringing a timely action." *Lozano*, 572 U.S. at 10. In other words, "the limitations period is deemed interrupted [and] when the tolling condition or event has ended, the [plaintiff] is allowed the remainder of the limitations period in which to file his action. *Haekal v. Refco, Inc.*, 198 F.3d 37, 43 (2d Cir 1999) (citation omitted).

The doctrine of equitable tolling been "developed to permit under certain circumstances the filing of a lawsuit that otherwise would be barred by a limitations period." *Bailey v. Glover,* 88 U.S. 342 (1874). The purpose of equitable tolling is to "preserve[] a plaintiff's claims when strict application of the statute of limitations would be inequitable." *United States v. Patterson,* 211 F.3d 927, 930 (5th Cir. 2000). Accordingly, it is employed "in the interests of justice to accommodate . . . a plaintiff's right to assert a meritorious claim when equitable circumstances have prevented a timely filing." *Cocke v. Merrill Lynch & Co.,* 817 F.2d 1559, 1561 (11th Cir.1987). In this way, it "serves to ameliorate harsh results that sometimes flow from a strict, literalistic construction and application of administrative time limits contained in statutes and rules." *Machules v. Dept. of Admin.*, 523 So.2d 1132, 1134 (Fla. 1988) (citation omitted).

A plaintiff is "entitled to equitable tolling if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing. *Holland v. Florida*, 560 U.S. 631, 650 (2010); *see also Alachua County v. Cheshire,* 603 So.2d 1334, 1337 (Fla. 1992) (noting that equitable tolling is warranted when a plaintiff has "in some extraordinary way been prevented from asserting his rights."). This determination is made on a "case-by-case basis." *Id.* The Supreme Court has emphasized "the need for 'flexibility' for avoiding 'mechanical rules'" in making this assessment, encouraging courts to "'relieve hardships which, from time to time, arise from a hard and fast adherence' to more absolute legal rules, which, if strictly applied, threaten the 'evils of archaic rigidity.'" *Id.* (citations omitted). Succinctly stated, the "'flexibility' inherent in 'equitable procedure' enables courts 'to meet new situations [that] demand equitable intervention, and to accord all the relief necessary to correct . . . particular injustices.'" *Id.* (citation omitted).

Turning to the instant matter, there are a multitude of extraordinary circumstances that justify the equitable tolling of Plaintiff's statutory deadlines. Indeed, given the subject matter of the case, the prominent positions held by many of the individuals involved, and the numerous high-profile investigations, inquiries and proceedings that have preceded this action, there is no shortage of unique and exceptional factors that have prevented Plaintiff from bringing forth his claims in a more

timely manner. Without question, the most notable factor is that, for a majority of time that Defendants' actions were underway—from January 20, 2017 through January 20, 2021—Plaintiff was serving as President of the United States. As such, he was preoccupied with carrying out his eminently important presidential duties and was therefore impeded from effectively asserting his rights. This fact, on its own, warrants an equitable tolling of all relevant statutes of limitations during that span of time.

The Supreme Court has recognized that the President "occupies a unique position in the constitutional scheme." *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982). Article II of the Constitution vests the entirety of the "executive power" of the United States government in the President and provides that "the President shall be Commander in Chief of the Army and Navy of the United States." U.S. Const. Art. II; *see also Nixon*, 457 U.S. at 750 (noting that Art. II, § 1 "establishes the President as the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity."). The President also has an overarching duty to "preserve, protect, and defend the Constitution" and to take "[c]are that the Laws be faithfully executed[.]" U.S. Const. Art. II, §§ 1, 3. In short, the President is responsible for "enforc[ing] . . . federal law," "conduct[ing] . . . foreign affairs," and "manag[ing] . . . the Executive Branch." *Nixon*, 457 U.S. at 750. For this reason, the Supreme Court has consistently acknowledged that the President's responsibilities are "of unrivaled gravity and breadth," *Trump v. Vance*, 140 S. Ct. 2412, 2425 (2020), and that "[i]n drama, magnitude, and finality his decisions so far overshadow any others that almost alone he fills the public eye and ear," *Clinton v. Jones*, 520 U.S. 681, 698 (1997). In other words, considering the vastness and importance of his duties, it can be said that a President "never adjourns." *Id.* at 713 (Breyer, J., concurring in judgment).

In view of this concern, the *Nixon* court cautioned that "[b]ecause of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government." *Nixon*, 457 U.S. at 749. The *Clinton* court echoed this sentiment, proclaiming that the President "occupies a unique office with powers and responsibilities so vast and important that the public interest demands that he devote his undivided time and attention to his public duties." *Clinton*, 520 U.S. at 697. Thus, the holdings in *Nixon* and *Clinton* both underscore the principle that "[i]ncidental to the functions confided in Article II is 'the power to perform them[] *without obstruction or impediment*.'" *Vance*, 140 S. Ct. at 2432 (citation omitted) (emphasis added).

4

Consistent with this reasoning, Plaintiff should be afforded an equitable tolling in the instant matter as to all applicable statutes of limitations for the duration of time that he was serving as President of the United States. Given the immense and unrelenting demands involved in serving as President, Plaintiff was simply not in a position to commence a lawsuit against Defendants during the time he was in office, particularly not one as complex and wide-spanning as the present action. As a sitting President, Plaintiff tirelessly devoted himself to serving the Nation and ensuring the well-being of the American people. Indeed, it was his obligation and duty – any other course of action would have been "to the detriment of . . . the Nation that the Presidency was designed to serve." *Nixon*, 457 U.S. at 753. It follows, therefore, that Plaintiff should not be penalized for choosing to forego his own self-interests in favor of fully and faithfully executing his duties as President.[2] It is difficult to envision a more "equitable circumstance" that requires accommodation in "the interests of justice." *Cocke,* 817 F.2d at 1561.

Moreover, not only would have it been imprudent and infeasible for Plaintiff to have filed the instant action during his presidential campaign, but it would also have been entirely inappropriate. Several of Defendants in this action—such as James Comey, Andrew McCabe, Bruce Ohr, and others—were high-ranking government officials with the Federal Bureau of Investigation (FBI) and/or the Department of Justice (DOJ) for much of the time that Plaintiff was serving as President. There were also numerous high-profile investigations and proceedings taking place during that time which related to the underlying facts and circumstances of this case. For instance, it likely would have been improper for Plaintiff—the head of the Executive Branch and most prominent member of the United States government—to sue his Executive Branch subordinates, as doing so would have been a potential conflict of interest and risked interfering with the then-ongoing investigation being carried out by Special Counsel Robert Mueller. Such an act would have also likely raised separation of powers concerns due to the potential disruption of the investigation being carried out at that time by the Select Committee on Intelligence. *See*, *e.g.*, *Cheney v. US Dist. Court for D.C.*, 542 U.S. 367, 389-390 (2004) ("'[O]ccasion[s] for constitutional confrontation between

---

[2] It is worth noting that the tolling provisions of the Servicemembers Civil Relief Act, 50 U.S.C. §§ 3901-4043, is based upon a similar premise – namely, that individuals who selflessly devote their time and energy to serving the Nation should not be punished for "dropping their affairs to answer their country's call." *Le Maistre v. Leffers*, 319 U.S. 561, 575 (1948). The President of the United States—who is the Commander and Chief of the nation's armed forces—should be afforded the same benefit.

5

the two branches' should be avoided whenever possible.") (quoting *Nixon,* 418 U.S. at 692); *see also Trump v. Mazars USA LLP*, 140 S.Ct. 2019, 2033-34 ("Congress and the President have an ongoing institutional relationship as the 'opposite and rival' political branches established by the Constitution.").

Therefore, in view of the unique circumstances presented in this case, Plaintiff respectfully requests that all applicable statutes of limitation in this action be equitably tolled from January 20, 2017 through January 20, 2021 – the four-year period during which Plaintiff was serving as President of the United States.

## B. ALL OF PLAINTIFF'S CAUSES OF ACTION HAVE BEEN TIMELY ASSERTED

Assuming *arguendo* that equitable tolling is not warranted in the instant scenario, Plaintiff's claims are timely all the same. Indeed, contrary to Defendants' contention, each of Plaintiff's claims was asserted well within the applicable statute of limitations period for the reasons set forth below.

### i. Civil RICO (18 U.S.C. § 1962(c) and RICO Conspiracy (18 U.S.C. § 1964)

#### a. The Statute of Limitations Has Been Suspended Throughout the Pendency of Related Criminal and Civil Proceedings

When passing the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1961-1968, Congress neglected to provide an applicable statute of limitations for causes of action arising under the statute. Thereafter, in *Agency Holding Corp. v. Malley-Duff & Assoc.*, 483 U.S. 143 (1987), the Supreme Court "borrow[ed]" the four-year statute of limitations of the Clayton Act, codified in 15 U.S.C. § 15(b), and held that it is applicable to Civil RICO claims. *Malley-Duff*, 483 'U.S. at 148. In doing so, the Court recognized that "even a cursory comparison of the two statutes reveals that the civil action provision of RICO was patterned after the Clayton Act" and acknowledged that "the Clayton Act clearly provides a far closer analogy than any available state statute, and that the federal policies that lie behind RICO and the practicalities of RICO litigation make the selection of the 4–year statute of limitations for Clayton Act actions . . . the most appropriate limitations period for RICO actions." *Id.* at 156; *see also Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 189, 117 S. Ct. 1984, 1990 (1997) ("Congress consciously patterned civil RICO after the Clayton Act."). Among other things, the Court noted that: "[b]oth RICO and the Clayton Act are designed to remedy economic injury by providing for the recovery of treble damages, costs, and attorney's fees[;] [b]oth statutes bring to bear the pressure of 'private attorneys general' on a serious

national problem for which public prosecutorial resources are deemed inadequate; [and] both statutes aim to compensate the same type of injury; each requires that a plaintiff show injury 'in his business or property by reason of' a violation." *Malley-Duff*, 483 U.S. at 150-51.

Critically, when a statute of limitations is 'borrowed' in this way, the statute is adopted *in its entirety*. In *Johnson v. Railway Exp. Agency, Inc.*, 421 U.S. 454, 463-64 (1975), the Supreme Court stated:

> Any period of limitation . . . is understood dully only in the context of the various circumstances that suspend it from running against a particular cause of action. Although any statute of limitations is necessarily arbitrary, the length of the period allowed for instituting suit inevitably reflects a value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones. In virtually all statutes of limitations the chronological length of the limitation period is interrelated with provisions regarding tolling, revival, and questions of application.

In other words, when a statute of limitations is 'adopted'—as is the case here—the tolling and suspension provisions contained in the adopted statute will likewise be carried over. *Id.*; *see also Chardon v. Fumero Soto*, 462 U.S. 650, 657 (1983) ("Because the 'chronological length of the limitation period is interrelated with provisions regarding tolling' . . . the practice of 'borrowing' state statutes of limitations "logically include[s] rules of tolling.") (citations omitted); *Harbin v. Straub*, 490 U.S. 536 (1989) ("In virtually all statutes of limitations, the chronological length of the limitation period is interrelated with provisions regarding tolling, revival, and questions of application. . . [c]ourts thus should not unravel state limitations rules unless their full application would defeat the goals of the federal statute at issue.") (citing *Johnson*, *supra*).

Critically, the Clayton Act contains a tolling provision, codified as 15 U.S.C. § 16(i), which states as follows:

> Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws, but not including an action under section 15a of this title, the running of the statute of limitations in respect to every private or State right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter[.]

The legislature's reason for including this tolling provision was to allow a potential plaintiff to "reap the benefits" of a related government proceeding by allowing the potential plaintiff to "study the [g]overnment's case, estimate his own damages, assess the strength and validity of his suit, and prepare and file his complaint." 2 U.S. Code Cong. And Admin. News, 84th Cong. 1955, at 2328,

2332; *see also Minnesota Min. & Mfg. Co. v. New Jersey Wood Finishing Co.*, 381 U.S. 311, 317 (1965) ("it is plain that in [§ 16(i)]  Congress meant to assist private litigants in utilizing any benefits they might cull from government . . . actions."); *Union Carbide & Carbon Corp. v. Nisley*, 300 F.2d 561, 569 (10th Cir. 1962) (noting that the purpose of the Clayton Act's tolling provision is to "to vouchsafe the intended benefits of related government proceedings by suspending the running of the statute of limitations until the termination of the government proceedings[.]").

Indeed, several courts have already confirmed that, consistent with *Johnson v. Railway Exp. Agency, Inc,* the tolling provision of 15 U.S.C. § 16(i) applies in full force to RICO actions. *See, e.g., Pension Fund Mid Jersey Trucking Industry v. Omni Funding*, 687 F.Supp. 962, 965 (D.N.J., June 28, 1988) ("I conclude that the tolling provisions of the Clayton Act are applicable under RICO."); *Gianelli v. Schoenfeld*, 2021 WL 4690724, at *6 (E.D. Cal. Oct. 7, 2021) ("The court is willing to assume . . . that the Clayton Act's tolling provision applies to RICO claims."); *Pres. Petrified Forrest v. Renzi*, 2014 WL 530574, at *3-4 (D. Ariz. Feb. 12, 2013) ("The Court concludes that the tolling provision in 15 U.S.C. § 16(i) applies to the RICO civil enforcement provisions."). Thus, since § 16(i) is applicable to Plaintiff's RICO claims, the question turns to whether there are circumstances present that warrant tolling here.

The tolling effect of 15 U.S.C. § 16(i) is triggered upon the commencement of any "civil or criminal proceeding . . . instituted by the United States." 15 U.S.C. § 16(i). The time of commencement of a proceeding is generally considered to be the filing of an indictment or complaint. *See, e.g., Leh v. Gen. Petroleum Corp.*, 382 U.S. 54,  59-63 (1965) (giving tolling effect from the time that the government filed a complaint); *Minn. Mining & Mfg. Co*, 381 U.S. at 313 (giving tolling effect from the date the FTC filed an enforcement action); *Chipanno v. Cahmpion Int'l Corp.*, 702 F.2d 827, 832-33 (9th Cir. 1983) (giving tolling effect from the date government filed a complaint). When applicable, § 16(i) "tolls the statute of limitations against all participants in a conspiracy which is the object of a Government suit, whether or not they are named as defendants or conspirators therein." *Zenith Radio Corp. v. Hazeltine Research,* 401 U.S. 321, 336, 91 S. Ct. 795, 805 (1971). Moreover, "[s]uspension of the running of the statute of limitations pending resolution of the government action may not be made to turn on whether the United States is successful in proving the allegations of its complaint." *Leh*, 382 U.S. at 65.

Although Defendants argue that § 16(i) is inapplicable because there are no "government actions founded on the specific RICO predicate acts [] alleged" in the Complaint, Def. Mem. at 5,

they fail to recognize that the express language of the statute requires only that a prior proceeding be "based in whole or *in part* on *any matter* complained of" in the instant proceeding. 15 U.S.C. § 16(i). Indeed, to establish that a prior proceeding qualifies under § 16(i), a "private plaintiff is not required to allege that the same means were used to achieve the same objectives of the same conspiracies by the same defendants . . . [r]ather, effect must be given to the broad terms of the statute itself—'based in whole or in part on any matter complained of." *Leh*, 382 U.S. at 59. All that is required is that Plaintiff show that "the matters complained of in the government suit bear a *real relation* to the private plaintiff's claim for relief." *Id.* at 59 (emphasis added); *see also Minnesota Min. & Mfg. Co.*, 381 U.S. at 323 (stating that § 16(i) "provides for tolling as long as the private claim is based 'in part on any matter complained of' in the government proceedings."). To make this determination, courts will look towards "a comparison of the two complaints on their face." *Leh*, 382 U.S. at 65.

Here, there are three prior proceedings with subject matter that overlap significantly with the matters complained of in the instant complaint, and therefore qualify as "civil or criminal proceedings under § 16(i):

*First*, the enforcement action commenced by the Federal Election Commission (FEC) against the DNC and the Clinton Campaign, under the caption *In the Matter of DNC Services Corp./Democratic National Committee and William Q. Derrough in his official capacity as treasurer; Hillary for America and Elizabeth Jones in her official capacity as treasurer; Perkins Coie LLP; Marc Elias; Fusion GPS; Christopher Steele*, Federal Election Commission, MURs 7291, 7331 and 7449 (the "FEC Action"), qualifies as such. While § 16(i) states only that it applies to a "civil or criminal proceeding " that is "instituted by the United States," the Supreme Court has interpreted this language broadly to encompass federal administrative proceedings. Specifically, in *Minnesota Min. & Mfg. Co.*, the Court found that a proceeding initiated by the Federal Trade Commission (FTC) qualified under § 16(i). In doing so, the Court pointed to the legislative intent of § 16(i) and implied that all proceedings initiated by a federal agency would similarly qualify:

> We hold, therefore, that the limitation provision of [§ 16(i)] is tolled by Commission proceedings to the same extent and in the same circumstances as it is by Justice Department actions. In so holding we give effect to Congress' basic policy objectives in enacting [§ 16(i)]—objectives which would be frustrated should we reach a contrary conclusion and thereby deprive large numbers of private litigants of the benefits of government antitrust suits simply because those suits were pursued by

one governmental agency rather than the other." *Minnesota Min. & Mfg. Co.*, 381 U.S. at 321-322.

The operative complaint in the FEC Action, the First General Counsel's Report (the "FEC Complaint"), was filed on April 10, 2019.[3] *See generally* Declaration of Alina Habba, **Exhibit A**; *see also* Am. Compl. ¶ 83. In sum and substance, the FEC Complaint alleges that the DNC and the Clinton Campaign "failed to file accurate disclosure reports when they mischaracterized the payee and purpose of certain disbursements disclosed as made to Perkins Coie LLP for legal services, when in fact the payments were passed through to the research firm Fusion GPS for the purpose of opposition research and should have been disclosed as such." Habba Dec., **Ex. A** at 1. In addition to the DNC and the Clinton Campaign, the Complaint discusses many of the prominent Defendants in this action, including Perkins Coie, Marc Elias, Robby Mook, Fusion GPS, Glenn Simpson, Christopher Steele, and Orbis Ltd. The facts alleged in the FEC Complaint overlapped immensely with the allegations contained in Plaintiff's Complaint, particularly with regard to the construction of the Enterprise, the RICO Defendants' actions in furtherance of the Enterprise's goals, their collective efforts to conceal their illicit arrangement by misreporting the relationship between the DNC/the Clinton Campaign and Fusion GPS and funneling funds through Perkins Coie, and Defendants' knowledge of the same.

For example, the FEC Complaint describes how the Clinton Campaign and the DNC, through their joint general counsel, Perkins Coie, worked with Fusion GPS, who retained Steele and Orbis Ltd. to perform opposition research on Plaintiff and lead a media smear campaign against him. It goes on to describe how "Steele drafted a series of memoranda based on the information he gathered (i.e., the dossier) and provided the memoranda, intermittently, to Fusion, which in turn shred some of the information therein . . . with Perkins Coie, which in turn shared some of the information with [the Clinton Campaign and the DNC]." *Id.* at 38; *compare generally to* Am. Compl. It even discusses events such as Fusion GPS and Steele meeting with major media outlets to discuss the details the alleged Trump-Russia collusion, *id.* at 11 n. 37; *compare to* Am. Compl. ¶ 227, Steele providing a copy of the Dossier to the FBI, Habba Dec., **Ex. A** at 10; *compare to* Am. Compl. ¶¶ 158, 226, 651, and Steele describing the contents of the Dossier to a journalist with *Mother Jones*, Habba Dec., **Ex.**

---

[3] The First General Counsel's Report was subsequently affirmed and authorized for compulsory process by the FEC Commissioners on July 23, 2019. *See* Certification ¶ 2.a, MURs 7291 &7449 (DNC & HFA) (July 26, 2019); Am. Compl. ¶¶ 83, 471.

**A** at 10; *compare to* Am. Compl. 272-275. Given the significant overlap between the FEC Complaint and the Complaint, there is a sufficient throughline between the two actions to qualify the FEC Action as a "civil or criminal proceeding . . . instituted by the United States." Accordingly, the statute of limitations for Plaintiff's RICO claim was suspended as of the time of the filing of the FEC Complaint on April 10, 2019, and said suspension remained in place when Plaintiff's Complaint was filed on March 24, 2022.[4]

*Second,* the criminal action commenced on September 16, 2021 by the United States of America (through Special Counsel John Durham) against Michael Sussmann in the United States District Court, District of Columbia, under the caption *United States v. Michael Sussmann*, case no. 1:21-cr-00582-CRC (the "Sussmann Action") also qualifies as a "civil or criminal proceeding. . . instituted by the United States" for the purposes of § 16(i). The operative complaint in the Sussmann Action is the indictment dated September 16, 2021 (the "Sussmann Indictment"). The Sussmann Indictment is practically a word-for-word retelling of the Alfa Bank-related allegations detailed in the Complaint and outlines many of the facts surrounding the coordinated efforts between Sussmann and Joffe to falsely implicate Plaintiff as colluding in Russian, including: (i) Joffe's cyber-related efforts to mine and manipulate data to create an "inference" that Plaintiff was engaged in wrongdoing, *see* Habba Dec., **Ex. B** at ¶¶ 12-15, 21-24; *compare to* Am. Compl. at ¶¶ 135-146, 185-190; (ii) Sussmann's numerous meetings, conferences, and communications with other RICO Defendants and the billing of his time to the Clinton Campaign and the DNC, *see* Habba Dec., **Ex. B** at ¶¶ 4, 9, 14, 19, 20, 24-27, 29-39; *compare to* Am. Compl. at ¶¶ 175-184, 195-197, 206, 224, 242; (iii) Sussmann's attempts to leak the false allegations through the media, Habba Dec., **Ex. B** at ¶¶ 1, 2, 22, 25, 34-37; *compare to* Am. Compl. at ¶¶ 174-176, 184, 191, 232; (iv) Sussmann's proffering of false statements to the FBI and the CIA, Habba Dec., **Ex. B** at ¶¶ 3-7, 24, 26-28, 30-33, 39-44, 46; *compare to* Am. Compl. at ¶¶ 172, 198, 204-217, 297-311; and (v) Sussmann's drafting of the various misleading and falsified 'white papers' which were ultimately provided to the FBI and the CIA, *see* Habba Dec., **Ex. B** at ¶¶ 24, 26-27, 30; *compare to* Am. Compl. at ¶¶ 172, 184, 193-194, 198, 201, 204-217, 297-311. The Sussmann Indictment is also littered with references

---

[4] The FEC Action was resolved on February 22, 2022 by virtue of the DNC and the Clinton Campaign entering into respective Conciliation Agreements, s*ee* Am. Compl. ¶¶ 477-479; *see also* **Ex. B**, so the suspension remained effective for an additional one year after said resolution, until February 23, 2023, *see* § 16(i).

to the other RICO Defendants, including Joffe, *see* Habba Dec., **Ex. B** ¶¶ 4, 6, 12-15, 17-28, 30, 33, 38-39, members of the Clinton Campaign, *see id.* ¶¶ 4, 6, 9-11, 19-20, 24-27, 29-30, 33, 37-38, 46, Elias, *id.* ¶¶ 10, 19-22, 24-26, 33, and Fusion GPS, *id.* ¶¶ 11, 20, 22, 24, 26-27, 30,33-35, and alleges that they all worked together to carry out a joint conspiracy – a theory that was crystalized in a later filing in the action, *see* Habba Dec., **Ex. C**, The Government's Motion *In Limine* (ECF Doc. No. 61), *United States v. Sussmann*, case no. 1:21-cr-00582-CRC, District of Columbia (April 4, 2022) at 19 (stating that the "evidence, public information, and expected testimony clearly establishes by a preponderance of evidence that [Sussmann] and [Joffe] worked in concert with each other and with agents of the Clinton Campaign to research and disseminate the [Alfa Bank] allegations."); *see also id.* at 32 (noting a "common plan and mutual coordination among" Fusion GPS, Joffe, Sussmann, and the Clinton Campaign.). Unsurprisingly, the Sussmann Indictment is cited throughout the Complaint and discussed at length, while the evidence and testimony adduced at the Sussmann trial is similarly prominent. Therefore, the Sussmann Action qualifies as a "civil or criminal proceeding . . . instituted by the United States" that suspends the running of Plaintiff's RICO statute of limitations from the date of its filing—September 16, 2021—through the present.[5]

*Third,* the criminal action commenced on November 3, 2021 by the United States of America (through Special Counsel John Durham) against Igor Danchenko in the United States District Court, Eastern District of Virginia, under the caption, *United States v. Igor Danchenko*, case no. 1:21-cr-00245-AJT (the "Danchenko Action") is also a "civil or criminal proceeding. . . instituted by the United States" within the context of § 16(i). The operative complaint in the Danchenko Action is the indictment dated November 3, 2021 (the "Danchenko Indictment"). Like the Sussmann Indictment, the Danchenko Indictment provides a comprehensive overview of another portion of the Enterprise's activities – the creation of the Steele Dossier and the fraudulent, media-centric smear

---

[5] The Sussmann Action was resolved on May 31, 2022, when a decision was rendered after jury trial, *see* Def. Mem. at 12 n 12; therefore, the suspension remained effective for an additional one year after said resolution, until May 31, 2023, *see* § 16(i). Additionally, as an aside, although Sussmann was acquitted on the charge of making a false statement in violation of 18 U.S.C. § 1001(a)(2), the acquittal has no legal effect on the applicability of the tolling provision of § 16(i). *See Leh*, 382 U.S. at 65-66 ("Obviously suspension of the running of the statute of limitations pending resolution of the government action may not be made to turn on whether the United States is successful in proving the allegations of its complaint.") (citing *Minn. Mining & Mfg. Co*, 381 U.S. at 316). Nor should it, since Plaintiff was able to "reap the benefits" of the Sussmann Action as evidenced by the vast number of references in the Complaint to testimony and evidence adduced throughout the course of the Sussmann Action.

campaign headed by Fusion GPS. *See generally* Habba Dec., **Ex. D**; *compare to* Am. Compl. For the same reasons the Sussmann Action qualifies as a "civil or criminal proceeding. . . instituted by the United States," the Danchenko Action does as well. Accordingly, the Danchenko Action suspends the running of Plaintiff's RICO statute of limitations from the date of its filing—November 3, 2021—through the present.

Based on the foregoing, pursuant to the tolling provision of § 16(i), Plaintiff's RICO claims have been suspended from as early as April 2019, but no later than September 16, 2021 or, alternatively, November 3, 2021, through the present.

b. *Fraudulent Concealment Compels Equitable Tolling of Plaintiff's RICO Claims*

The statute of limitations for Plaintiff's RICO claim must also be tolled because the RICO Defendants engaged in a concerted effort to fraudulently conceal their wrongdoing.

"Under the fraudulent concealment doctrine, even when a claim has already accrued, a plaintiff may benefit from equitable tolling in the event that the defendant took specific steps to conceal her activities from the plaintiff." *Fedance v. Harris*, 1 F.4th 1278, 1283 (11th Cir. 2021)). "Fraudulent concealment occurs when a defendant makes affirmative acts or misrepresentations 'which are calculated to, and in fact do, prevent the discovery of the cause of action,'" *Id.* at 128 (citation omitted), or "where the wrong is of such a character as to be self-concealing." *Foudy v. Indian River*, 845 F.3d 117 (11th Cir. 2017) (citation omitted). "[I]f the defendant conceals *any* element of the offense . . . the [statute of limitations] will be tolled." *Mathews v. Kidder, Peabody & Co., Inc.*, 260 F.3d 239, 256 n.26 (3d Cir. 2001) (emphasis in original).

As detailed in the Complaint, the RICO Defendants engaged in a litany of affirmative acts and misrepresentations that were specifically designed to conceal the nature of their racketeering activities which, in turn, prevented Plaintiff from discovering his RICO cause of action. From the outset, the RICO Defendants organized the Enterprise in a manner that would obscure their interactions and communications, under the guise of attorney-client privilege, as evidenced by statements made by Elias himself. Am. Compl. ¶¶ 79-82, 592-595. To further cover their tracks, the RICO Defendants devised an arrangement whereby the DNC and the Clinton Campaign would funnel their payments to Fusion GPS through Perkins Coie—in violation of campaign finance laws—thereby avoiding public disclosure requirement and obfuscating the ties between the RICO Defendants. *Id.* ¶ 83-84, 470-479, 596.

Beyond that, the RICO Defendants also committed numerous fraudulent acts that served to

conceal their RICO violations. The Complaint details all of this conduct at length, but to briefly name a few: (i) Sussmann's misrepresentation to FBI General Counsel, Jim Baker, that his meeting was "not on behalf of any client; as a result of that lie, the FBI placed a "close hold" placed on Sussmann as a source, and his identity was kept confidential from all except a chosen few within the FBI; even FBI agents were not aware of Sussmann's identity until the filing of the indictment in the Sussmann Action on September 16, 2021, *id.* ¶¶ 599-600; (ii) Joffe's intentional circumvention of his FBI handler, choosing to instead feed false information directly to Special Agent Grasso while instructing him "not to disclose his identity to other people in the bureau," which led to Joffe's identity being kept as confidential source, further obscuring his wrongdoing until the filing of the indictment in the Sussmann Action on September 16, 2021, *id.* ¶¶ 601-602; and (iii) since the inception of their plan, many of the RICO Defendants have made false or misleading statements, often times under oath, in the course of congressional investigations, law enforcement and/or counter-intelligence investigations, and civil or criminal proceedings, all for the purpose of concealing their wrongdoing, *id.* ¶ 604.

Moreover, the acts described above—in addition to *all* of the predicate acts in violation of federal obstruction of justice laws (i.e., 18 U.S.C. § 1512)—are self-concealing wrongs that must be construed as acts of fraudulent concealment. *See Foudy*, 845 F.3d at 1125 ("A self-concealing wrong is one in which the clandestine nature of the activity is essential to the act itself, where a "deception, misrepresentation, trick or contrivance is a necessary step in carrying out the illegal act," not merely "separate from the illegal act and intended only to cover up the act.").

Based on the foregoing, an equitable tolling of the statute of limitations for Plaintiff's RICO claim is warranted. The tolling should run through September 16, 2021, when the Sussman Indictment was filed and Plaintiff became aware that he had a valid RICO cause of action, upon learning the identity of two of the RICO Defendants—Sussmann and Joffe—as well as discovering that the RICO Defendants had engaged in a pattern of racketeering activity, including the commission of the predicate acts of obstruction of justice and theft of trade secrets.

### c.  *Accrual Under the Discovery Rule*

In determining when accrual begins for a cause of action under the civil RICO statute, courts look towards the injury discovery rule. *See generally Rotella v. Wood*, 528 U.S. 549, 560 (2000). When the injury discovery rule applies, "accrual is delayed until Plaintiff has 'discovered'" his injury. *Fedance*, 1 F.4th at 1285 (citing *Gabelli v. SEC*, 568 U.S. 442, 449 2013). Thus, the relevant

inquiry is "when the [plaintiff's] injury was or should have been discovered." *Lehman v. Lucom*, 727 F.3d 1326, 1330 (11th Cir. 2013).

Since Plaintiff's RICO claims (Counts I and II) set forth several independent injuries that Plaintiff has incurred by way of Defendants' various RICO violations, the separate accrual rule comes into play as well. Pursuant to the separate accrual rule, "if a new RICO predicate act gives rise to a new and independent injury, the statute of limitations clock will start over for the damages caused by the new act." *Lehman v. Lucom*, 727 F.3d 1326, 1331 (11th Cir. 2013) (citing *Klehr,* 521 U.S. at 190). For an injury to be considered new and independent, it must be "a new and independent act that is not merely a reaffirmation of a previous act and [i]t must inflict new and accumulating injury on Plaintiff." *Pilkington v. United Airlines,* 112 F.3d 1532, 1537–38 (11th Cir.1997)).

In the Complaint, Plaintiff sets forth nine distinct types of injuries he was caused to sustain by way of the RICO Defendants' actions, including: (i) "loss of political []reputation;" (ii) "loss of [] business reputation;" (iii) "loss of existing and future business opportunities;" (iv) "loss of competitive position;" (v) "loss of business revenue;" (vi) "loss of goodwill;" (vii) "loss of trade secrets;" (viii) "loss of contractual relations;" and (ix) "defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the RICO Defendants' actions and the various federal investigations and/or official proceedings which arose therefrom." Am. Compl. ¶¶ 615-616. For the purposes of the separate accrual rule, these injuries can be grouped into three subsets of categories, as discussed below.

The first category of damages is the attorneys' fees and costs of defense that Plaintiff was caused to incur by way of Defendants' fraudulent provocation of numerous federal investigations into his alleged collusion with Russia. All of these expenses were incurred between September 2017 and 2020, in connection with the Mueller Investigation, with the vast majority being incurred subsequent to April 2018.[6] Therefore, the true extent of this portion of Plaintiff's injuries was not discoverable until April 2018 at the earliest.

The second category of damages is the losses Plaintiff sustained to his business and political reputation as a direct result of Defendants' racketeering activity. The earliest Plaintiff could have these damages would have been on May 17, 2017 – the date of the commencement of the DOJ's criminal probe headed by Special Counsel Robert Mueller (the "Mueller Investigation"). The

---

[6] Plaintiff's legal billing records are subject to attorney-client privilege and other applicable privileges but shall be made available for in-camera inspection upon the Court's request.

Mueller Investigation was a highly publicized federal investigation which dominated the news cycle for years, severely impacted the public's perception of his presidential administration, and "irreparable, unjustly and permanently tarnished Plaintiff's political reputation." Am. Compl. ¶ 614. Thus, Plaintiff could not have been aware of the true extent of reputational damage caused by the RICO Defendants' acts until the Mueller Investigation was commenced, at the earliest.

The third category of damages is the loss of trade secrets incurred in connection with the RICO Defendants' exploitation of proprietary data belonging to Plaintiff and his business, the Trump Organization. As alleged in the Complaint, Plaintiff was not aware that his sensitive, confidential, and proprietary data had been stolen and misappropriated until September 16, 2017, when these "revelations were exposed for the first time in the Sussmann indictment and/or subsequent motions filed by Special Counsel John Durham." Am. Compl. 146.   Given the sophisticated and technical nature of the RICO Defendants' cyberattack, it would not have been plausible for Plaintiff to have discovered this injury at an earlier date.

Therefore, when coupled with the tolling considerations set forth above, Plaintiff's RICO claim has been timely asserted as to all three categories of damages.

## C. *The Remaining Claims are Timely*

### a. *Malicious Prosecution*

The statute of limitations for malicious prosecution under Florida law is four years. *See* Fla. Stat. § 95.11(3)(o)(setting a four-year statute of limitations for "[a]n action for assault, battery, false arrest, malicious prosecution, malicious interference, false imprisonment, or any other intentional tort"). The statute of limitations begins to run when the prosecution is terminated in Plaintiff's favor. *See Olson v. Johnson*, 961 So. 2d 356, 359 (Fla. 2nd DCA 2007) ("For a cause of action for malicious prosecution, the right to maintain a suit arises upon termination of the prosecution favorably to Plaintiff."); *see also Baez v. Root*, 2014 WL 1414433 at *2 (S.D. Fla., April 11, 2014) (four-year statute of limitations applies to conspiracy claims).

Here, the Complaint alleges that Defendants engaged in conduct that was designed to—and ultimately successful in—provoking the commencement of the FBI's Crossfire Hurricane investigation, and by extension, the Mueller Investigation, which entailed more than 2,800 subpoenas, approximately 500 search warrants, and interviews of more than 500 witnesses. *See* Am. Compl. ¶¶ 459-462. These investigations culminated with the filing of the "Report on the

Investigation into Russian Interference in the 2016 Presidential Election" (the "Mueller Report") which found that there was no evidence to conclude that the Trump Campaign coordinated with Russia to influence the election. This finding was further substantiated in a letter dated March 24, 2019 wherein Attorney General William P. Barr confirmed that there was insufficient evidence to support any criminal charges against Plaintiff. As a result, these investigations were effectively "terminated in Plaintiff's favor" on March 24, 2019, thereby triggering the accrual of the four-year statute of limitations. *Olson*, 961 So. 2d at 359.

Therefore, since Plaintiff's malicious prosecution claim was filed prior to the expiration of the statute of limitations on March 24, 2023, the claim is timely.

### b. *Injurious Falsehood*

Under Florida law, the tort of defamation and the conspiracy to commit it (whether libel or slander) is subject to a two-year statute of limitations. *See* Fla. Stat. § 95.11(4)(g). *See also Wagner, Nugent, Johnson, Roth, Romano, Erikson & Kupfer, P.A. v. Flanagan*, 629 So. 2d 113, 115 (Fla. 1993). As set forth above, the statute of limitations as to each of the libelous statements at issue should be equitably tolled during the time that Plaintiff was serving as President. Moreover, many of the statements were made in the two years immediately preceding the instant filing of the Complaint. *See* Am. Compl., ¶ ¶463, 503, 512, 513, 514, 519, 520. Each and every one of these statements were false, made with actual malice, and designed to further the lie that Plaintiff coordinated with Russia to undermine the 2016 election. As such, Plaintiff has demonstrated that the defamatory statements were made and published within the statutory period.

### c. *Computer Fraud and Abuse Act, Stored Communications Act, and Theft of Trade Secrets*

The Computer Fraud and Abuse Act (CFAA) and the Stored Communications Act (SCA) both have two-year statutes of limitations, *see* 18 U.S.C. § 1030(g); 18 U.S.C. § 2701, while Theft of Trade Secrets has a three year statute of limitations, *see* 18 U.S.C. § 1832.

The federal discovery rule applies to all three of these claims. *Chappell v. Rich*, 340 F.3d 1279, 1283 (11th Cir. 2003) (CFAA); *see also*, *Sewell v. Bernardin*, 795 F.3d 337, 338 (2d Cir. 2015) (SCRA); *see also*, *Sisoian v. Int'l Bus. Machines*, 2014 WL 4161577, at *4-5 (W.D. Tex. Aug. 18, 2014) (theft of trade secrets).  Under the federal discovery rule, Plaintiff's claims accrued when it either knew or should have known both 1) that it has suffered the injury that forms the basis of his complaint, and 2) that Defendant inflicted that injury. *Mullinax v. McElhenney*, 817 F.2d 711, 716

(11th Cir. 1987). In assessing whether a plaintiff should have known of their claim, the court must determine whether facts sufficient to support a cause of action were or should have been apparent "to a person with a reasonably prudent regard for his rights." *Id.*

Here, Plaintiff did not learn of Defendants' unlawful infiltration of his computers to access sensitive, proprietary and confidential internet data until September 16, 2021, upon the filing of the Sussmann Indictment. *See* Am. Compl. ¶ 704. Plaintiff simply could not have known that its computer systems were infiltrated prior to that point. Furthermore, and as discussed at great length below, DNS data can rightfully be defined as a trade secret as it constitutes highly sensitive and confidential material which, upon release, damaged Plaintiff.  It is that discovery of damages linked to illegal computer access, that commenced the statute. Defendants have therefore failed to show that Plaintiff discovered any damage from the violation of the Computer Fraud and Abuse Act before two years of first alleging this claim.

## II.   THE COMPLAINT PUTS FORTH VALID AND COGNIZABLE CLAIMS AGAINST ALL OF DEFENDANTS

Rule 8(a)(2) F. R. Civ. P. requires a complaint to provide "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give Defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although a complaint need not include detailed factual allegations, to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when Plaintiff pleads factual content that allows the court to draw the reasonable inference that Defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556).  For the reasons set forth below, Plaintiff has satisfied the Rule 8 threshold with respect to all of the claims asserted in the Complaint.

### A.  CIVIL RICO (18 U.S.C. § 1962(C))

The civil RICO statute is an "aggressive initiative" for fighting crime which is intended to be "read broadly," *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497-98 (1985), and "liberally construed to effectuate its remedial purpose," *Boyle v. United States*, 556 U.S. 938, 944 (2009) (citing § 904(a), 84 Stat. 947, note following 18 U.S.C. § 1961). Indeed, the Supreme Court has repeatedly emphasized that the RICO statute must be viewed in context of "Congress' self-

consciously expansive language" and "approach" in passing the law. *Sedima*, 473 U.S. at 497–98.

Under § 1962(c) of the civil RICO statute, it is unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ." 18 U.S.C. § 1962(c). To prove a violation of § 1962(c), a plaintiff must show that Defendants "(1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two racketeering acts." *Ray v. Spirit Airlines, Inc.,* 836 F.3d 1340, 1348 (11th Cir. 2016). In addition, Plaintiff must establish "(1) the requisite injury to 'business or property,' and (2) that such injury was 'by reason of' the substantive RICO violation." *Id.* As set forth below, Plaintiff has sufficiently alleged all these elements and, therefore, has asserted a cognizable claim under 18 U.S.C. § 1962(c).

### i.    *Existence of an Enterprise*

Pursuant to 18 U.S.C. § 1961(4), an enterprise is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." In particular, an association in-fact enterprise consists of "*any* union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (Emphasis added.) This construction is "obviously broad" and has a "wide reach." *Boyle*, 556 U.S. at 944. Indeed, the "very concept of an association in fact enterprise is expansive" and encompasses any "group of persons associated together for a common purpose of engaging in a course of conduct." *Id.* (citations omitted). In short, to establish the existence of an association in-fact enterprise, a plaintiff need only show that the enterprise has three structural features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946. Plaintiff has adequately pleaded each of these elements and has established that the Enterprise is a valid association in-fact enterprise.

*First*, Plaintiff has shown that the Enterprise had a purpose, identified with particularity as being the "common, unlawful goal of corruptly and wrongfully harming Plaintiff's political reputation, damaging his electability for the 2016 Presidential Election and subsequent elections, impeding his ability to effectively govern, and otherwise sabotaging his political career through deceptive, criminal and fraudulent means, including, but not limited to, falsely implicating Plaintiff, the Trump Campaign, and the Trump Administration as colluding with Russia." Am. Compl. ¶ 531. Further, the Complaint plausibly alleges, even proves, that each and every one of the RICO

Defendants shared this goal. Indeed, throughout the Complaint, Plaintiff affirmatively pleads that each of the RICO Defendants shared in the Enterprise's common purpose and had the requisite awareness of the Enterprise's racketeering activities. *See, e.g., id.* ¶¶ 535, 555, 568-569, 572-573, 577, 621-627; *see also* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally"). Moreover, the Complaint sets forth a great deal of facts—which are extensively sourced and cited therein and cannot possibly be construed as being 'conclusory'—to support this position, including, without limitation, the following:

- *Clinton/Clinton Campaign*: on several occasions, U.S. intelligence officials, including CIA Director John Brennan, reported that Clinton had "approved a proposal from one of her foreign policy advisors to vilify [Plaintiff] by stirring up a scandal claiming interference by Russian security services" and that she planned to "t[ie] [Plaintiff] to Putin and the Russians' hacking of the Democratic National Committee," *id.* ¶¶ 162, 163, 196; Steele testified under oath that Clinton was "aware of [his] reporting," including the development of the fraudulent Dossier," *id.* ¶102; the Clinton Campaign was admittedly "on a mission to get the press to focus on . . . the prospect that Russia had not only hacked and stolen e-mails from the Democratic National Committee, but that it had done so to help [Plaintiff]," *id.* ¶ 165; all of Sussmann's time in furtherance of drafting his 'white papers' and making false statements to law enforcement (FBI and CIA) was billed to the Clinton Campaign, even reimbursing him for the USB drive which housed the falsified documents, *id.* ¶¶ 175-184, 195-197, 199, 206, 224, 242; Clinton and the top members of her campaign agreed to "affirmatively push" derogatory information about Plaintiff, which they knew to be false, to the media, *id.* ¶¶ 245-254; Sussmann testified under oath that the Clinton Campaign and the DNC shared his objective and specifically "direct[ed]" him to meet with the FBI and the CIA and to make false statements and provide falsified materials to both agencies, *id.* ¶ 307.

- *DNC*: DNC leadership had concocted a plan to "damage Republican presidential candidates' credibility with voters" by, among other things, "utiliz[ing] [opposition] research to place highly targeted hits" against Republican candidates, *id.* ¶50; the CFO of the Clinton Campaign admitted that the DNC was "fully under the control" of the Clinton Campaign, ," *id.* ¶59; the FEC noted the arrangement between the DNC and the Clinton Campaign was "troubling" and found that there was an "unusual degree of closeness between [the Clinton Campaign] and the DNC," *id.* ¶60; Steele testified that the DNC was "keen to see" the Steele Dossier be publicly reported by the media prior to November 18, 2016 – election day, *id.* ¶239; Sussmann testified under oath that the Clinton Campaign and the DNC shared his objective and specifically "direct[ed]" him to meet with the FBI and the CIA and to make false statements and provide falsified materials to both agencies, *id.* ¶ 307.

- *Perkins Coie/Elias/Sussmann*: Elias purposefully positioned himself as the "gatekeeper" between Fusion GPS and the Clinton Campaign/DNC for the express purpose of concealing their communications under the guise of attorney-client privilege, *id.* ¶¶ 78-82; Elias knowingly assisted in laundering the funds paid from the Clinton Campaign/DNC to Fusion GPS, *id.* ¶ 83; Elias authorized the decisions to retain Fusion GPS and Steele/Orbis Ltd., and he knew that they were being hired for illicit purposes, *id.* ¶¶ 76-82, 98, 124; Sussmann planned to engage in 'circular reporting' tactics with Joffe by simultaneously reporting false information to the FBI,

*id.* ¶¶ 136-139, 172;  Sussmann testified under oath that he had a common, shared objective with the Clinton Campaign and the DNC to meet with the FBI and the CIA and to make false statements and provide falsified materials to both agencies, *id.* ¶ 307; Elias and Sussmann participated in countless meetings with the RICO Defendants for the purposes of coordinating, planning and plotting the underlying unlawful conduct at issue in this action, *see generally id.*

- *Fusion GPS*: Simpson initiated Fusion GPS's involvement in the scheme by contacting a "senior figure in the Democratic Party" and stating that Plaintiff's presidential run "had to be stopped," *id.* ¶ 72; Simpson was aware that Fusion GPS was performing work for the DNC and Clinton Campaign, through Perkins Coie, *id.* ¶ 76; Fusion GPS recruited the assistance of Steele, who was "desperate that [Plaintiff] not get elected" and was "passionate about [Plaintiff] not being President," *id.* ¶ 95; Simpson specifically instructed Steele to include the false Alfa Bank allegations in the Steele Dossier, *id.* ¶ 176; Steele testified that the Fusion GPS wanted the Steele Dossier to become a major media story prior to election day, *id.* ¶ 239; despite knowing it was based on illegitimate information, Fritsch pressured a reporter to "do the f-cking alfa bank secret comms story" which he described as "hugely important," *id.* ¶ 244; Simpson had a meeting with a journalist wherein he "wanted [the journalist] to publish that the US Government was investigating [Plaintiff]," despite knowing the allegations were false, *id.* ¶ 273.

- *Joffe*: was offered a high-ranking government position if Clinton won the 2016 election, *id.* ¶132; sought to create a false "inference" that servers tied to Plaintiff were communicating with a Russian bank, in the hopes that "[Clinton's] opposition research and whatever professional gov[ernments] and investigative journalists are digging [would] come up with the same things," *id.* ¶187; acted at the behest of Democratic "VIPs," which can be reasonably inferred to be the other RICO Defendants, *id.* ¶¶ 141, 188; the CIA concluded that the DNS data obtained by Joffe was manipulated, specifically that it was "user created and not machine/tool generated," *id.* ¶ 309; Ankura, a private consulting firm, determined that the data was assembled and manipulated by "malicious actors," *id.* ¶¶ 310-311; Joffe claimed that it was "vitally important . . . in 2016 to make sure the [Trump-Alfa Bank] threat] . . . was known before the election," *id.* ¶ 324; Joffe planned to engage in 'circular reporting' tactics with Sussmann by simultaneously reporting false information to the FBI, *id.* ¶¶ 136-139, 172.

Defendants do not seriously dispute that Plaintiff has pleaded a legally cognizable RICO enterprise. Rather, they half-heartedly argue that the purpose of the Enterprise, as alleged, is "legitimate" and "not unlawful." Def. Mem. at 8. This argument not only disregards the specific language of the Complaint[7] and the breadth of allegations contained therein but it also ignores the plain language of the statute and the applicable case law. *See* 18 U.S.C. 1962(c) (stating that it "shall be unlawful for any person. . . associated with any enterprise. . . to conduct or participate, directly

---

[7] For instance, the Complaint alleges that the Enterprise "had a common, ***unlawful*** goal of ***corruptly*** and ***wrongfully*** harming Plaintiff's political reputation, damaging his electability for the 2016 Presidential Election and subsequent elections, ***impeding*** his ability to effectively govern, and otherwise ***sabotaging*** his political career through ***deceptive***, ***criminal*** and ***fraudulent*** means, including, but not limited to, ***falsely implicating*** Plaintiff, the Trump Campaign, and the Trump Administration as colluding with Russia."). Am. Compl. ¶ 531  (emphasis added).

or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."); *see also Boyle*, 556 U.S. at 948 ("[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose."). Further, although not required, there is no question that Plaintiff has established that the Enterprise's goal is in furtherance of not only an unlawful purpose, but also a fraudulent one. *See generally Cisneros v. Petland, Inc.*, 972 F.2 1204, 1212 (explaining when it is necessary to show that a RICO enterprise has a common, fraudulent purpose). Therefore, Defendants' contention that the Enterprise is not cognizable because it has a "lawful" purpose is easily dispelled.

*Second*, the Complaint lays out the relationship of the parties in meticulous detail, setting forth the identities of the individuals and entities that comprise the Enterprise, their prior relationships and how they came to associate together, their shared purpose and common objectives, their respective roles and responsibilities in the Enterprise, their efforts to coordinate and communicate with one another, and their interrelated conduct in carrying out the Enterprise's illicit activities. Further, although not a necessary component of an association in-fact enterprise[8], the Complaint even describes the structural framework of the Enterprise and its chain of command, with Clinton, the Clinton Campaign, and the DNC serving in a leadership role, Perkins Coie overseeing and coordinating the day-to-day operations of the Enterprise, and Perkins Coie/Elias/Sussmann and Joffe each utilizing their specialized skills to lead separate, albeit interconnected, aspects of the overall scheme. *See* Am. Compl. ¶534. The Complaint also details how each member of the Enterprise had an existence separate and apart from the pattern of racketeering activities of the RICO Enterprises and how each member of the Enterprise engages in operations that are distinct from their activities on behalf of the RICO Enterprises. *See generally id.*

The Complaint further explains the frequent interactions between the various RICO Defendants and their substantial efforts to coordinate their operations and carry out the activities of the Enterprise. For instance, from June 2016 through November 2016, there were *daily* conference calls between the Clinton Campaign, the DNC, Perkins Coie, and Fusion GPS, and required attendees included Elias, Simpson, Fritsch, and Clinton Campaign lawyer Debbie Fine, *id.* ¶ 85; there were also weekly in-person meetings between Elias, Simpson, and Fritsch, *id.* ¶ 86; and there

---

[8] *See, e.g., Boyle*, 556 U.S. at 948 (stating that an association in-fact enterprise "need not have a hierarchical structure or a 'chain of command' . . . members of the group need not have fixed roles; different members may perform different roles at different times.")

were numerous meetings and conference calls involving a combination of Elias, Sussmann, Fusion GPS, Joffe, Steele, and representatives of the Clinton Campaign and/or the DNC, all of which were done for the purpose of furthering the RICO Defendants' scheme and were billed to the Clinton Campaign and/or the DNC, *see, e.g.*, *id.* ¶¶ 175-184, 195-197, 202-203, 242-245. Therefore, the Complaint extensively details the relationships among the RICO Defendants and their frequent coordination, interaction and planning.

*Third*, the facts alleged by Plaintiff clearly identify a scheme that has a sufficient longevity to carry out the Enterprise's goals. As explained in the Complaint, the Enterprise's multi-faceted goal was to: (i) "damag[e] the [Plainitff's] electability for the 2016 Presidential Election and subsequent elections;" (ii) imped[e] [Plainitff's] ability to effectively govern; and (iii) "sabotage[e] his political career." Am. Compl. ¶ 531. To accomplish those lofty goals, the RICO Defendants were necessarily required to engage in a complex, yearslong scheme. That is precisely what they did. Thus, contrary to Defendants' misapprehension, the Enterprise's conduct did not cease after Plaintiff was elected President. Indeed, even a cursory inspection of the Complaint reveals that a significant amount of the RICO Defendants' predicate acts took place *after* the election had already been decided in November 2016. *See, e.g.*, Am. Compl. at ¶¶ 279-341. Not only do the facts support this notion, but it is also entirely consistent with the Enterprise's goals – after Plaintiff was elected as President, the RICO Defendants remained entrenched in their efforts to "damage his electability for . . . subsequent elections" and to "imped[e] his ability to effectively govern" *Id.* ¶ 531.

Indeed, throughout their moving papers Defendants repeatedly mischaracterize Plaintiff's construction of the Enterprise, claiming that its stated goal was to get Hillary Clinton elected in 2016. To be clear, that is not what Plaintiff has alleged. As is plainly set forth in the Complaint, the Enterprise's activities were intended to *inflict harm upon Plaintiff*, not benefit Hillary Clinton. Specifically, the Complaint alleges that the RICO Defendants sought to "corruptly and wrongfully harm[] Plaintiff's political reputation, damage[e] his electability . . . imped[e] his ability to effectively govern, and otherwise sabotage[e] his political career through deceptive, criminal and fraudulent means[.]" Am. Compl. ¶ 531. In other words, the RICO Defendants sought to fraudulently tarnish Plaintiff's reputation to the point that he would be removed from the political sphere altogether. Any benefit that Clinton may have received from Plaintiff's expected downfall was merely incidental to this plot. Further, even if, as Defendants argue, one or more of the RICO Defendants' actions and motivations were related solely to the 2016 Presidential Election and

nothing beyond—a position that is entirely unsupported by the facts of the Complaint— it does not follow that the Enterprise, as a whole, was restricted to this single purpose. *See Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1285–86 (11th Cir. 2006) ("[T]here has never been any requirement that the 'common purpose' of the enterprise be the sole purpose of each and every member of the enterprise. . . it may often be the case that different members of a RICO enterprise will enjoy different benefits from the commission of predicate acts.").

For the foregoing reasons, Plaintiff has established that the Enterprise is a cognizable association-in-fact enterprise under the RICO statute.

### ii.   *Participation in the Enterprise's Affairs*

Under 18 U.S.C. § 1962(c), a plaintiff must show that Defendants "conduct[ed] or participate[d], directly or indirectly, in the conduct of [the RICO] enterprise's affairs through a pattern of racketeering activity[.]" 18 U.S.C. § 1962(c). "[T]o 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs . . . RICO liability is not limited to those with primary responsibility for the enterprise's affairs[] . . . [or] to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (footnote omitted). Therefore, "'to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs,' § 1962(c), one must participate in the operation or management of the enterprise itself." *Id. at 185*.

Here, the Complaint clearly establishes that each of the RICO Defendants "conduct[ed] or participat[ed], directly or indirectly," in the affairs of the Enterprise. 18 U.S.C. § 1962(c). As to each individual RICO Defendant, the Complaint alleges, in pertinent part, as follows:

- *Clinton*: exerted significant control over both the Clinton Campaign and the DNC and used this position to direct, oversee, and conduct the management of the Enterprise, *id.* ¶¶ 56-61, 534; expressly authorized dissemination of false claims to media, including *Slate, id.* ¶¶ 246-254*; proliferated the spread of false information by republishing Sullivan's press release to her millions of followers on Twitter with additional, misleading information regarding its contents, *id.* 268, and a second tweet further spreading this false narrative, *id.* ¶ 269; in addition, based upon on the totality of evidence in the Complaint, Clinton's prominence within the Clinton Campaign and the significant control she exerted over the DNC, it is reasonable to infer that she conducted and/or participated in most, if not all, of the Enterprise's acts described herein.

- *Clinton Campaign*: funded Perkins Coie's various activities in furtherance of the Enterprise, including Sussmann's "confidential project," which it knew to be part of the Enterprise's operations, *id.* ¶¶ 14, 19, 20, 24-27, 29-39, 177; paid $180,000 to Fusion GPS to fund the Steele Dossier and other fraudulent 'opposition research,' funneled the money through

24

Perkins Coie, and misreported the payments to the FEC for the purpose of concealing the existence of the Enterprise, *id.* ¶ 83; authorized each and every fraudulent communication made by Fusion GPS to the media, *id.* ¶ 149; paid for the thumb drives containing the falsified Alfa Bank server data, *id.* ¶ 199; disseminated falsified Alfa Bank server data to *Slate* despite not "totally understand[ing]" the data, not being "totally confident' in its veracity, and believing it was "highly suspect," *id.* 246-254; Sullivan released an official Clinton Campaign press release regarding the Alfa Bank server allegations, which the Clinton Campaign brass knew to be false, *id.* ¶265; Sussmann testified under oath that he was directed by his clients—the Clinton Campaign and the DNC—to meet with the FBI and the CIA to make false representations and provide falsified materials, *id.* ¶ 307; conspired with Danchenko in furtherance of him making false statements to the FBI, *id.* ¶¶ 329-341.

- *DNC*: paid $777,907.97 to Fusion GPS to fund the Steele Dossier and other fraudulent 'opposition research,' funneled the money through Perkins Coie, and misreported the payments to the FEC for the purpose of concealing the existence of the Enterprise, *id.* ¶83; funded Perkins Coie's various activities in furtherance of the Enterprise, including Sussmann's "confidential project," which it knew to be part of the Enterprise's operations, *id.* ¶¶ 14, 19, 20, 24-27, 29-39, 177; authorized each and every fraudulent communication made by Fusion GPS to the media, *id.* ¶ 149; conspired with Danchenko in furtherance of him making false statements to the FBI, *id.* ¶¶ 329-341; Sussmann testified under oath that he was directed by his clients—the Clinton Campaign and the DNC—to meet with the FBI and the CIA to make false representations and provide falsified materials, *id.* ¶307.

- *Perkins Coie/Elias/Sussmann*: Perkins Coie, Elias, and Sussmann jointly serves as general counsel to the Clinton Campaign and the DNC, *id.* ¶¶ 46, 53; Elias, through Perkins Coie, oversaw the day-to-day operations of the Enterprise and served as the "gatekeeper" of communications between Clinton/the Clinton Campaign/the DNC and Fusion GPS/Joffe, *id.* ¶¶ 79-82; Elias hired Fusion GPS, authorized the hiring of Orbis Ltd. and Steele, and generally oversaw the development of the dossier and the fraudulent anti-Trump smear campaign, *id.* ¶¶ 73, 79-82, 98; Elias sought to conceal the relationship between the Clinton Campaign/the DNC and Fusion GPS through misreporting of payments, *id.* ¶¶ 83-84; Elias authorized each and every fraudulent communication made by Fusion GPS to the media, *id.* ¶ 149; Elias assisted with the drafting and preparation of Sullivan's October 31, 2016 press release concerning the false Alfa Bank server allegations, *id.* ¶ 267; Sussmann recruited Joffe and led the cyber-based attack against Plaintiff, *id.* ¶ 68; Sussmann drafted various misleading and falsified 'white papers' which were ultimately provided to the FBI and the CIA, *id.* ¶¶ 172, 184, 193-194, 198, 201, 204-217, 297-311; Sussmann knowingly disseminated false and derogatory information through the media, *id.* ¶¶ 174-176, 184, 191, 232; Sussmann made false representations and provided falsified information and data to the FBI, *id.* ¶¶ 172, 198, 204-217; Sussmann made false representations and provided falsified information and data to the CIA, *id.* ¶¶ 172, 198, 297-311; conspired with Danchenko in furtherance of him making false statements to the FBI, *id.* ¶¶ 329-341.

- *Fusion GPS*: spearheaded the campaign to falsely tarnish Plaintiff's reputation through the media by implicating him as colluding with Russia, *id.* ¶ 150; had numerous fraudulent interactions and communications with members of the media in an effort to have false stories published, *id.* ¶¶ 152-155, 227-231, 244, 255-252, 272-275, 287; hired Orbis Ltd. and Steele for the purposes of developing a fraudulent dossier, *id.* ¶¶ 94-97, 103-106; oversaw and

participated directed in the development of the fraudulent Steele Dossier, *id.* ¶¶ 103-106, 151; directed Steele to provide the Steele Dossier to law enforcement officials, *id.* 159; directed Steele to include the Alfa Bank allegations in the Steele Dossier, *id.* 176; directed Steele to provide the Steele Dossier to various members of the media, *id.* ¶ 151, 227; conspired with Danchenko in furtherance of him making false statements to the FBI, *id.* ¶¶ 329-341; drafted white papers involving falsified Alfa Bank server data, *id.* ¶ 561; provided a thumb drive containing the Steele Dossier to Bruce Ohr, intending for him to circulate it to law enforcement officials, *id.* ¶¶ 280-281; Simpson specifically instructed Steele to include the false Alfa Bank allegations in the Steele Dossier, *id.* ¶ 176; provided the Steele Dossier to David Kramer, knowing that he would give it to Senator John McCain, *id.* ¶ 291; continued its work of "exposing Russian interference in the 2016 Presidential Election" with The Democracy Integrity Project, for the purpose of "push[ing] the information…to policymakers on Capitol Hill, the press, and the FBI," *id.* ¶¶ 312-326.

- *Joffe*: exploited his access to non-public data sources, including DNS internet traffic, of a healthcare provider; Trump Tower; Plaintiff's private apartment in Central Park West, and the Executive Office of the President of the United States, in furtherance of his efforts to falsely implicate Plaintiff, *id.* ¶¶ 140-141; after obtaining the data, he "spoofed" the information, by disguising the origin of the computer communications, and making them appear falsely to originate from a particular IP address, *id.* ¶ 142; circumvented his FBI handler to make false representations and provided falsified information and data to an FBI special agent, *id.* ¶¶ 218-225; continued his work of "exposing Russian interference in the 2016 Presidential Election" with The Democracy Integrity Project, *id.* ¶¶ 312-326.

Moreover, Perkins Coie, Elias, and Sussmann raise the additional argument that they were merely providing "traditional legal services" and therefore cannot qualify as members of an enterprise. Def. Mem. at 39. While it is true that provision of traditional legal services, on its own, will not typically give rise to RICO liability, there is no "per se rule that one cannot operate or manage an enterprise via the provision of legal services." *Al-Rayes v. Willingham,* no. 6-cv-0362, 2007 WL 788401 * 2 (M.D. Fla. 2007). Indeed, when "the professional services provided strike at the very core of the enterprise,' it can be said that the lawyer is managing or operating the enterprise." *Id.* Here, the Complaint positions Perkins Coie, Elias and Sussmann as key players in the Enterprise, alleging that they are the "central hub that coordinated and oversaw the day-to-day operations of the Enterprise," with "Elias and Sussmann each leading parallel operations to wrongly implicate [Plaintiff] as colluding with Russia." Am. Compl. ¶¶ 68, 534. Perkins Coie, Elias, and Sussmann played a vital role in planning and carrying out the Enterprise's illicit operations, far beyond the provision of traditional legal services.

Based on the foregoing, Plaintiff has shown that each and every one of the RICO Defendants "participate[d] in the operation or management of the enterprise itself." *Reves*, 507 U.S. at 185.

### iii.     Pattern of Racketeering Activity

A "pattern of racketeering activity" requires "at least two acts of racketeering activity, one of which occurred after the effective date of [the RICO statute] and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). "[A]cts of racketeering activity" include "any act which is indictable under any of the [enumerated statutory provisions]." 18 U.S.C. § 1961(1). These "acts of racketeering activity" are also known as "predicate acts." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 236 (1989). As described *infra*, the facts alleged in the Complaint establish that RICO Defendants committed a vast number of predicate acts, each in violation of one of the following federal statutes: (1) Obstruction of Justice, 18 U.S.C. § 1512; (2) Theft of Trade Secrets, 18 U.S.C. § 1832; and (3) Wire Fraud, 18 U.S.C. § 1343.

### a.     Obstruction of Justice (18 U.S.C. § 1512)

The Complaint sufficiently pleads that the RICO Defendants intentionally mislead law enforcement authorities, including the FBI and the CIA, and committed numerous acts which constitute obstruction of justice in violation of 18 U.S.C. § 1512. There are two separate provisions of 18 U.S.C. § 1512 which are relevant here: § 1512 (b)(3) and § 1512 (c)(2).

First, § 1512 (b)(3) criminalizes "misleading conduct toward another person, with intent to . . . hinder, delay or prevent the communication to a law enforcement officer . . . relating to the commission or possible commission of a federal offense." 18 U.S.C. § 1512(b)(3). This provision "criminalizes the transfer of misleading information which actually relates to a potential federal offense." *United States v. Ronda*, 455 F.3d 1273, 1288 (11th Cir 2006) (citing *United States v. Veal*, 153 F.3d 1233, 1252 (11th Cir. 1998)). Importantly—despite Defendants' insistence to the contrary—§ 1512(b)(3) "*does not require that a defendant's misleading conduct relate in any way either to an 'official proceeding' or even to a particular ongoing investigation,*" *id.* at 1288 (emphasis added); see also 18 U.S.C. § 1512(b)(3) (unlike other provisions of § 1512, the language "official proceeding" is not contained in section (b)(3)). In this way, § 1512 (b)(3) applies broadly to "ensur[e] that transfers of information to federal law enforcement officers and judges relating to the possible commission of federal offenses be truthful and unimpeded." *Id.* at 1286.

Plaintiff has alleged that the RICO Defendants engaged in a concerted plot to mislead and defraud federal authorities, including the FBI and the CIA, and made numerous false and misleading

statements to federal law enforcement officers, withheld pertinent and relevant information, and provided falsified and fabricated materials and records, including spoofed and "user created" data, various white papers with deceptive analysis of said data, and the fraudulent Steele Dossier. *See, e.g.,* Am. Compl. ¶¶ 94-123, 172-194, 204-225, 297-311. These actions, as alleged, each constitute a predicate act in violation of § 1512(b)(3). *See id.* at 1290 ("The fabrication of evidence to mislead federal investigators violates § 1512(b)(3)."); *United States v. Ronga*, 682 Fed.Appx. 849, 855 (11th Cir. 2017) (noting that § 1512(b)(3) "criminalizes attempts to provide misleading information or inhibit truthful information from being transferred."); *see also* 18 U.S.C. 1515(a)(3)(A),(C),(D) ("[M]isleading conduct" is defined to include "knowingly making a false statement" and "knowingly submitting or inviting reliance on a writing or recording that is false, forged, altered, or otherwise lacking in authenticity. . . [or] other object that is misleading in a material respect.").

Second, § 1512(c)(2) criminalizes the act of "corruptly . . . obstruct[ing], influenc[ing], or imped[ing] any official proceeding, or attempt[ing] to do so." 18 U.S.C. § 1512(c)(2). To prove a violation of this catchall provision, a plaintiff must show that Defendant "engaged in conduct which constituted a substantial step toward the commission of the crime of obstruction of an official proceeding;" that Defendant acted "'corruptly,' " *i.e.,* "with an improper purpose and to engage in conduct knowingly and dishonestly with the specific intent to subvert, impede or obstruct" the grand jury investigation; and [that the] "[t]he natural and probable effect of [Defendant's] conduct would be the interference with the due administration of justice." *United States v. Mintmire*, 507 F.3d 1273, 1289 (11th Cir. 2007).

For the same reasons set forth above, the RICO Defendants' numerous attempts to deceive federal law enforcement officials, including making false statements and providing fraudulent evidence, satisfies these elements. Moreover, while § 1512(c)(2) does require an 'official proceeding' to be involved to some extent, this requirement is met because—contrary to Defendants' contention—the FBI's Crossfire Hurricane investigation qualifies as an 'official proceeding.' *See, e.g., United States v. Lee*, 919 F.3d 340 (6th Cir. 2019) (finding that defendant's misleading acts and representations to FBI agents during preliminary investigation stage was sufficient to constitute a violation of 18 U.S.C. § 1512); *United States v. Grubb*, 11 F.3d 426 (1993) (finding that FBI investigation qualifies as proceeding for the purpose of various obstruction of justice statutes). Even if it does not, to prove a violation of § 1512(c)(2), a plaintiff must only show that "Defendant knew of or foresaw an official proceeding, and knew that his actions were likely to affect it." *United States*

*v. Friske*, 640 F.3d 1288, 1292 (11th Cir. 2011). Since the RICO Defendants were no doubt aware that their obstructive and fraudulent conduct would affect not only the Crossfire Hurricane investigation, but also the investigations carried out by the House Permanent Select Committee on Intelligence and the Department of Justice's Special Counsel investigation led by Robert Mueller—both of which were either pending or easily foreseeable when all of the predicate acts occurred—the 'official proceeding' requirement is satisfied nonetheless. *See* 18 U.S.C. 1515(a)(1)(B),(C) ("'[O]fficial proceeding' is defined to include "a proceeding before Congress" and "a proceeding before a Federal Government agency which is authorized by law.").

Moreover, Sussmann argues that his alleged conduct—making false statements to the and presenting falsified documents to federal law enforcement authorities—is protected under the *Noerr-Pennington* doctrine. However, *Noerr-Pennington* is not applicable here since these actions fall squarely within the doctrine's "sham" exception. *See, e.g., City of Columbia v. Omni Outdoor Adv., Inc.*, 499 U.S. 365, 380 (1991) ("A 'sham' situation involves a defendant whose activities are not genuinely aimed at procuring favorable government action at all . . . not one who genuinely seeks to achieve his governmental result, but does so through improper means.") (citations omitted); *see also PREI v. Columbia Pictures*, 508 U.S. 49, 51 (1993) ("Under the sham exception, activity "ostensibly directed toward influencing governmental action" does not qualify for *Noerr* immunity if it "is a mere sham to cover. . . an attempt to interfere directly with the business relationships of a competitor.").

Therefore, the Complaint sufficiently alleges that the RICO Defendants committed numerous violations of 18 U.S.C. § 1512, all of which qualify as RICO predicate acts.

### b. *Theft of Trade Secrets (18 U.S.C. § 1832)*

Plaintiff has similarly put forth a cognizable theory that the RICO Defendants committed numerous predicate acts in violation of the Defense Trade Secrets Act, 18 U.S.C. § 1832, which criminalizes, in pertinent part, the following conduct:

> Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly . . . (1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information; or (2) without authorization . . . alters . . . transmits . . . delivers . . . communicates, or conveys such information.

In arguing that Plaintiff has failed to state an adequate violation of 18 U.S.C. § 1832, Defendants propose that Domain Name System (DNS)-related data does not fit within the definition of a trade secret under federal law. As an initial matter, this issue is not properly before the court at this time since "[w]hether a particular type of information constitutes a trade secret is a question of fact" that is inappropriate for consideration at the motion to dismiss stage. *Del Monte v. Dole*, 136 F. Supp. 2d 1271, 1292 (S.D. Fla. 2001); *see also Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1311 (11th Cir. 2020) ("[W]hether something is a trade secret is a question typically 'resolved by a fact finder after full presentation of evidence from each side.'") (citations omitted).

In any event, Plaintiff has adequately alleged that the information stolen by the RICO Defendants does indeed constitute a trade secret as the term is defined broadly to include "all forms and types of financial, business, scientific, technical, economic, or engineering information," that "derives independent economic value" that is not "readily ascertainable through proper means." 18 U.S.C. § 1839(3). To be considered a trade secret, information must have "independent economic value, actual or potential, from not being generally known." *Id.* In addition, the owner must have taken "reasonable measures" to keep the information secret. *Id.* "[N]o category of information is excluded from protection as a trade secret because of its inherent qualities." *Clark v. Bunker*, 453 F.2d 1006, 1009 (9th Cir. 1972).

Here, Plaintiff has alleged that the RICO Defendants stole and/or conspired to steal trade secrets in the form of "proprietary, sensitive and confidential internet data, records and/or information," including "data originating from his servers located at his private New York residence and those located at Trump Tower and used in connection with his business." Am. Compl. ¶ 544. Among other confidential and proprietary information, Plaintiff specifically identifies "DNS internet traffic data" as information that was stolen. As alleged in the Complaint, DNS data "reveals a comprehensive view into [Plaintiff and his company]'s website traffic, e-mail traffic, webmail traffic, chat messaging, in addition to the types of technology, hardware, software, programs, securities and processes being utilized by the server" as well as reveal his personal, political, and business-related "contacts, client lists, business dealings, financial dealings, communications, future and current plans, techniques, patterns, methods, processes, and procedures, as well as identification of their corporate partners, political associates, clients, and vendor." *Id.* ¶ 545.

Defendants do not dispute that DNS data reveals highly private and sensitive information, admitting that "'whoever operates the DNS resolver gets to see the names of all the websites' a user

visits" and that "DNS operators . . . can see all of the DNS queries that a user issues." Def. Mem. at 11 (citation omitted). With no choice but to admit this damning truth, Defendants offer up several red-herring arguments in an attempt to distract the Court from the validity of Plaintiff's claim. As set forth below, these arguments fail.

First, Defendants contend that Plaintiff's DNS records are not a trade secret because they are "public." Yet, in doing so, Defendants fail to recognize that a trade secret need not be wholly private, but rather may "exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which in unique combination, affords a competitive advantage and is a protectable secret." *Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1202 (5th Cir. 1986)). In fact, "[e]ven if *all* of the information is publicly available, a unique compilation of that information, which adds value to the information, also may qualify as a trade secret." *Digiport, Inc. v Foram Dev. BFC, LLC*, 314 So.3d 550, 553 (Fla. Dist. Ct. App. 2020) (citing *Capital Asset Rsch. Corp. v. Finnegan*, 160 F.3d 683, 686 (11th Cir. 1998)). For this reason, Florida courts have consistently confirmed that the "'distillation of' publicly available information [is] a protectable trade secret." *Compulife*, 959 F.3d at 1314. This is particularly true when the collection of information is accomplished through utilization of special technology to compile an "infeasible amount of data." *Id*. Certainly, the instant scenario—wherein it is alleged that Joffe "exploited [his] access to non-public and highly-sensitive data sources and/or servers" of Neustar and/or NSS's databases to unlawfully obtain Plaintiff's DNS data, including that he "queried the[] holdings of non-public internet data against a lengthy list of more than 9,000 IP addresses, 3,000 internet domains, and 60 e-mail address" and obtained "37 million DNS lookups" relating to Plaintiff—easily meets this standard.

Defendants' argument that Plaintiff does not "own" his DNS data is similarly misguided. Def. Mem. at 10. The question of whether that an individual has ownership rights in his DNS data was addressed by the Ninth Circuit in *Kremen v. Cohen*, 337 F.3d 1024 (9th Cir 2003). In that case, the court was grappling with the issue of whether a domain name can be considered 'property' within the context of a conversion claim. The court held in the affirmative, finding that a domain name qualifies as 'property' under the merger requirement due to its connection to DNS, which, in and of itself, is construed as a document. *Id.* at 1033-34. Specifically, the court recognized that "***DNS is a document*** (or perhaps more accurately a collection of documents) . . . [t]hat it is stored in electronic form rather than on ink and paper[.]." *Id.* and found that theft of DNS data is sufficient to support a

claim of conversion. *Id.* at 1034 (Emphasis added). The court also noted that the ever-updating nature of DNS data does not impact this analysis, noting that "[a] document doesn't cease being a document merely because it is often updated; [w]hether a document is updated by inserting and deleting particular records or by replacing an old file with an entirely new one is a technical detail with no legal significance." *Id.* at 1035.

Following the decision in *Kremen*, numerous courts have followed suit and held that DNS qualifies as a 'document.' *See, e.g., Best Carpet Values v. Google LLC*, no. 5:20-cv-047000 (N.D. Cal. Sept. 24, 2021) ("Plaintiffs' website is also connected to the DNS through its domain name. . . just as Kremen's domain name was connected to the DNS."); *Salonclick LLC v. Superego Management LLC*, no. 16-cv-2555 (S.D.N.Y. Jan. 18, 2017) ("Plaintiff has stated a claim for conversion of its domain name and social media accounts."); *Sprinkler Warehouse, Inc. v. Systematic Rain, Inc.,* 880 N.W.2d 16, 23 (Minn. 2016) (Internet domain name constitutes intangible personal property); *Integrated Direct Mktg., LLC v. May,* 495 S.W.3d 73, 76 (Ark. 2016) (intangible property, such as electronic data, can be converted). Most notably, in *Domain Protection, LLC v. Sea Wasp, LLC*, a decision that was later affirmed by the Fifth Circuit, the court agreed that "DNS' architectural mechanisms for storage of domain names constitute documents." *Domain Protection, LLC v. Sea Wasp, LLC*, 426 F.Supp.3d 355, 392-393 (E.D. Tex. 2019), *aff'd sub nom*. *Domain Protection, L.L.C. v Sea Wasp, L.L.C.*, 23 F.4th 529 (5th Cir. 2022). The court, however, took it a step further, recognizing that DNS servers collect "data, records, emails and other ***proprietary information***." *Id.* at 393 (Emphasis added). These decisions, taken together, soundly support Plaintiff's position that DNS data can contain—or, on its own, be construed as—a trade secret.

Defendant' also argue that Plaintiff's DNS data lacks "independent economic value" is similarly misguided. Defendants' fail to acknowledge that a trade secret need not be a current source of independent economic value – "*potential*" value is equally valid. 18 U.S.C. 1839(3) (Emphasis added). Defendants cannot seriously dispute that data revealing a comprehensive view into the "website traffic, e-mail traffic, webmail traffic, chat messaging, in addition to the types of technology, hardware, software, programs, securities and processes being utilized by the servers" of a presidential candidate (and, ultimately, a sitting President) and his business, do not have potential value. This is particularly true when the information was stolen from a *rival candidate*, as courts have presumed that "disclosure to a competitor is more harmful than disclosure to a noncompetitor. *Cytodyne Tech., Inc. v. Biogenic Tech., Inc.*, 216 F.R.D. 533, 536 (M.D. Fla. 2003).

Finally, Plaintiff has adequately established that the RICO Defendants intended to injure Plaintiff by stealing his DNS records. "[T]he bar for what counts as 'use' of a trade secret is generally low." *Compulife*, 959 F.3d at 1313. "There are no technical limitations on the nature of the conduct that constitutes 'use' of a trade secret. . . . [a]s a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to Defendant is a 'use.'" *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1292 (11th Cir. 2003) (quoting Restatement (Third) of Unfair Competition § cmt c. (1995)). As detailed at length in the Complaint, Plaintiff has alleged that, after obtaining Plaintiff's DNS data, the RICO Defendants "altered, spoofed and/or falsified" it to "create a misleading connection between Trump and Alfa Bank" and, thereafter, provided the falsified data to law enforcement officials, including the FBI and the CIA. Am. Compl. ¶¶ 305, 309. In other words, the RICO Defendants sought to weaponize the ill-gotten data by manipulating it in a deceptive manner to make it appear as if he were colluding with Russia, all in an effort to provoke an unfounded investigation that would tarnish his political reputation. The contention that the DNS data was falsified is supported by the investigative findings of the CIA, *id.* ¶ 309 (finding that the data was not "technically plausible," that it did not "withstand technical scrutiny," that it "contained gaps" and was "user created and not machine/tool generated"), and Ankura, "an industry-leading private technological consulting firm hired by Alfa Bank to investigate the server claims," *id.* 310 (finding that it was "likely that threat actors may ha[d] conducted some inauthentic DNS activity to force a 'connection' between Alfa-Bank and the Trump Organization").

Based on the foregoing, Plaintiff has alleged a cognizable claim of theft of trade secrets in violation of 18 U.S.C. § 1832.

### c.   *Wire Fraud (18 U.S.C. § 1343)*

The third predicate act identified in the complaint is wire fraud. "[W]ire fraud occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the . . . wires in furtherance of that scheme." *American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283 (11th Cir. 2010) (citing *Pelletier v. Zweifel*, 921 F.2d 1465, 1498 (11th Cir.1991).

As to the first element, "[t]he law in the Eleventh Circuit makes clear that a defendant 'schemes to defraud'" where "he schemes to 'depriv[e] [someone] of something of value by trick, deceit, chicane or overreaching.'" *United States v. Takhalov*, 827 F.3d 1307, 1312–13 (11th Cir. 2016). "All that is necessary is that the scheme be reasonably calculated to deceive; the intent

element of the crime is shown by the existence of the scheme." *United States v. Bradley*, 644 F.3d 1213, 1239 (11th Cir. 2011).

The full details of the RICO Defendant's fraudulent scheme are set forth in the Complaint and are too onerous to fully recount herein. However, to briefly summarize, the RICO Defendants "engaged in a calculated scheme to defraud the news media, law enforcement and counterintelligence officials for the purpose of proliferating a false narrative of collusion between Trump and Russia." Am. Compl. ¶ 577. In furtherance of this goal, the RICO Defendants sent a significant number of wire communications that were "intended to deceive [] journalists, reporters and/or media contacts so that they would publish false, defamatory, and inaccurate articles, stories, and/or news pieces about Plaintiff and his alleged collusion with Russia." *Id.* ¶ 586. They also sent many wire communications that were "intended to deceive [] law enforcement officials and/or counterintelligence officials to provoke them into launching one or more public investigation(s) into Plaintiff and his alleged collusion with Russia." *Id.* ¶ 587. As discussed below, the Complaint outlines thirty-three acts of wire fraud committed by the RICO Defendants, each described in precise detail. Therefore, Plaintiff has adequately pleaded the Enterprise's scheme to defraud.

As to the second element, unlike obstruction of justice and theft of trade secrets, predicate acts of wire fraud must be plead with particularity in accordance with the heightened pleading standard of FRCP 9(b). "The application of the rule, however, must not abrogate the concept of notice pleading," *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988); thus, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b). Further, courts apply Rule 9(b) less stringently when specific "factual information [about the fraud] is peculiarly within Defendant's knowledge or control." *Hill v. Morehouse Med. Assocs., Inc.*, 2003 WL 22019936, at *3 (11th Cir. Aug. 15, 2003).

To satisfy the second element, a plaintiff must allege: "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled[]; and (4) what Defendants gained by the alleged fraud." *Cigna Corp.*, 605 F.3d at 1291 (citing *Brooks v. BCBS of Fla., Inc.,* 116 F.3d 1364, 1380-81 (11th Cir.1997)). Any wire transmission that is "incident to an essential part of the scheme" is sufficient to constitute an act of wire fraud. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008). Even "innocent" transmissions—"ones that contain no false information—may supply the mailing [or wire] element." *Schmuck v. United States*, 489 U.S. 705, 715 (1989).

The Complaint easily satisfied these requirements. Plaintiff specifically identifies the precise statements, documents, and/or misrepresentations made by each and every RICO defendant in furtherance of the Enterprise's fraudulent scheme, including Clinton, *see* Am. Compl. ¶¶ 583(f), (q), (v), (w), (ee), (ff), (gg), Clinton Campaign, *see id.* ¶¶ 583(f), (j), (q), (r), (u), (v), (w), (y), (aa), (bb), DNC, *see id.* ¶¶ 583(d), (e), (dd), Perkins Coie, *see id.* ¶¶ 583(j), (k), (m), Elias, *see id.* ¶¶ 583(j), Sussmann, *see id.* ¶¶ 583(k), (m), Fusion GPS, *see id.* ¶¶ 583(a) ,(b), (c), (n), (o), (p), (s), (t), (x), and Joffe, *see id.* ¶¶ 583(g), (h), (i), (l), (z), (cc). In total, Plaintiff identifies thirty-three wire transmissions sent by the RICO Defendants in furtherance of their fraudulent scheme, and each is pleaded with the requisite particularity, including the time and place made and the identity of the actor. Plaintiff further identifies the content of the statements and the manner in which these acts were intended to mislead the intended recipients, namely, "journalists, reporters, media contacts, law enforcement officials, and counterintelligence officials." *Am. Compl.* ¶¶ 577, 578, 585-87.[9] With regard to the fraudulent statements made to "journalists, reporters and/or media contacts," Plaintiff specifies that the RICO Defendants sought to deceive them so that "they would publish false, defamatory, and inaccurate articles, stories, and/or news pieces about Plaintiff and his alleged collusion with Russia," *id.* ¶ 586; with regard to the fraudulent statements made to "law enforcement officials and/or counterintelligence officials," Plaintiff specifies that the RICO Defendants sought to deceive them for the purpose of "provoke[ing] them into launching one or more public investigation(s) into Plaintiff and his alleged collusion with Russia," *id.* ¶ 587.

Defendants attempt to argue that Plaintiff's wire fraud allegations are insufficient because their fraudulent scheme was not designed to "obtain" money or property. Def. Mem. at 13. In putting forth this argument, Defendants expose their ignorance of the guiding case law. Indeed, it is well established that a wire fraud scheme need not be designed to "obtain" property; it is equally valid when it is designed to "*deprive*" another of property. *See U.S. v. Bradley*, 644 F.3d 1213, 1240 (11th Cir. 2011) (stating that a "'scheme to defraud' . . . signifies the deprivation of something of value by trick, deceit, chicane or overreaching.") (quoting *U.S. v. Pendergraft*, 297 F.3d 1198, 1208-09 (11th Cir. 2002). Here, it has been alleged that the RICO Defendants sought to "depriv[e] Plaintiff

---

[9] To the extent Defendants argue, in passing, that Plaintiff was not the one who relied upon the fraudulent misrepresentations, it is well established that a plaintiff "need not show, either as an element of [their] claim or as a prerequisite to establishing proximate causation, that it relied on Defendant's alleged misrepresentations." *Bridge*, 553 U.S. at 661.

of tangible and/or intangible property, including, without limitation, causing loss of political and/or business reputation, loss of business opportunities, loss of competitive position, and/or loss of business revenue, loss of goodwill, loss of trade secrets, and/or loss of contractual relations." Am. Compl. ¶ 578. These types of losses are properly construed as 'deprivation of property' within the context of a wire fraud claim. *See, e.g., Mid Atlantic Telecom, Inc. v. Long Distance Services, Inc.*, 18 F.3d 260, 264 (4th Cir. 1994) (recognizing "lost customers and lost revenue" as valid wire fraud injury); *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 565 (5th Cir. 2001) (recognizing "injuries to competitive position" as valid wire fraud injury); *Alix v. McKinsey & Co.*, 23 F.4th 196, 204–06 (2d Cir. 2022) (recognizing loss of potential clients and contractual relations as cognizable RICO injury); *Lewis v. Lhu*, 696 F.Supp. 723, 727 (D.D.C. 1988) (recognizing reputational damages as valid wire fraud injury); *Bridge*, 553 U.S. at 649-650 (recognizing "lost valuable liens" as valid wire fraud injury; also, contemplating that "[if] an enterprise that wants to get rid of rival businesses mails misrepresentations about them to their customers and suppliers . . . [and] the rival businesses lose money as a result of the misrepresentations, it would certainly seem that they were injured in their business 'by reason of' a pattern of mail fraud[.]").

Therefore, wire fraud is sufficiently pleaded as a predicate act in the Complaint.

### d. *Continuity of the Racketeering Activity*

Moreover, contrary to Defendants' contention, the Complaint alleges a pattern of racketeering activity that is sufficiently continuous. Continuity is a "closed and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989). The pattern of racketeering carried out by the Enterprise, as alleged in the Complaint, meets both definitions of continuity.

First, the Complaint successfully pleads that the Enterprise's continuity is open-ended. To plead an open-ended continuity, a plaintiff must allege that an enterprise poses a continuing threat, which can be accomplished by showing that "the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future," or that "the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *H.J. Inc.*, 492 U.S. at 242. Plaintiff has done both. First, Plaintiff has shown that the racketeering acts themselves are likely to extend indefinitely into the future, particularly with respect to the acts of wire fraud, as the RICO Defendants have not relented in their efforts to tarnish Plaintiff's political reputation by perpetuating

36

the false narrative that he colluded with Russia. For example, many of the RICO Defendants have continued to regularly engage with the media in furtherance of their effort to corroborate the supposed Trump-Russia collusion – Clinton has publicly accused him of colluding with Russia and Putin multiple times in the past year, *see* Am. Compl. 518-522, while John Podesta (who was a member of the Clinton Campaign as all relevant times) runs *The Moscow Project*, an organization which describes itself as the "one-stop-shop for the who, what when, and where of all things Trump and Russia" and which, to this day, continues to release articles aimed at corroborating Trump-Russia collusion, *see id.* ¶¶ 498-501. Moreover, many of the RICO Defendants, including Fusion GPS, Joffe, Sussmann, and Clinton Campaign members Podesta and Sullivan, have worked with The Democracy Integrity Project (TDIP) to "continue exposing Russian Interference in the 2016 Presidential Election." The stated goal of their collective efforts is to "push the information obtained from Fusion [GPS] and Steele to policymakers on Capitol Hill, the press, and the FBI" – a clear continuation of the Enterprise's goal. The RICO Defendants' overlapping conduct is unlikely to cease anytime soon given their "longstanding interpersonal and/or professional relationships rooted in their political and professional connections, ongoing business dealings, and mutual interest and participation in common activities and dealings." *Id.* ¶ 537. Indeed, the Complaint succinctly alleges that the "potential that Plaintiff could run for President again in 2024" raises a serious threat that the Enterprise's conduct will continue for the foreseeable future as they seek to "further damage Plaintiff's electability and to ensure that he is unable to secure a victory in the 2024 Presidential Election." *Id.* ¶ 533. Given the RICO Defendants' history, there is a significant risk that they will resort to engaging in "theft of trade secrets, obstruction of justice, and other unlawful tactics" to accomplish this goal—if they have not already—since these "predicate acts or offenses are part of" the Enterprise's "regular way of doing business." *Id.* ¶ 531; *Jackson v. BellSouth Telecomms.* 372 F.3d 1250, 1265 (11th Cir. 2004*)*.

Defendants strain to argue that "[t]he speculative possibility that Plaintiff may run against a *different* Democratic nominee does not suggest that *these* Defendants will engage in any future racketeering activity." Def. Mem. at 15 (emphasis in original). In so arguing, Defendants display a fundamental misunderstanding of the Enterprise's purpose, as described in the Complaint. To be clear, Plaintiff does not contend—and the Complaint does not allege—that the RICO Defendants' goal was to get Hillary Clinton elected as President in 2016. Rather, it is alleged that their purpose was—and remains to this day—to "corruptly and wrongfully harm[] Plaintiff's political reputation,

damage[e] his electability . . . imped[e] his ability to effectively govern, and otherwise sabotage[e] his political career through deceptive, criminal and fraudulent means[.]" Am. Compl. ¶ 531. Their goal is not, and never was, tied to Hillary being the Democratic nominee; it is all about causing harm to Plaintiff, sabotaging his career, and keeping him out of office. Therefore, the Complaint adequately alleges that the Enterprise's pattern of racketeering acts is open-ended.

In the alternative, Plaintiff has also successfully pleaded closed-ended continuity. To plead closed-ended continuity, a plaintiff must allege that defendants engaged in a "series of related predicates extending over a substantial period of time." *Id.* The Eleventh Circuit has not identified a minimum duration that qualifies as a "substantial period of time," *see Jackson*, 372 F.3d at 1266–67, but courts in this district have found patterns lasting twelve months, *Hyundai Motor Am. Corp. v. North Am. Auto. Servs.*, 2021 U.S. Dist. LEXIS 99713 at *22 (S.D. Fla. May 25, 2021) (Middlebooks, J), and eighteen months, *see Magnifico v. Villanueva*, 783 F. Supp. 2d 1217, 1229 (S.D. Fla. 2011), to constitute a sufficient length of time.

Here, Plaintiff's wire fraud claim alone spans more than six years, extending from May 14, 2016, when Fusion GPS commenced their efforts to deceive a *Slate* journalist, Franklin Foer, into writing an article about the purported Trump-Alfa Bank connection (the article would eventually be written and become the subject of a Clinton Campaign press release and numerous misleading Clinton tweets), *see* Am. Compl. ¶ 583(a), through February 16, 2022, when Clinton sent another tweet that was a deliberate attempt to mislead the public and further the Enterprise's fraudulent scheme, *id.* ¶ 583(gg). Further, it is a near certainty that the RICO Defendants engaged in many more fraudulent acts between May 16, 2022, to the present, in furtherance of their scheme. For instance, as noted in the Complaint, considering that Fusion GPS, Joffe, Sussmann, and Steele, Sussmann were hired by The Democracy Integrity Project to "continue exposing Russian interference in the 2016 Presidential Election" for the purpose of "push[ing] the information . . . to policymakers on Capitol Hill, the press, and the FBI,"—efforts which "continued long after the election"—there is a reasonable presumption that the RICO Defendants' fraudulent acts run through, at the very least, the release of the *New Yorker* article, "*Was there a connection between a Russian Bank and the Trump Campaign?*" on October 8, 2018. *Id.* ¶¶ 313, 314, 324. While the particular circumstances surrounding these fraudulent acts are yet to be unearthed, any lack of particularity in this regard should not be construed against Plaintiff since this "specific factual information about the fraud is peculiarly within the [RICO Defendants'] knowledge or control." *Hill v. Morehouse*

*Med. Assocs., Inc.*, No. 02–14429, 2003 WL 22019936 at *3 (11th Cir. Aug. 15, 2003). This is particularly true when considering that the RICO Defendants' intentionally utilized attorney-client privilege as a means of concealing their fraudulent acts. By way of example, a significant portion of the fraudulent statements underpinning Plaintiff's wire fraud claim—namely, the various e-mails between Fusion and their media contacts—was determined by the court in the *U.S. v. Sussmann* matter to be protected by attorney-client privilege, and the communications were only made public due to the prosecution team unintentionally filing them as an unredacted exhibit on the public docket.[10] Therefore, Plaintiff must be afforded the opportunity to uncover the Enterprise's additional acts of fraud through the discovery process.

Regardless, even setting aside the end date of the wire fraud activity altogether, the latest act of obstruction of justice, which occurred on November 16, 2017 when the RICO Defendants conspired with Steele and Danchenko to make false statements and misrepresentations to the FBI, provides an eighteen-month timeframe that is sufficient to satisfy the continuity requirement. *See Hyudai Motor Am. Corp., supra; Magnifico*, *supra*.

Moreover, Defendants' argument that closed-ended continuity does not apply because the Enterprise has only a "single scheme with a discrete goal" is entirely without merit. *See* Def. Mem. at 15 (citing *Jackson*, 372 F.3d at 1267). The Complaint specifically outlines a "two-pronged plan" that was effectuated by the Enterprise – Elias, on one end, oversaw Fusion GPS' efforts to "spearhead the media-based smear campaign against Plaintiff," including the development of a "dossier, based on lies and misinformation purporting to show an incriminating link between Trump and Russia, which would be used to mislead law enforcement officials and ignite a media frenzy" and an otherwise "calculated scheme to defraud the news media, law enforcement and counterintelligence officials for the purpose of proliferating a false narrative of collusion between Trump and Russia"; meanwhile, on another end, Sussmann oversaw Joffe's "cyber-based, data-driven attack against Plaintiff," including efforts to "uncover proprietary data that could then be manipulated to give the impression that Trump was engaged in illegitimate business with a Russian bank, Alfa Bank." Am. Compl. ¶¶ 68, 534, 577. Thus, the RICO Defendants' goal was not singular, nor was it discrete. *See Jackson*, 372 F.3d at 1267 (noting that a "single scheme with a discrete goal"

---

[10] *See, e.g.,* Tim Pearce, *Latest Durham Drop Teaveals Starting Emails from Fusion GPS to Media Figures*, THE DAILY WIRE, https://www.dailywire.com/news/latest-durham-drop-reveals-startling-emails-from-fusion-gps-to-media-figures.

is "narrow in scope."). To the contrary, it was "extensive" and "widespread." *See Hyundai Motor Am. Corp.*, 2021 U.S. Dist. LEXIS 99713 at *11. Therefore, Defendants' argument that the Complaint only alleges a "single scheme with a discrete goal" must be disregarded.

### iv. *RICO Standing and Causation*

RICO provides a private cause of action for "[a]ny person injured in his business or property by reason of a violation of Section 1962 of this chapter." 18 U.S.C. § 1964(c). To have standing under Section 1964(c), a civil RICO plaintiff must show: (1) that his alleged harm qualifies as an injury to his business or property; and (2) that the harm was "by reason of" the RICO violation, which requires Plaintiff to establish proximate causation. *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992). Plaintiff has easily satisfied both of these requirements.

First, the Complaint alleges that Plaintiff suffered at least nine independent and distinct harms to his business and property, including: (i) "loss of political []reputation"; (ii) "loss of [] business reputation"; (iii) "loss of existing and future business opportunities"; (iv) "loss of competitive position"; (v) "loss of business revenue"; (vi) "loss of goodwill"; (vii) "loss of trade secrets"; (viii) "loss of contractual relations"; and (ix) "defense costs, legal fees, and related expenses incurred in connection with his effort to defend against the RICO Defendants' actions and the various federal investigations and/or official proceedings which arose therefrom." Am. Compl. ¶¶ 615-616. Of these damages, Defendants only challenge two of them—attorneys' fees and loss of business opportunities—as being inadequately pleaded. As to the remaining types of injuries, Defendants concede that they are legally cognizable damages.

With regard to the defense costs and attorneys' fees, Defendants argue, that Plaintiff has no standing to recover for attorneys' fees because—according to Defendants—he apparently did not pay the claimed fees out of his own pocket. This bald assertion is utterly false and, unsurprisingly, is made without any factual support. Instead, Defendants merely point to recent payments made by various political action committees to one of the undersigned law firms and seemingly suggest that this means that Plaintiff has not paid a single dollar towards legal fees dating back to 2015. Simply put, this argument lacks any merit and does not warrant further discussion. Plaintiff has pleaded the specific, ascertainable amount of attorneys' fees that he was caused to incur as a result of the RICO Defendants' actions. *See* Am. Compl. ¶¶ 616, 632, 655, 665, 678, 692, etc. ("Plaintiff was forced to incur expenses in an amount to be determined at trial, but known to be in excess of twenty-four millions dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and

related expenses[.]"). There is no question that these expenses constitute a cognizable injury under the RICO statute. *See, e.g., Alexander Grant and Co. v. Tiffany Industries, Inc.*, 770 F.2d 717, 719 (8th Cir. 1985) (finding that attorneys' fees, defense costs, and related expenses qualify as RICO injury).

As for the loss of business opportunities, these damages are a similarly well-established RICO injury. *See, e.g., Mid Atlantic Telecom.*, 18 F.3d at 264 (recognizing "lost customers and lost revenue" as RICO injury); *Procter & Gamble Co.*, 242 F.3d at 565 (recognizing "injuries to competitive position" as RICO injury); *Alix*, 23 F.4th at 204–06 (recognizing loss of potential clients and contractual relations as RICO injury); *Lewis*, 696 F.Supp. at 727 (recognizing reputational damages as RICO injury); *Bridge*, 553 U.S. at 649-650 (recognizing "lost valuable liens" as RICO injury). Further, to the extent Defendants argue that this category of damages is too speculative, "[t]he law is well-settled that uncertainty as to amount of damages is not reason to deny a plaintiff some recovery." *Alix*, 23 F.4th at 207 (citing *Story Parchment Co. v. Paterson Parchment Co.*, 282 U.S. 555, 563-568 (1931)). Indeed, a "wrongdoer is not entitled to complaint that [damages] cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise . . . the risk of the uncertainty should be thrown upon the wrongdoer instead of the injured party." *Id.; see also Bridge*, 553 U.S. at 654-655 ("The direct-relation requirement avoids the difficulties associated with attempting to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors; prevents courts from having to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries; and recognizes the fact that directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.") (citations omitted).  Plaintiff has set forth thesehis damages with the requisite specificity but, even if he had not, this issue is not appropriately before the court at this time – at a minimum, Plaintiff must be allowed to engage in discovery to uncover the breadth of the RICO Defendants' wrongful acts which, in turn, will inform the full extent of the injuries they wrought upon Plaintiff.

Second, the causation element is also satisfied. "Proximate cause . . .is a flexible concept that does not lend itself to 'a black-letter rule that will dictate the result in every case.'" *Bridge*, 553 U.S. at 654 (citation omitted). To effectively plead causation under RICO, a plaintiff is required only to allege "some direct relation" between the injury asserted and the injurious conduct. *Corcel Corp. v.*

*Ferguson Enters., Inc.*, 551 F. App'x 571, 576 (11th Cir. 2014). It is only necessary to plead that Defendants' "conduct was a substantial factor in the sequence of responsible causation." *Id.*

Here, it is alleged that, "[a]s a direct and proximate result of the RICO Defendants' racketeering activity described herein, numerous unfounded investigations, including the FBI's Crossfire Hurricane investigation and its full field Alfa Bank investigation, numerous congressional investigations, and Special Counsel investigations were commenced; countless false, damaging, and defamatory articles and media stories of all types (televisions, radio, internet, etc.) were published, resulting in the widespread dissemination of false, damaging and defamatory accusations of Plaintiff's purported collusion with Russia which became years-long headline story that irreparable, unjustly and permanently tarnished Plaintiff's political reputation." Am. Compl. ¶ 614. This assertion is supported by the voluminous, well-sourced allegations contained in the Complaint. Indeed, throughout the Complaint, Plaintiff outlines, in meticulous detail, the various illicit acts of the RICO Defendants and how those acts were the direct and proximate cause of Plaintiff's injuries.

Defendants try to circumvent Plaintiff's well-pled allegations by cherry-picking a select few events from the nearly 200-page Complaint and attempting to distinguish the same as not causally related to Plaintiff's injuries. For instance, Defendants argue that Sussmann's misrepresentation to FBI General Counsel, Jim Baker, that he "was not acting on behalf of any client" cannot be tied to Plaintiff's injuries because Sussmann was ultimately acquitted by a jury on a related criminal charge. This argument is flawed for several reasons. First, criminal cases have an extremely high burden of proof, so an acquittal is by no means an acknowledgement of innocence. In fact, Sussmann relayed the very same to Baker in a text message—as referenced in the Complaint, *see* Am. Compl. ¶ 204— so the fact that the statement was made is not in dispute. More importantly, despite the high-profile jury trial that surrounded it, Sussmann's misrepresentation to Jim Baker is a very minor part of the RICO Defendants' wide-spanning scheme. In fact, it was not even the most noteworthy thing that happened at his meeting with Baker on September 19, 2017; he also handed over falsified records and threatened that a major media outlet would be reporting on the story imminently (omitting the fact that he had provided the story to the major media outlet) – which led to the FBI launching a "full field investigation" into the supposed Trump-Alfa Bank connections "as a direct result of Sussmann's meeting with Baker." *Id.* ¶¶ 206, 214.

Defendants also try to argue that the RICO Defendants' actions were not the driving factor in the commencement of the various FBI investigations, but the Complaint has set forth a vast

number of facts that indicate otherwise. *See, e.g.*, *id.* ¶ 158 (Steele began sending the Dossier to the FBI on July 5, 2016, mere weeks before Crossfire Hurricane was commenced); *id.* ¶ 204-214, 343 (Alfa Bank 'full field investigation' launched four days after Sussmann's meeting with Jim Baker); *id.* ¶ 226 (Inspector General Michael Horowitz's finding that Steele Dossier was relied upon in granting FISA warrants). Further, the question of which factors ultimately led to the commencement of said investigation is the epitome of a factual issue that is not appropriate for determination at this time. Moreover, Defendants' willingness to point to the IG Report as a reliable source on this issue is telling, as the same report found that the Steele Dossier played a "central and essential role in the decision by the FBI [Office of General Counsel] to support the request for FISA surveillance . . . as well as the [Department of Justice]'s ultimate decision to seek the FISA Order." *Id.* ¶ 226.

Beyond that, Defendants fail to recognize that Plaintiff's injuries are not only tied to the unfounded investigations and proceedings that were commenced by the RICO Defendants' acts – they also stem from the *yearslong* media storm that resulted from their scheme to mislead the media into publishing disparaging and damaging stories about Plaintiff. There is no question that the RICO Defendants' fraudulent communications with members of the media, intentional leaking of spurious stories, and publication of false statements and accusations, were the root cause of these damages. On this basis alone, Plaintiff has pleaded sufficient causation for a cognizable RICO injury. Nonetheless, given the widespread, multi-faceted nature of the RICO Defendants' actions, it would be a pointless endeavor to attempt to tie *each and every* one of the RICO Defendants' acts to Plaintiff's injuries. It is the conduct of the Enterprise *as a whole* that must be a "substantial factor in the sequence of responsible causation," *Corcel Corp.*, 551 F. App'x at 576. Considering the totality of the facts alleged in the Complaint, there is no question that Plaintiff has successfully made this showing.

Therefore, for the foregoing reasons, Plaintiff has successfully pleaded standing and causation under RICO.

## B. RICO CONSPIRACY (18 U.S.C. § 1962(D))

The Complaint similarly puts forth a valid claim of RICO conspiracy pursuant to 18 U.S.C. § 1962(d).

18 U.S.C. § 1962(d) provides, in pertinent part, that: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection …(c) of this section." To establish a violation of 18 U.S.C. § 1962(d), a plaintiff must allege that "the conspirators agreed to participate directly or

indirectly in the affairs of an enterprise through a pattern of racketeering activity." *In re Managed Care Litig.*, 298 F.Supp. 1259, 1280 (S.D.FL. 2003). "A plaintiff can establish a RICO conspiracy claim in one of two ways: (1) by showing that Defendant agreed to the overall objective of the conspiracy; or (2) by showing that Defendant agreed to commit two predicate acts." *American Dental Assn.*, 605 F.3d at 1293 (citation omitted). Such a claim may be shown through circumstantial evidence, including "inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *United States v. Sylvestri*, 409 F.3d 1311, 1328 (11th Cir. 2005); *see also American Dental Assn.*, 605 F.3d at 1293 (noting that a plaintiff need not offer direct evidence of a RICO agreement; existence of a conspiracy "may be inferred from the conduct of the participants.").

At the outset, the Complaint firmly establishes that each and every one of the RICO Defendants violated 18 U.S.C. § 1962(d) by agreeing to the overall objective of the Enterprise and/or agreeing to commit, at a minimum, two predicate acts. The facts, circumstances, and postulations in support of this showing are detailed at length in Section II(A)(iii)(b) above.

As for Defendants who are implicated in the RICO Conspiracy claim, but not the RICO claim, there is ample evidence to support a showing that each of them violated as 18 U.S.C. § 1962(d) as well. In particular, the following facts, as fully elucidated in the Complaint, are sufficient to infer that each of these Defendants either agreed to the overall objective of the Enterprise's conspiracy, agreed to commit at least two predicate acts, or both:

- *Steele/Orbis Ltd.*: Steele was "desperate that Donald Trump not get elected" and "was passionate about [Donald J. Trump] not being president," *id.* ¶ 95; in accepting his assignment to collect intelligence regarding a purported Trump-Russia connection, Steele was aware that "Democratic Party Associates" were paying for his and Fusion GPS's "research" and that the "ultimate client" was "the leadership of the Clinton Presidential Campaign," *id.* ¶ 99; Steele testified that "the purpose of [his] work was to prevent [Plaintiff] from becoming president," *id.* ¶ 105; Steele provided reports from the FBI which contained false information regarding Carter Page and his purported ties to Russia, *id.* ¶226; Steele met with the FBI's Crossfire Hurricane team and failed to disclose the identities of his client, thereby furthering the Enterprise's conspiracy, *id.* ¶ 233. Steele further confirmed that he shared the DNC and Clinton Campaign's goal of having the information "come to light" prior to election day, *id.* ¶239; Steele further met with a journalist from *Mother Jones* on October 31, 2016 because he "wanted [Corn] to publish that the US Government was investigating Trump" and was "aware that Mr. Corn was likely to be publishing an article after the interview." *id.* ¶¶ 272, 273; In mid-November of 2016, Steele met with David Kramer, an affiliate of Senator John McCain, and showed him the Dossier in the hopes that McCain would share his findings with his "colleagues on the various committees in the Senate," including "his committees in Congress, the Homeland Security Committee and the Intelligence Committee," as well as "other agencies", *id.* ¶ 291.

- *Danchenko*: Danchenko served as the primary source for the information contained in the Dossier, *id.* ¶109; Danchenko, in thanking Dolan for the information he provided, stated that their "goals clearly coincided" with respect to gathering derogatory information about Trump, *id.* ¶12; during interviews with the FBI, Danchenko readily conceded that he had "zero corroboration for the key allegations he contributed to the Dossier; *id.* ¶331; Danchenko repeatedly lied to the FBI during these interviews by stated that he never communicated with Dolan in the course of providing information for the Dossier, *id.* ¶335; After Danchenko was indicted, Durham filed a motion to inquire into potential conflicts of interest in Danchenko's criminal case, as Danchenko's defense counsel also represents the Clinton Campaign, noting that "the interests of the Clinton Campaign and [Danchenko] could potentially diverge in connection with any plea discussions, pre-trial proceedings, hearings, trial, and sentencing proceedings.", *id.* ¶ 488.

- *Dolan*: has longstanding ties to the Democratic party, including a close relationship with Clinton, the Clinton Campaign and the DNC, and was closely associated with two of Steele's sub-sources, Danchenko and Olga Galinka, *id.* ¶¶ 96, 336-340; Dolan was the source of a significant portion of the false information contained in the Steele Dossier, which he provided to Danchenko who, in turn, reported it to Steele, *id.* ¶¶ 113; Dolan has admitted that the information he provided to Danchenko was false. Danchenko further acknowledged that their "goals clearly coincide" with respect to gathering derogatory information about Plaintiff and tarnishing his reputation, *id.* ¶120.

- *Sullivan*: Joffe, in exploiting and unlawfully accessing Plaintiff's data in search of a secret "back channel" between Plaintiff and Alfa Bank, explicitly acknowledged that this was done at the behest of certain "VIPS" which included Sullivan, *id.* ¶141; During the course of the Democratic National Convention, Sullivan began to "sound the alarm" about Russian interference in the 2016 election and was "on a mission to get the press to focus on... the prospect that Russia had not only hacked and solen e-mails from the Democratic National Committee, but that it had done so to help Donald Trump and hurt Hillary Clinton." *id.* ¶165; Sullivan then set up meetings with major networks to brief them on "the nature of the connections between several members of Trump's foreign policy and political team and elements of the Russian Government or Russian-backed proxies" and how these connections allegedly created a "pretty disturbing picture." *id.* ¶167; On October 31, 2016, Sullivan put out a written campaign statement that Trump and the Russians had set up a "secret hotline" through Alfa Bank and that "federal authorities" were investigating "this direct connection between Trump and Russia" and portrayed these finding as the work of independent experts, without disclosing their connection the Clinton Campaign. *id.* ¶265; It was later revealed that Sullivan participated in meetings with The Democracy Intelligence Project ("TDIP"), along with Simpson and Fritsch, with the explicit purpose of finding ways to "raise money to continue their efforts to investigate the Russian interference in the campaign." *id.* ¶313.

- *Podesta*: Podesta affirmatively pushed the false Trump-Russia connection when he met with reporters and stated that "I've been involved in politics for nearly five decades. This definitely is the first campaign that I've been involved in which I've had to tangle with Russian intelligence agencies who seem to be doing everything they can on behalf of our opponent." *id.* ¶276; Podesta was also part of the meeting with TDIP and other senior campaign leadership to find ways to raise money to continue to investigate purported Russian interference, *id.* ¶313; Podesta accused Plaintiff on Twitter of "running a big lie campaign" centered on the investigation into Russian

meddling in the US election." *id.* ¶496; Podesta, through the Center for American Progress to establish the "Moscow Project", which was set up as a basis to continue to spread the false Russian narrative. *id.* ¶¶ 498-501.

- *Mook*: Mook, along with Elias, Podesta, Sullivan, and Palmieri about whether the campaign "should affirmatively push [the Alfa Bank allegations] to the media [.]" *id.* ¶247; In doing so, Mook readily admitted that he "wasn't totally confident in" the veracity of the information and thought it was "highly suspect." *id.* ¶248; Notwithstanding this admission, Mook then discussed with Clinton the decision to push the false Alfa Bank allegations to the media, which Clinton agreed to, *id.* ¶252.

- *Reines*: Reines served as a long-time communications advisor to Hillary Clinton and participated in the widespread dissemination of the falsehood that Plaintiff colluded with Russia to undermine the 2016 election. *id.* ¶215; For instance, on April 16, 2018, Reines tweeted "yes collusion, yes collusion, yes collusion" in response to an article discussing Plaintiff's policy decisions regarding Russian sanctions. Even after the conclusion of the Mueller investigation, Reines continued to push that the purported conspiracy was ongoing, stating "you saying it on Fox doesn't make it so," *id.* ¶463.

- *Nellie Ohr/Bruce Ohr*: Bruce Ohr served as an Associate Deputy Attorney General at the same time that his wife, Nellie Ohr, was a contractor for Fusion GPS. *id.* ¶¶88, 89. The RICO defendants exploited this relationship for the express of lending credibility to the fraudulent Dossier. *Id.* Nellie Ohr directly assisted in the compilation of the Dossier, *id.* ¶103; On July 31, Steele met with Nellie and Bruce Ohr to discuss his work on the Dossier, and Bruce Ohr was already aware that Steele was "sharing this information with the Clinton Campaign." *id.* ¶169; Notwithstanding, Bruch Ohr met with Andrew McCable and Lisa Page and briefed them on the false accusations contained in the Dossier, *id.* ¶170; Bruce Ohr testified that his wife provided him with a memory stick, which included research she performed for Fusion GPS on various Russian figures. Bruce Ohr explained that she provided this information so that he would provide it to the FBI, *id.* ¶284; Bruce Ohr concealed this meeting from the DOJ and was later disciplined for doing so, *id.* ¶286; On December 20, 2016, Bruce Ohr provided the FBI with a second hard drive to the FBI, which similarly contained reports prepared by his wife. Through their collective conduct, Crossfire Hurricane was commenced and/or continued.

- *Neustar Inc./Neustar Security Services*: Neustar was aware of, and complicit in, Joffe's commission of theft of trade secrets on several occasions, as evidenced by several e-mail communications between Joffe (or Manos Antonakatis on his behalf) and Neustar employee, Steve DeJong. *id.* *¶185*, 328; DeJong was aware of, and actively assisted with, Joffe's exploitation of Neustar's database of private and proprietary data, *id.* ¶ 185, 186, 328.

Accepting the above allegations as true, taken with all reasonable inferences and viewed in a light most favorable to Plaintiff, there is no question that the Complaint sufficiently details and pleads that each of the above-referenced Defendants agreed to the overall objective of the RICO conspiracy or, alternatively, agreed to commit at least two predicate acts. Therefore, Plaintiff has asserted a viable claim under 18 U.S.C. § 1962(d) as to all of these Defendants.

### C.  INJURIOUS FALSEHOOD

Plaintiff has asserted a cognizable and actionable claim of injurious falsehood against z is well-supported by the allegations contained in the Complaint.

In order to sustain a claim for injurious falsehood, a plaintiff must adequately allege: (1) a falsehood; (2) published or communicated to a third party; (3) Defendant knew the falsehood would likely induce others not to deal with Plaintiff; (4) the falsehood did play a material and substantial part in inducing others not to deal with Plaintiff; and (5) special damages. *Bothmann v. Harrington*, 458 So. 2d 1163, 1168 (Fla. 3d DCA. 1984). "Plaintiff must also allege damages as a result of the communicated falsehood." *Arthrex, Inc. v. W. Coast Med. Res., LLC*, 2015 WL 12844946, at *8 (M.D. Fla. Nov. 25, 2015).

Here, Plaintiff has sufficiently pled all of these elements. The Complaint sets forth a bevy of falsehoods to mainstream media outlets, government authorities, and the general public, which were intended to create a non-existent link between Plaintiff and Russian agents. As detailed in the Complaint, all of these statements were false and all of them were published to third parties. Further, despite Defendants' transparent attempt to mischaracterize the nature of Plaintiff's allegations, the Complaint is *replete* with statements that Defendants knew that their statements were false and that they would be damaging to Plaintiff. *Id*. ¶¶ 501, 519, 583, 673, 676, 689.

Plaintiff has also alleged that Defendant's defamatory statements were designed to economically damage him ("Defendants conspired to disseminate false information and spread a false narrative in an attempt to ruin Plaintiff.) *Id*. Defendants weakly posit that Plaintiff failed to identify the "various investigations" and "official proceedings" that were spurred by the defamatory statements. However, this argument is demonstrably false and should not be countenanced by this Court. The Complaint recounts in meticulous detail the numerous proceedings that were directly instigated by Plaintiff's defamatory publications and explains that the falsehoods were spread to *both* media outlets and law enforcement officials. *See Id*. ¶¶ 157, 158, 166, 167, 172, etc. As a result, Defendants conduct is directly attributed to provoking both the unwarranted media frenzy and the unfounded investigations, including Crossfire Hurricane, the Alfa Bank investigation, and the Mueller Investigation.

Moreover, contrary to Defendants' assertion, the First Amendment does not immunize Defendants from the indisputable harm created by their publications, nor can they be simply characterized as 'political speech.' It is well established that the privilege for political speech is a

*qualified* privilege, which can be defeated by a showing that Defendants acted with actual malice. *See Fridovich v. Fridovich*, 598 So. 2d 65, 69 (Fla. 1992) ("In overcoming a qualified privilege, a plaintiff would have to establish by a preponderance of the evidence that the defamatory statements were false and uttered with common law express malice-i.e., that Defendant's primary motive in making the statements was the intent to injure the reputation of Plaintiff."); *see also Nodar v. Galbreath*, 462 So. 2d 803, 809 (Fla. 1984) ("A communication made in good faith on any subject matter by one having an interest therein, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty."). Proof of actual malice may be shown "'by proving a series of acts which, in their context or in light of the totality of surrounding circumstances, are inconsistent with the premise of a reasonable man pursuing a lawful objective, but rather indicate a plan or course of conduct motivated by spite, ill-will, or other bad motive.'" *Asinmaz v. Semrau*, 42 So. 3d 955, 958 (Fla. 4th DCA 2010).

In *Asinmaz*, the Court held, "[a] defamation based upon a completely unreasonable belief, which the party knows is without foundation, may be sufficient to infer an intent to harm." *Asinmaz*, 42 So. 3d 955, 959. Specifically, this Court found actual malice could be inferred from the "unreasonableness of [defendant's] conduct in accusing [plaintiff] of stealing her diamonds and then, without ever investigating something over which she had absolutely no expertise, filing a report with the police." *Asinmaz*, 42 So. 2d at 959. The Court further explained, "[a]t the time [defendant-customer] filed the report accusing [plaintiff-jeweler] of theft, she was aware that she did not actually know whether her accusation was true." Id. This court reasoned defendant "intended to harm [plaintiff] by getting the police involved" *Id*.

The Supreme Court of Florida scrutinizes statements made to law enforcement with particular care, because "[t]here is no benefit to society or the administration of justice in protecting those who make intentionally false and malicious defamatory statements to the police. The countervailing harm caused by the malicious destruction of another's reputation by false accusation can have irreparable consequences." *Fridovich v. Fridovich*, 598 So. 2d 65, 69 (Fla. 1992).

Plaintiff easily crosses this threshold. The Complaint meticulously describes the manner by which Defendants concocted a false narrative regarding a non-existent link between Plaintiff and the Russian Government, and then distributed these publications to law enforcement officials to spur an investigation of Plaintiff. *See* Amended Compl., ¶¶ 635–652. Therefore, Plaintiff's claim satisfies the actual malice standard and must be permitted to proceed past the pleading stage.

48

Furthermore, Plaintiff's injurious falsehood claim is supported by a cognizable theory of recoverable damages. Defendants fundamentally misconstrue the tort of injurious falsehood by summarily stating that Plaintiff's must fail because his injuries are not "economic" in nature. Contrary to Defendants' assertion, recovery is not limited to injuries that are economic in nature. Indeed, injurious falsehood is much more broadly applied – it is designed to redress defamatory actions which *affect* an economic interest. The gist of injurious falsehood is the "intentional interference with another's economic relations." *Salit v. Ruden*, 742 So.2d 381, 386 (Fla. 4th DCA 1999); *see also*, *Sailboat Kev. Inc. v. Gardner*, 378 So.2d 47, 48 (Fla. 3d DCA 1979) (Injurious falsehood is interchangeable with slander of title, disparagement of property, or trade libel.)

Here, the Complaint pleads that Plaintiff has "been injured in his business and property and has incurred and will continue to incur, significant damages, losses, and deprivation of tangible and intangible property, including but not limited to loss of political and/or business reputation, loss of business opportunities, loss of competitive position, loss of business revenue, loss of goodwill, loss of trade secrets, and/or loss of contractual relations." Am. Compl. ¶ 664." In addition, Plaintiff has also pled that he suffered special damages directly stemming from Defendants' injurious falsehoods. *See Salit v. Ruden*, 742 So. 2d 381, 388 (Fla. Dist. Ct. App. 1999) ("The chief characteristic of special damages is a realized loss."). Plaintiff has pled specific, ascertainable amounts of attorneys' fees that he was caused to incur as a result of Defendants' defamatory statements. *See* Am. Compl. ¶ 655 ("Plaintiff was forced to incur expenses in an amount to be determined at trial but known to be in excess of twenty-four million dollars ($24,000,000) and continuing to accrue, in the form of defense costs, legal fees, and related expenses[.]"). As enumerated by the Supreme Court, legal fees constitute special damages in trade libel claims such as the one asserted by Plaintiff. *Horgan v. Felton*, 123 Nev. 577, 586 (2007). Based on the foregoing, Plaintiff has asserted a legally cognizable claim for injurious falsehood against Clinton, Sullivan, Schiff, Danchenko, Sussmann, and Steele.

For these same reasons, Plaintiff has sufficiently pled his claim of conspiracy to commit injurious falsehood. The elements of a civil conspiracy are: (a) a conspiracy between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts performed pursuant to the conspiracy. *Walters v. Blankenship*, 931 So. 2d 137, 140 (Fla. Dist. Ct. App. 2006). A cause of action for civil conspiracy "requires an actionable underlying tort or wrong." *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997). As demonstrated both above and in the

underlying complaint, each of the above-named Defendants participated in the conspiracy to disseminate injurious falsehoods concerning Plaintiff to third parties, including "government authorities, media outlets, and the general public." *See* Am. Compl. ¶ 658. As Plaintiff has adequately pled the underlying tort, the conspiracy count must similarly survive.

### D. MALICIOUS PROSECUTION

At the outset, it is important to note that Defendants attempt to draw an arbitrary distinction between Crossfire Hurricane and Mueller Investigation in arguing against Plaintiff's malicious prosecution claim. However, as noted in the Complaint, the Mueller Investigation is merely an extension of Crossfire Hurricane which, by and large, served the same exact purpose. Indeed, Plaintiff alleges that Defendants efforts to harm Plaintiff, Crossfire Hurricane was initially launched to investigate whether Plaintiff's campaign coordinated with Russia to undermine the 2016 election. Am. Compl., ¶ 671. Thereafter, Robert Mueller was appointed as Special Counsel to take over and "oversee" the investigation. *Id*. ¶ 456. Thus, for the purposes of Plaintiff's malicious prosecution claim, Crossfire Hurricane and the Mueller Investigation should be viewed in the same light.

To prevail in a malicious prosecution action brought under Florida law, Plaintiff must establish each of six elements: "(1) an original criminal or civil judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding against the present plaintiff in the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence of probable cause for the original proceeding; (5) there was malice on the part of the present defendant; and (6) Plaintiff suffered damage as a result of the original proceeding." *Alamo Rent-A-Car, Inc. v. Mancusi*, 632 Sfo.2d 1352, 1355 (Fla. 1994).

The Mueller Investigation qualifies as a criminal proceeding under the first element of the inquiry. By way of illustration, In *Caplan v. Johnson*, the court found that the mere issuance of the warrants was sufficient to equal the commencement of a criminal proceeding, and held that under Florida law, arrest was not an element essential to establish malicious prosecution. *Caplan v. Johnson*, 414 F.2d 615, 618 (5th Cir. 1969). In that same vein, when the Mueller Investigation was first initiated, Acting Attorney General Rod Rosenstein issued an order appointing Robert S. Mueller as Special Counsel to investigate, among other things, whether Plaintiff colluded with the Russian government. In doing so, he invoked 28 U.S.C. § 515—which empowers the Attorney General to initiate "any kind of *legal proceeding*, civil or criminal"—to commence the proceeding. 28 U.S.C.

§ 515 (emphasis added). Furthermore, a substantial amount of litigation was carried out in furtherance of the Mueller Investigation. As referenced in Attorney General William Barr's letter dated March 24, Robert Mueller "issued more than 2,800 subpoenas, executed nearly 500 search warrants, obtained more than 230 orders for communication records, issued almost 50 orders authorizing use of pen registers, made 13 requests to foreign governments for evidence, and interviewed approximately 500 witnesses." Am. Compl. ¶ 461, n. 244. Given the magnitude and scope of the Mueller Investigation, coupled with the statutory authority under which it was commenced, there is no question that it qualifies as a 'proceeding' for the purposes Plaintiff's malicious prosecution claim.

As discussed at length above, and as detailed throughout the Complaint, Defendants were the legal cause of both Crossfire Hurricane and the subsequent Mueller Investigation Mueller Investigation. Among other things, Defendants intentionally and maliciously instigated the Mueller Investigation by providing law enforcement officials with patently false information relating to Plaintiff's supposed ties to Russia. *Id*. at ¶ 669.

Further, there was a bonafide termination of a criminal proceeding in Plaintiff's favor. On March 22, 2019, Special Counsel Robert Mueller concluded his 22-month investigation and submitted the Mueller Report to Attorney General William Barr. In the Mueller Report, Special Counsel Mueller found that there was no evidence that either Plaintiff or his campaign colluded with the Russian Government to undermine the 2016 presidential election. *Id*. at ¶¶ 459-460. Specifically, the Mueller Report stated that Mueller "did not find that the Trump campaign, or anyone associated with it, conspired or coordinated with the Russian government in these efforts, despite multiple efforts from Russian-affiliated individuals to assist the Trump campaign." *Id*. at ¶ 461. Attorney General William Barr, in a subsequent letter to Congress on March 24, 2019, confirmed Mueller's findings and terminated the proceeding. Therefore, the Mueller Report serves as veritable proof that the Mueller Investigation was terminated in Plaintiff's favor.

Plaintiff successfully pled the remaining elements of his malicious prosecution claim. As detailed in great length in the Complaint, the present collectively advanced the creation of the fraudulent Steele Dossier, the white papers, and other falsehoods that served as the basis for Crossfire Hurricane, which then culminated in the continuation of the Mueller Investigation, which had no justifiable basis. *Id*. at ¶¶ 670, 674. Finally, Plaintiff established that he suffered damages known to be in excess of $24 million dollars in the form of "defense costs legal fees, and related

expenses incurred in connection with his effort to defend against Defendants' false accusations and the various federal investigations and/or official proceedings arose therefrom." *Id*. at ¶ 678.

Based on the foregoing, Plaintiff has set forth a valid and cognizable claim for malicious prosecution. In addition, and as illustrated above, Plaintiff's conspiracy must also survive as Plaintiff has met each of the elements to satisfy the underlying tort.

### E.  STORED COMMUNICATIONS ACT

Plaintiff has also asserted a claim against Defendants under the Stored Communications Act (the "SCA"). A person or entity violates the SCA when it: "(1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system." 18 U.S.C. § 2701.

Here, Plaintiff has stated an adequate SCA claim because he has alleged that Defendants intentionally and improperly exceeded their authority to access servers belonging to the EOP and Trump Organization to access non-public, proprietary, and confidential information. First, Plaintiff sufficiently alleges that the Servers were facilities through which an electronic communication service is provided. As provided in the Complaint, the facilities identified includes computer servers, networks, or systems, and provided through Plaintiff's computer or computer servers, networks, or systems, are "electronic communications" as they are "housed in, and transmitted to, servers connected to the internet." Am. Compl. ¶ 729. Moreover, the Eleventh Circuit has recognized that a facility can include the "physical means or equipment for doing something." *Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1178 n.4 (11th Cir. 2017) (rejecting defendant's argument that he did not access a facility within the meaning of the SCA based on the plain-meaning of facility as defined by the Oxford English dictionary).

Plaintiff explicitly alleges that they accessed confidential information housed in, and transmitted to, servers connected to the internet. Defendants' attempt to liken the instant scenario—involving computer servers of the White House and The Trump Organization, a billion-dollar company—to cases dealing with the infiltration of cell phones and personal hard drives is unconvincing. *See* Deft. Memo, at 28. Indeed, Plaintiff properly alleges that The Trump Organization and the White House are entire interconnected systems which house electronic communications. By infiltrating these networks, Defendants were able to cross check their own

internal data with "a lengthy list of more than 9,000 IP addresses, 3,000 internet domains, and 60 e-mail addresses and domains that related to Donald J. Trump, the Trump Organization, and numerous Trump associates." Courts have recognized that a plaintiff can state a SCA claim for these types of cloud-based facilities. *Hamilton Grp. v. Basel*, 311 F. Supp. 3d 1307, 1320 (S.D. Fla. 2018) ("The Eleventh Circuit has unequivocally stated that Microsoft 365, a cloud-based service, through which emails are sent and received, and which was the system Plaintiff used, "is a facility.")

Further, Plaintiff properly alleges both the DNS and other confidential, proprietary information which was illicitly accessed by Defendants was both held in electronic storage and constituted private data. "Authorized access, in the electronic context, typically involves consideration of 'the expected norms of intended use or the nature of the relationship established' between the holder of the communications and the authorized party." *Bovino v. MacMillan*, 28 F. Supp. 3d 1170, 1176 (D. Colo. 2014) (quoting *U.S. v. Phillips*, 477 F.3d 215, 219 (5th Cir. 2007)). It has been held that unauthorized access to DNS and related internet logging data is within the purview of the Stored Communications Act. *See*, e.g., *Domain Protection, LLC*, 426 F.Supp. at 355 ("Verisign's electronic registry is a database which stores records for domain names. Given that this database enables internet service providers and enables internet navigation by storing signals that provide for such navigation, Verisign's database falls within the ambit of the Stored Communications Act."). For this reason, the court found that Defendant service provider's conduct in "unlawfully and without authorization" assuming control of Plaintiff's DNS data and records— which were being stored in Defendant's electronic registry—had plead an adequate claim of conversion and violation of the Stored Communications Act.

Here, Defendants similarly accessed Plaintiff's servers to retrieve his non-public DNS data without his knowledge or consent. The DNS data and records squarely falls within the parameters of the SCA. *Id.* By infiltrating Plaintiff's servers and gaining access to these communications, Defendants violated the SCA and must therefore be held liable. At this early stage of pleading, Plaintiff has readily satisfied his burden to state a claim.

### F.   COMPUTER FRAUD & ABUSE ACT

The Computer Fraud and Abuse Act ("CFAA") is a federal criminal statute that also authorizes civil actions for any person who suffers damage or loss by reason of a violation of the statute. 18 U.S.C. § 1030(g). To prove a claim under § 1030(a)(4), a party must demonstrate that a defendant: (1) accessed a "protected computer" (2) without authorization or by exceeding such

authorization as was granted, (3) "knowingly" and with "intent to defraud," and (4) as a result has "further[ed] the intended fraud and obtain[ed] anything of value. *Pharmerica, Inc. v. Arledge*, 2007 WL 865510 *6 (M.D. Fla. March 21, 2007).

Defendants appear to readily concede that two of these elements—access to a "protected computer" and "intent to defraud"—are met. In arguing the remaining two elements, Defendants point to *Van Buren v. United States,* 141 S. Ct. 1648 (2021), but the facts contained in *Van Buren* are readily distinguishable from the case at bar. In *Van Buren*, a police officer had accepted a bribe to run a license plate search in excess of his authorized access to the police department's computer system. In finding that the officer did not violate the CFAA, the Supreme Court noted that the language "exceeds authorized access" in the CFAA is intended to protect computers from "inside hackers - those whose access a computer with permission, but then exceed the parameters of authorized access by entering an area of the computer to which the authorization does not extend." *Id*. It further held that "an individual 'exceeds authorized access' when he accesses a computer with authorization but then obtains information located in particular areas of the computer—such as files, folders, or databases—that are *off limits* to him." *Id*. at 1662 (emphasis added).

Here, Defendants mischaracterize the allegations contained in the Complaint, claiming that Plaintiff's sole contention is that Joffe and Neustar accessed DNS data that was "already available to them." Def. Memo, 26. This argument is misleading. What Plaintiff actually alleges is that these Defendants "knowingly, intentionally and *unlawfully accessed* and/or exceeded their authority to access" the computers belonging to the EOP and those belonging to the Trump Organization. Am. Compl. ¶¶ 697-700. Plaintiff's CFAA claim is viable on this basis alone. Further, the allegations establish that Defendants exceeded their authorization by accessing data that would be otherwise "off limits" to Joffe and Neustar, namely information that reveals Plaintiff's and The Trump Organization's "contacts, client lists, business dealings, financial dealings, communications, future and current plans, techniques, patterns, methods, processes, and procedures, as well as identification of their corporate partners, political associates, clients, and vendors." *Id*. ¶713-714. Given the highly-sensitive nature of this information, it falls well within the type of "off limits" that violates the CFAA when accessed in an unauthorized manner. *Van Buren*, *supra*.

Furthermore, at this stage of litigation, Plaintiff is unable to determine the exact nature of the data that Defendants unlawfully misappropriated to harm and malign Plaintiff. Given Joffe's involvement with Neustar and the Data Companies to infiltrate, access, and misappropriate

Plaintiff's data, Plaintiff maintains a good faith basis to believe that Defendants gained access to additional 'off-limits' information not yet known to Plaintiff. Am. Compl. ¶¶ 140, 142, 546. As such, Plaintiff has alleged sufficient facts to warrant additional discovery to determine the full extent of Defendants' tortious conduct. *See Bessemer Sys. v. Fiserv Sols.*, LLC, 2021 U.S. Dist. LEXIS 175153, at *30 (W.D. Pa. Sep. 15, 2021) (finding that it would be inappropriate to dismiss Plaintiff's Complaint before discovery sheds further light on the nature of the "security review" at issue).

Plaintiff also pleads a compensable loss in relation to Defendants' violation of CFAA. The term "loss" means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offenses, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service. 18 U.S.C. § 1030(e)(11). *Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1173 (11th Cir. 2017). Further, as discussed above with regard to theft of trade secrets, Plaintiff sustained significant losses as a result of the misappropriation of Plaintiff's DNS and other proprietary data. Therefore, Plaintiff's CFAA claim has been sufficiently pled.

### G. THEFT OF TRADE SECRETS (18 U.S.C. § 1832)

For the same reasons set forth in Section II(A)(iii)(b)—discussing theft of trade secrets as a predicate act—Plaintiff's standalone cause of action for theft of trade secrets is legally cognizable.

### III. ALTERNATIVELY, PLAINTIFF SEEKS LEAVE TO AMEND THE COMPLAINT

Rule 15 dictates that leave to amend a pleading "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). A court should deny leave to amend a pleading only when "(1) the amendment would be prejudicial to the opposing party, (2) there has been bad faith or undue delay on the part of the moving party, or (3) the amendment would be futile." *Foman v. Davis*, 371 U.S. 178, 182 (1962). None of these circumstances are applicable here. Thus, to the extent the Court finds the Complaint inadequate in any respect, Plaintiff respectfully requests leave pursuant to Fed. R. Civ. Proc. 15(a) to serve a Second Amended Complaint, as any such inadequacies, would be merely issues of technical pleading rather than substantive defects.

### CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion in its entirety.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed this 4th day of August, 2022, with the Clerk of Court using CM/ECF, which will send a notice of electronic filing to all Parties listed on the Service List.

**THE TICKTIN LAW GROUP**
270 SW Natura Avenue
Deerfield Beach, Florida 33441
Telephone: (561) 232-2222

 _/s/ Pete*r Ticktin*_
PETER TICKTIN, ESQUIRE
Florida Bar No. 887935
JAMIE ALAN SASSON, ESQUIRE
Florida Bar No. 10802
Our Matter No.: 22-0062

and

**HABBA MADAIO & ASSOCIATES LLP**
1430 US Highway 206
Suite 240
Bedminster, New Jersey 07921
ALINA HABBA, ESQUIRE (*Pro Hac Vice*)
New Jersey Bar No. 018592010
MICHAEL T. MADAIO, ESQUIRE (*Pro Hac Vice*)
New Jersey Bar No. 070752013
Our Matter No.: 4500-74