UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 2:22-cv-14102-DMM

DONALD J. TRUMP,

                Plaintiff,

v.

HILLARY R. CLINTON, HFACC, INC.,
DEMOCRATIC NATIONAL COMMITTEE,
DNC SERVICES CORPORATION, PERKINS
COIE, LLC, MICHAEL SUSSMANN, MARC
ELIAS, DEBBIE WASSERMAN SCHULTZ,
CHARLES HALLIDAY DOLAN, JR., JAKE
SULLIVAN, ADAM SCHIFF, JOHN PODESTA,
ROBERT E. MOOK, PHILLIPE REINES,
FUSION GPS, GLENN SIMPSON, PETER
FRITSCH, NELLIE OHR, BRUCE OHR, ORBIS
BUSINESS INTELLIGENCE, LTD.,
CHRISTOPHER STEELE, IGOR DANCHENKO,
NEUSTAR, INC., NEUSTAR SECURITY SERVICES,
RODNEY JOFFE, JAMES COMEY, PETER STRZOK,
LISA PAGE, KEVIN CLINESMITH, ANDREW MCCABE,
ROD ROSENSTEIN, JOHN DOES 1 THROUGH 10
(said names being fictitious and unknown persons),
and ABC CORPORATIONS 1 THROUGH 10 (said
names being fictitious and unknown entities),

                Defendants.

_____

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE UNITED STATES'
MOTION TO DISMISS AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION TO SET
ASIDE THE GOVERNMENT'S CERTIFICATION AS TO AS TO DEFENDANTS,
ADAM SCHIFF AND ROD ROSENSTEIN**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ii, iii

LEGAL ARGUMENT ...........................................................................................1

   I.    THE UNITED STATES' WESTFALL ACT CERTIFICATION IS IMPROPER AND MUST BE SET ASIDE ........................................................................................1

       A. Adam Schiff Was Not Acting Within the Scopeof His Employment.........................4

         i. Schiff's Conduct Was Not "of the Kind" He is Employed to Perform....................4

         ii. Schiff's Actions Were Outrageous and Motivated by an Independent Purpose....11

       B. Rod Rosenstein Does Not Qualify for Westfall Act Certification ...........................13

   II.   AT A MINIMUM, PLAINTIFF IS ENTITLED TO ENGAGE IN LIMITED DISOCVERY TO DETERMINE WHETHER THE DEFENDANTS' CONDUCT WAS WITHIN THE SCOPE OF THEIR EMPLOYMENT ................................................16

   III.   THE DISTRICT COURT PROPERLY RETAINS SUBJECT MATTER JURISDICTION IN THE INSTANT MATTER ....................................................18

CONCLUSION....................................................................................................18

# TABLE OF AUTHORITIES

*Adams v. Vertex, Inc.,*
  2007 U.S. Dist. LEXIS 22850, at *8 (D.D.C. Mar. 29, 2007). ........................................... 12, 13

*Allaithi v. Rumsfeld,*
  753 F.3d 1327, 1332 (D.C. Cir. 2014)................................................................................... 4, 6

*Armstrong v. Thompson,*
  759 F.Supp.2d (D.D.C. 2011)................................................................................... 6, 7, 10, 13

*Council on Am. Islamic Relations v. Ballenger,*
  444 F.3d 659, 664 (D.C. Cir. 2006)........................................................................ 4, 6, 8, 9, 10

*Flohr v. Mackovjak,*
  84 F.3d 386, 390 (11th Cir. 1996) ........................................................................................... 3

*Gutierrez de Martinez v. Lamagno,*
  515 U.S. 417, 434 (1995).................................................................................................... 2, 17

*Haddon v. United States,*
  68 F.3d at 1424 (D.C. Cir. 1995).......................................................................................... 4, 6

*Hendrix v. Snow,*
  170 F.App'x 68, 82 (11th Cir. 2006). ....................................................................................... 3

*Hicks v. Office of the Sergeant at Arms for the U.S. Senate,*
  873 F. Supp. 2d 258, 266 (D.D.C. 2012)................................................................. 5, 9, 15, 16

*Hosey v. Jacobik,*
  966 F.Supp. 12, 15 (D.D.C.1997)..................................................................................... 14, 15

*Islamic Am. Relief Agency v. Gonzales,*
  477 F.3d 728, 737 (D.C.Cir. 2007)........................................................................................ 18

*Jacobs v. Vrobel,*
  724 F.3d 217, 221 (D.C. Cir. 2013 ........................................................................................ 17

*Jordan v. Medley,*
  711 F.2d 211, 215 (D.C. Cir. 1983)........................................................................... 11, 13, 17

*Majano v. United States,*
  469 F.3d 138, 142 (D.C. Cir. 2008)................................................................... 11, 13, 15, 17

*Osborn v. Haley,*
    549 U.S. 225, 229-30 (2007) ............................................................... 1, 2

*Penn Cent. Transp. Co. v. Reddick,*
    398 A.2d 27, 31 (D.C. 1979) ............................................................. 11, 17

*Rasul v. Myers,*
    512 F.3d 644, 655 (D.C. Cir. 2008) ..................................................... 3, 17

*S.J. & W Ranch, Inc. v. Lethinen,*
    913 F.3d 1538, 1542-43 (11th Cir. 1990) ................................................. 3

*Smith v. Clinton,*
    253 F.Supp.3d 222, 234 (D.C. Cir. 2017) ............................................... 17

*Stokes v. Cross,*
    327 F.3d 1210, 1214 (D.C.Cir.2003) ................................ 2, 8, 13, 15, 16, 17, 18

*Weinberg v. Johnson,*
    518 A.2d 985, 991 (D.C.1986) .............................................................. 3

*Wilson v. Libby,*
    535 F.3d 697, 711 (D.C. Cir. 2008) ....................................................... 8

*Wuterich v. Murtha,*
    562 F.3d 375, 381 (D.C. Cir. 2009) .................................... 3, 8, 10, 17, 18

The plaintiff, Donald J. Trump ("Plaintiff")[1], respectfully submits this memorandum of law in opposition to the Motion to Substitute and Dismiss filed by the United States (the "United States" or the "Government") on August 18, 2022 (the "Motion") and in support of Plaintiff's cross-motion  (the "Cross-Motion") to set aside the certification as to the defendants, Adam Schiff ("Schiff") and Rod Rosenstein ("Rosenstein") (collectively, "Defendants"). As discussed herein, the Federal Employees Liability Reform and Tort Compensation Act of 1988, is not applicable in the instant scenario and, therefore, the United States' certification should be set aside and Defendants should be resubstituted as the proper party defendants.

## LEGAL ARGUMENT

## I.      THE UNITED STATES' WESTFALL ACT CERTIFICATION IS IMPROPER AND MUST BE SET ASIDE

The Federal Employees Liability Reform and Tort Compensation Act, commonly known as the Westfall Act, is a limited waiver of sovereign immunity that makes the United States liable "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1) (emphasis added); *see also* 28 U.S.C. § 2679. The Westfall Act "accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties." *Osborn v. Haley*, 549 U.S. 225, 229 (2007). In this way, the "core purpose" of the Westfall Act is "to relieve covered employees from the cost and effort of defending the lawsuit, and to place those burdens on the Government's shoulders." *Id.* at 252.

---

[1] All capitalized terms herein shall have the same meaning and shall be defined in the same manner and context as they appear and are pleaded in the Amended Complaint.

Since claims against individual government employees are only prohibited when that employee was acting within the scope of his employment at the time of the alleged wrong, the Westfall Act outlines a procedure for the Attorney General to 'certify' that a federal employee was indeed acting within that scope. 28 U.S.C. § 2679(d)(1). In particular, the Westfall Act states, in pertinent part:

> Upon certification by the Attorney General that the defendant employee *was acting within the scope of his office or employment at the time of the incident out of which the claim arose,* any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

While certification by the Attorney General constitutes *prima facie* evidence that a federal employee was acting within the scope of his employment, it "does not conclusively establish as correct the substitution of the United States as defendant in place of the employee." *Gutierrez de Martinez v. Lamagno,* 515 U.S. 417, 434 (1995). Indeed, the Westfall Act "does not preclude a district court from resubstituting the federal official as defendant for purposes of trial if the court determines that the Attorney General's scope-of-employment certification was incorrect." *Osborn v. Haley*, 549 U.S. 225, 229-30 (2007); *see also Gutierrez de Martinez*, 515 U.S. at 436-37. In other words, the certification is the "first, but not the final word" on whether a federal employee was acting within the scope of his employment; plaintiffs may still seek "judicial review of the Attorney General's scope-of-employment determination." *Id*. at 246; *see also Stokes v. Cross,* 327 F.3d 1210, 1214 (D.C. Cir. 2003) ("[A] plaintiff challenging the government's scope-of-employment certification bears the burden of coming forward with specific facts rebutting the certification."). Such review shall be *de novo*, as the question is a mixed question of fact and law

governed by the law of the state where the incident occurred. *S.J. & W Ranch, Inc. v. Lethinen*, 913 F.3d 1538, 1542-43 (11th Cir. 1990).

A court's review of Westfall Act certification is a "highly fact-specific" inquiry that "turns on the unique circumstances of the case" before the court. *Hendrix v. Snow*, 170 F.App'x 68, 82 (11th Cir. 2006). The relevant question is whether the federal employee was acting within the scope of his employment, and this determination is guided by state law. *See*, *e.g.*, *Flohr v. Mackovjak,* 84 F.3d 386, 390 (11th Cir. 1996) ("The question of whether an employee's conduct was within the scope of his employment is governed by the law of the state where the incident occurred.").

Here, Plaintiff does not dispute that District of Columbia law governs with respect to both Defendants. Generally, the District of Columbia courts "look[] to the Restatement (Second) of Agency" in determining whether an employee's actions fall within the scope of employment. *Rasul v. Myers*, 512 F.3d 644, 655 (D.C. Cir. 2008). The Restatement (Second) of Agency outlines the following test for delineating scope of employment:

> (1) Conduct of a servant is within the scope of employment if, but only if: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master[;] and (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

Restatement (Second) of Agency § 228 (1958).

"[T]he test for scope of employment is an objective one, based on all the facts and circumstances." *Weinberg v. Johnson,* 518 A.2d 985, 991 (D.C.1986). A plaintiff must "alleg[e] sufficient facts that, taken as true, would establish that the defendant['s] actions exceeded the scope

of [his] employment." *Wuterich v. Murtha*, 562 F.3d 375, 381 (D.C. Cir. 2009) (quoting *Stokes,* 327 F.3d at 1215). The court, in turn, must "accept [the plaintiff's] factual allegations as true and construe the complaint liberally in his favor in accordance with the standard of Federal Rule of Civil Procedure 8(a)." *Id.* at 384.

For the reasons discussed below, as it relates to the conduct alleged in the Amended Complaint, neither Schiff nor Rosenstein were acting within their authorized scope of employment with the United States Government. Therefore, Westfall Act certification must be set aside as to both of these defendants.

### A. *Adam Schiff Was Not Acting Within the Scope of His Employment*

Schiff is, and at all relevant times was, a Member of Congress and the Chairman of the House Permanent Select Committee on Intelligence ("HPSCI"). Notwithstanding the same, the conduct alleged in the Amended Complaint falls outside the scope of Schiff's governmental employment because it was not "of the kind that he is employed to perform" and it was not "actuated. . . by a purpose to serve the master." Restatement (Second) of Agency § 228. Therefore, Schiff is disqualified from Westfall Act certification under the first and third prongs of the Restatement test.

### i. *Schiff's Conduct Was Not "of the Kind" He is Employed to Perform*

The first prong this Court must consider is whether the conduct alleged is "of the kind [the federal employee] is employed to perform." Restatement (Second) of Agency § 228. To qualify in this regard, the employee's actions "must have either been of the same general nature as that authorized or incidental to the conduct authorized." *Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 664 (D.C. Cir. 2006) (quoting *Haddon v. United States*, 68 F.3d at 1424 (D.C. Cir. 1995)). "Conduct is 'incidental' if it is 'foreseeable' . . . [and] it is 'foreseeable' only if it is a 'direct outgrowth of the employee's instructions or job assignment.'" *Allaithi v. Rumsfeld*, 753

F.3d 1327, 1332 (D.C. Cir. 2014) (quoting *Haddon*, 68 F.3d at 1424).  Further, "if the employee's tort did not arise directly from performance of an authorized duty and the job merely provided an opportunity to act, courts have found such conduct to be outside the scope of employment." *Hicks v. Office of the Sergeant at Arms for the U.S. Senate*, 873 F. Supp. 2d 258, 266 (D.D.C. 2012) (emphasis added).

Here, Schiff's actions were not "of the kind" that he performs in his capacity as a Congressman. To the contrary, his conduct—publicly discussing the evidentiary basis of a then-ongoing HPSCI investigation—was expressly forbidden by federal procedures and protocols. Indeed, as Chairman of the HPSCI, Schiff was bound by the Rules and Procedure of the Select Committee on Intelligence, as well as the corresponding legislative resolution, S. Res. 400, 94th Cong., 2d Sess. (1976) (collectively, the "HPSCI Rules"), which, together, set forth the rules governing the activities of the HPSCI and its members. The HPSCI rules make clear that the details surrounding the HPSCI's investigations—including the evidence its members view connection with those investigations—are to be kept strictly confidential in the absence of specific authorization to disclose such matters publicly.

In particular, the Rules and Procedure of the Select Committee on Intelligence states as follows:

> No member of the Committee . . . shall disclose, in whole or in part ***or by way of summary***, the contents of any classified or committee sensitive[2] papers, materials,

---

[2] Per the HSCPI Rules, "committee sensitive" means "information or material that pertains to the confidential business or proceedings of the Select Committee on Intelligence, within the meaning of paragraph 5 of Rule XXIX of the Standing Rules of the Senate, and is: (1) in the possession or under the control of the Committee; (2) discussed or presented in an executive session of the Committee; (3) the work product of a Committee member or staff member; (4) properly identified or marked by a Committee member or staff member who authored the document; or (5) designated as such by the Chairman and Vice Chairman (or by the Staff Director and Minority Staff Director acting on their behalf). Committee sensitive documents and materials that are classified shall be

briefings, testimony, or other information received by, or in the possession of, the Committee to any other person, except as specified in this rule. . . Public disclosure of classified information in the possession of the Committee may only be authorized in accordance with Section 8 of S. Res. 400 of the 94th Congress.

HPSCI Rules and Procedure, § 9.7 (emphasis added). Section 8 of S. Res. 400 of the 94th Congress, in turn, requires an affirmative vote by the Committee that such a public disclosure would "serve the public interest." S. Res. 400 § 8.

By all indications, Schiff did not obtain an affirmative vote from the Committee before publicly discussing his assessment of the adequacy of the evidence in the HPSCI's possession.[3] Thus, his communications with the media—including his characterizations of the confidential materials he had viewed in connection with his role as Chairman of the HPSCI as "smoking gun evidence," "more than circumstantial evidence," "significant evidence," and "compelling evidence" that supposedly proved that Plaintiff had colluded with Russa, *see* Am. Compl. ¶¶ 505, 512—were a clear violation of HPSCI protocols. As such, these statements cannot possibly be construed as being "authorized" by the United States government. *Ballenger*, 444 F.3d at 664.

Nor can Schiff's conduct be viewed as being incidentally authorized by the HPSCI since his unauthorized statements were not a "direct outgrowth of [his] instructions or job assignment" and were therefore not "foreseeable." *Allaithi*, 753 F.3d at 1332. The matter of *Armstrong v. Thompson*, 759 F.Supp.2d 89 (D.D.C. 2011) is instructive here. In *Thompson*, the defendant, an officer with the Treasury Inspector General for Tax Administration (TIGTA), sent several letters

---

handled in the same manner as classified documents and material in Rule 9.2. HPSCI Rules and Procedure, § 9.3.

[3] Transcripts regarding Committee votes to publicly disclose investigation-related matters have typically been made publicly available. *See*, *e.g.*, September 17, 2019 HPSCI meeting, https://bit.ly/3RDQhxo. To date, no transcript has been released demonstrating any request by Schiff to communicate with the media concerning the evidentiary basis of the HPSCI's investigation.

to the plaintiff's prospective employer which "disclos[ed] facts about the TIGTA's internal investigation of the plaintiff [and] ma[de] allegations about the plaintiff's misconduct[.]" *Thompson*, 759 F.Supp.2d at 91. After the plaintiff sued, the district court was tasked with determining whether Westfall Act certification was appropriate in such a scenario. In determining that it was not, the court found that the defendant's actions were not within the scope of her employment with the TIGTA because her disclosure of confidential details of the internal investigation was unauthorized and, therefore, not foreseeable :

> [The defendant] admitted that as a law enforcement officer, she did not have the authority to disclose that the plaintiff was under investigation by the Department of the Treasury[]. It can therefore not be said that she was acting in compliance with her position as a law enforcement officer for the [the government] when she wrote the letters she sent to the USDA. Thus, it was not foreseeable to the [government] that [the defendant] would possess information concerning the internal investigation of the plaintiff; **if anything, it was foreseeable to the [government] that [the defendant], in line with her position as a law enforcement officer,** ***would not*** **disclose any sensitive information without prior authorization by a superior**. *See Haddon,* 68 F.3d at 1424 (explaining that to be foreseeable the torts must be a direct outgrowth of the employee's instructions or job assignment).

*Thompson*, 759 F Supp.2d at 94 (emphasis added).

Here, similarly, Schiff lacked the authority to publicly disclose (including "by way of summary") information pertaining to the evidentiary basis of the HPSCI's investigation. *See* HPSCI Rules and Procedure, § 9.7. He frequently disregarded his obligation to maintain the confidentiality and integrity of the HPSCI's investigation by openly discussing the merits and evidentiary basis of the investigation on major media outlets such as MSNBC, CNN, ABC and CBS. Shockingly, he even took it a step further by blatantly mischaracterizing the weight of the evidence in the HPSCI's possession, claiming that the Committee had a "smoking gun" that was "significant" and "compelling" proof of Plaintiff's purported wrongdoing. Am. Compl. ¶¶ 508, 512, 514, 644. Like in *Thompson*, this conduct was in direct violation of established government

protocol and, therefore, could not have been foreseen by the United States government. Indeed, Schiff's actions were not a "direct outgrowth of [his] instructions or job assignment" with the HPSCI, but, rather, a flagrant dereliction of his responsibilities as its Chairman. Therefore, this conduct "exceeded the scope" of Schiff's employment and it was not "of the kind" that Schiff was expected or authorized to perform. *Stokes*, 327 F.3d at 1215.

In the Motion, the Government fails to acknowledge the unauthorized nature of Schiff's conduct or otherwise grapple with the relevant case law in any meaningful way. Instead, the Government merely points to several cases which, it claims, support the sweeping proposition that "Members of Congress act within the scope of their office when they communicate with their constitutes on matters of public concerns." Def. Mem. at 12. Of course, these cases establish no such rule.

As an initial matter, of the numerous cases cited by the Government, only two—*Council on Am. Islamic Relations v. Ballenger,* 444 F.3d 659 (D.C. Cir. 2006) and *Wuterich v. Murtha*, 562 F.3d 375 (D.C. Cir. 2009)—involve the application of D.C. law. The remaning cases, which arise from different jurisdictions, have no bearing on the instant matter since it is well-established that "[t]o determine whether an employee was acting within the scope of employment under the Westfall Act, [courts] apply the *respondeat superior* law in the state in which the alleged tort occurred." *Wilson v. Libby*, 535 F.3d 697, 711 (D.C. Cir. 2008) (citation omitted).

Further, the court's holding in *Ballenger* directly undercuts the Government's claim that Members of Congress are *always* immune from tort liability in their dealings with the press. In fact, the *Ballenger* court specifically cautioned against this type of expansive interpretation of its decision, noting that its holding was intended to be narrowly limited to the facts of that case:

> **[The plaintiff] protests that a holding in favor of [the defendant] 'would immunize many federal employees for any gratuitous slander in the context of**

> ***statements of a purely personal nature.' It does no such thing.*** This case, like
> every judicial decision, cannot be divorced from its facts. To be sure, it involves a
> statement by a congressman to the press. But ***our ratio decidendi necessarily***
> ***depends on the context in which the statement was made.*** *See* Karl Llewellyn,
> THE BRAMBLE BUSH 72-76 (Oceana Publications, 1981) (1930) (Those 'who
> think that precedent produces or ever did produce a certainty that did not involve
> matters of judgment and of persuasion . . . simply do not know our system of
> precedent in which they live.'). ***We lack the power to render an opinion on any***
> ***case or controversy not properly before us.***

*Ballenger*, 444 F.3d at 666.

Indeed, closer inspection of the *Ballenger* decision reveals that the "context in which [the

plainitff's] statement was made" is easily distinguishable from the instant action. In *Ballenger*, the

court noted that the plaintiff, a Member of Congress, had made a statement to the press that was

intended to "defuse an issue that could affect [his] representational responsibilities" and was

therefore "motivated—at least in part—by a legitimate desire to discharge his duty as a

congressman." *Id.* at 665. In finding that the plaintiff's statement was acting within the scope of

his employment when he made said statement, the court relied heavily on the fact that there was a

"clear nexus between the congressman answering a reporter's question . . . and the congressman's

*ability to carry out his representative responsibilities effectively*." *Id.* at 665-66. In other words,

the court's decision turned on the fact that the plaintiff's statements was reactionary—it was in

response to an inquiry from a reporter concerning an issue relating to him individually—and his

response was a good faith effort to address nascent concerns threatening his ability to effectively

perform his duties. Here, on the other hand, Schiff was not being pressed by a reporter to respond

to an urgent issue; instead, it was Schiff himself who actively sought out the media and opted, time

and time again, to appear on national news programs. *See Hicks*, 873 F.Supp.2d at 266 ("[I]f the

employee's tort did not arise directly from performance of an authorized duty and the job *merely*

*provided an opportunity to act*, courts have found such conduct to be outside the scope of

employment."). Further, his statements did not remotely relate to his fitness or competency to serve in Congress and therefore were not in any way tied to his "ability to carry out his representative responsibilities effectively." *Ballenger*, 444 F.3d at 665-66. Finally, unlike the defendant in *Ballenger*, Plaintiff has alleged that Schiff's statements were not made in good faith but, rather, were "routinely false[]" and done in furtherance of an effort to "disseminate false information and spread a false narrative in an attempt to ruin Plaintiff." Am. Compl. ¶¶ 505, 636. Therefore, the court's holding in *Ballenger* is inapposite.

The D.C. Circuit Court's decision in *Wuterich* is similarly distinguishable. In *Wuterich*, the plaintiff, a U.S. Marine, sued the defendant, a Congressman, over allegedly defamatory statements the defendant had made to the media regarding the plaintiff's military activities in Iraq. *See generally Wuterich*, 562 F.3d 375. The *Wuterich* court found that these statements were within the defendant's scope of employment based on its reasoning that "the underlying conduct — interviews with the media about the pressures on American troops in the ongoing Iraq war — is unquestionably of the kind that [the defendant] was employed to perform as a Member of Congress," particularly because he "was the Ranking Member of the Appropriations Committee's Subcommittee on Defense and had introduced legislation to withdraw American troops from Iraq." *Id.* at 384-85. In other words, the statements made by the defendant were precisely the type that he was authorized to—even expected to—make in connection with his role as a Congressman. As a result, these statements were a wholly foreseeable aspect of his employment. Schiff, on the other hand, made statements that he was explicitly *not* authorized to make. He blatantly violated HPSCI protocol by publicly commenting on sensitive and confidential matters. Unlike the defendant in *Wuterich*, these unauthorized statements were not foreseeable; to the contrary, it would have been foreseeable that "in line with [his] position . . . [he] would *not* disclose any sensitive information

without prior authorization." *Thompson*, 759 F Supp.2d at 94 (emphasis added). Therefore, the court's holding in *Wuterich* is not applicable here.

Based on the foregoing, Schiff does not qualify for Westfall Act certification because the conduct alleged in the Amended Complaint is not "of the kind he is employed to perform." Restatement (Second) of Agency § 228.

   ii. *Schiff's Actions Were Outrageous and Motivated by an Independent Purpose*

Schiff's bid for Westfall Act certification similarly falls short with respect to third prong of the Restatement test.

Under the third prong, a federal employee's actions must be "actuated, at least in part, by a purpose to serve the master." Restatement (Second) of Agency § 228. The Restatement goes on to state that "[a]n act of a servant is not within the scope of employment if it is done with no intention to perform it as a part of or incident to a service on account of which he is employed." *Id.* § 235. In making this assessment, "[i]t is the state of the servant's mind which is material . . . [c]onduct is within the scope of employment only if the servant is actuated to some extent by an intent to serve his master." *Id.* § 235 cmt. a. This rule applies with particular force in suits involving "an intentional tort," which "by its nature is willful and thus more readily suggests personal motivation." *Jordan v. Medley*, 711 F.2d 211, 215 (D.C. Cir. 1983) (Scalia, J.); *see also Majano v. United States*, 469 F.3d 138, 142 (D.C. Cir. 2008), ("[T]he nature of the alleged tort permits the imputation of a purely personal motive.") (citation omitted). Indeed, among other factors, "[t]he outrageous quality of an employee's act may well be persuasive in considering whether [an employee's] motivation was purely personal." *Penn Cent. Transp. Co. v. Reddick*, 398 A.2d 27, 31 (D.C. 1979) (cleaned up); *see also* Restatement (Second) of Agency § 245 cmt. F ("[T]he fact that the servant acts in an outrageous manner or inflicts a punishment out of all proportion to the

necessities of his master's business is evidence indicating that the servant has departed from the scope of employment in performing the act.").

Here, Plaintiff has alleged—and the facts substantiate—that Schiff engaged in a pattern of outrageous and malicious behavior aimed at sabotaging Plaintiff's presidential administration and sewing distrust amongst the American people. It is apparent on the face of the Amended Complaint, and the numerous official government documents incorporated therein, that Schiff intentionally and materially misled the American people as to the merits of HPSCI's investigation and the nature of the evidence it possessed. The results speak for themselves: contrary to Schiff's numerous proclamations that he had seen "significant" and "compelling" evidence of Trump-Russia collusion, the HPSCI's final report conclusively found that there was *no evidence* of collusion between Trump and Russia. Am. Compl. ¶ 506. Indeed, in its report, the HPSCI declared, in no uncertain terms, that "[a]fter more than three years of investigation by this Committee, we can now say with no doubt, there was no collusion." *Id.*[4] The disparity between Schiff's sensational claim that he had seen evidence akin to a "smoking gun," and the HSPCI's ultimate finding that there was no evidence of collusion, is more than sufficient to impute a personal motive for his actions. It is clear that, in making his various media appearances, Schiff did not intend to further any legitimate purpose of the HSPCI or to inform the American people in a conscientious manner. Rather, he sought to exploit his position of Chairman of the HPSCI as a means of advancing his personal interests, undermining his political opponents, and misleading the public in the hopes of swaying their trust in a then-sitting President of the United States. Due to the shocking and incendiary nature of this conduct, it cannot possible be said to be "actuated . . . by a purpose to

---

[4] *See also* Report of the Select Committee on Intelligence , United States Senate, Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, Volume 5: Counterintelligence Threats and Vulnerabilities at 942, https://bit.ly/3qcA8n0.

serve" the United States. Restatement (Second) of Agency § 228; *see also Adams v. Vertex, Inc.*, 2007 U.S. Dist. LEXIS 22850, at *8 (D.D.C. Mar. 29, 2007) ("[A]n employee who is acting only for his own "independent malicious or mischievous purpose" is, as a matter of law, *not* intending to serve the employer."). Therefore, Schiff is unable to qualify for Westfall Certification under the third prong of the Restatement test.

Based on the foregoing, Schiff's acts were not "actuated, at least in part, by a purpose to serve" the United States and, therefore, he is not entitled to certification under the Westfall Act. Restatement (Second) of Agency § 228.

## B.  *Rod Rosenstein Does Not Qualify for Westfall Act Certification*

Rosenstein, who, at all relevant times was the Deputy Attorney General and/or Acting Attorney General of the United States, similarly does not qualify for Westfall Certification since his alleged conduct falls outside the scope of his employment with the United States.

Like Schiff, Rosenstein is unable to satisfy the third prong of the Restatement test, which requires that a federal employee's actions are "actuated, at least in part, by a purpose to serve the master." Restatement (Second) of Agency § 228. Actions that are "entirely the consequence of a personal animosity" do not fall within the scope of employment. *Jordan v. Medley*, 711 F.2d 211, 216 (D.C. Cir. 1983); *see also Adams*, 2007 U.S. Dist. LEXIS 22850, at *8 ("[A]n employee who is acting only for his own "independent malicious or mischievous purpose" is, as a matter of law, *not* intending to serve the employer."); *Thompson*, 759 F.Supp.2d at 95 ("[A]ttempts to serve once's employer are not usually expressed with an air of contempt and depreciation."). Whether the agent is acting on behalf of his employer or acting in furtherance of his own ends depends on the employee's intent at the moment a tort occurs and the nature of the attack. *Majano,* 469 F.3d at 142

13

Here, Plaintiff has alleged that Rosenstein "bore utter disdain" for Plaintiff and that he "overzealously targeted" him in his role as Attorney General. Am. Compl. ¶ 447. Specifically, the Amended Complaint details how Rosenstein "exploited his authority and intentionally concealed and manipulated the false collusion conspiracy" in the hopes of fulfilling his purely personal objective of having Plaintiff removed from office. *Id.* ¶ 437. Plaintiff has alleged, among other things, that Rosenstein willingly advanced and continued the Crossfire Hurricane investigation despite knowing that it lacked a legitimate evidentiary basis, withheld pertinent evidence and information from law enforcement officials, intentionally circumvented federal procedure in appointing a Special Counsel, and knowingly submitted affidavits containing false and misleading information in an effort to obtain an unfounded FISA warrant. *See generally* Am. Compl. at 95-100, 158-163.

Critically, D.C. courts have found that a federal law enforcement official may be acting outside the scope of his employment when his actions are specifically designed to impede, obstruct or otherwise interfere with an ongoing investigation. The matter of *Stokes v. Cross* is on point. In *Stokes,* the plaintiff, a high-ranking official with the United States Government Printing Office (GPO), alleged that the defendants had "orchestrat[ed] a conspiracy to injure, defame, harm, or destroy his professional reputation." *Stokes,* 327 F.3d at 1212. In particular, the plaintiff alleged that the defendants, who were all law enforcement officials with the GPO, had falsely concocted an internal complaint against him and then "failed to reasonably investigate [it] in good faith" by "destroy[ing] and ignor[ing] critical evidence" and "preparing and submitting false affidavits" designed to implicate the plaintiff. *Id.* Despite the defendants' arguments that their conduct was "incidental to their duty to investigate and report other officers who fail to render assistance [to another officer]," the D.C. Circuit court ordered limited discovery as to whether Westfall Act

certification was appropriate upon its finding the plaintiff had made sufficient allegations that the defendants' intentional interference with the investigation was orchestrated to sabotage the plaintiff's career, which, if true, would "indicate that they had maliciously acted contrary to their employer's interests." *Id.* at 1216*; see also Hosey v. Jacobik,* 966 F.Supp. 12, 15 (D.D.C. 1997) (stating that where the plaintiff alleged that the individual defendant gave materially false information to a background investigator, if "the Court concluded that [the individual defendant] gave information to the [investigator] with the sole intent of protecting his own interests, not those of the Government, then Plaintiff would carry his burden on the third prong" in rebutting the certification).

In a similar vein, in *Hicks v. Off. of the Sergeant at Arms for the U.S. Senate*, the plaintiff, an officer with the Office of the Sergeant at Arms for the United States Senate, sued fellow officers who, he claimed, had "caused a Capitol Police internal affairs investigation to be launched against [him] by falsifying a report against him." 873 F.Supp.2d 258, 269 (D.D.C. 2012). In evaluating whether Westfall Act certification was proper, the district court found that "limited discovery" was warranted because the "evidence [c]ould show that [the defendants] gave false reports to Capitol Police in order to harm [the plaintiff] and not out of any desire to serve the Senate." *Id.* at 270. In explaining its reasoning, the  district court succinctly stated that "[m]isusing internal complaint procedures and submitting a report containing false statements are actions that could 'permit[ ] the imputation of a purely personal motivation' . . . and could be viewed as an act not intended to serve the master." (citing *Majano*, 469 F.3d at 142).

The holdings of *Stokes* and *Hicks* are incredibly prescient here. As with those cases, Plaintiff has alleged that Rosenstein intentionally targeted him and that his actions were not motivated by any legitimate law enforcement goals, but, rather, by his own animus and ill-will

towards Plaintiff. The actions taken by Rosenstein in furtherance of this goal—failing to investigate in good faith[5], ignoring critical evidence[6], submitting false affidavits[7], and misusing governmental processes and procedures[8]—are precisely in line with the conduct of the defendants in *Stokes* and *Hicks*, which were found to be sufficient to justify limited discovery as to whether the defendants had a "maliciously acted contrary to their employer's interests." *Stokes,* 327 F.3d at 1216. Plaintiff's contention that Rosenstein was nefariously conspiring against him is further underscored by the allegation that Rosenstein's secretly met with other high-ranking Department of Justice (DOJ) officials to discuss a plot to invoke the 25th Amendment in the hopes of having Plaintiff unseated as President, *id.* ¶¶ 420, 447, as well as the allegation that Rosenstein had plans to secretly record his conversation with Plaintiff, *id.* ¶ 448.

Therefore, given that the Amended Complaint presents a cognizable theory that Rosenstein acted in bad faith and sought to pursue his own personal agenda while disregarding the interests of the United States, Westfall Act certification is not appropriate. At a minimum, to the extent this Court does not find that Plaintiff has not sufficiently established that Rosenstein was acting for a "purely personal motivation" at this stage of litigation, Plaintiff is entitled to additional discovery on this issue.

---

[5] *See*, *e.g.*, Am. Compl. ¶ 440 ("Rosenstein failed to question Comey, Strzok, and others at the FBI about the lack of evidence, or demand they produce some tangible evidence that would justify his continued investigation."); *id.* ¶ 435 ("Rosenstein later admitted to not reading the entire FISA warrant prior to signing the document.").

[6] *See*, *e.g.*, *id.* ¶ 439 ("Rosenstein, in his position as head of the investigation, intentionally failed to expose the truth, specifically that the FBI investigation was devoid of any evidence, and therefore illegitimate.").

[7] *See*, *e.g.*, *id.* ¶ 438 ("[I]t was well-known to Rosenstein, prior to signing the FISA warrant, that the FBI document that initially launched the Trump-Russia probe . . . failed to identify a single piece of plausible evidence justifying the Bureau's investigation of the Trump campaign.").

[8] *See*, *e.g.*, *id.* ¶ 445 ("Despite the fact that there was no evidence of any crime committed, Rosenstein abused his authority by appointing a Special Counsel.")

II.     **AT A MINIMUM, PLAINTIFF IS ENTITLED TO ENGAGE IN LIMITED DISCOVERY TO DETERMINE WHETHER THE DEFENDANTS' CONDUCT WAS WITHIN THE SCOPE OF THEIR EMPLOYMENT**

It is well-established that the scope of a defendant's employment is an issue of fact that generally cannot be determined at the motion to dismiss stage. *See Jordan v. Medley,* 711 F.2d 211, 215 (D.C.Cir. 1983) ("Before examining the evidence on this point, we may note that the District of Columbia courts have considered it to be the general rule that scope of employment presents a jury question."); *see also Penn Central Transp. Co.*, 398 A.2d at 32 ("The preliminary question for the trial court is 'whether there is any [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed' . . . [i]f such evidence exists, the trial court is obliged to give the case to the jury.") (citations omitted). This holds true when the scope of employment issue is premised upon certification under the Westfall Act. *Majano,* 469 F.3d at 141 ("[W]e note that scope of employment questions are generally viewed as questions of fact best resolved by a jury.").

In evaluating whether the Westfall Act applies, the Attorney General's certifications is not afforded any particular evidentiary weight since it merely states, in conclusory terms and without elaboration, that the defendant's conduct was within the scope of employment. *Gutierrez de Martinez*, 515 U.S. at 434. "To rebut the certification, the plaintiff must allege, in either the complaint or a subsequent filing, specific facts 'that, taken as true, would establish that the defendant['s] actions exceeded the scope of [his] employment.'" *Jacobs v. Vrobel,* 724 F.3d 217, 221 (D.C. Cir. 2013) (quoting *Stokes,* 327 F.3d at 1215). In making this assessment, a court must "adhere to the teachings of *Iqbal* and *Twombly* in determining whether the plaintiff has met his or her burden to rebut the presumption." *Smith v. Clinton*, 253 F.Supp.3d 222, 234 (D.C. Cir. 2017) (citing *Jacobs*, 724 F.3d at 221). "If a plaintiff meets this pleading burden, he may, if necessary, attain 'limited discovery' to resolve any factual disputes over jurisdiction." *Wuterich*, 562 F.3d at

381 (citing *Stokes*, 327 F.3d at 1214, 1216). Indeed, this standard is flexible and liberally applied – a plaintiff is entitled to discovery on the issue of scope of employment issue he alleges "*any facts that, if proven, would establish that the defendants were acting outside the scope of their employment.*" *Rasul v. Myers*, 512 F.3d 644, 662 (D.C. Cir. 2008) (citing *Islamic Am. Relief Agency v. Gonzales,* 477 F.3d 728, 737 (D.C. Cir. 2007)) (emphasis added).

As outlined above, Plaintiff has plainly satisfied this burden. Even assuming *arguendo* that Plaintiff has not established as a matter of law that Schiff and Rosenstein were acting outside the scope of their employment then, at a minimum, Plaintiff has raised numerous issues of material fact that, if proven, would establish that Defendants were acting outside of the scope of their employment. As such, Plaintiff must at least be afforded an opportunity to engage in "limited discovery" to resolve these factual disputes and dismissal is not appropriate at this time. *Wuterich*, 562 F.3d at 381 (citing *Stokes*, 327 F.3d at 1214, 1216).

## III.   THE DISTRICT COURT PROPERLY RETAINS SUBJECT MATTER JURISDICTION IN THE INSTANT MATTER

For the reasons stated above, Westfall Act certification is not proper as to either Schiff or Rosenstein since the conduct alleged against these defendants is outside their scope of their employment. As such, the exhaustion requirement contained in the Federal Torts Claims Act is a moot issue and cannot curtail this Court's jurisdiction.  Nonetheless, in an abundance of caution, Plaintiff respectfully requests that—should this Court determines that Westfall Act certification is warranted as to either Defendant—any resulting dismissal be without prejudice to afford Plaintiff the opportunity to pursue his administrative remedies in accordance with  28 U.S.C. § 2675.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant his cross-motion and deny Defendants' motion in its entirety.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed this 6th day of September, 2022, with the Clerk of Court using CM/ECF, which will send a notice of electronic filing to all Parties listed on the Service List.

**THE TICKTIN LAW GROUP**
270 SW Natura Avenue
Deerfield Beach, Florida 33441
Telephone: (561) 232-2222

 /s/ Peter Ticktin
PETER TICKTIN, ESQUIRE
Florida Bar No. 887935
JAMIE ALAN SASSON, ESQUIRE
Florida Bar No. 10802
Our Matter No.: 22-0062

and

**HABBA MADAIO & ASSOCIATES LLP**
1430 US Highway 206
Suite 240
Bedminster, New Jersey 07921
ALINA HABBA, ESQUIRE (*Pro Hac Vice*)
New Jersey Bar No. 018592010
MICHAEL T. MADAIO, ESQUIRE (*Pro Hac Vice*)
New Jersey Bar No. 070752013
Our Matter No.: 4500-74