# EXHIBIT A



Doumar Martin ₚₗₗc
LAW OFFICES

May 31, 2022

**VIA EMAIL AND MAIL**

Peter Ticktin, Esq.
Jamie Sasson, Esq.
The Ticktin Law Group
270 SW Natura Avenue
Deerfield Beach, Florida 33441

Alina Habba, Esq.
Michael Madaio, Esq.
HABBA MADAIO & ASSOCIATES LLP
1430 US Highway 206
Suite 240
Bedminster, New Jersey 07921

Re: **Trump v. Clinton, et al., 2:22-cv-14102-DMM**

Dear Counsel:

Our firm represents Defendant Charles Dolan in the above referenced matter. We write this letter to confirm that our client, Mr. Dolan, had no role in any conspiracy related to the *Steele Dossier*. As is clear from the attached Wall Street Journal article of May 9, Mr. Dolan was as surprised and shocked as anyone when the Dossier was publicized in early 2017, and himself derided its contents as fake news. *See* attached article. This article reflects the Wall Street Journal's extensive review of investigatory materials as well as interviews.

Unfounded rumors have ricocheted around the internet that somehow Mr Dolan was a source of an allegation as to sexual activity, but there is no factual or evidentiary support for this rumor. Mr. Dolan stayed in a Moscow hotel, and got a tour of the hotel, and Mr. Danchenko stayed in the same hotel, but that's it. The FBI grilled Mr. Dolan on multiple occasions, and the Danchenko Indictment details his contacts with Mr. Danchenko, but again there are no facts therein to the effect that Mr. Dolan discussed any sexual rumors with Mr. Danchenko -- because he did not. The Indictment and news reports suggest that Mr. Danchenko heard sexual rumors directly from hotel staff.

Mr. Dolan also had no contact with any defendant besides Mr. Danchenko during the relevant period. Hillary Clinton is on record through a spokesperson as stating she has no recollection at all of Chuck Dolan. His contacts with Mr. Danchenko involved possible mutual business interests and help for a conference in Moscow. There is no indication, allegation, or inference that Mr. Dolan knew that any information was to be passed to the FBI or any other law enforcement.

It appears that the Durham investigation has unearthed evidence that Hillary Clinton, John Podesta, Robby Mook, Marc Elias, Fusion, GPS, and Mr. Steele may have had some agreement amongst themselves to craft memos that would be presented to the FBI, and there is some evidence that some FBI agents were, at least among themselves, determined to get President Trump. There is no dispute that Mr. Dolan was not part of any of these agreements. There is not a sufficient factual basis to name him in the Complaint. Hillary Clinton is on record through a spokesperson as stating she has no recollection at all of Chuck Dolan.

In sum, you do not have any evidence, or inference, sufficient for Mr. Dolan to be named in any Count of the Complaint, and we request that Mr. Dolan be dismissed from the Complaint. In addition, given the paltry facts, your counts against Mr. Dolan have no basis in law either.

Your allegations as to Mr. Dolan being part of the Clinton conspiracy is entirely based on conjecture and speculation, as opposed to fact --- the same kind of frivolous speculation that you claim is part and parcel of the *Steele Dossier*. In addition to being "frivolous" under Rule 11, your Complaint erroneously identifies Mr. Dolan as a former "Chairman of the DNC" in Paragraph 78(b), which he never was and could have been easily checked. This misrepresentation confirms that allegations as to Mr Dolan were not checked and lack a factual basis. It only confirms the frivolous nature of your slanderous Complaint as to Mr. Dolan.

Accordingly, we request that in any Amended Complaint, presumably to be filed on June 20, that Mr. Dolan not be named as a defendant.

If he is named as a defendant, or if he is not dropped from the existing Complaint, we will seek Rule 11 sanctions.

We request a response by June 10, 2022.

Please do not hesitate to contact us with any questions.

Sincerely,

George R.A. Doumar

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/the-surprising-backstory-of-how-the-steele-dossier-was-created-11652103582

# Three Friends Chatting: How the Steele Dossier Was Created

Report that rattled the political world often echoed talk among three acquaintances, including the main investigator and an old schoolmate

*By Alan Cullison and Aruna Viswanatha*
May 9, 2022 9:39 am ET

Hours after the publication in early 2017 of a dossier claiming President-elect Donald Trump conspired with Russia to steer the U.S. election, a public relations executive in Washington tapped out an email to a client whose company was cited in the document, cast as a villain.

"I'm hoping that this is exposed as fake news," Charles Dolan Jr. wrote. "I will check with some folks in the intel world to see if they know who produced this." The dossier, published by BuzzFeed News, used code names to conceal its sources. Some were close to Kremlin corridors of power, it said.

The dossier proceeded to rivet the U.S. political class, win credibility within the Federal Bureau of Investigation, cast a shadow over the first two years of the Trump presidency and cost millions of dollars for investigations and lawsuits, only to eventually be mostly discredited. One reason was where much of the dossier's information came from—anything but Kremlin insiders.

Instead, a Wall Street Journal review found, many of the dossier's key details originated with a few people gossiping after they had been brought together over a minor corporate publicity contract.

The dossier's author, former British spy Christopher Steele, relied mainly on a Washington researcher to gather information. According to FBI notes of an interview with that researcher, Igor Danchenko, he said he wasn't comfortable with the assignment and some of his sources were old friends—one a former schoolmate—whose information Mr. Steele exaggerated.

It wasn't until last November that prosecutors identified a man they pinpoint as one of Mr. Danchenko's most important sources. Based on an indictment of Mr. Danchenko for lying to the FBI about whom he'd talked to, one of his key sources was none other than Mr. Dolan, the PR executive who tried to reassure a client.

The indictment says Mr. Danchenko relied on "PR Executive-1" for what became a dossier note about upheaval on Mr. Trump's campaign staff. The indictment also suggests that Mr. Danchenko drew on PR Executive-1—since confirmed to be Mr. Dolan—for part of the dossier's most lurid allegation, that Russian agents once secretly videotaped prostitutes cavorting in Mr. Trump's Moscow hotel room.

Mr. Trump has denied that ever happened, and denied other allegations in the dossier as well. Special Counsel Robert Mueller included no evidence of such a hotel episode in the lengthy report of his investigation of Russian election meddling.



Mr. Danchenko has pleaded not guilty to lying to the FBI, and his attorney didn't respond to requests for comment. Mr. Dolan declined to comment, saying through an attorney it would be inappropriate to speak as long as Mr. Danchenko faces charges. Mr. Steele, who has said the dossier was meant as raw intelligence and never intended for public consumption, didn't respond to a request for comment.

How someone like a Washington PR operative could be conflated with a Trump or Kremlin insider goes to the heart of the story behind the dossier. It is one that can be told in greater detail today thanks to particulars of the Danchenko indictment and documents associated with Mr. Dolan's work, as well as to interviews with acquaintances of Mr. Dolan and Mr. Danchenko, which provided the basis for the reporting.

Couched in the language of conspiracy and professional spycraft, the dossier quickly became the lexicon of opposition to Mr. Trump, and was devoured by a country hungry for information about a Kremlin effort to influence elections that was real. But the dossier was wrong in nearly all its salient details, and the way it was compiled was far more random, haphazard and amateurish than anyone knew.

U.S. government investigations found some evidence that the Trump campaign held furtive meetings with Russians involved in influencing the elections. Mr. Mueller charged dozens of Russian entities and individuals with engaging in a two-pronged attack of disinformation and hacked computers, and described in his report repeated contacts between Russia-linked entities and Trump campaign advisers that happened at around the same time.

But Mr. Mueller reported no evidence that the campaign conspired with Russia's military intelligence apparatus as it hacked into the email of the Democratic National Committee. The dossier took real events, such as the visit of a Trump adviser to Moscow, and expounded on them by describing meetings with high-level Kremlin officials for which no corroborating evidence surfaced.

While investigations and court battles have peeled back many origins of the dossier's claims, any trial of Mr. Danchenko could provide further insight. The special counsel looking into the FBI's handling of the Russia probe, John Durham, continues to investigate. One remaining riddle is whether the dossier's misinformation was purely careless or might have included disinformation sown by the Kremlin itself.

By spring 2016, Mr. Danchenko and Mr. Dolan moved in the same social and business circles in Washington, where both worked as consultants. As the presidential campaign gathered steam, they and a third friend overseas, Olga Galkina, spent hours trading the sort of gossip and purported inside knowledge that greases the skids of commercial deals and social interactions in political circles.

Mr. Danchenko passed some of this chatter on to his boss, Mr. Steele. In short order, versions of it appeared in the dossier, which Mr. Steele filed in a series of dated memos through the rest of 2016.



Mr. Danchenko told the FBI of other people he also spoke to in gathering information for Mr. Steele. Many of his details, however, came through this route, the Journal's review shows.

What brought Mr. Danchenko, Mr. Dolan and Ms. Galkina together was a marketing campaign —funded by the Dolan PR client whose company was cited in the dossier.

He was Aleksej Gubarev, a Russian internet entrepreneur living in Cyprus, who decided in early 2016 to launch a U.S. marketing campaign to burnish the image of his cloud server company.

A computer-science prodigy from the Siberian city of Ust-Ilimsk, Mr. Gubarev founded his first company at age 24 and a decade later formed a new one, Servers.com, which he hoped would leapfrog competitors with state-of-the-art hardware and a global VPN system.

He hired Ms. Galkina, also Russian-born, as his press secretary and in early 2016 sent her to Washington to seek someone to promote his business in the U.S. In D.C. Ms. Galkina sought help from Mr. Danchenko, with whom she once attended an elite school in the Russian city of Perm.

Mr. Danchenko had spent most of his professional life in the U.S., including several years as a researcher for the Brookings Institution. By 2016 he was doing research for Mr. Steele.

When Ms. Galkina asked him to suggest a publicist for her employer, Mr. Danchenko emailed his former boss at Brookings, Fiona Hill. "I have an URGENT small favour to ask you," Mr. Danchenko wrote, relaying that a "very good old friend of 25 years" was seeking help from a public relations firm with Russia experience and would be in Washington the following week.

Ms. Hill, who later became a top National Security Council Russia expert—and later still a witness at Mr. Trump's first impeachment hearings—forwarded the email to Mr. Dolan, the PR executive. After Ms. Galkina arrived in Washington, Mr. Danchenko took her shopping and to a restaurant, say FBI notes of a later interview with the researcher.

Mr. Dolan, who goes by Chuck, had spent much of his career in Democratic politics, as a Virginia state chairman in former President Bill Clinton's two presidential campaigns and an adviser on Hillary Clinton's 2008 primary campaign in Iowa and New Hampshire. By 2016 he was working for KGlobal, a communications firm with Republican ties that was trying to develop its international business.

It hired him in part for his Russia expertise, say former colleagues. In a previous job, Mr. Dolan represented the Kremlin in a publicity push, including organizing meetings between President Vladimir Putin and Western journalists and experts, giving him access to some high Russian officials. Former colleagues at KGlobal, which didn't respond to requests for comment, said he regaled them with tales of his doings in Russia, such as getting through a police stop by showing a badge indicating he was in the country at Kremlin invitation.

Mr. Dolan and Ms. Galkina discussed a marketing campaign for her employer. "I was very impressed with the level of your professionalism and skills," Ms. Galkina emailed Mr. Dolan after she returned to Cyprus. "For me it was like a 3rd grader from the math school to see the professor from MIT."

Mr. Gubarev's company flew Mr. Dolan and two KGlobal colleagues to Cyprus in July 2016 and put them up at the Four Seasons hotel so they could deliver a sales pitch, Mr. Gubarev said. With Mr. Trump clinching the Republican nomination in the U.S., the talk in Cyprus wandered into politics. The Danchenko indictment says Mr. Dolan brought Ms. Galina a book by Mrs. Clinton he inscribed "To my good friend Olga, A Great Democrat." Mr. Dolan signed a three-month contract to help Servers.com with "message development" and outreach in the U.S. for $25,000 a month.

Mr. Danchenko's work for Mr. Steele, which had mostly involved business intelligence, also took a turn toward politics. Mr. Steele, a former agent in Russia for the British intelligence agency MI-6, asked Mr. Danchenko to work on a new assignment Mr. Steele had accepted: to look for compromising material on Mr. Trump in Russia.

The assignment came from Fusion GPS, a Washington firm that does investigations for private clients. Republicans opposed to Mr. Trump's bid for the GOP nomination initially

hired Fusion, but by this time it was employed by Perkins Coie, a law firm representing Mrs. Clinton's primary campaign and the Democratic National Committee.



A lawyer for the firm, which was founded by former Wall Street Journal reporters, didn't respond to a request for comment. Executives of Fusion have said in the past they retained Mr. Steele based on his Moscow experience and blue-chip Russian source network.

Mr. Danchenko, interviewed by the FBI in 2017 after his role became known to investigators, expressed surprise at how specific and conclusive some of the information he gave Mr. Steele looked later in the dossier, according to a report by the Justice Department's inspector general's office. He said some of the dossier's assertions were based on "word of mouth and hearsay" or "conversation that he had with friends over beers," the IG said an FBI agent told it.

Mr. Danchenko also told the FBI that Mr. Steele had told him it was a security risk to take notes, so he kept none, other than "scribbles" or "chicken scratch notes here and there." He said he gave "verbal debriefs" to Mr. Steele, who he said didn't press him on who his sources were.

One of Mr. Danchenko's chats with Mr. Dolan appeared to figure in the dossier's most inflammatory entry.

Mr. Dolan was helping to organize a fall 2016 conference in Moscow to drum up foreign investment. While in Moscow in June to lay the groundwork, he stayed at the Ritz-Carlton, a few hundred yards from the Kremlin. He met with the hotel's general manager and got a tour of the hotel, including the presidential suite, according to the indictment of Mr. Danchenko. It says he also met with Mr. Danchenko, who was in town.

Less than a week later, Mr. Steele's first dossier chapter alleged that a "Source D," described as a close associate of Mr. Trump, had said Mr. Trump once hired prostitutes to urinate on the bed when he stayed in the Ritz-Carlton's presidential suite, because former President Barack Obama, whom the dossier said Mr. Trump detested, had stayed there.

The dossier said the Kremlin had video and was holding it as *kompromat,* or compromising material. It said the episode had been confirmed by a senior member of the hotel staff and a female hotel staffer.

Prosecutors noted that the dossier reflected some details Mr. Dolan had learned on the hotel tour, such as that Mr. Trump had stayed at the hotel's presidential suite.

Mr. Danchenko told the FBI he had gotten the prostitute story from a friend. He said that he heard it told in jest and that he described it to Mr. Steele as rumor and speculation, the Justice Department inspector general's office said it was told by an FBI agent.

Mr. Danchenko said he inquired about the story with hotel managers, who laughed it off and said that all kinds of things happen at the hotel, which he took to be not a denial, according to an FBI agent's notes of an interview with Mr. Danchenko.

A Washington lawyer who accompanied Mr. Dolan on the hotel tour has told investigators the hotel staff didn't say anything about prostitutes, according to the indictment of Mr. Danchenko. The lawyer, identifiable from the description as Stephen Kupka, declined to comment.

In late July 2016, WikiLeaks started releasing emails stolen from the Democratic National Committee. On July 31, the FBI opened an investigation into whether there were any ties between the Trump campaign and Russian election meddling. These events were separate from the dossier, but would soon become linked.

Throughout the summer, Mr. Dolan, Mr. Danchenko and Ms. Galkina traded gossip, speaking frequently, according to interviews and email messages reviewed by the Journal.

Whether Mr. Dolan knew the conversations were being adapted for the dossier is unclear. He later told the FBI he wasn't aware of the specifics of Mr. Danchenko's project, according to the indictment of Mr. Danchenko. Some associates of Mr. Dolan say he appeared shocked by the dossier's contents when they were published.



Notes of an FBI interview with Mr. Danchenko say he related how one day when he was at a swimming pool, Ms. Galkina told him by phone that a Trump campaign adviser named Carter Page had secretly met with a senior Kremlin official.

That notion soon appeared in a dossier memo. The FBI included the reference when it sought and gained a warrant to surveil Mr. Page as part of its probe of Russian election interference. The Justice Department's inspector general later criticized the FBI for taking the dossier reference at face value.

Mr. Danchenko said he didn't ask Ms. Galkina for her source because he had no reason to doubt her, according to FBI interview notes.

Ms. Galkina couldn't be reached for comment. In a statement filed in a related civil lawsuit in Washington last June, she said she talked to Mr. Danchenko over the years but never gave him permission to disclose their discussions. After The Wall Street Journal revealed her role as a dossier source in October 2020, Russia's state-owned RIA Novosti news agency quoted her as saying that was "not true."

The indictment also states that in August 2016, "PR Executive-1"—Mr. Dolan—told Mr. Danchenko he'd "had a drink with a GOP friend of mine" who said Paul Manafort was forced out as Mr. Trump's campaign manager after alienating others on the team. The indictment refers to Mr. Manafort as "Campaign Manager-1."

A dossier chapter two days later stated: "Several senior players close to TRUMP had wanted MANAFORT out, primarily to loosen his control on strategy and policy formulation." The dossier attributed this to an "American political figure associated with Donald TRUMP."

Mr. Dolan later told the FBI he hadn't met with any GOP friend but got his information from public news sources, according to the indictment.

As Mr. Dolan prepared for the fall investment conference in Moscow, he was in touch with the chief of the Russian Embassy's economic section in Washington, Mikhail Kalugin. In an Aug. 19 email to Mr. Dolan that is described in the Danchenko indictment, Mr. Kalugin told Mr. Dolan he was returning to Russia and would be replaced.

In a dossier report dated Sept. 14, 2016, which was one day after Mr. Dolan called Mr. Danchenko, according to prosecutors, Mr. Steele wrote that Mr. Kalugin was being withdrawn at short notice because of his alleged involvement in the Kremlin's election-interference operation and would be replaced.

The Russian embassy in Washington said Mr. Kalugin's departure was part of a regular diplomatic rotation and had "no connection with the alleged election interference operation whatsoever."

In October, Messrs. Dolan and Danchenko flew to Moscow for the investment conference, dubbed "Inside the Kremlin," which featured a prominent Russian legislator, Russian diplomats, a foreign business delegation and a lecture by Mr. Dolan on the U.S. presidential race.

By October, bits of the dossier were being leaked to reporters and government officials in Washington, where one news article said that Mr. Page's supposed meetings made him a possible back channel to the Kremlin. Mr. Page called this "complete garbage" and denied he met with senior Kremlin officials.



In October, Ms. Galkina gave Mr. Danchenko a new story, he told the FBI—that the Kremlin had reshuffled its secret channels with the Trump campaign to cover its tracks. She said Mr. Page had been replaced as intermediary by Michael Cohen, then a Trump lawyer, and Mr. Cohen had met with Kremlin officials somewhere in Europe and discussed ways to minimize the appearance of contacts between Trump aides and Russia.

The dossier later cited this supposed meeting in two reports. On Oct. 20, it said: "Speaking to a compatriot and friend on 19 October 2016, a Kremlin insider provided further details of reported clandestine meeting / s between Republican presidential candidate, Donald TRUMP's lawyer Michael COHEN and Kremlin representatives in August 2016." It added that the Kremlin insider said the meeting was in Prague because plans for a Moscow rendezvous were "judged too compromising."

Mr. Cohen has denied he ever was in Prague. The FBI later determined the allegations about his traveling to Prague weren't true.

The last chapter of the dossier gave further details of the putative Prague meeting, alleging that Mr. Cohen not only cooperated with the Russians in their hacking of the Democrats but also helped pay the hackers on behalf of the Trump campaign team. According to Mr. Danchenko's interviews with the FBI, Ms. Galkina was the main source for this bit, which Mr. Cohen has also denied.

By this time, Ms. Galkina's relationship with her employer in Cyprus, Mr. Gubarev, had soured, and she had resigned. Her former supervisor filed a report with police, seen by the Journal, saying she chronically appeared at work late, sometimes drunk, and alleging that a friend of Ms. Galkina's tried to extort him for money.

Mr. Danchenko also approached Mr. Gubarev's business for money—payment for the service of introducing Ms. Galkina to Mr. Dolan in Washington.

"We never got a chance to communicate, but I have heard many great things about you while I facilitated the meetings," Mr. Danchenko wrote in a Dec. 1 email. He attached an invoice for $1,159, which Mr. Gubarev said his business promptly paid.

The final memo of the Steele dossier, dated Dec. 13, called Mr. Gubarev one of those involved in Russia's election interference.

In this memo, Mr. Steele wrote that Mr. Gubarev's companies had used "botnets and porn traffic" to steal data and conduct "altering operations" against Democratic Party leadership.

The report said Mr. Gubarev was a significant player in this operation after being "recruited under duress by the FSB," the Russian security agency.

Mr. Gubarev denied any connection to Russian hacking or Russian security services.

The dossier said another significant player in the hacking was Seva Kapsugovich. The allegation originated with Ms. Galkina, Mr. Danchenko told the FBI, according to its notes of an interview with him. The name didn't appear in a search of Russian names, but a Seva Kaptsugovich, spelled with a "T," was a notorious convicted child molester in Perm, the Russian home city of Mr. Danchenko and Ms. Galkina as well as of her former supervisor in Cyprus. Seva Kaptsugovich, imprisoned in 2013, couldn't be reached.

As portions of the dossier spread around Washington, it set off alarm bells. At a late-2016 security conference in Halifax, Nova Scotia, a Steele associate approached a senior director of the McCain Institute—named for the late Arizona Sen. John McCain—and said Mr. Steele had a report detailing collusion between Russia and the Trump campaign.

The McCain Institute official, David Kramer, described the approach in a lawsuit deposition in London and said he flew to London and met with Mr. Steele. On his return to Washington, Mr. Kramer met with Glenn Simpson, one of the founders of Fusion GPS, who handed over two paper copies of the Steele memos to deliver to Mr. McCain, according to Mr. Kramer's deposition.



Mr. McCain gave the FBI's then-director James Comey 16 of the dossier's memos, five of which the FBI hadn't previously seen, according to the Justice Department inspector general.

National security officials debated whether to include the material in the intelligence community's formal assessment of Russian interference in the 2016 election. Central

Intelligence Agency officials argued against, describing it as internet rumor. Mr. Comey argued for, saying that while the FBI couldn't vouch for the material, Mr. Steele appeared to be credible.

At Trump Tower in Manhattan, Mr. Comey and other intelligence officials briefed the incoming president and his team on the intelligence assessment, mentioning an assertion by Mr. Steele that Russia had files of derogatory information on both 2016 candidates.

Mr. Comey then stayed behind to brief Mr. Trump on the allegations involving prostitutes, telling him the FBI didn't know whether the allegations were true and wasn't investigating them, Mr. Comey later told the inspector general's office.

Mr. Comey suggested tweaking a planned statement from the Director of National Intelligence to cite the dossier and say that intelligence officials hadn't made any judgment about whether it was reliable. "Much of what he reports in the current document is consistent with and corroborative of other reporting," Mr. Comey wrote in an email at the time, according to the inspector general's report. The statement wasn't changed.

On Jan. 10, 2017, less than two weeks before the presidential inauguration, BuzzFeed News published the full dossier.



Mr. Gubarev said he learned about the report when a friend sent him a link to the BuzzFeed article. Mr. Gubarev said that at first he didn't take it seriously, writing an email to Mr. Dolan with a smiling emoticon in the subject line and saying "need to found out who is make this stupid report."

Mr. Dolan told him he thought the report might get traction in public. "It will have some legs with the sex allegations," he wrote

Mr. Gubarev had declined to renew the publicity campaign for which he hired Mr. Dolan, saying he expected more for the $75,000 his company spent. But after the dossier's publication, Mr. Gubarev hired Mr. Dolan again, this time to fight off the bad press, as Western banks were moving to cut his credit lines.

Mr. Gubarev said Mr. Dolan told him that Mr. Danchenko likely had compiled the dossier for Mr. Steele.

Mr. Gubarev sued BuzzFeed and Mr. Steele, lodging defamation claims in Florida and at the High Court in London.

According to a filings in his suit against BuzzFeed, that organization's law firm paid $4 million to hire Anthony Ferrante, a former director for cyber-incident response for the U.S. National Security Council.

Mr. Ferrante wrote in a May 2018 report that an examination of "technical evidence" suggested Russian cyber espionage groups had used Mr. Gubarev's company "to support malicious spear phishing campaigns against the Democratic Party leadership which resulted" in the theft of Clinton campaign-related emails.

The Mueller investigation didn't link the breach to Mr. Gubarev's companies, saying only that Russian military intelligence leased servers from third-party providers around the world.

Mr. Ferrante didn't respond to requests for comment. BuzzFeed declined to comment.

A judge in Florida ruled against Mr. Gubarev, saying BuzzFeed couldn't be held liable for publishing a document that was the subject of official government conduct. A judge in London said Mr. Steele couldn't be held liable either, as he wasn't involved in the decision to make the dossier public. Mr. Gubarev said he isn't appealing the rulings because the court process was expensive and giving him "bad karma."

In May 2019, then-Attorney General William Barr assigned Mr. Durham, then U.S. Attorney for Connecticut, to investigate the Justice Department's handling of the dossier and related issues. Just before the 2020 election, Mr. Barr made Mr. Durham a special counsel, ensuring his investigation would continue no matter who won.

Mr. Durham brought the indictment of Mr. Danchenko in early November. A trial is scheduled for October, six years after Mr. Danchenko met Mr. Dolan and reunited with his school pal Ms. Galkina.



Mr. Gubarev said he was shocked that the indictment pointed to Mr. Dolan as an important source for the dossier. He said Mr. Dolan did a good job helping him fight to clear his name. "He is a nice guy, he did his best," Mr. Gubarev said. "Washington is a strange place that I don't understand."

Mr. Gubarev said he resigned from Servers.com in 2018 because he believed his presence there was creating problems with banks worried about the allegation he was tied to election hacking. Lately he has been investing in artificial-intelligence-enabled mobile phone applications from his home in Cyprus.

Mr. Danchenko recently posted a lament on Twitter, without specifying to whom it was addressed:

"So, what is it that you wanted to do? You unveiled my identity, ridiculed me, made sure I can't work or travel… as I spend all of my and my family money to the penny… And what's your endgame? (Asking for a friend course).

"I am weary. And it's a drag for others. May I not play this stupid game any more?"

**Corrections & Amplifications**
The name of law firm Perkins Coie was misspelled as Perkins Cole in an earlier version of this article. (Corrected on May 9)

**Write to** Alan Cullison at alan.cullison@wsj.com and Aruna Viswanatha at Aruna.Viswanatha@wsj.com

*Appeared in the May 10, 2022, print edition as 'Three Friends' Chats Fed the Steele Dossier'.*