IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | Criminal Case No. 1:21-CR-245 (AJT) |
| | : | |
| **IGOR Y. DANCHENKO,** | : | |
| | : | |
| Defendant. | : | |

# GOVERNMENT'S OPPOSITION TO DEFENDANT'S
# MOTION TO DISMISS THE INDICTMENT

The United States of America, by and through its attorney, Special Counsel John H. Durham, respectfully submits this opposition to the defendant's Motion to Dismiss the Indictment for Failure to State an Offense (Docket No. 79, hereinafter "Def. Mot."). For reasons stated below, the Government submits that the motion should be denied.

## FACTUAL BACKGROUND

The defendant is charged in a five-count indictment ("Indictment") with making materially false statements to FBI agents in violation of Title 18, United States Code, Section 1001. The Government assumes the Court's familiarity with the facts contained in the Indictment and in its prior filings.

## LEGAL STANDARD

In a criminal case, a motion to dismiss tests not the sufficiency of the evidence supporting the indictment but rather whether the indictment sufficiently charges the offense set forth against the defendant. *See United States v. Lewis*, 387 F. Supp. 2d 573, 577 (E.D. Va. 2005). Accordingly, an indictment need only contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). This requirement is satisfied when the indictment contains the elements of the offense charged, fairly informs the defendant of the charge (so that he may prepare his defense), and enables the defendant to plead double jeopardy as a defense to future prosecutions for the same offense. *See United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007); *see also United States v. Brandon*, 150 F. Supp. 2d 883, 884 (E.D. Va. 2001) ("In general, if an indictment sets forth the essential elements of [an] offense in sufficient detail so as fairly to inform the defendant of the nature of the charge, then it is immune from attack on a motion to dismiss." (footnote omitted)). "[T]to give a defendant sufficient notice of the charges against him, the indictment need only track the language of the statute at issue." *United States v. Lindh*, 212 F. Supp. 2d 541, 575 (E.D. Va. 2002).

Where, as here, a motion has been filed to dismiss an indictment containing multiple counts, "each count is viewed as a separate indictment for purposes of determining its sufficiency." *United States v. Smith*, 44 F.3d 1259, 1264 (4th Cir. 1995). "Yet, while each count must stand on its own, incorporated and realleged paragraphs from another count must be considered." *United States v. Le*, 310 F. Supp. 2d 763, 772 n.5 (E.D. Va. 2004). Ultimately, to warrant dismissal of an indictment, the defendant must demonstrate that the allegations in the

2

indictment, even if true, would not state an offense. *See United States v. Thomas*, 367 F.3d 194, 197 (4th Cir. 2004). "It is elementary that a motion to dismiss an indictment implicates only the legal sufficiency of its allegations, not the proof offered by the Government." *United States v. Terry*, 257 F.3d 366, 371 (4th Cir. 2001) (King, J., concurring).

## ARGUMENT

The defendant asks this Court to dismiss the Indictment arguing that the FBI's questions to the defendant were "fundamentally ambiguous and/or that the defendant's responses were either "literally true, non-responsive or ambiguous." *See* Def. Mot. at 10. The defendant alternatively argues that the defendant's statements were not material to any function or decision of the FBI. *Id.* As addressed below, the arguments set forth by the defendant are plainly questions of fact within the purview of a jury. As such, the Government respectfully submits the Court should deny the defendant's motion to dismiss the Indictment.

### I. The Questions Posed by the FBI Were Not Fundamentally Ambiguous Nor Were the Defendant's Answers Literally True

#### A. Legal Standard

The defendant exhausts the majority of his 25-page motion attempting to shoehorn the valid false statement counts at issue here into two extremely narrow and rarely-sustained defenses to false statement charges: literal truth and fundamental ambiguity. *See United States v. Bronston*, 409 U.S. 352, 354 (1973) (reversing perjury conviction where statement was literally true but not responsive to the question posed); *United States v. Sarwari*, 699 F.3d 401, 407 (4th Cir. 2012) (noting that "the answer to a fundamentally ambiguous question may not, as a matter of law, form the basis for a false statement"). As an initial matter, whether any of the counts in the Indictment lend themselves

3

to such a defense is plainly a factual issue that must be decided by the jury based on all of the evidence in this case. Under controlling Fourth Circuit law, the Court must only look to the face of the Indictment to resolve a motion to dismiss, and here, the Indictment properly alleges false statements.

The *Bronston* literal truth defense is exceptionally narrow and only applies where a defendant's alleged false statements are "undisputedly literally true." *Sarwari*, 669 F.3d at 407; *see also United States v. Chujoy*, 207 F. Supp. 3d 626, 655 (W.D. Va. 2016) ("*Bronston* addresses answers that are both non-responsive and literally true and is inapplicable to answers that are responsive or not indisputably true"). A question is fundamentally ambiguous only when it "is not a phrase with a meaning about which men of ordinary intellect could agree, nor one which could be used with mutual understanding by a questioner and answerer unless it were defined at the time it were sought and offered as testimony." *Sarwari*, 699 F.3d at 407 (quoting *United States v. Lighte*, 782 F.2d 367, 374 (2d Cir. 1985)). But a defendant cannot establish that questions are "fundamentally ambiguous" by isolating them from their context or by showing that words used in a question are amenable to multiple meanings, or that an answer "might generate a number of different interpretations." *Lighte*, 782 F.2d at 375; *see also United States v. Strohm*, 671 F.3d 1173, 1178 (10th Cir. 2011) ("Simply plumbing a question for *post hoc* ambiguity will not defeat a perjury conviction where the evidence demonstrates the defendant understood the question in context and gave a knowingly false answer."). Where a question is merely susceptible to multiple interpretations, and a defendant's answer is true under one understanding of the question but false under another, there is no fundamental ambiguity as a matter of law and the *jury determines* whether the defendant knew his statement was false. *Sarwari,* 669 F.3d at 407-408 (stating that "[w]here a

4

question is only arguably ambiguous, the issue of the defendant's guilt is properly one for the jury"). Even statements that "could be literally true in isolation" can support a false statements conviction if they are "materially untrue" in "the context in which the statements were made." *Id.* (citing *United States v. Schafrick*, 871 F.2d 300, 304 (2d Cir. 1989)).

B.  **Discussion**

The charged statements here fall squarely within the realm of properly-alleged false statements. On June 15, 2017, the defendant was interviewed by the FBI. During this interview, which was recorded, the FBI agent's question to the defendant about Charles "Chuck" Dolan (anonymized in the Indictment as "PR Executive-1") was not fundamentally ambiguous, or even arguably ambiguous. To the contrary, the agent's question was decidedly straightforward:

> FBI AGENT-1: Okay, so you've had . . . was there any . . . but you had never talked to Chuck Dolan about anything that showed up in the dossier [Steele Reports] right?
>
> THE DEFENDANT: No.
>
> FBI AGENT-1: You don't think so?
>
> THE DEFENDANT: No. We talked about, you know, related issues perhaps but no, no, no, nothing specific.

The defendant argues that the "reasonable reading of this question is whether Mr. Danchenko and [Dolan] *talked* about the Company Reports themselves *after they were published*." Def. Mot. at 14 (emphasis in original). As an initial matter, the question must be viewed in context. And given the context discussed below, the defendant's reading is entirely unreasonable. Indeed, the central focus of this interview was to uncover the defendant's sub-sources who provided the information that would later appear in the Steele Reports. The defendant had previously met

5

with the FBI on *multiple* occasions over the course of *six* months to the same end and made it expressly clear to them that he had communicated with his sub-sources during the 2016 time period in order to collect information that Steele would later include in the dossier. Whether the defendant had communicated with Dolan – or anyone for that matter – about the information in the Steele Reports *after* they were published would be of little, if any, moment to the FBI, which was endeavoring to uncover the defendant's sources who provided the information *underlying* the dossier. Further, the question immediately preceding the question at issue was whether Mr. Steele and Danchenko had other sources beside the defendant for the dossier reports.[1] Thus, viewed in the proper context of the extensive interview and the multiple prior interviews, the question was clearly directed at learning whether the defendant had communicated with Dolan about information that later appeared in the Steele Reports. *See United States v. Graves*, 593 F. App'x 164, 167 (4th Cir. 2014) (in discussing the inapplicability of the literal truth and fundamental ambiguity defense, the court noted that "the jury had the opportunity to gauge for itself, in the context of the full conversation, whether the [defendant] had made a false statement"). Even assuming, *arguendo*, that the question was "arguably ambiguous," the issue of a defendant's guilt is properly one for the jury. *Sarwari*, 669 F.3d at 408.

        The defendant next seizes on the fact that the question posed by the agent used the word "talked" rather than a broader term such as "communicated" or a more specific term liked

---

[1] The defendant spends significant time arguing about the ambiguity of the agent's question regarding whether Charles Dolan was an additional source for Christopher Steele. This question, however, does not form the basis of the false statement charged in Count One. Rather, the charged false statement relates to whether the defendant spoke to Mr. Dolan about any material contained in the Steele Reports. *See* Indictment ¶ 103.

6

"emailed." See Def. Mot. at 14. Courts have repeatedly held, however, that a defendant cannot establish that a question is "fundamentally ambiguous" by isolating it from its context or by showing that words used in a question are amenable to multiple meanings, or that an answer might generate several different interpretations. *See Sarwari*, 669 F.3d at 407 (citing *Lighte*, 782 F.2d at 375); *see also United States v. Strohm*, 671 F.3d 1173, 1178 (10th Cir. 2011) (stating that "given the nature of language, in hindsight, many questions could be susceptible to differing interpretations. Simply plumbing a question for *post hoc* ambiguity" does not establish fundamental ambiguity where the evidence demonstrates the defendant understood the question in context and gave a knowingly false answer). Indeed, such a rigid standard would completely override the purpose of Section 1001. In this case, the defendant made clear to the FBI in numerous meetings that he had communicated with his sub-sources through a variety of methods, including email, phone, social media messages, and in-person. It therefore would be nonsensical for the FBI to have intentionally limited the scope of its questions to phone calls and in-person meetings with Dolan, but not other forms of communication. Under the defendant's reading, in order to elicit truthful answers, the FBI would have been forced to inquire specifically if the defendant used any number of methods to communicate with Dolan – email, landline phone, cellular telephone, encrypted application, carrier pigeon, etc. Plainly, the law does not contemplate such particularity requirements in cases where the defendant (and any reasonable listener) clearly would understand the context of the question. Importantly, the Government's evidence will demonstrate that the defendant plainly understood that the word "talked" was directed at all forms of communications with Charles Dolan. In fact, the defendant himself demonstrated an understanding that his email communications were relevant to the FBI's inquiry,

7

because he chose to provide them with selective emails and social media postings on multiple occasions over the course of his relationship with the FBI. Accordingly, the agent's question was not fundamentally ambiguous.

In the same vein, the defendant argues that his answer to the agent's question was "literally true" because the defendant did not "talk" with Mr. Dolan, but rather exchanged emails. *See* Def. Mot. at 14-15. This argument is equally unavailing. "When a question is not 'fundamentally ambiguous,' but merely susceptible to multiple interpretations, and a defendant's answer is true under one understanding of the question but false under another, *the fact finder* determines whether the defendant knew his statement was false." *Sarwari*, 669 F.3d 401 (emphasis added); *United States v. Purpera*, 844 F. App'x 614, 632 (4th Cir. 2021) ("[the literal truth defense] does not apply to an answer [that] would be true on one construction of an arguably ambiguous question but false on another"); *see also United States v. Thomas*, 612 F.3d 1107, 1114-18 (9th Cir. 2010) (same). As discussed above, the question posed by the agent was not "fundamentally ambiguous," and thus, it is for the jury to decide whether the defendant's statement was knowingly false.

The defendant next argues that the "distinction between talking about 'anything' or 'related issues' and something 'specific' is at best vague and open to subjective interpretation, and consequently cannot support a false statement charge under § 1001." Def. Mot. at 15. To the contrary, there is nothing vague about the defendant's answer, *e.g.*, that he did not speak with Charles Dolan about any specific information that appeared in the Steele Reports. The defendant's answer "no, no, no, nothing specific," could not be more responsive. And the purported information that Danchenko obtained from Dolan concerning Manafort (and which

8

appeared in the Steele Reports) was not a "related issue[];" it was *the issue* being discussed in the relevant report. "An answer that is responsive and false on its face does not come within [a] literal truth analysis simply because the defendant can postulate unstated premises of the question that would make his answer literally true." *United States v. Bollin*, 264 F.3d 391, 411 (4th Cir. 2001), overruled on other grounds by *United States v. Chamberlin*, 868 F.3d 290 (4th Cir. 2017). In any event, the evidence at trial will demonstrate that, in fact, Dolan and the defendant did discuss very specific allegations regarding the Trump Campaign – allegations that appeared in a Steele Report a mere two days after the defendant received the information from Dolan.

The defendant's attempts to claim "literal truth" with respect to his statements concerning Sergei Millian are equally unavailing. As noted above, the *Bronston* literal truth defense applies where a defendant's answers are *both* non-responsive and literally true but "is inapplicable to answers that are responsive or not indisputably true." *Chujoy*, 207 F.Supp.3d 626, 655 (W.D.Va. 2016) (quoting *Strohm*, 671 F.3d at 1185). Here, defendant does not dispute that his statements were responsive to questions posed by the FBI about contacts with Mr. Millian. On that basis alone, the literal truth defense is unavailable to the defendant. In addition to this fatal deficiency, the defendant's self-serving and conclusory assertions as to the literal truth of his statements to the FBI concerning his contacts with Millian cannot satisfy the literal truth defense. In fact, the defendant did not provide the FBI with the two emails he sent to Millian that *on their face* directly contradict his claim that he believed he spoke to Millian on the phone. The conflict between the emails – which make no mention of a call or missed meeting in New York – and his own statements, create an issue of fact for the jury, and not an issue of law that can be resolved by the Court prior to trial. Further undermining these arguments is the fact that the defendant stated

9

that information contained in a June 2016 Steele Report might have come from Sergei Millian, notwithstanding the fact that his first attempt to contact Millian by email was not until July 21, 2016 – an email that he conveniently withheld from the FBI. The Government also plans to introduce evidence which reflects that *every* phone call received by the defendant from July 21, 2016[2] through August 2016 on the *phone number that he provided* to Sergei Millian was from individuals other than Millian who were known to the defendant (either from his contacts list or through other means), and thus, the defendant's contention about an "anonymous caller" is not supported by the evidence.[3] Presented with all these facts, a jury could reasonably conclude that the defendant fabricated the alleged call with Millian. Again, the defendant's statements concerning Millian cannot be viewed in isolation, but must be viewed in the context and scope of his previous interviews with the FBI, including the January 2017 interviews. In that context, there are ample facts set forth in the Indictment alone by which a jury could reasonably determine that defendant's statements regarding his alleged communication with Millian were false.

## II. The Indictment Sufficiently Alleges that the Defendant's False Statements to the FBI Were Material

### A. Legal Standard

The defendant's arguments based on materiality are similarly unavailing. As a preliminary matter, these arguments are premature. The Supreme Court in *United States v. Gaudin*

---

[2] The evidence at trial will establish that the defendant first reached out to Mr. Millian by email on July 21, 2016.

[3] The contention that the defendant may have received an "anonymous call" from someone he believed to be Millian on an internet-based application is also not supported by the evidence. Indeed, at no time did the defendant inform Millian that he could be contacted on an internet-based application, to say nothing of the particular application Millian should utilize.

10

held that materiality is an essential element of Section 1001 that must be resolved by a jury. 515 U.S. 506, 509 (1995). Whether the Government has proved facts beyond a reasonable doubt illustrating that a false statement is material to an agency decision is a mixed question of fact and law typically resolved by a properly instructed jury. *See id.; see also United States v. Garcia-Ochoa,* 607 F.3d 371, 376 (4th Cir. 2010) ("Materiality, [as an element of 18 U.S.C. 1001], is a question of fact (or at the very least a mixed question of law and fact) to be resolved by the *fact finder*") (emphasis added); *United States v. David,* 83 F.3d 638, 646 (4th Cir. 1996) ("[I]t is obvious error today not to submit the question of materiality to the jury in a false statements prosecution.").

Although Section 1001 does not define "materially," the Supreme Court has held that a materially false statement has "a natural tendency to influence, or [be] capable of influencing, the decision of the decision-making body to which it was addressed." *Kungys v. United States*, 485 U.S. 759, 770 (1988). But as the Supreme Court explained in *Gaudin*, a statement need not actually influence an agency for it to be material; it need only have "a natural tendency to influence, or [be] capable of influencing" an agency function or decision. 515 U.S. at 509. Thus, materiality is not dependent upon whether a particular government agency was actually influenced by a defendant's false statements. *See United States v. Arch Trading Co.*, 987 F.2d 1087, 1095 (4th Cir. 1993) (affirming false statements conviction where defendant's misrepresentations did not prompt any official action); *United States v. Friedhaber*, 856 F.2d 640, 642 (4th Cir. 1988). Indeed, whether the false statement in fact influenced an agency's action is irrelevant. *United States v. Hamilton,* 699 F.3d 356, 362 (4th Cir. 2012); *see also United States v. Raza*, 876 F.3d 604, 616-617 (4th Cir. 2017) (collecting cases). This proposition is well-settled throughout the Circuits. *See e.g., United*

11

*States v. Moore*, 612 F.3d 698, 701–02 (D.C. Cir. 2010) (a false statement is material if it has the capability to influence a "discrete decision" or "any other function of the agency."); *United States v. White,* 270 F.3d 356, 365 (6th Cir. 2001) ("'materiality' is a fairly low bar . . . . [T]he government must present at least some evidence showing how the false statement in question was capable of influencing federal functioning."); *United States v. Moore,* 446 F.3d 671, 681 (7th Cir. 2006) (statement is material if it "has a natural tendency to influence, or . . . is capable of affecting, a government function"); *United States v. Calhoon,* 97 F.3d 518, 530 (11th Cir. 1996) ("it is enough if the statements had a natural tendency to influence [ ] or [were] capable of affecting or influencing a government function") (internal quotation marks deleted); *United States v. Alemany Rivera,* 781 F.2d 229, 235 (1st Cir. 1985) ("test for materiality under 18 U.S.C. § 1001 is . . . whether [the statement] had the capacity to influence a government function"); *United States v. Lichenstein,* 610 F.2d 1272, 1278 (5th Cir. 1980) ("false statement must simply have the capacity to impair or pervert the functioning of a government agency").

Moreover, the capacity of a false statement to influence a government agency or function must be measured at the point in time that the statement was uttered. *See United States v. Sarihifard*, 155 F.3d 301, 207 (4th Cir. 1998) (citation omitted). Finally, "materiality is not dependent upon the believability of the false statement. *Id.* (affirming conviction for false statements even where United States Attorney immediately recognized defendant's statements were false). It is black letter law that materiality does not turn on the actual knowledge of investigators at the time of the false statement. Indeed, as Justice Scalia stated in *Brogan v. United States*:

> It could be argued, perhaps, that a disbelieved falsehood does not pervert an investigation. But making the existence of this crime turn upon the credulousness of the federal investigator (or the

12

> persuasiveness of the liar) would be exceedingly strange; such a defense to the analogous crime of perjury is certainly unheard of.

522 U.S. 398, 402 (1998). In fact, a statement can be material even if the decision-maker has already arrived at a conclusion before the statement is made. *See United States v. Safavian*, 649 F.3d 688 (D.C. Cir. 2011); *see also Moore*, 612 F.3d at 701-702. To that end, "[w]hen statements are aimed at misdirecting agents and their investigation, even if they miss spectacularly or stand absolutely no chance of succeeding, they satisfy the materiality requirement of [Section] 1001." *United States v. Lupton*, 620 F.3d 790, 806-807 (7th Cir. 2010). As the Fifth Circuit has opined:

> "Con[] men often succeed in persuading the gate keeper to allow them to enter. Agency protocol is not always followed and those familiar with protocol are not always on duty. The test is whether the statement tests these protocols, or has the natural tendency to influence or be capable of influencing the decision maker, not whether it actually influenced the decision on this one occasion.

*United States v. Abrahem*, 678 F.3d 370, 374 (5th Cir. 2012).

**B. Discussion**

Here, the defendant's false statement with respect to Charles Dolan's role as a source for the Steele Reports was plainly material. The defendant's sole argument appears to be that Mr. Dolan provided the defendant with information from public news sources and thus his false statement could not be material. *See* Def. Mot. at 16-17. As an initial matter, this assertion is simply incorrect. Mr. Dolan's August 20, 2016 email to the defendant clearly states that he received information from a "GOP friend of mine" who provided information both contained in the Politico article Dolan attached *and* additional information not contained in the article. Indeed, the email states "she [the purported GOP friend] also told me that Corey Lewandowski, who hates Manafort and still speaks to Trump regularly played a role. He is said to be doing a happy dance

13

over it." This information is not contained in the article. Thus, it is only reasonable that the defendant would assume this information (and other information) contained in the email was from a non-public source. It also is of no help to the defendant that – as will become clear through Dolan's testimony at trial – Dolan fabricated the genesis of this information. Indeed, Dolan's fabrication makes the defendant's false statement all the more material, because it underscores that had the FBI *known* Dolan was the source of these allegations, it might have interviewed him and determined that it was not, in fact, reliably sourced.

Moreover, the defendant misunderstands the Government's theory of materiality. The defendant's lie was material because, as the Indictment plainly lays out, had the FBI known that Charles Dolan was a source for the Steele Reports, it is more likely that they would have (or should have) also interviewed Dolan, given Dolan's (1) relationship to several key players who appear in the Steele Reports and (2) proximity to the defendant at the time the defendant was allegedly gathering information that would later appear in the Steele Reports. Indeed, Dolan had relationships with several Russian government officials, including, but not limited to, Dimitry Peskov (anonymized in the Indictment as "Russian Press Secretary-1"), Mikhail Kalugin (anonymized in the Indictment as "Russian Diplomat-1") and Sergei Kislyak (anonymized in the Indictment as "Russian Ambassador-1"). Further, Dolan was present with the defendant in June 2016 at the Ritz Carlton Moscow when the defendant allegedly personally gathered information on Donald Trump's purported salacious sexual activity at that hotel. Again, had the FBI known that Dolan was a source for the Steele Reports – in addition to his ties to some of the key protagonists – the FBI logically would have interviewed Dolan. The fact that the FBI was aware that Dolan maintained some of these relationships and failed to interview Dolan is of no moment. *See Arch Trading Co.*, 987 F.2d

14

at 1095 (holding that a material fact is one that has "a natural tendency to influence agency action *or is capable of influencing agency action* . . . . [W]hile it may be a fact that [defendant's] misrepresentations did not prompt any official action, the prompting of such action is not an element of a § 1001 offense.") (emphasis added). *See Abrahem*, 678 F.3d at 374.

The defendant's false statements with respect to Sergei Millian are also plainly material. The defendant argues that the false statements could not be material because "none of these statements could have impacted the government's decision to obtain its first or second FISA warrants against Advisor-1 [Carter Page], which were issued on or about October 21, 2016, and January 12, 2017, because Mr. Danchenko's statements were made months later, with the first charged statement occurring on March 16, 2017." *See* Def. Mot. at 23. Further, the defendant argues that the defendant's false statements made on October 24, 2017 and November 16, 2017 should be dismissed "because they occurred after the government obtained its last FISA warrant against Advisor-1 on or about June 29, 2017 . . . and, therefore, could not have impacted the government's decision to obtain *any* of the FISA warrants." *Id.* (emphasis in original). The defendant fundamentally misunderstands the government's obligations to the Foreign Intelligence Surveillance Court ("FISC"). As an initial matter, two of the defendant's false statements (March 16, 2017 and May 18, 2017) were made during the pendency of the FISA surveillance against Carter Page. Notwithstanding when the false statements were made, had the defendant been truthful about his purported interactions with Sergei Millian, the FBI and DOJ would have been under an affirmative obligation to inform the FISC – at any time during the pendency of the surveillance of Page or thereafter – about information that would have undermined the statements it had made in

15

its four FISA applications regarding the information allegedly provided by Millian. Indeed, FISC Rules of Procedure dictate that:

> If the government discovers that a submission to the Court contained a misstatement or omission of material fact, the government, in writing, must immediately inform the Judge to whom the submission was made of:
>
> (1) the misstatement or omission;
> (2) any necessary correction;
> (3) the facts and circumstances relevant to the misstatement or omission;
> (4) any modification the government had made or proposes to make in how it will implement any authority or approval granted by the Court; and
> (5) how the government proposes to dispose of or treat any information obtained as a result of the misstatement or omission.

*See* United States Foreign Intelligence Surveillance Court Rules of Procedure 13. Thus, the FBI and DOJ would be required to inform the FISC about the misrepresentations made in *each* of the applications it provided to the FISC. Had the FISC known of these misrepresentations, it could have terminated the surveillance of Carter Page and/or ordered the FBI and DOJ to destroy the information it had already collected.

The defendant next argues that his false statements regarding Millian are not material because he provided the FBI with the email that "the indictment now alleges is the smoking gun that proves Mr. Danchenko did not in fact believe he spoke with Chamber President-1 [Millian]." Def. Mot. at 24. The defendant, however, conveniently omits pertinent and inculpatory facts from his argument. Indeed, in his January 2017 interview with the FBI, the defendant stated, in sum, that he emailed Millian twice and received no response back. The defendant further stated, that following his second email to Millian, he received a telephone call

16

in late July 2016 from an "anonymous" caller he believed to be Millian. He further stated that during this purported call, the defendant and the "anonymous" individual he believed to be Millian agreed to meet in New York City at the end of July. During the January 2017 interviews, the defendant did in fact provide the FBI with a Russian-language email to Dimitry Zlodorev (anonymized in the Indictment as "Russian Journalist-2") dated August 24, 2016, which stated that Millian had not responded to his emails. But as discussed above, the defendant did *not* provide the FBI with the two additional emails that he sent to Millian, including an August 18, 2016 email which made clear that Danchenko had not, in fact, heard back from him by that date – thus making a late July phone call and planned meeting in New York an impossibility. Put another way, the defendant wanted the FBI to believe that he emailed Millian twice in July 2016, received no response, but received a phone call from someone he believed to be Millian in late-July.

The Government will argue at trial that the defendant provided the FBI with the August 24, 2016 email to Zlodorev in an effort to show that he had, in fact, asked Zlodorev for Millian's contact information. However, reflecting the fact that the defendant could not keep his lies straight, he provided the August 24, 2016 email not realizing it would demonstrate that he had not, in fact, spoken to the "anonymous" caller he told the FBI he believed was Millian by late August 2016. That the defendant slipped up by providing the FBI with an email that contradicted his own prior lies is of no moment. The defendant cites no law – nor could he – stating that a defendant's unintentional exposure of his own prior misstatements undermines their falsity or their materiality. To the contrary, such evidence only underscores the defendant's intent to deceive the FBI. And the fact that the FBI apparently did not identify or address these

17

inconsistencies which the Special Counsel's evidence at trial will show is, again, of no moment when evaluating falsity or materiality. *See Arch Trading Co.*, 987 F.2d at 1095; *Abrahem*, 678 F.3d at 374.

## CONCLUSION

For the foregoing reasons, the Court should deny the defendant's Motion to Dismiss the Indictment.

Respectfully submitted,

JOHN H. DURHAM
Special Counsel

By:

/s/
Michael T. Keilty
Assistant Special Counsel
michael.keilty@usdoj.gov

Brittain Shaw
Assistant Special Counsel
brittain.shaw@usdoj.gov

**Certificate of Service**

I hereby certify that on the 16th day of September, 2022, I electronically filed a copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

By:

/s/
Michael T. Keilty
Assistant Special Counsel
michael.keilty@usdoj.gov