**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

DONALD J. TRUMP,

      Plaintiff,

v.                                                     Case No. 2:22-cv-14102-DMM

HILLARY R. CLINTON, et al.,

      Defendants.

**PLAINTIFF'S AND PLAINTIFF'S ATTORNEYS' MOTION FOR**
**INDICATIVE RULING BASED UPON NEW EVIDENCE**

BINNALL LAW GROUP, PLLC
Jared J. Roberts (FL Bar #1036550)
Jason C. Greaves (*pro hac vice* application forthcoming)
717 King Street, Suite 200
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jared@binnall.com
jason@binnall.com

*Counsel for President Donald J. Trump, Alina Habba, Michael T. Madaio, Habba, Madaio, & Associates, Peter Ticktin, Jamie Alan Sasson, and The Ticktin Law Group*

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................................................i

TABLE OF AUTHORITIES.....................................................................................................ii

BACKGROUND .....................................................................................................................1

**ARGUMENT**........................................................................................................................2

      1.    Fed. R. Civ. P. 60(b) Relief from this Court's Judgments is Appropriate. ........................ 2

      2.    Fed. R. Civ. P. 62.1 Allows this Court to Remedy Defendants' Malfeasance................ 17

CONCLUSION ........................................................................................................................18

REQUEST FOR HEARING ....................................................................................................18

CERTIFICATE OF CONFERRAL 7.1(A)(3) .........................................................................18

CERTIFICATE OF SERVICE.................................................................................................20

# TABLE OF AUTHORITIES

## Cases

*Bankers Mortgage Co. v. United States,*

   423 F.2d 73, 77 (5th Cir. 1970) ..................................................................................... 5

*Booker v. Singletary,*

   90 F.3d 440, 442 (11th Cir. 1996) .................................................................................. 5

*Doe v. Bush,*

   261 F.3d 1037, 1064 (11th Cir. 2001) .......................................................................... 20

*Forrest Creek Assoc., Ltd. v. McLean Sav. & Loan Ass'n,*

   831 F.2d 1238, 1245 (4th Cir. 1987) ............................................................................ 15

*Franken v. Mukamal,*

   449 Fed. App'x 776, 779 n.2 (11th Cir. 2011) ............................................................. 19

*Griffin v. Swim-Tech Corp.,*

   722 F.2d 677, 680 (11th Cir. 1984) ................................................................................ 5

*Holland v. Florida,*

   560 U.S. 631, 649 (2010) ............................................................................................ 5, 6

*In re Gen. Elec. Sec. Litig.,*

   2021 WL 2688695, at *7 (S.D.N.Y. Jun. 30, 2021) ..................................................... 15

*In re South Coast Oil Corp.,*

   566 Fed. App'x 594, 596 (9th Cir. 2014) ..................................................................... 15

*Jarvis v. JP Morgan Chase Bank, N.A.,*

   2010 WL 2927276, at *1 (C.D. Cal. Jul. 23, 2010) ....................................................... 3

*Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.,*

   298 F.3d 600, 607 (7th Cir. 2002) .................................................................................. 3

*Mahone v. Ray,*

    326 F.3d 1176, 1178 (11th Cir. 2003) ...................................................................... 20

*Munoz v. United States,*

    451 Fed. App'x 818, 820 (11th Cir. 2011) ...................................................... 2, 20, 21

*Nixon v. Fitzgerald,*

    457 U.S. 731, 749 (1982) .................................................................................... 6

*Pace v. DiGuglielmo,*

    544 U.S. 408, 418 (2005) .................................................................................... 5

*Schink v. Comm. of Social Security,*

    935 F.3d 1245, 1258 n.3 (11th Cir. 2019) ........................................................... 3

*Toole v. Baxter Healthcare Corp.,*

    235 F.3d 1307, 1316 (11th Cir. 2000) ................................................................ 4

*Trump v. Clinton,*

    Cons. Nos. 22-13410, 22-14099, 23-10387, ECF No. 108, Order of the Court

    (11th Cir. Jul. 13, 2023) ...................................................................................... 2

*United States ex rel. Dingle v. BioPort Corp.,*

    270 F. Supp. 2d 968, 972 (W.D. Mich. 2003) ...................................................... 3

*United States v. MacAndrew,*

    2023 WL 196132, at *2 n.1 (D.D.C. Jan. 17, 2023) ............................................. 4

*United States v. Stinson,*

    729 Fed. App'x 891, 900 n.7 (11th Cir. 2018) ................................................... 11

*White Oak Vineyards & Winery LLC v. White Oak Spirits, LLC,*

    2015 WL 12731903, at *2 (C.D. Cal. Mar. 9, 2015) ............................................. 3

**Other Authorities**

FBI Director Testifies at Oversight Hearing Part 2, C-SPAN at 00:00:35 (Jul. 12, 2023),

    https://www.c-span.org/video/?529135-4/fbi-oversight-hearing-part-2 ................................. 17, 18

John Durham Testifies on his Investigations of the FBI Part 1, C-SPAN at 01:03:07 (Jun. 21, 2023),

    https://www.c-span.org/video/?528789-1/special-counsel-john-durham-testifies-investigation-

    fbi-part-1 ....................................................................................................................................17

U.S. Dept. of Justice, Office of Special Counsel John H. Durham, *Report on Matters Related*

    *to Intelligence Activities and Investigations Arising Out of the 2016 Presidential Campaigns*

    (May 12, 2023) ........................................................ 2, 5, 7, 8, 9, 11, 12, 13, 14, 15, 16, 17, 18

**Rules**

Fed. R. App. P. 12.1 ...........................................................................................................................19

Fed. R. App. P. 12.1(a) ......................................................................................................................20

FED. R. CIV. P. 60(b)(2) .......................................................................................................................3

FED. R. CIV. P. 60(b)(6) ....................................................................................................................3, 5

Fed. R. Civ. P. 62.1(a) .......................................................................................................................19

Fed. R. Civ. P. 62.1(b) .......................................................................................................................20

Fed. R. Evid. 201(b)(2) ........................................................................................................................3

Federal Rule of Civil Procedure 62.1 .............................................................................................2, 19

**U.S. Constitution**

U.S. Const. Art. II, § 1 .........................................................................................................................6

U.S. Const. Art. II, §§ 1, 3 ....................................................................................................................6

The recent release of the Durham Report seismically alters the legal landscape of this case. While this Court previously held that President Donald J. Trump and his counsel made frivolous factual and legal allegations, the Durham Report corroborates many facts and allegations about which this Court expressed skepticism.[1] In fact, it bolsters several allegations that this Court seemed to dismiss as unsupported, not giving them the assumption of truth that they deserved at the motion to dismiss stage.

Notably, the Durham Report outlines the role that each RICO Defendant played to harm President Trump, and directly contradicts factual claims previously made by certain Defendants before this Court. This new evidence confirms the plausibility of President Trump's Amended Complaint and is enough to get President Trump past the motion to dismiss threshold and makes any award of sanctions inappropriate.

## BACKGROUND

This Court issued three orders in this case that are currently on appeal. First, on September 8, 2022, the Court dismissed President Trump's Amended Complaint with prejudice. Second, on November 10, 2022, the Court awarded Rule 11 sanctions to Defendant Dolan against President Trump's counsel, Alina Habba, Michael T. Madaio, Habba, Madaio, & Associates, Peter Ticktin, Jamie Alan Sasson, and The Ticktin Law Group. Third, on January 19, 2023, the Court awarded sanctions to the remaining Defendants against President Trump, Alina Habba, and Habba, Madaio, & Associates. Each of these rulings was timely appealed to the Eleventh Circuit. Dkt. Nos. 272, 291, 308. The Eleventh Circuit consolidated all three of these appeals on March 31, 2023, via an emailed order.

---

[1] The orders entered by this Court imposing sanctions against President Trump and his counsel raise reasonable questions as to the appearance of impartiality of the Court, and therefore a Motion to Disqualify is forthcoming.

On May 12, 2023, the government released the *Report on Matters Related to Intelligence Activities and Investigations Arising Out of the 2016 Presidential Campaigns* authored by Special Counsel John H. Durham ("Durham Report"), which is the most comprehensive and current report on the investigation into the origin and maintenance of the Crossfire Hurricane investigation. Given the crossover between those events and the events alleged in President Trump's Amended Complaint, the Durham Report provides new context to President Trump's prior legal and factual claims. On July 13, 2023, the Eleventh Circuit issued an order staying the consolidated appeal so that Plaintiff and Plaintiff's counsel may seek an indicative ruling from this Court. *Trump v. Clinton*, Cons. Nos. 22-13410, 22-14099, 23-10387, ECF No. 108, Order of the Court (11th Cir. Jul. 13, 2023). Accordingly, President Trump and his former counsel bring this motion to allow this Court to make an indicative ruling and regain jurisdiction over this case to consider the Durham Report in connection with President Trump's Amended Complaint.

## ARGUMENT

Pursuant to Federal Rule of Civil Procedure 62.1, a district court may consider and issue an indicative ruling on a Rule 60(b) motion while a case is pending appeal. *Munoz v. United States*, 451 Fed. App'x 818, 820 (11th Cir. 2011). Rule 60(b) provides a method for obtaining relief from a final judgment. Accordingly, Plaintiff and Plaintiff's former counsel respectfully request this Court issue an indicative ruling finding that it would grant the Rule 60(b) motion if the Eleventh Circuit remands jurisdiction of this case.

### 1. Fed. R. Civ. P. 60(b) Relief from this Court's Judgments is Appropriate.

Under Rule 60(b), a district court may grant relief from a final judgment or order when there is "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." FED. R. CIV. P. 60(b)(2). Additionally, courts may grant relief from a final judgment or order "for any other reason that justifies relief." FED. R. CIV. P. 60(b)(6).

In light of the new evidence contained in the Durham Report,[2] this Court should vacate its prior order to dismiss pertaining to the two RICO claims and claim for injurious falsehood against Defendants Clinton, Clinton Campaign, DNC, Perkins Coie, Sussmann, Dolan, Sullivan, Podesta, Mook, Reines, Elias, Fusion GPS, Simpson, Fritsch, Nellie Ohr, Bruce Ohr, Orbis Ltd., Steele, Danchenko, Neustar, Inc., Neustar Security Services, Schultz, and Joffe, and the two sanctions orders.

> When a district court considers a Rule 60(b)(2) motion, it involves a five-part test:
>
> "(1) the evidence must be newly discovered since the trial; (2) due diligence on the part of the movant to discover the new evidence must be shown; (3) the evidence must not be merely cumulative or impeaching; (4) the evidence must be material; and (5) the evidence must be such that a new trial would probably produce a new result."

*Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1316 (11th Cir. 2000). Here, the first two elements are undoubtedly met. The Durham Report came out *after* this Court closed this case and could not have been discovered previously.  Further, the evidence is not merely cumulative or for impeachment; it is new evidence, developed by an investigation conducted by an agent of the United States government, detailing Defendants' respective roles in the RICO actions and conspiracy. While Defendants may

---

[2] In determining the motion to dismiss, the Court may take judicial notice of the Durham Report because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Schink v. Comm. of Social Security*, 935 F.3d 1245, 1258 n.3 (11th Cir. 2019) (quoting Fed. R. Evid. 201(b)(2)). Courts routinely take judicial notice of government documents. *See Jarvis v. JP Morgan Chase Bank, N.A.*, 2010 WL 2927276, at *1 (C.D. Cal. Jul. 23, 2010) (holding that federal courts routinely take judicial notice of "documents available on government websites."); *Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.*, 298 F.3d 600, 607 (7th Cir. 2002) (taking judicial notice of information from FDIC's official website); *United States ex rel. Dingle v. BioPort Corp.*, 270 F. Supp. 2d 968, 972 (W.D. Mich. 2003) ("Public records and government documents are generally considered not to be subject to reasonable dispute. . . . This includes public records and government documents available from reliable sources on the Internet.") (citation omitted); *White Oak Vineyards & Winery LLC v. White Oak Spirits, LLC*, 2015 WL 12731903, at *2 (C.D. Cal. Mar. 9, 2015) (holding that "Records and reports from government agencies are the proper subject of judicial notice."). Likewise, the District of Columbia district court took judicial notice of background information in the January 6th Report because it came from a source whose accuracy cannot be reasonably questioned. *United States v. MacAndrew*, 2023 WL 196132, at *2 n.1 (D.D.C. Jan. 17, 2023).

argue that it is not new evidence and merely corroborates the Amended Complaint, the Durham Report is composed of findings from the Durham Investigation, making it new evidence.

Moreover, the Durham Report, as detailed below, is material and would likely produce a different result. This evidence corroborates facts that are key to the plausibility and probability of President Trump's claims. Therefore, the introduction of this evidence is likely to change the outcome of this case at every level of the proceedings.

Alternatively, relief is warranted under Rule 60(b)(6) due to extraordinary circumstances. *Booker v. Singletary*, 90 F.3d 440, 442 (11th Cir. 1996). "The provisions of this rule must be carefully interpreted to preserve the delicate balance between the sanctity of final judgments and the 'incessant command of the court's conscience that justice be done in light of *all* the facts.'" *Griffin v. Swim-Tech Corp.*, 722 F.2d 677, 680 (11th Cir. 1984) (quoting *Bankers Mortgage Co. v. United States*, 423 F.2d 73, 77 (5th Cir. 1970)) (emphasis in original).

    *a.   Order on Motion to Dismiss*

This Court granted Defendant's motions to dismiss on September 8, 2022. In doing so, the Court dismissed all President Trump's claims on statute of limitations and merits grounds. *See generally*, Dkt. No. 267. At issue here are President Trump's two RICO claims, and his claim for injurious falsehood.

    i.   Statute of Limitations

The findings of the Durham Report support President Trump's argument for equitable tolling of the statute of limitations. A plaintiff is "entitled to equitable tolling if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (citing *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). Courts have emphasized that this determination is made on a "case-by-case basis." *Id.* The Supreme Court has noted "the need for 'flexibility' [and] for avoiding 'mechanical rules'" in

making this assessment, encouraging courts to "'relieve hardships which, from time to time, arise from a hard and fast adherence' to more absolute legal rules, which, if strictly applied, threaten the 'evils of archaic rigidity.'" *Id.* (citations omitted).

Here, President Trump's circumstances satisfy both prongs. President Trump was the President of the United States from January 20, 2017, until January 20, 2021. The Supreme Court has recognized that the President "occupies a unique position in the constitutional scheme." *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982) (also noting that U.S. Const. Art. II, § 1 "establishes the President as the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity."). The President also has an overarching duty to "preserve, protect, and defend the Constitution" and to take "[c]are that the Laws be faithfully executed[.]" U.S. Const. Art. II, §§ 1, 3. In short, the President is responsible for "enforc[ing] . . . federal law," "conduct[ing] . . . foreign affairs," and "manag[ing] . . . the Executive Branch." *Nixon*, 457 U.S. at 750. For this reason, the *Nixon* court cautioned that "[b]ecause of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government." *Nixon*, 457 U.S. at 749.

During President Trump's entire term, he was forced to address allegations from a baseless investigation, largely perpetuated by Defendants. As the Durham Report now confirms, the FBI opened an investigation into President Trump without "any actual evidence." Durham Report at 8. The FBI did so swiftly, without evaluating any of the 'evidence' given to them, through agents with hostile feelings towards President Trump. *Id.* at 9. Had the FBI carefully analyzed the information given to them from persons such as Defendants, it would have realized that there was no evidence that President Trump or his campaign were colluding with Russia. *Id.* Notably, at this same time, the FBI received intelligence from a trusted source "pointing to a Clinton campaign plan to vilify Trump

by tying him to Vladimir Putin so as to divert attention from her own concerns relating to her use of a private email server." *Id.* at 10.

President Trump was fully occupied with his duties as President of the United States from January 20, 2017, until January 20, 2021. These duties included ensuring that the laws of the United States were duly executed, overseeing multiple international peace deals, and creating a thriving economy. These endeavors consumed his entire time in a way that is different and out of the control of any ordinary citizen or event.

In addition, President Trump was facing an investigation into his candidacy and his campaign instituted by, what we now know, was a partisan Department of Justice and Federal Bureau of Investigation. President Trump, as president, could have taken action against these investigators, but it may have created an appearance that he was attempting to shut down the investigation or otherwise interfering with law enforcement functions. Such an appearance would have undermined President Trump's belief in law and order and sent the wrong message to the Country. Therefore, President Trump was obligated to let these initial investigations unfold in their entirety before he could bring this suit. These extraordinary circumstances have not been faced by a Plaintiff before in this Nation. This Court is, therefore, justified in finding that the statute of limitations was equitably tolled during the pendency of this investigation.

     *ii.*   *Merits of the RICO Claims*

The findings of the Durham Report support President Trump's RICO claims. As an initial matter, adding to President Trump's open-ended continuity claim for establishing a pattern, President Trump has since filed to run for President of the United States in 2024. Regarding the enterprise element, the Durham Report provides extensive details about how these defendants coordinated and acted toward the common goal of damaging then-candidate Trump's reputation, including his companies. *See generally* Durham Report at 92–97, 109–11, 243–82. Specifically, the Durham Report

exposes Defendants' conduct in working together to formulate a false story of alleged Trump/Russia collusion. Defendant Clinton, and those working closely with her, "were seeking in 2016 to promote a false or exaggerated narrative to the public and to U.S. government agencies about Trump's possible ties to Russia." *Id.* at 82. It was Defendants Clinton, Clinton Campaign, and DNC, that funded the Steele Reports, which were filled with smears and falsehoods about President Trump and his businesses. *Id.* at 304. U.S. intelligence officials knew that the Clinton Campaign had paid for these reports, however, they still used information derived from the "Clinton Plan" to justify and maintain their investigation of Trump. *Id.* at 82.

Further, the Durham Report shows that Defendants Sussman, Fusion GPS, Perkins Coie, Elias, and Joffe, worked together to create the false Alfa Bank allegations. *Id.* at 92–97, 243–82. It took FBI cyber experts all of a day to dismantle these allegations, finding that the Alfa Bank "white papers" conclusions were not supported by the technical data, used questionable methodology, and "did not 'ring true at all.'" *Id.* at 258. Despite this, the Clinton campaign funded these Alfa Bank allegations for delivery to the media and the FBI. *Id.* at 305. As shown by the Durham Report, Defendant Sussman provided this manufactured information to James Baker at the FBI, falsely claiming to be acting "*not on behalf of a client or company*" and then increased the pressure on Baker to act on the information by telling him that media outlets would soon be reporting on it. *Id.* at 255. Additionally, the Report found that Defendant Sussman provided misleading testimony to Congress. *Id.* at 271. This coordinated feeding of false information to government investigative agencies and the media shows that Defendants worked together for an unlawful purpose to harm President Trump. The fact that Defendants intentionally spread misleading information to investigators and the media also helps corroborate the predicate acts for obstruction of justice, as well as wire fraud.

Further, this injury was to President Trump's business and property, as confirmed by the Durham Report. Specifically, the Steele Dossier, largely funded and supported by Defendants,

included allegations about President Trump's business dealings.[3] The Durham Report, however, found that the FBI—certainly not for lack of trying—never found corroborating evidence for the information in the Dossier. Durham Report at 13. Also, as noted, Defendants Sussman and Clinton spread the lie that The Trump Organization had secret ties to Alfa Bank, debunked in the Durham Report. *Id.* at 255–67.

Accordingly, in light of the Durham Report, President Trump pled sufficient information in his Amended Complaint to survive a motion to dismiss. Thus, President Trump respectfully requests that this Court issue an indicative ruling that the newly discovery evidence in the Durham Report is sufficient to vacate the Court's prior dismissal order of President Trump's RICO claims.

      *iii.*     *Merits of the Injurious Falsehood Claim.*

As discussed above, the Durham Report lends credence to President Trump's argument for equitable tolling of the statute of limitations. Accordingly, each of the injurious, false statements referenced in President Trump's Amended Complaint should fall within the statutory period.

The Court's remaining issues with Injurious falsehood dealt with President Trump's injury, and First Amendment concerns. *See* Dkt. No. 267 at 47–49. As described above, the Durham Report exposed the lies regarding President Trump's business dealings. Further, the Durham Report, as described below, is replete with examples of Defendants' malice against President Trump. Accordingly, given the new factual considerations of the Durham Report, this Court should vacate its order dismissing President Trump's claim for Injurious Falsehood.

---

[3] In Report 080, it is alleged that the Kremlin had "offered [Trump] various lucrative real estate development business deals in Russia," presumably through his businesses, which specializes in commercial real estate. In Report 095, there is discussion of Trump's alleged "business dealings in China and other emerging markets" which "were substantial and involved the payment of large bribes and kickbacks[.]" In Report 113, it is alleged that Trump "had paid bribes . . . to further his interests but very discreetly and only through affiliated companies, making it hard to prove."

b. *Order Granting Defendant Dolan's Motion for Sanctions*

On November 10, 2022, this Court granted Defendant Dolan's Rule 11 motion for sanctions without an evidentiary hearing. In doing so, this Court accepted Defendant Dolan's narration of 'facts' as true, contrary to the allegations of Plaintiff's Amended Complaint. Specifically, this Court found three facts in Mr. Dolan's favor: (1) Defendant Dolan was not "intimately" involved with the Clinton Campaign and "there was no basis" for that belief, (2) Defendant Dolan was not the source of allegations against President Trump regarding salacious sexual activity in a Moscow Ritz Carlton hotel, and (3) Defendant Dolan did not engage with Mr. Danchenko to provide information for the Steele dossier. Dkt. No. 284 at 6–9. This Court found it conclusive that Defendant Dolan was not the source for the Ritz Carlton story because the government did not allege as such in Defendant Danchenko's trial. Dkt. No. 284 at 8–9.

As the Eleventh Circuit has held, however, "sanctions may not be imposed unless a particular allegation is utterly lacking in support." *United States v. Stinson*, 729 Fed. App'x 891, 900 n.7 (11th Cir. 2018). As the investigation underlying the Durham Report plainly shows, Plaintiff's claims were not lacking factual support, and the Durham Report, supported by an actual investigation, contradicts all three of this Court's factual findings.

First, while Defendant Dolan may not have been "intimately" involved with the Clinton Campaign, there was certainly a reasonable basis for thinking he was. Russian official Olga Galinka, who Defendant Dolan frequently met with, believed that Defendant Dolan played a significant role in the Clinton Campaign. When Defendant Dolan told Galinka that he was attending a reception for Hillary Clinton, Galinka asked him to deliver a message directly to Defendant Clinton. Durham Report at 148. Galinka further stated in emails that if Defendant Clinton were elected President, Defendant Dolan would take her to the State Department. *Id.* While Defendant Dolan originally stated that he did not discuss politics with Galinka, his story unraveled after Defendant Dolan was confronted with

emails and social media messages between him and Galinka. *Id.* at 149. Galinka even admitted to discussing the Steele reports with Defendant Dolan. *Id.*

Further, Defendant Dolan's role in the larger political world was not as *de minimus* as simply knocking on doors. Defendant Dolan "previously served as (i) Executive Director of the Democratic Governors Association, (ii) Virginia Chairman of former President Clinton's 1992 and 1996 presidential campaigns, and (iii) an advisor to Hillary Clinton's 2008 presidential campaign." *Id.* at 138–39. In its executive summary, the Durham Report describes Dolan as "a Virginia-based public relations professional who had previously held multiple positions and roles in the Democratic National Committee ("DNC") and the Democratic Party." *Id.* at 14. Thus, it was not a stretch to say that Defendant Dolan previously served in significant positions within the Democratic National Party apparatus.

Second, the Durham Report shows that not only was Defendant Dolan a definite source for information in the Steele Reports, but it also strongly indicates that Defendant Dolan may have been the source of salacious sexual activity rumors regarding President Trump. As the Durham Report notes, "the June 20, 2016 Steele Report reflected facts that Dolan learned during the June Planning trip to Moscow." *Id.* at 145. In June 2016, Defendant Dolan stayed at the Ritz Carlton, received a tour of the hotel, and met with senior staff, including the hotel's general manager. *Id.* Notably, on June 15, 2016, Defendant Dolan sent an email stating, "I'm in Russia making plans to be adopted in the event this mad man [Trump] gets elected." *Id.* at 144. Ultimately, the Steele dossier listed Sergei Millian and the hotel's general manager as the sources for this allegation, as well as a staffer that the hotel general manager indicated would confirm the allegations. *Id.* at 144–47. Originally, Defendant Danchenko claimed that *he* had met with both Millian and the hotel general manager and provided the allegations to Defendant Steele after those meetings. *Id.* at 146–47. The Durham Report, however, uncovered that Defendant Danchenko did not meet with Millian until July 2016, after the Steele Report included

these allegations, and Defendant Danchenko never met with the hotel's general manager. *Id.* at 147. In fact, the only person that had met with the hotel's general manager was Defendant Dolan. *Id.*

Then, on June 17, 2016, after meeting with Defendant Dolan in Moscow, Defendant Danchenko flew to London to meet with Defendant Steele. *Id.* at 144. And on June 20, 2016, Defendant Steele published the false allegation of salacious sexual activity by President Trump. *Id.* The Durham Report also described that during his interview with their office regarding these false allegations of salacious sexual activity, Defendant Dolan was "inconsistent" and his "recollection vacillated." *Id.* at 145.

To say that this was all just a coincidence—after Defendant Dolan made his intentions known in email, was the only person to have met with the named sources in the June Steele Report and displayed flustered behavior during questioning on this subject—is contrary to common sense. As the Durham Report noted, "[i]n light of these facts, there appears to be a real likelihood that Dolan was the actual source of much of the Ritz Carlton and Pavlov information contained in the Steele Reports." *Id.* at 148.

Third, the Durham Report outlines Defendant Dolan's role in the crafting of the Steele dossier. While it may be true that Defendant Dolan first became affiliated with Defendant Danchenko to plan a conference in Moscow, his role in this conspiracy grew over time, and it was untruthful for Defendant Dolan to claim that he had no role in the Steele dossier.

Defendant Steele specifically named Defendant Dolan as one of the sources of the dossier. Durham Report at 137. While Defendant Dolan claims to have never met Defendant Steele, "[c]uriously, Steele was in Cyprus at the same time Dolan was meeting with Galinka and others in Cyprus." *Id.* at 148. Defendant Dolan further admitted that he provided information to Defendant Danchenko that ultimately ended up in the Steele dossier regarding Paul Manafort's firing, *and that he fabricated the information. Id.* at 138, 148, 152, 172. In addition, "[t]he Steele Report contained information

that Danchenko had gathered directly from Dolan." *Id.* at 150. Galinka told the FBI that "she provided Dolan with information that would eventually be in the Steele Reports." *Id.* at 172.

During all of this, Defendant Danchenko even emailed Defendant Dolan looking for "rumor[s]" because he was "working on a 'project against Trump'". *Id.* at 150. While Defendant Dolan has continued to maintain that he only provided (fabricated) information on Manafort's firing, the Durham Report acknowledged that allegations in the September 2016 Steele report "bore substantial similarities to information that Dolan received in May and August 2016." *Id.* at 154. In fact, on September 13, 2016, the day prior to the September Steele report, Defendant Dolan reached out to Defendant Danchenko, prompting Defendant Danchenko to travel that same day from Russia to London, where Defendant Steele was located. *Id.* Further, the information in the September Steele report came from a person that Defendant Danchenko did not even know but was in fact associated with Defendant Dolan. *Id.* As the Durham Report stated, based on Defendant Dolan's emails, he "appears to volunteer that he possesses inside information on the Steele Report allegations." *Id.* at 156.

Defendant Dolan had connections to key sources of the Steele dossier such as Dimitry Peskov, Alexey Paclov, Olga Galinka and her employer, and Defendant Danchenko, who was the "primary sub-source for the Steele Reports". *Id.* at 171–72. Defendant Dolan was in Moscow with Defendant Danchenko in October 2016, while Defendant Danchenko was actively gathering information for the Steele dossier. *Id.* at 157. Defendant Danchenko even left out material information regarding his meetings with Defendant Dolan during interviews with the FBI. *Id.* at 161. Thus, Defendant Dolan's inside knowledge, Defendant Danchenko's efforts to hide his meetings with Defendant Dolan, and Defendant Dolan's close connections with sources of the Steele dossier resulted in the Durham Report conclusion that the FBI erred when it failed to investigate or interview Defendant Dolan. *Id.* at 160. To say that a broader relationship between Defendant Dolan and Defendant Danchenko was

implausible because they were simply planning a business conference is incredible in light of the Durham Report. Indeed, Defendant Dolan and Defendant Danchenko continued to meet after the conference and met at times coincidentally close to the release of various Steele reports. *Id.* at 159.

Regarding the Amended Complaint's allegation about Defendant Dolan's job and location, while Defendant Dolan may not have held the official title of Chairman of the DNC, nor is he a resident of New York, these facts are immaterial to the Amended Complaint as a whole. As several courts have found, immaterial facts are an insufficient basis for Rule 11 sanctions. *See In re Gen. Elec. Sec. Litig.*, 2021 WL 2688695, at *7 (S.D.N.Y. Jun. 30, 2021) (holding that sanctions were not appropriate where the errors of fact played no material role in the outcome of the litigation); *Forrest Creek Assoc., Ltd. v. McLean Sav. & Loan Ass'n*, 831 F.2d 1238, 1245 (4th Cir. 1987) ("[Rule 11 sanctions] do [ ] not extend to isolated factual errors, committed in good faith, so long as the pleading as a whole remains 'well grounded in fact.'"); *In re South Coast Oil Corp.*, 566 Fed. App'x 594, 596 (9th Cir. 2014) (denying sanctions because the alleged mischaracterizations were either aggressive advocacy or immaterial to the merits of the case).

Here, the material facts pertaining to Defendant Dolan in the Amended Complaint were undoubtedly plausible as the Durham Report confirms. A reasonable inference can be drawn that Defendant Dolan knowingly fed information to Defendant Danchenko that Defendant Steele would ultimately use in an attempt to harm President Trump and his presidential campaign. Thus, Rule 11 sanctions for any alleged mischaracterizations are wholly inappropriate under this newly discovery evidence in the Durham Report. At the very least, the Durham Report, a newly released government investigation report, represents extraordinary circumstances justifying vacatur of this Court's prior order granting Defendant Dolan Rule 11 sanctions.

*c.   Second Order on Sanctions*

On January 19, 2023, this Court used its inherent authority to award sanctions to the remaining Defendants. This Court found that President Trump's Amended Complaint was frivolous "both factually and legally." Dkt. No. 302 at 6. As discussed in section 1(a) above, the findings of the Durham Report sufficiently support President Trump's legal and factual claims that the Amended Complaint should not even have been dismissed—it certainly was not sanctionable.

To begin, this Court called it "implausible" and "categorically absurd" that Defendant Comey would have conspired with Defendant Clinton to harm President Trump. Dkt. No. 302 at 10. The Durham Report, however, found that at least some high-level actors within the FBI, central to the Crossfire Hurricane investigation, had a "clear predisposition" against President Trump which was not shared in their investigation, or lack of investigation of Clinton. Durham Report at 47.

The FBI rapidly opened its investigation into President Trump's campaign, during the height of his campaign for president against Defendant Clinton, despite "not possess[ing] any intelligence showing that anyone associated with the Trump campaign was in contact with Russian intelligence officers at any point during the campaign." *Id.* at 59. In fact, the Report concluded that the FBI's investigation significantly relied on leads from President Trump's political opponents. *Id.* at 18.

Notably, it is clear, based on the Durham investigation and report, that Defendant Comey was *actually* aware of a Clinton campaign plan to smear President Trump by associating him with Vladimir Putin as early as August 3, 2016, three days after the FBI opened the Crossfire Hurricane investigation, and ignored it. *Id.* at 85. Based on the timeline of events, it is likely that Defendant Comey knew about this *prior* to opening Crossfire Hurricane, because (1) the CIA had received intelligence of the Clinton scheme in late-July, (2) that intelligence was provided to and reviewed personally by CIA Director Brennan, (3) on July 28, 2020, Brennan briefed President Obama on "intelligence relevant to the 2016 presidential election," and (4) the next morning, July 29, 2020, Brennan briefed Defendant Comey on

his meeting with the President. *Id.* at 84. While Brennan was non-committal in testimony as to whether he discussed the Clinton scheme at that meeting and with Defendant Comey on July 29, 2020, it is certainly plausible that he did. *Id.*

Indeed, while this Court called it "categorically absurd" that Defendant Comey would conspire with Defendant Clinton, given Defendant Comey's announcements before the 2016 election, the Durham Report found that there was disparate treatment in the way that the FBI handled allegations regarding candidates Trump and Clinton. Specifically, the Report found that the FBI acted considerably more favorably to Defendant Clinton's campaign than President Trump's campaign. *Id.* at 68–81. One example of this is that the FBI provided defensive briefings to the Clinton campaign, but not the Trump campaign. Durham Report at 298. Moreover, the CIA made the FBI aware, via a referral letter, of the Clinton campaign plan but the FBI declined to take action regarding this referral. *Id.* at 86–87.

Thus, it is not "implausible" or "absurd" that the Director of the FBI, Defendant Comey, conspired with Defendant Clinton, President Trump's political opponent. As exposed in the Durham Report, it was his FBI that entirely declined to investigate serious allegations about the Clinton campaign when even the CIA requested the investigation but chose to rapidly open an investigation into President Trump based on a single piece of raw, unvetted, and unverified intelligence.

Next, this Court noted that the Crossfire Hurricane investigation was opened "for an authorized purpose" and "with adequate factual predication" Dkt. No. 302 at 16. As the Durham Report clearly articulates and documents, however, the FBI opened its Crossfire Hurricane investigation without "any actual evidence of collusion." Durham Report at 8. As already discussed, at least some actors central to the Crossfire Hurricane investigation had a "clear predisposition" against President Trump. *Id.* at 47. Further, in his testimony to Congress, and in response to a question from Congressman Mike Johnson, Special Counsel Durham noted that it was "correct" that "the FBI

15

did not have an adequate basis on which to launch Crossfire Hurricane." John Durham Testifies on his Investigations of the FBI Part 1, C-SPAN at 01:03:07 (Jun. 21, 2023), https://www.c-span.org/video/?528789-1/special-counsel-john-durham-testifies-investigation-fbi-part-1. In fact, Special Counsel Durham stated, there was "not a legitimate basis to open [Crossfire Hurricane] as a full investigation." *Id.* at 00:42:45. Even if the investigation was opened for an authorized purpose, this does not mean that individuals intent on preventing their political opponent from becoming President could not utilize it to further their own malicious and illegal purposes.

Even FBI Director Christopher Wray acknowledged these failures in his testimony to Congress. Importantly, Director Wray noted that regarding Crossfire Hurricane, "there were failures, significant failures with respect to exculpatory information." FBI Director Testifies at Oversight Hearing Part 2, C-SPAN at 00:00:35 (Jul. 12, 2023), https://www.c-span.org/video/?529135-4/fbi-oversight-hearing-part-2. Director Wray further stated, regarding the FISA application, "certainly there were violations that were totally unacceptable and, in my view, cannot be allowed to happen again." *Id.*

In this sanctions order, the Court again referenced the allegations pertaining to Defendant Dolan. Dkt. No. 302 at 16. As noted above, however, Defendant Dolan likely played a significant role in the crafting of the Durham Report and was directly aware of Defendant Danchenko's "project."

Further, the Durham Report adds context to much of President Trump's allegations that came from the various criminal indictments. In addition to the information on Defendant Dolan, the Report discusses at length Defendant Sussman's use of President Trump's "non-public or proprietary internet data." Durham Report at 246; *see generally* Durham Report at 244–54.

Accordingly, much of the evidence from the investigation summarized in the Durham Report supports President Trump's prior claims. Given this new evidence, and the extraordinary circumstances that this Report presents, vacating this sanctions order is appropriate.

### 2. Fed. R. Civ. P. 62.1 Allows this Court to Remedy Defendants' Malfeasance.

"A party proffering newly discovered evidence may obtain an indicative ruling from a district court concerning relief from judgment pending appeal." *Franken v. Mukamal*, 449 Fed. App'x 776, 779 n.2 (11th Cir. 2011) (citing Fed. R. Civ. P. 62.1; Fed. R. App. P. 12.1). Rule 62.1 codified what the Eleventh Circuit followed for decades. In 2003, the Eleventh Circuit reversed the district court's ruling that it did not have jurisdiction to entertain a Rule 60(b) motion for reconsideration. *Mahone v. Ray*, 326 F.3d 1176, 1178 (11th Cir. 2003). In *Mahone*, the plaintiff filed a motion for reconsideration after filing their notice of appeal, alleging that the defendant engaged in fraud. *Id.* at 1179. While the district court found that it did not have jurisdiction over the plaintiff's motion, the Eleventh Circuit held that the district court may still entertain "motions on matters collateral to those at issue on appeal." *Id.* (citing *Doe v. Bush*, 261 F.3d 1037, 1064 (11th Cir. 2001)). Thus, district courts presented with a Rule 60(b) motion while the case is pending on appeal "should consider the motion and assess its merits." *Id.* at 1180.

Accordingly, the Federal Rules of Civil Procedure adopted Rule 62.1 to codify decisions such as the one in *Mahone*. *Munoz*, 451 Fed. Appx. at 819 n.1. "[T]he rule provides that a district court may "(1) defer considering the motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue." *Id.* (citing Fed. R. Civ. P. 62.1(a)). In the event a district court indicates that it would deny the motion, the movant can appeal that denial. *Id.* at 820. If the district court indicates that it "would grant the motion or that the motion raises substantial issues," then the appellate court is permitted to remand the case to the district court for further proceedings. *Id.* at 819 n.1.

Thus, Plaintiff and Plaintiff's counsel respectfully request that this Court indicate if it would grant their Rule 60(b) motion to vacate this Court's prior orders granting Defendants' motions to dismiss as to the two RICO claims and the injurious falsehood claim against Defendants Clinton,

17

Clinton Campaign, DNC, Perkins Coie, Sussmann, Sullivan, Podesta, Mook, Reines, Elias, Fusion GPS, Simpson, Fritsch, Nellie Ohr, Bruce Ohr, Steele, Danchenko, Neustar, Inc., and Neustar Security Services, and the two sanctions awards. If this Court states that it would grant the Rule 60(b) motion, Plaintiff and Plaintiff's counsel would promptly notify the Court of Appeals in the pending appeal of this Court's action. Fed. R. Civ. P. 62.1(b); Fed. R. App. P. 12.1(a). The Eleventh Circuit would then be able to remand the matter to this Court to vacate the judgments.

## CONCLUSION

The Durham Report is new evidence supporting many of President Trump's claims. Accordingly, Plaintiff and Plaintiff's counsel respectfully request the chance to be heard on the merits of this Court's consideration of the Durham Report and issuing an indicative ruling.

## REQUEST FOR HEARING

Given the extraordinary circumstances of this case, Plaintiffs request an oral hearing on this matter.

## CERTIFICATE OF CONFERRAL 7.1(A)(3)

The undersigned counsel conferred with all parties through their counsel in a good faith effort to resolve the issues raised in this motion but has been unable to do so.

Dated: July 27, 2023                              Respectfully submitted,

                                                 /s/ Jared J. Roberts
                                                 Jared J. Roberts (FL Bar #1036550)
                                                 Jason C. Greaves (*pro hac vice* application
                                                 forthcoming)
                                                 BINNALL LAW GROUP, PLLC
                                                 717 King Street, Suite 200
                                                 Alexandria, VA 22314
                                                 Tel: (703) 888-1943
                                                 Fax: (703) 888-1930
                                                 jared@binnall.com
                                                 jason@binnall.com

*Counsel for President Donald J. Trump, Alina Habba, Michael T. Madaio, Habba, Madaio, & Associates, Peter Ticktin, Jamie Alan Sasson, and The Ticktin Law Group*

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2023, a copy of the foregoing was filed with the Clerk of the

Court using the Court's CM/ECF system, which will send a copy to all counsel of record.

Dated: July 27, 2023                     /s/ Jared J. Roberts
                                          Jared J. Roberts

                                          *Counsel for President Donald J. Trump, Alina*
                                          *Habba, Michael T. Madaio, Habba, Madaio, &*
                                          *Associates, Peter Ticktin, Jamie Alan Sasson, and*
                                          *The Ticktin Law Group*